UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LISA MONTGOMERY )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>WILLIAM P. BARR, et. al. )<br>)<br>**Defendants.** ) | No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff Lisa Montgomery respectfully submits this memorandum of law in support of her request for a temporary restraining order and preliminary injunction.

**I.**

**INTRODUCTION**

Plaintiff Lisa Montgomery is the only woman on federal death row, and the first woman to face federal execution in nearly seventy years. On October 16, 2020, Defendant Barr announced—with no notice to Mrs. Montgomery's lawyers—that he had scheduled her execution for December 8, 2020. At all times between October 16 and the date of this filing, the Covid-19 pandemic has threatened the health and well-being of millions of people, including those involved in the case of Mrs. Montgomery. Infection rates are now at an all-time high.

Three days after the execution date was set, Mrs. Montgomery's lead lawyers—Kelley Henry and Amy Harwell—traveled to Carswell, Texas to meet with Mrs. Montgomery. Ex. 1, Decl. of Amy Harwell ("Harwell Decl."), at ¶9; Ex. 2, Decl. of Kelley Henry ("Henry Decl."), at ¶20. Mrs. Montgomery has several mental disabilities that frequently cause her to lose touch with reality. Ex. 2, Henry Decl., at ¶12. The symptoms of her mental illness are particularly severe in times of stress. *Id.* at ¶17. When Henry and Harwell visited her at the Carswell Unit, they discovered that Mrs. Montgomery's mental health had

already deteriorated. Ex. 1, Harwell Decl., at ¶9; Ex. 2, Henry Decl., at ¶ 20. She was particularly distraught about the conditions of her confinement: she had been placed in a suicide cell and her underwear had been taken away. Ex. 3, Ltr. From Kelley Henry to Kaci Inman ("Inman Ltr."). As a victim of repeated rape, incest, and child sex trafficking, the loss of her underwear was particularly traumatic. Henry and Harwell spent hours trying to calm her, explain the status of her case, and ascertain her current mental status. Ex. 1, Harwell Decl., at ¶9; Ex. 2, Henry Decl., at ¶¶ 20–22.

Mrs. Montgomery's mental health—and the extent to which she is able to grasp what is happening to her—lies at the core of her efforts to obtain a reprieve and a commutation of her sentence to life imprisonment. For this reason, among others, it is vital that counsel be able to meet with Mrs. Montgomery in person to evaluate her mental status. This is particularly vital since, as a result of the pandemic, the mental health experts who have evaluated Mrs. Montgomery in the past are unable to travel to the prison. *See* Ex. 6, Decl. of Ruben Gur, Ph.D. ("Gur Decl."), at ¶¶ 3, 6; Ex. 7, Decl. of Katherine Porterfield, Ph.D. ("Porterfield Decl."), at ¶¶ 3, 5, 6; Ex. 8, Decl. of George Woods, M.D. ("Woods Decl.:), at ¶¶ 3, 4, 6; Ex. 11, Decl. of Siddhartha Nadkarni, M.D. ("Nadkarni Decl."), at ¶¶ 3, 6.

Harwell visited Mrs. Montgomery again on October 26, 2020. Ex. 1, Harwell Decl., at ¶11. Harwell and Henry visited Mrs. Montgomery a third time on November 2, 2020. Ex. 1, Harwell Decl., at ¶12. They discovered that Mrs. Montgomery was showing signs of dissociation in reaction to the news of her execution date, and that her mental health had worsened between their first and third visits. Ex. 1, Harwell Decl., at ¶¶11–12.

Until Mrs. Montgomery's execution date was scheduled, Henry and Harwell were working remotely in accordance with the policies of the Office of the Federal Defender. Ex 2, Henry Decl., at ¶18. Their supervisor, Henry A. Martin, had forbidden all non-essential travel in accordance with the guidance of the Centers for Disease Control. *Id.* After the scheduling of Mrs. Montgomery's execution date, Martin reluctantly allowed Harwell and Henry to visit Mrs. Montgomery. *Id.* For each of their visits, Harwell and

Henry traveled from Nashville, TN to Carswell, Texas. Each round trip involved two plane flights, transit through two airports, hotel stays, and interaction with dozens of people including airline attendants, car rental employees, passengers, and prison guards. Ex. 2, Henry Decl., at ¶ 25.

Henry obtained a test for Covid-19 on November 9, 2020. *Id.* Henry received a positive test result on November 10, and Harwell received a positive test result on November 11. *Id.*; Ex 1, Harwell Decl., at ¶14. Both contacted their physicians, who directed them to rest and to quarantine. Ex. 2, Henry Decl., at ¶ 25; Ex. 1, Harwell Decl., at ¶14. Harwell was forced to cancel a trip to Carswell. Ex. 1, Harwell Decl., at ¶17. Neither can travel to visit Mrs. Montgomery between now and the filing deadline for the clemency application. Moreover, both Harwell and Henry are virtually bed-ridden. They both have debilitating fatigue that prevents them from working on Mrs. Montgomery's clemency application. They have a range of other symptoms as well, including headaches, chills, sweats, gastrointestinal distress, inability to focus, and impaired thinking and judgment. Ex. 2, Henry Decl., at ¶25; Ex. 1, Harwell Decl., at ¶16.

