# Exhibit 2

Declaration of Kelley J. Henry

I, Kelley J. Henry, being of lawful age and a citizen of Nashville, Davidson County, Tennessee, declare the following:

1. My name is Kelley J. Henry. I am an attorney licensed to practice in the States of Tennessee and Missouri. I am admitted to practice in the United States Supreme Court, the United States Courts of Appeals for the Sixth, Eighth, Ninth, and Tenth Circuits, and the United States District Courts for the District of Arizona, Western District of Missouri, Western District of Oklahoma, and the Eastern, Middle, and Western Districts of Tennessee.

2. I have worked on death penalty cases in some form or fashion since 1989. I have represented more than 50 indigent capital defendants at trial, direct appeal, state post-conviction, federal habeas corpus, executive clemency, and execution. I have represented 17 death sentenced inmates at the stage where the state has sought an execution warrant. I have achieved more than thirty stays of execution, two reprieves, and one grant of executive clemency. Three of my former capital clients were eventually released from prison.

3. I am the 2019 recipient of the American Bar Association Death Penalty Representation Project's Justice John Paul Stevens Guiding Hand of Counsel Award. I am the 2012 and 2019 co-recipient of the Tennessee Association of Criminal Defense Lawyer's Bill Redick Death Penalty Award.

4. I have been an invited speaker and trainer to numerous national, regional, and local seminars regarding the representation of the capital defendants. Topics on which I have been invited to present include identifying and working with mentally ill clients, intellectual disability, mitigation investigation, effective clemency proceedings, and working with expert witnesses.

5. I have attended numerous training sessions regarding the representation of capital defendants with severe mental illness and trauma. I have received hundreds of hours of training on the identification and detection of symptoms of neurocognitive impairment, psychotic disorders, mood disorders, and trauma-related disorders. I have also received substantial training in investigation and documentation of childhood physical, sexual, and psychological abuse. My training has been in the form of formal seminars designed for capital defense investigation, as well as personal research, and working with experts.

6. I currently serve as a Supervisory Assistant Federal Public Defender in the Federal Public Defender's Office for the Middle District of Tennessee.

7. In 2012, I was asked to accept an appointment as co-counsel for Lisa Marie Montgomery. I was approached because of my experience working with clients who have severe trauma histories and mental illness, as well as my successful clemency work on behalf of Tennessee death row inmate Gaile Owens. The two locally appointed attorneys for Mrs. Montgomery, Lisa Nouri and Christine Blegen,[1] had no previous death penalty experience, nor did they have experience working with clients with mental illness. With the permission of my Federal Defender and in compliance with the Administrative Office of the United States Courts policy on out of district representation, I agreed to accept the appointment.

8. I assigned Assistant Federal Attorney Amy Harwell as my co-counsel. I chose Ms. Harwell because of her experience working with clients with severe trauma histories, including female defendants. Ms. Harwell's history and expertise are described in her declaration which is being filed contemporaneous to this one.

9. Mrs. Montgomery has a history of severe trauma, including sexual abuse, incest, gang rape, and child sex trafficking. She is emotionally fragile and extremely mentally ill. She finds it extremely difficult to trust attorneys, particularly men. As Mrs. Montgomery's attorney for the past eight years I have developed a relationship of trust and confidence. I have visited her dozens of times and have spent more than 100 hours with her to build a relationship of trust and rapport. I have worked with my co-counsel and experts to intentionally create a safe environment for Mrs. Montgomery to be able to reveal her mental health symptoms and trauma history.

10. Over time, and with the assistance of experts, I have learned a great deal about her emotional functioning and behaviors and have become familiar with the signs and symptoms of Mrs. Montgomery's mental illness. She often hides her symptoms around people she does not trust as a means of self-protection.

11. Her mental illness fluctuates in intensity, and the symptoms worsen when she is under stress or when she is forced to confront her past experiences. I have also observed Mrs. Montgomery's physical, psychological, and emotional reactions to reexperiencing the trauma which she endured in the past. Based on my training and my consultation with mental health experts, as well as from many years of working with her, I am able to identify times when her thinking becomes more disorganized and disconnected from reality.

