# Exhibit 9

**Declaration of Carol A. Wright**

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the following is true and correct:

1) I am an attorney licensed to practice law in Ohio, Pennsylvania, and the federal courts. I have concentrated my practice on representing death-sentenced individuals in all phases of litigation from trial through clemency proceedings since 1999. In 2008, I became the Supervisor of the newly formed Capital Habeas Unit ("CHU") in the Federal Public Defender's Office for Southern Ohio. In that position I hired, trained and supervised attorneys, investigators and paralegals in representing death-sentenced clients in federal habeas corpus and clemency proceedings. I have presented on clemency representation in capital conferences. In 2018, I accepted a job as the Chief of the Capital Habeas Unit for the Middle District of Florida to open a new CHU in Florida.

2) I have been asked by members of Mrs. Montgomery's defense team to execute a Declaration speaking to my experience representing death-sentenced prisoners in clemency and describing the basic tasks that go into clemency representation in capital defender offices. Mrs. Montgomery's attorneys have told me a bit about her case and the circumstances they are facing seeking to advocate for clemency during the COVID-19 pandemic. I am also aware that Mrs. Montgomery's principal attorneys, Amy Harwell and Kelley Henry, are presently ill with COVID-19.

3) Representation during a pending execution date is governed by Guidelines designed to provide equal representation for all clients. Those Guidelines include the American Bar Association ("ABA") *Standards for Criminal Justice*, the ABA *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, ("ABA Guidelines")[1], the ABA Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines"), the National Legal Aid & Defender Association ("NLADA") *Performance Guidelines for Criminal Defense Representation*, and the NLADA *Standards for the Appointment and Performance of Counsel in Death Penalty Cases.*

4) The Supplementary Guidelines extend to all stages of a case and make clear: "The skills, abilities, and functions outlined in the[] Supplementary Guidelines must be present throughout the defense team, and the responsibility for the development and presentation of mitigation evidence must be incorporated into the defense case at all stages of the proceedings

[1] 31 HOFSTRA L. REV. 913 (2003), available at http://ambar.org/2003guidelines.

from the moment the client is taken into custody, and extending to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, appeal, post-conviction review, clemency proceedings and any connected litigation. The duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision-makers, rests upon defense counsel."[2] Further, the Guidelines direct: "At no stage of a capital representation may counsel limit the scope of services to be provided without risking violation of Model Rule 1.2."[3]

5) Specific Guidelines related to counsel's duties during the execution-date stage of the case include:

**ABA GUIDELINE 10.15.1—DUTIES OF POST-CONVICTION COUNSEL**

A. Counsel representing a capital client at any point after conviction should be familiar with the jurisdiction's procedures for setting execution dates and providing notice of them. Post-conviction counsel should also be thoroughly familiar with all available procedures for seeking a stay of execution.

B. If an execution date is set, post-conviction counsel should immediately take all appropriate steps to secure a stay of execution and pursue those efforts through all available fora.

C. Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

D. The duties of the counsel representing the client on direct appeal should include filing a petition for certiorari in the Supreme Court of the United States. If appellate counsel does not intend to file such a petition, he or she should immediately notify successor counsel if known and the Responsible Agency.

E. Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to:

---

[2] ABA Supplemental Guidelines, 36 Hofstra L. Rev. 677, 678-79 (2008).

[3] Lawrence J. Fox, *Capital Guidelines and Ethical Duties: Mutually Reinforcing Responsibilities*, 36 Hofstra L. Rev. 775, 792 & n.89 (2008) (discussing how the ABA Guidelines "can be seen as simply the very specific implementation of the ethical rules" set forth in the *Model Rules of Professional Conduct*).

1. maintain close contact with the client regarding litigation developments; and

2. continually monitor the client's mental, physical and emotional condition for effects on the client's legal position;

3. keep under continuing review the desirability of modifying prior counsel's theory of the case in light of subsequent developments; and

4. continue an aggressive investigation of all aspects of the case.

**NLADA Standard 11.9.5 Duties Common to All Postjudgment Counsel**

(a) Counsel representing a capital client at any point after imposition of the death sentence should be familiar with the procedures by which execution dates are set and how notification of that date is made. Counsel should also be familiar with the procedures for seeking a stay of execution from all courts in which the case may be lodged when an execution date is set.

(b) Counsel should take immediate steps to seek a stay of execution, and to appeal from any denial of a stay, in any and all available courts when an execution date is set.

(c) Counsel should continually monitor the client's mental, physical and emotional condition to determine whether any deterioration in the client's condition warrants legal action.