Defendant Barr's setting of Mrs. Montgomery's execution date during the height of the pandemic has therefore interfered with Mrs. Montgomery's statutory right to counsel to assist her in the filing of her clemency application. It has also prevented her from participating in the clemency process, as she relies on her attorneys to present a comprehensive petition for commutation. Ex. 9, Decl. of Carol A. Wright ("Wright Decl."), at ¶ ¶ 4–8 (discussing the role and function of counsel in the clemency process); *id.* at ¶ 16 (discussing the unique needs of clients with mental illness). Neither her attorneys nor the mental health experts who are familiar with her mental health are able to visit her to ascertain her mental status.

Injunctive relief is therefore essential to preserve Mrs. Montgomery's rights to access a clemency proceeding under conditions that allow her to untrammeled access to counsel and expert assistance. As a person with a profound mental illness, Mrs. Montgomery requires the assistance and advice of counsel. And as a person with a history of extreme trauma induced by overwhelming sexual violence, she requires careful and compassionate legal representation by the lawyers who have spent many years earning her trust.

In order to vindicate Mrs. Montgomery's right to counsel under 18 U.S.C. §3599(e), and to safeguard her due process rights to access a minimally fair clemency process, injunctive relief is warranted. *See Harbison v. Bell*, 556 U.S. 180, 193 (2009) (noting that §3599(e) emphasizes continuity of counsel representing death-sentenced prisoners in clemency proceedings).

## II.

## STATEMENT OF FACTS

The statement of facts set forth in Mrs. Montgomery's complaint, filed concurrently with this Memorandum, is incorporated herein by reference.

## III.

## MONTGOMERY IS ENTITLED TO PRELIMINARY RELIEF

Mrs. Montgomery seeks a temporary restraining order and preliminary injunction enjoining the Defendants from taking adverse action relating to her request for reprieve until they provide a clemency process that comports with fundamental fairness, 18 U.S.C. § 3599, and the Fifth Amendment to the U.S. Constitution.

**A.      Standard for Preliminary Injunctive Relief.**

The primary function of a preliminary injunction is to preserve the status quo so as to prevent the irreparable loss of rights until the merits of a case can be adjudicated.  Indeed, "[t]he most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." Charles Alan Wright & Arthur R. Miller, 11A *Fed. Prac. and Proc.* § 2947 (3d ed. 2013).

Preliminary relief is warranted where the party seeking relief makes a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *see also* FED. R. CIV. P.

65; L.R. 65. In this Circuit, courts have traditionally applied these factors on a "sliding scale," where a stronger showing of some factors can compensate for a weaker showing as to others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999); *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005) ("'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'"); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) ("If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.").

Because injunctive relief is an equitable remedy, the courts have counseled that the test for determining whether issuance of an injunction is appropriate must be administered with flexibility. *See Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1349 (D.C. Cir. 2008). Standards for issuing a temporary restraining order and a preliminary injunction are "the same" and can therefore be analyzed together. *Singh v. Carter*, 168 F. Supp. 3d 216, 223 (D.D.C. 2016).

The following discussion of the underlying merits of this lawsuit and of the stakes involved in this controversy demonstrates that all four of these factors weigh in Mrs. Montgomery's favor.

**B.     Mrs. Montgomery Meets the Standards Necessary to Entitle Her to Preliminary Relief.**

    **1.     Mrs. Montgomery is likely to prevail on the merits.**

        a.     <u>Prevailing Standard</u>

It is well-established that in a preliminary injunction context, the movant need not prove her case, but must only show a likelihood of eventual success. Thus, the plaintiff need not establish that she will ultimately prevail to "a mathematical probability." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). "The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *Id.* For example, "if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a

correspondingly lower standard can be applied for likelihood of success." *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009).

      b.  <u>The Merits of the Claims Presented</u>

  On the merits, it bears recalling that "[a] prisoner under death sentence remains a living person and consequently has an interest in her life." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288 (1998) (O'Connor, J., concurring in part and concurring in judgment); *see also id.* at 291 (Stevens, J., concurring in part and dissenting in part). To protect the sanctity and dignity of human life, the Constitution requires that before a state kills, it must ensure "that some *minimal* procedural safeguards apply to clemency proceedings." *Id.*

  Mrs. Montgomery will succeed on the merits. The Supreme Court in *Harbison* underscored the vital role of counsel in the clemency process. The Court held that death-sentenced prisoners are entitled to representation by counsel in clemency proceedings, and that this representation should be carried out by lawyers who represented the prisoner in federal habeas proceedings. *Harbison*, 556 U.S. at 193–94. Although *Harbison* involved the application of a federal statute, the Court's interpretation of Congress' intent was intertwined with its conclusion that "[c]lemency . . . is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Id.* at 192 (citing *Herrera v. Collins*, 506 U.S. 390, 412 (1993)). Indeed, the Court rejected the Government's contention that clemency proceedings are "a matter of grace entirely distinct from judicial proceedings," emphasizing that clemency is "the 'fail safe' in our criminal justice system." *Id. See also Kansas v. Marsh*, 548 U.S. 163, 193 (2006) (Scalia, J., concurring) ("Reversal of an erroneous conviction on appeal or on habeas, or the pardoning of an innocent condemnee through executive clemency, demonstrates not the failure of the system but its success. Those devices are part and parcel of the multiple assurances that are applied before a death sentence is carried out.").