12. My training and my discussions with experts in Mrs. Montgomery's case have also enabled me to identify the warning signs that Mrs. Montgomery's psychosis is breaking through her medication. She is currently receiving a number of psychotropic medications, but the symptoms of her mental illness continue to break through. For

---

[1] The Court later removed Ms. Blegen as counsel for Mrs. Montgomery.

Page **2** of **8**

example, I have personally witnessed Mrs. Montgomery dissociate. During these episodes, she develops a blank stare and her eyes become glassy. Her body will be very still.

13. Mrs. Montgomery's mental health is a critical component of any request for her sentencing commutation. It takes a skilled and experienced interviewer and advocate to present a complete picture of Mrs. Montgomery's mental and cognitive impairments.

14. As Ms. Harwell explains in more detail in her declaration, since receiving notice of her execution date on October 16, 2020, Mrs. Montgomery has exhibited signs of a declining mental state. Upon receipt of the notice of execution date, Mrs. Montgomery began to hyperventilate and became despondent. The prison put her on suicide watch, where she remains.

15. For the seven and a half years prior to the pandemic, our legal team saw to it that Mrs. Montgomery received an in-person, contact legal visit every 4 to 6 weeks. The purpose of these frequent visits was to maintain steady and consistent observation of Mrs. Montgomery's mental health, as well as develop a trusting relationship so that Mrs. Montgomery could speak openly and share her experiences without fear of harm or humiliation. A few months before I was appointed as counsel in her case, Mrs. Montgomery made a serious suicide attempt by swallowing over 70 Tylenol. She was taken to an outside hospital, where her stomach was pumped, and she was treated for liver failure.

16. Mrs. Montgomery's psychiatric symptoms are terrifying to her. For example, she hears the voice of her mother, who abused her throughout her life and sex-trafficked her as a child, disparaging her inside her head. For many years, Mrs. Montgomery would compulsively cut her hair short, hearing her mother say, "Only good girls can have long hair." This is something her mother said to her growing up, when her mother would chop off Lisa's hair as punishment for perceived wrongdoing.

17. A frequent symptom that Mrs. Montgomery experienced and reported was that if she were left alone in a room with a man, particularly an authority figure, she would break out in hives. She had to work with her previous female prison psychologist for several months to transition to the new male psychologist. Because of Mrs. Montgomery's trauma history, the prison was compelled to devise a complex strategy simply to enable her to sit in the same room and speak with the male psychologist.

18. Upon learning of the execution notice, I immediately requested permission for Ms. Harwell and myself to travel to Fort Worth, Texas to consult with and observe Mrs. Montgomery. At the time, our office had put in place a strict policy forbidding travel out of state, as well as in-person prison visits and in-person interviews. Any exception

could only be made by the Federal Defender and required the presence of exigent circumstances. The policy was put in place in coordination with our federal court and in compliance with the CDC guidelines. The purpose of the policy was to protect the health of our staff, Court staff, the U.S. Marshals, our clients, witnesses, the families of each of these, and the community at large. My Defender, Henry Martin, granted my request permitting my travel and the travel of Ms. Harwell to visit with Mrs. Montgomery.

19. Since then I have traveled to visit with Mrs. Montgomery on two occasions: October 19-21 and November 1-3. Prior to that, the last time I saw Mrs. Montgomery was February 22, 2020. Ms. Harwell accompanied me on both trips. On both trips, we traveled on a non-stop flight from Nashville to Dallas, rented a car, and stayed at a hotel in Fort Worth. We followed CDC Guidelines, including the wearing of N95 masks.

20. On October 19-20, we met with Mrs. Montgomery for the first time since she learned about her execution date. During our visits, Mrs. Montgomery was dressed only in a suicide smock. I observed large dark purple bruises on the insides of both biceps. She had not been given a shower since October 16. Mrs. Montgomery reported extreme distress because she was being denied underwear, a bra, and socks. She was not permitted to have a cup in her room. She had to request a paper cone to get water from the faucet which is attached to the toilet. She reported that she did not eat, drink, or take her medication for two days. She was told that she had to request toilet paper and would only be permitted four sheets per use. She was also being denied telephone calls to family. Mrs. Montgomery was further distressed that she did not have access to music, books, or television. Mrs. Montgomery was clearly frightened. She cried frequently and was visibly dissociative.