6) The Guidelines related to the duties of clemency counsel include:

**ABA GUIDELINE 10.15.2—DUTIES OF CLEMENCY COUNSEL**

A. Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

B. Clemency counsel should conduct an investigation in accordance with Guideline 10.7.

C. Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible, tailoring the presentation to the characteristics of the particular client, case and jurisdiction.

D. Clemency counsel should ensure that the process governing consideration of the client's application is substantively and procedurally just, and, if it is not, should seek appropriate redress.

**NLADA Standard 11.9.4 Duties of Clemency Counsel**

(a) Clemency counsel should be familiar with the procedures for and permissible substantive content of a request for clemency.

(b) Clemency counsel should interview the client and any prior attorneys if possible, and conduct an investigation to discover information relevant to the clemency procedure applicable in the jurisdiction.
(c) Clemency counsel should take appropriate steps to ensure that clemency is sought in as timely and persuasive a manner as possible.

7) For more than a decade, the topic of clemency representation has been discussed at capital defense conferences and trainings, and attorneys are largely in agreement over what the best practices governing this representation is. Although the courts as of yet may not have developed as robust an understanding of counsel's obligations in clemency as the federal public defenders' offices have, we consider the work described herein foundational to the ethical representation of clients represented by our offices and by other appointed counsel.

8) Over the last several years, institutional defender offices (like FPD Middle District Tennessee) as well as appointed counsel working with defender offices, have become increasingly committed to ensuring that the representation each client receives is consistent with the relevant guidelines governing our professional responsibilities as capital defense attorneys. Not only does this ensure that we are always providing our clients representation at the level contemplated by Congress in ensuring the provision of attorneys to death-sentenced prisoners in federal court under 18 U.S.C. § 3599 once an execution date has been set (18 U.S.C. § 3599(e)); but adhering to these professional standards is essential for ensuring that our clients' cases are properly adjudicated and move efficiently through the judicial system.[4]

9) The bulk of my now more-than 20-years of experience representing death-sentenced clients in clemency has been in Ohio, an active death penalty state in the Sixth Circuit. Ohio has executed 56 people since 1999. The work we have done representing clients in clemency in Ohio has been guided by national standards of practice.

10) Although the clemency process in Ohio is different than the process set up for federally death sentenced inmates, the lessons we have learned from representing death-sentenced prisoners in clemency in Ohio are applicable and communicated to capital defenders in all jurisdictions.

[4] ABA Guidelines, Guideline 1.1, Commentary, at 929-30. The Guidelines "recognize[] the simple truth that any other course has weighty costs-to be paid in money and delay if cases are reversed at later stages or in injustice if they are not." *Id.* at 930.

11) As the Supervisor in the Southern District Ohio CHU, I directly participated in ten clemency proceedings and indirectly participated in at least twenty additional proceedings. I attended the majority of all clemency hearings during my time as Supervisor of the SD Ohio CHU. I also advised Criminal Justice Act panel attorneys and other external teams about clemency proceedings. I de-briefed teams after hearings and executions.

12) Each of the three governors that served during my tenure as the Supervisor of the CHU were willing, under certain circumstances, to grant commutations or reprieves. We were successful in obtaining clemency from both Democratic and Republican governors for several clients. This success was possible because of intense planning and execution of a clemency campaign for each of our clients.

13) Clemency is a remedy of last resort. Although concepts and ideas for a possible clemency campaign are conceived throughout the federal habeas representation, there are so many variables that the most important work on the clemency case typically happens in the last six months to a year before the execution date. Any sooner than that, and you are determining a clemency strategy without consideration for the most recent legal and factual developments in the case. Also, a premature campaign argues for clemency before the public or the president has had an opportunity to turn his focus to the case.

14) Even if you have been working on the case for some time, a careful re-examination of the file from the unique viewpoint of clemency is also essential. This requires reviewing everything in the file and meeting often with your client. It requires time because the files are large and because with the passage of time, the attorney must re-acquaint herself with the facts and legal arguments in the case. Oftentimes, advocating for a client for clemency involves a lot of time spent convincing the client to pursue clemency in the first place.

15) In addition to the review of the file, you must complete a thorough independent investigation into the client's social history. *See* ABA Guidelines 10.15.2(b). This is essential because there may be facts about your client or his case that could never have been part of the judicial proceedings but which may be very pertinent to any consideration of executive clemency. You also must complete a thorough independent investigation into the crime and all facets of the trial, sentencing, appeal, post-conviction and federal habeas stages. You must obtain all records relating to the client and his family.