  Yet Mrs. Montgomery's lawyers cannot represent her because they are seriously ill, through no

fault of their own. On the contrary, they are sick because Defendant Barr recklessly scheduled Mrs. Montgomery's execution in the middle of the Covid-19 pandemic. But for Barr's action, counsel would not have been stricken with the disease that is ravaging the country. But the pandemic affects more than counsel. Because of Covid-19, the experts familiar with her case cannot assess her mental state and therefore cannot participate in the clemency process.

The *Harbison* Court implicitly recognized that "meaningful access" to clemency is an essential prerequisite to the exercise of a prisoner's liberty interest in the clemency process. *See Harbison*, 556 U.S. at 192 (noting that 18 U.S.C. § 3599 ensured that no prisoner would be put to death without *meaningful access* to the "'fail-safe'" of our justice system) (quoting *Herrera*, 506 U.S. at 415) (emphasis added). Yet without the guiding hand of counsel, prisoners are effectively prevented from accessing the federal clemency process. *Id.* at 194. By passing 18 U.S.C. § 3599, Congress sought to ensure that "*condemned men and women [would not] be abandoned by their counsel at the last moment and left to navigate the sometimes labyrinthine clemency process from their jail cells.*" *Id.* (citing *Hain v. Mullin*, 436 F.3d 1168 (10th Cir. 2006) (emphasis added). These concerns are especially compelling in the case of prisoners such as Mrs. Montgomery, who is profoundly mentally ill and incapable of advocating for herself.

**2. Mrs. Montgomery will suffer irreparable injury if the injunction is not granted.**

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983) (citing 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (1973); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."); *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 16–17 (D.D.C. 2018) ("[A] preliminary injunction is an injunction to protect [the movant] from irreparable injury and to preserve the court's power to render a

meaningful decision after a trial on the merits."); *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.").

It is beyond cavil that Mrs. Montgomery will suffer irreparable injury if the requested restraining order is not entered by this Court, for she will be deprived of any meaningful opportunity for review of her clemency request—the remedy that provides a final "fail-safe" for death-sentenced prisoners. If this Court does not exercise its equitable powers to enjoin the Defendants from taking adverse action on her request for reprieve, it will allow Defendants to rest their life-or-death decision on a process that is undeniably arbitrary and unfair. Mrs. Montgomery will be executed without ever having received a fair opportunity with the assistance of counsel to access clemency proceedings.

**3.     The irreparable injury that Mrs. Montgomery will suffer if the injunction is not granted outweighs any harm to Defendants occasioned by an injunction.**

Mrs. Montgomery cannot identify any harm that would be suffered by Defendants by an injunction. Whatever harm may be asserted, it is certainly outweighed by the injury Mrs. Montgomery would suffer if she were executed despite deprivation of her federal constitutional rights.

**4.     The public interest will be served by the granting of preliminary relief.**

Although the public may have an interest in the finality of capital habeas cases, it also has a compelling interest in ensuring that procedures afforded death row inmates before they are executed comport with "civilized standards," *Woodson v. North Carolina*, 428 U.S. 280, 288 (1976), and a clemency system which operates, as it is supposed to, as a "fail-safe" protection against miscarriages of justice. *Herrera*, 506 U.S. at 415. It is in the public's interest to ensure that before the Government carries out an execution, it has afforded the prisoner a fair opportunity to demonstrate that she is deserving of mercy. Without the relief requested, that cannot happen.

## IV.

## CONCLUSION

Mrs. Montgomery has demonstrated a likelihood of success on the merits. Neither any alleged harm to Defendants or the public interest can outweigh that which would be suffered by Mrs. Montgomery if she was put to death in the absence of a meaningful clemency process. Plaintiff requests that this Court issue a temporary restraining order to prevent adverse action on her request for reprieve and commutation.

DATED:       November 12, 2020

Respectfully submitted,

s/Sandra L. Babcock

Sandra L. Babcock
Clinical Professor
157 Hughes Hall
Cornell Law School
Ithaca, NY 14853-4901
312.823.2330
Slb348@cornell.edu

Joseph Margulies
Professor of the Practice of Law and Government
Cornell University
Ithaca, NY 14853
607.216.2289

Zohra Ahmed
Clinical Teaching Fellow
Cornell Law School
Ithaca, NY 14853
415.260.9690

Edward J. Ungvarsky
D.C. Bar No. 459034
Ungvarsky Law, PLLC
114 North Alfred Street
Alexandria, VA 22314
Office: 571.207.9710
Cellular: 202.409.2084