21. During our October 19-20 visits, Mrs. Montgomery also expressed concern that she was being watched at all times. She reported that men were allowed to watch her use the toilet because the monitor broadcasting the 24-hour-per-day streaming from a video-camera in the ceiling of her cell is visible in the administration unit office. She stated that the anxiety of being watched on camera by these men created a situation where she could not urinate or defecate. I noted that a guard was sitting outside the visitation room with her ear pressed against the window. She was actively taking notes on a clipboard. I stepped out to complain that our conversation was privileged. The guard explained that she was doing as she was ordered and refused to cease listening or recording our conversation. We also observed a sign that said that the single telephone receiver Ms. Harwell and I were required to share in order to communicate with Mrs. Montgomery was being monitored.

22. In thirty years of capital defense, I have never observed such draconian conditions, even for a client on suicide watch, nor have I ever experienced such a blatant

intrusion on the attorney-client relationship as the intrusion during our visit with Mrs. Montgomery. Ms. Harwell and I left the visit and worked together to write a letter to the attorney for BOP to insist on changes to Mrs. Montgomery's conditions of confinement and to the protocols that interfered with our ability to communicate confidentially with our client.

23. Ms. Harwell visited Mrs. Montgomery alone on October 25. When we returned together to Texas to visit with Mrs. Montgomery on November 2, we noticed that her mental distress had deepened. By this time, Mrs. Montgomery had finally been provided with mesh panties. When the prison staff gave her the panties, they warned her to "be a good girl." This of course was triggering to Mrs. Montgomery given the frequent taunts from her abusive mother that Mrs. Montgomery was not a "good girl." Mrs. Montgomery disclosed that she had been hearing her mother's voice. She also described night terrors of being raped. Mrs. Montgomery was even more dissociative on this visit. Her affect would switch from flat to tearful. She expressed terror at the thought that, if she displeased the guards, her panties would be taken away. Ms. Harwell and I promised that we would return and continue to monitor her conditions and keep her informed of what we were doing in her case, to the extent she could understand.

24. On November 5, 2020, Ms. Harwell began to exhibit symptoms of COVID-19. She was tested on November 6 and received notice of her positive result on November 11. Her symptoms are described in her declaration.

25. On November 7, 2020, I noticed that I had lost my sense of smell and began experiencing overwhelming fatigue and difficulty concentrating. Upon advice of my physician, I obtained a test on November 8. I was informed that I tested positive for COVID-19 on November 10. My symptoms, which continue to increase daily, now include gastrointestinal distress, severe headache, loss of taste, loss of appetite, cough, sore throat, and head congestion. My overarching symptom is fatigue and impaired concentration. I have been instructed to rest and not work. It should be noted that in preparing this declaration I had to take frequent breaks because looking at the computer screen worsens my headaches. I also had difficulty finding the correct words. I used my computer's grammar software to assist me. This declaration took me three to four times as long to write as would normally be the case for me.

26. I was last seen in the Emergency Room for chest pain in December 2019. I am 54 years old, and have been informed by my doctor that I am at risk for stress cardiomyopathy. This obviously causes me and my physician concern about the impact that my current condition of COVID-19 could have on my heart.

27. In addition to concern for my own health, I have concern for my husband who is 63 years' old and has elevated blood pressure.

28. My defender, Henry Martin, emailed a request for a reprieve of Mrs. Montgomery's execution date due to my illness and that of Ms. Harwell to the Office of Pardon Attorney on November 9, 2020. That request was rejected.

29. I sent an email to Kenneth Hyle, Assistant Director/General Counsel, Federal Bureau of Prisons requesting that the Bureau reset Mrs. Montgomery's execution date. Mr. Hyle declined.