These records may include educational, employment, military, criminal history, prison, medical, mental health, social security, children's services', religious, etc. They will also involve your investigation into facts that have occurred after your client was sentenced to death. Every person involved in the client's life that can be interviewed should be interviewed. This thorough independent investigation may alert a team to additional litigation that is necessary to vindicate the client's rights.

16) For clients who are mentally ill, attorneys typically must obtain a new assessment of their mental functioning, even if a similar assessment was conducted years earlier during habeas proceedings. It is roundly accepted that expert visits have to take place in-person, face-to-face. This is because mental health fluctuates over time. In addition, the mental health of many death row prisoners worsens over time, particularly once an execution date is scheduled. Additionally, the team needs to determine if the client is competent to be executed. In federal defender offices and among capital defenders this work is not considered optional.

17) All of this work requires time and team effort. The client should be visited at least monthly, if not bi-monthly, to keep him/her appraised of the team's efforts, to learn more about the client, and to build a trusting relationship. This is also true of the client's family or friends identified by the client. The clemency process should be explained to the client and to any potential witnesses. In states that set execution dates with less lead time, this work would presumably have to start in earnest as soon as an execution date is announced.

18) All interviews with the client and potential witnesses in support of clemency must be in person, face-to-face, one-on-one interviews. This is necessary for two reasons. First, in order to receive accurate information in an interview, the interviewer must build a rapport with the witness. *See* Supplementary Guidelines 5.1.C & 10.11.C. Many of the topics that must be explored are highly sensitive, and witnesses must be given the appropriate space and support in order for them to feel comfortable enough to discuss those sensitive topics. In Mrs. Montgomery's' case, I have been made aware that a significant component of her mitigation history relates to child sexual abuse, child sex trafficking, gang rape, and ensuing mental illness. There is no way to fully develop this type of information, which is undoubtedly relevant to clemency consideration, without being able to speak face-to-face and spend time with witnesses. Developing this sort of information requires a significant amount of time spent with the witness and the client. Often,

several visits with witnesses are required before the rapport and trust has built to the point where sensitive information will be provided. Even where witnesses have already spoken about traumatic events, they often provide additional details that they had neglected to mention earlier. The setting of the execution date can also prompt witnesses who were previously reluctant to talk to the defense team to come forward and share information.

19) The second reason for requiring in person, face-to-face interviews with all witnesses is that the team must gauge how best to present information to the relevant decision maker—in this case, the Pardons Attorney and the President. Members of the defense team involved in clemency representation must ask themselves, is this witness a good historian? Are there documents or other tangible evidence that will support what this witness is saying? What is the best way to present this witness's information? These are questions that can only be answered by meeting with the witness and building a rapport and an understanding of what the clemency process entails and what the goal of the presentation is. One meeting is never sufficient, because rapport and trust is not gained in one meeting.

20) Even if the witness stands solidly in support of your client, her ability to communicate what she knows about the client's background, character, and history may be limited. I recall a brother of a client who was interviewed in person by our mitigation investigator on several occasions. Both he and his brothers had been subjected to extreme physical abuse, often tied to their beds at night, left without food and physically beaten by foster parents. It was only after several meetings that he was able to disclose the sexual abuse he suffered at the hands of the foster father—abuse that was undoubtedly relevant to the client's case for clemency. It was clear from the repeated visits that the brother could never have spoken of this abuse in front of the decision maker, however—even though his recounting of the abuse would be the best way to transmit this information. A decision was made to videotape his testimony. That decision also required preparation, practice, mastering the video equipment and working with the brother to get through the video session. It was a compelling video but took several months of preparation, work, editing and teamwork to complete.

21) For clients who are victims of sexual abuse, counsel must carefully prepare them for the likelihood that intimate details of their lives will be shared with the public. Clients feel a great deal of shame around these events, and often have very strong feelings about how and when the information should be

shared. These feelings can change very quickly under the stress of an execution date.

22) As the team begins to focus on the theme and theories of the clemency process, people need to be identified that can speak to the theme and theories. These people may be family members, friends, former teachers or coaches, co-defendants, witnesses, jurors, former attorneys and experts. After all these people are interviewed, decisions are made as to who can best convey the theme and theories developed. Once identified, each of the narrators need to be prepared for their presentation on that theme, whether that is through live presentation, video, or affidavit. This takes practice and time. It cannot be done over email, phone, or Zoom. It should also not be done during an exceptionally difficult time for the potential witness, like during the stress caused by a global pandemic.

23) This work in gathering evidence for clemency is necessarily very broad. Clemency may be the only opportunity to present evidence that could not be considered by a court due to procedural default or other evidentiary rulings. Some evidence, such as your client's adjustment to incarceration, may never have been previously available for any judicial tribunal to consider. Clemency is a unique opportunity to present a complete and holistic view of the case so that the decision makers can arrive at a conclusion about the fairness of executing the death sentence.