30. Ms. Harwell and I are in an untenable position. If we do the work we need to do for Mrs. Montgomery, we put our health and the health of our families at serious risk. We do not know the course of our illness, but research suggests that, if we fail to follow the instructions to rest, we will get sicker or, at the very least, it will take longer for our symptoms to subside, causing us to need to quarantine even longer. As we are at the beginning stages of our illness, and our symptoms continue to increase in number and severity, we cannot know how long our quarantine will last, nor how long we will continue to suffer symptoms.

31. Even if we could engage in meaningful legal work at our home computers, we are unable to access Mrs. Montgomery's physical file because we are not permitted to leave our homes or enter our office building. Mrs. Montgomery's physical file contains family photographs, videos, and examples of Mrs. Montgomery's artwork. These types of exhibits are frequently included as part of a clemency application.

32. More importantly, we cannot adequately and accurately assess Mrs. Montgomery's mental state through telephone calls. We need to be able to assess Mrs. Montgomery by viewing her non-verbal, behavioral, and physical reactions and by conducting an interview that allows for an adequate level of rapport-building for this mentally ill client to be able to communicate. Mrs. Montgomery has been diagnosed with complex post-traumatic stress disorder, bipolar disorder, traumatic brain injury, and focal cerebral dysfunction by multiple mental health experts. These multiple conditions have symptoms that are manifest in her behaviors (dissociation, hyperarousal, and avoidance) and her reactions to other people (interpersonal distortions, hypervigilance, and mistrust). In both in-person visits with Mrs. Montgomery over the last two weeks, she exhibited signs of dissociation. These symptoms of dissociation would not be apparent in a telephone call and Mrs. Montgomery herself, due to the nature of dissociation, cannot identify when they are happening. Avoidance of thoughts, feelings and reminders of trauma, another classic symptom in trauma survivors, is not something that can be assessed through the telephone or reported easily by a client.

33. Individuals who have suffered inescapable abuse, such as that suffered by Mrs. Montgomery when she was chronically raped by her stepfather and other men as an

adolescent, can develop a set of reactions in which they seemingly stop trying to escape the abuse, because they realize that there is no viable escape. Sometimes called "learned helplessness," this reaction is widely recognized as an outcome in those who suffer chronic trauma.  Mrs. Montgomery often manifests this type of avoidant reaction with those who are "in charge" of her, particularly men.  She has a very difficult time voicing her fears and distress, especially to those in power. Her current conditions, in which she is in a highly-controlled environment, completely isolated, and without any of her usual support structures, is a highly stressful situation and, like a kidnapping victim, she is likely to manifest learned helplessness in her inability to speak up about her internal state of fear and distress.

34. Finally, Mrs. Montgomery's telephone conversations with counsel are monitored. The telephone receiver is handed to her through a door slot, and a guard is seated on the other side of the door. Mrs. Montgomery must sit on the cold floor with her back against the door because the length of the cord does not stretch to her bed. There is a video camera trained on her from above, tracking her inside her cell at all times. She is hyper aware that her reactions are being watched. She has been told by guards and mental health staff that they observed her crying when she was talking to her lawyers. This has been noted in the logs. Mrs. Montgomery sees this as a threat. She believes that, if she cries, the staff may take away her underwear or socks that she was denied for over a week. Her belief that her reactions during or after calls with counsel, or overheard statements while on the phone with counsel, may cause retaliatory action from the guards and/or mental health staff, interferes with counsel's ability to accurately assess Mrs. Montgomery's mental health status and counsel's ability to confidentially communicate with their client.

35. Mrs. Montgomery's present conditions of confinement have triggered a decline in her mental health. On one occasion, she reported that a male correctional officer stated that he was able to observe her "tinkle," a reference to watching her go to the bathroom. She reports that she has to take cold showers. These conditions are highly triggering, as they are reminiscent of the physical and sexual abuse she has endured. Her Ferguson Safety Smock leaves her exposed and, particularly when she was not allowed underwear, revealed her breasts, pubic area, and genitalia.

36. Because of my COVID-19 infection, and the inability of any other lawyer apart from myself and Ms. Harwell to prepare her clemency petition and monitor her mental health, I cannot prepare and present her clemency application before the deadline set by the government.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct.

Dated this 12th day of November. 2020.

*Kelley J. Henry*
_____
Kelley J. Henry

Page **8** of **8**