24) As the clemency decision and execution date nears, the client's anxiety increases, requiring more visits and more time from the team. In addition, the client's family and friends may need additional attention and time from the legal team to go over the plans for clemency, the plans for the execution, etc. There are times when the clemency process brings family members who have lost contact with the client back into the client's life. These rekindled relationships contribute to the strength of a clemency campaign: they can be powerful examples of forgiveness and redemption; they can lead to the revelation of new information that supports an existing clemency theme or establishes a new theme relevant to the clemency decision maker; they also broaden the base of support for the clemency effort.

25) Even in Ohio where clemency is sometimes granted, it is an exceptional event, and our clients know this. They come to realize that they are most likely to be executed. Although some clients have thought about this potential outcome, many have not. As a clemency decision nears, the team oftentimes finds themselves exploring difficult topics with their clients – remorse, the

meaning of life, beliefs about god and the afterlife. These are not conversations that can occur over the phone. They have to occur face-to-face and one-on-one. Nor are these conversations usually complete in one meeting. However, it is my sincere belief that these conversations are an integral, foundational part of the representation we are appointed to provide clients facing execution.

26) Clients need someone they can trust to talk to in the last days and hours of their lives. Though these sessions are very difficult for appointed counsel, it is an essential duty they have been appointed to carry out. And, when all else fails, it is often appointed counsel's duty to be a witness to the actual execution, to make sure it is conducted in conformance with the laws and protocols set forth and to note any irregularities or problems.

27) Many clients suffer from mental illness. These clients often become more anxious, agitated or even psychotic as clemency proceedings progress. Some shut down and require patience and repeated daily visits to get through the time. Others can become suicidal or act out, resulting in disciplinary action. In my experience, even clients who have been mostly stable for years may change and become mentally unstable due to the stress of an upcoming execution. Regardless, this has happened with sufficient regularity in my experience that it is always our practice that someone from the team is visiting the client at least two times weekly for at least a month or two before the execution date.

28) A clemency campaign requires extraordinary teamwork. Preparing for the actual hearing or meeting with the decision maker involves many months of work from all of the team members, including the lawyers, the mitigation investigator, the fact investigator and the paralegal. Additional team members may include experts or a person trained in Defense Initiated Victim Outreach. There are times when the team needs to meet, brainstorm, delegate tasks and review what they have learned. In-person team meetings are the most effective and help to manage the stress and anxiety of the team members whose client is nearing execution. There are so many different things that have to be happening all at the same time, it is critical to keep up and to make sure all team members are fulfilling their assigned tasks. It is also critical that the client's concerns are being shared so everyone on the team knows what to expect when they talk with the client.

## Worldwide Pandemic

29) The United States is currently in the midst of the worst global public health crisis in over 100 years.

30) Amy Harwell and Kelley Henry are very experienced federal defenders. I have been informed that they now are infected with COVID-19 after visiting Mrs. Montgomery, and are suffering a range of symptoms. This is disastrous for Mrs. Montgomery, because it means that the defense team will be unable to consult with her and monitor her mental health. As noted above, rapport must be maintained with the client to ensure her mental health leading up to the execution and to coordinate the clemency efforts. This requires frequent in person one-on-one visits. Phone calls are not sufficient to maintain this rapport. Moreover, prison phone calls are often limited in time and not the best quality. Little sensitive information, if any, will be divulged over the phone while talking with your client—even though sensitive information is often key to the case for clemency. Emails are not confidential and are impersonal. Team members must meet with the client.

31) The same problem exists with witnesses – family members, teachers, coaches, employers, former attorneys, jurors, spiritual advisors, etc. These people may be reluctant to talk over the phone and reluctant to get involved without team members spending significant time building a rapport with these individuals. This is particularly important with family members. Even if these individuals are located in a place where numbers of infections are not soaring, opening the door to a masked stranger is unlikely. Additionally, many of our clients come from more vulnerable populations, and their family members are likely to come from those same vulnerable populations and being even less willing to open the door to a stranger. The idea of meeting in an open space with sufficient social distancing also presents problems. Although this approach might work with someone the team has been working with on an ongoing basis, those individuals that have not yet been contacted are unlikely to agree to meet a masked stranger in the middle of a pandemic. Given the number of infected prisoners in prisons throughout the country, experts of any sort may be reluctant to meet with our clients at this time.

Carol Wright Digitally signed by Carol Wright
Date: 2020.11.11 22:38:31 -05'00'

Carol A. Wright