**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ORLANDO CORDIA HALL,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR, et al.,<br><br>Defendants. | Civil Action No. 20-cv-3184 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Orlando Cordia Hall, an inmate on federal death row, has filed this action to delay his November 19, 2020 execution. Though he was sentenced to death in 1995, this court enjoined his execution pending resolution of challenges brought by several federal death row inmates to an earlier version of the Bureau of Prisons' (BOP) execution protocol. Having found those claims obsolete given the BOP's adoption of a new protocol in 2019 (the 2019 Execution Protocol or the Protocol), the court vacated the injunction barring Plaintiff's execution on September 20, 2020. Ten days later, BOP noticed Plaintiff's execution for November 19, 2020, thus providing him fifty days' notice.

Plaintiff argues that the timing of his execution, particularly given the COVID-19 pandemic, deprives him of meaningful access to, and representation in, the clemency process in violation of his rights under the Due Process Clause and 18 U.S.C. § 3599. He further contends that the fifty-day notice violates his rights under the Due Process Clause, the Ex Post Facto Clause, and the Equal Protection Clause. He also alleges that the 2019 Execution Protocol

constitutes ultra vires agency action in violation of the Federal Death Penalty Act (FDPA), a claim the court has already addressed and dismissed in the *Execution Protocol Cases* litigation.

Before the court are Plaintiff's motion for a temporary restraining order and/or preliminary injunction, (ECF No. 3), and Plaintiff's emergency motion for a hearing, (ECF No. 14). For the reasons set forth below, Plaintiff's motions will be DENIED.

## I. BACKGROUND

Plaintiff was sentenced to death by the U.S. District Court for the Northern District of Texas in October 1995 and is currently incarcerated at the United States Penitentiary, Terre Haute. His conviction and sentence were affirmed on direct appeal, and his motion to vacate his sentence under 28 U.S.C. § 2255 was denied by both the District Court and the U.S. Court of Appeals for the Fifth Circuit. Several years later, based on intervening Supreme Court decisions, Plaintiff sought permission to file a successive § 2255 petition to challenge his firearm conviction under 18 U.S.C. § 924(c). The Fifth Circuit rejected that request late last month. *See In re Hall*, 2020 WL 6375718 (5th Cir. Oct. 30, 2020).

After Plaintiff's initial unsuccessful § 2255 challenge in 2007, he intervened in a pending civil action brought in this court by other federal death row prisoners challenging the BOP's lethal injection protocol. (*Roane v. Gonzales*, No. 05-cv-2337 (D.D.C.), ECF No. 38.) The court thereafter entered a preliminary injunction barring Plaintiff's execution and consolidated that case along with similar cases brought by other federal death row prisoners into a single action. (*See generally Execution Protocol Cases*, No. 1:19-mc-145.) The injunction remained in place from June 11, 2007 until September 20, 2020. (*Execution Protocol Cases*, ECF No. 266.)

On October 30, 2020, thirty days after BOP noticed Plaintiff's execution date, Plaintiff's counsel emailed the Office of the Pardon Attorney and the White House Counsel's office,

detailing the need for an investigation and requesting additional time to prepare Plaintiff's clemency application given the extraordinary conditions created by the COVID-19 pandemic. (Compl. ¶ 118; Compl. Ex. 11.) On November 2, 2020, a staff member from the Office of the Pardon Attorney at the Department of Justice advised Plaintiff's counsel that the office lacked the authority to reprieve, withdraw, or reschedule an execution date. (Compl. ¶ 120). Nevertheless, the staff member indicated that the October 30 email could be construed as a petition for commutation and that the Pardon Attorney would be willing to hold a telephonic hearing during the week of November 2. (*See* Compl. Ex. 13.) Counsel for Plaintiff informed the Office of the Pardon Attorney that such a request could not be properly construed as a petition for commutation and that agreeing to treat the request for an extension as a clemency petition may constitute a violation of counsel's professional obligations to Plaintiff. (Compl. Ex. 12.) Accordingly, Plaintiff did not file a clemency petition.

On November 3, 2020, Plaintiff filed a complaint and motion for a temporary restraining order and/or a preliminary injunction with this court.

## II. DISCUSSION

The standards for a temporary restraining order and a preliminary injunction are identical. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). In considering whether to grant the "extraordinary remedy" afforded by injunctive relief, courts assess four factors: (1) the likelihood of the plaintiff's success on the merits, (2) the threat of irreparable harm to the plaintiff absent an injunction, (3) the balance of equities, and (4) the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008) (citations omitted); *John Doe Co. v. Consumer Fin. Prot. Bureau,* 849 F.3d 1129, 1131 (D.C. Cir. 2017). The U.S. Court of Appeals for the District of Columbia Circuit has traditionally evaluated claims

for injunctive relief on a sliding scale, such that "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir. 2011). It has been suggested, however, that a movant's showing regarding success on the merits "is an independent, free-standing requirement for a preliminary injunction." *Id.* at 393 (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

**A. Inexcusable Delay**

Defendants first argue that Plaintiff's motion is inexcusably delayed and could be denied on that basis alone. (*See* ECF No. 15, Def. Opp'n at 3–4.) The argument is not without merit. As the Supreme Court has made abundantly clear, particularly in the death penalty context, the "'last-minute nature of an application' that 'could have been brought' earlier . . . 'may be grounds for denial of a stay'" or other equitable relief. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019) (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). Plaintiff was notified of his execution on September 30, but waited until November 3—a little more than two weeks before his execution—to file suit. Nevertheless, the court is unwilling to deny Plaintiff's motion on this basis. While the delay has certainly put the parties and the court on a tight timeline to resolve the motion, taking thirty days to file a new complaint and accompanying motion for relief is not per se unreasonable. Furthermore, many of the events described in the Complaint occurred several days before it was filed. (*See, e.g.*, Compl. ¶¶ 118–21 (describing events occurring between October 30, 2020 and November 2, 2020).)

**B. Likelihood of Success on the Merits**

Plaintiff first contends that the timing of his November 19 execution deprives him of clemency representation and access to the clemency process in violation of his Fifth Amendment

Case 1:20-cv-03261-RDM Document 15-1 Filed 11/16/20 Page 5 of 20

procedural due process rights (Counts I and II), and his statutory right to clemency representation pursuant to 18 U.S.C. § 3599 (Count III) ("the clemency claims"). Next, he argues that the fifty-day execution notice violates his Fifth Amendment substantive due process rights (Count IV), and inflicts a greater punishment in violation of the Ex Post Facto Clause (Count V) ("the notice claims"). Plaintiff also alleges that, in providing only fifty days' notice, Defendants arbitrarily treated him differently from other similarly situated inmates in violation of the Equal Protection Clause (Count VII). Finally, Plaintiff recycles an argument made in the *Execution Protocol Cases* litigation, arguing that the 2019 Protocol violates the FDPA (Count VI). Based on the record before it, including the Supreme Court's rulings in other challenges to the 2019 Protocol, the court finds that Plaintiff is unable to show a likelihood of success on any of these claims.

1. Clemency Claims

Plaintiff alleges that Defendants are violating his procedural due process and statutory rights by executing him in the middle of a pandemic, which has made it impossible to meaningfully pursue clemency. The argument raises issues that the court finds troubling, but, ultimately, unlikely to succeed.

*i. Procedural Due Process*

"The Fifth Amendment Due Process Clause protects individuals from deprivations of 'life, liberty, or property, without due process of law.'" *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (citing U.S. Const. amend. V). A procedural due process violation "occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections. Liberty interests arise out of the Constitution itself or 'may arise from an expectation or interest created by state laws or policies.'" *Id.* (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)).

At issue here is Plaintiff's continued interest in life, which he claims is burdened by his inability to have meaningful access to the clemency process. (*See* ECF No. 3-1, Pl. Mem. at 16–17.) Notwithstanding an impending execution, a death row inmate "maintains a residual life interest, e.g., in not being summarily executed by prison guards." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 281 (1998) (plurality opinion) (Rehnquist, C.J.). Indeed, "[w]hen a person has been fairly convicted and sentenced, his liberty interest, in being free from such confinement has been extinguished. But it is incorrect . . . to say that a prisoner has been deprived of all interest in his life before his execution." *Id.* at 289 (O'Connor, J., concurring in part); *see also id.* at 291 (Stevens, J., concurring in part and dissenting in part) ("There is [] no room for legitimate debate about whether a living person has a constitutionally protected interest in life. He obviously does."). Defendants do not appear to contest this point. Thus, the question is whether Defendants have provided adequate procedural safeguards for Plaintiff's clemency proceedings.[1]

The procedures required for federal clemency proceedings are limited. This is because "[f]ederal clemency is exclusively executive: Only the President has the power to grant clemency for offenses under federal law." *Harbison v. Bell*, 556 U.S. 180, 187 (2009) (citing U.S. Const. art. II, § 2, cl. 1 (setting forth the president's clemency power)). It is "a matter of grace, over which courts have no review." *United States v. Pollard*, 416 F.3d 48, 57 (D.C. Cir. 2005) (quoting *United States ex. Rel. Kaloudis v. Shaughnessy*, 180 F.2d 489, 491 (2d Cir. 1950)). Nevertheless, controlling Supreme Court precedent holds that "some *minimal* procedural safeguards apply to clemency proceedings." *Woodard*, 523 U.S. at 289 (O'Connor, Souter,

---

[1] It is unclear whether Plaintiff alleges that access to clemency itself is an independent liberty interest. While this might alter the court's procedural due process analysis, the conclusion is the same—for the reasons discussed, Plaintiff has not stated a viable procedural due process claim.

Case 1:20-cv-03261-TSC Document 21 Filed 11/16/20 Page 7 of 20

Ginsburg, & Breyer, JJ., concurring in part); *id.* at 292 (Stevens, J., concurring in part and dissenting in part) ("[E]ven if due process is required in clemency proceedings, only the most basic elements of fair procedure are required.") At a minimum, these procedures appear to be adequate notice and an opportunity to be heard. *See id.* at 290 (O'Connor, J.).

Plaintiff argues that he has not been afforded these minimal procedural safeguards for his clemency proceedings in two key respects. First, that given the timing of his execution, he did not have an adequate opportunity to prepare his clemency petition in accordance with the federal clemency regulations set forth at 28 C.F.R. §§ 1.10–.11. Second, that the ongoing COVID-19 pandemic has effectively made it impossible to participate in a meaningful clemency process in such a short time. However, the court finds that, under Supreme Court precedent, the procedures afforded to Plaintiff—of which he chose not to avail himself—were adequate.

Federal clemency regulations provide that "[n]o petition for reprieve or commutation of a death sentence should be filed before proceedings on the [inmate's] direct appeal of the judgment of conviction and first petition under 28 U.S.C. § 2255 have terminated." 28 C.F.R. § 1.10(b). To leave time for adequate review, a petition "should be filed no later than 30 days after the petitioner has received notification from the Bureau of Prisons of the scheduled date of execution" and "[a]ll papers in support of a petition . . . should be filed no later than 15 days after the filing of the petition itself." *Id.* Furthermore, clemency counsel "may request to make an oral presentation of reasonable duration to the Office of the Pardon Attorney in support of the clemency petition." *Id.* § 1.10(c).

Despite his arguments to the contrary, Plaintiff had meaningful access to all these procedures. First, he was permitted to file a clemency application within thirty days of receiving his execution notice. It was only on the very last day of the application period that Plaintiff's

counsel, having not yet filed a petition, sought an extension from the Office of the Pardon Attorney. Notwithstanding that that office did not have the authority to grant an extension, it nevertheless offered to construe Plaintiff's request as a petition in order to preserve Plaintiff's access to the clemency process. (*See* ECF No. 15-1, Gillespie Decl. ¶¶ 8–9.) The Office of the Pardon Attorney also offered to arrange for a hearing via telephone given Plaintiff's stated concerns about the pandemic. (*Id.* ¶ 9.) Plaintiff's counsel rejected these offers and chose not to file a clemency petition.

Plaintiff next points out that, had he followed the federal clemency regulations, the Office of the Pardon Attorney would have had only five days in which to consider his application. But Defendants have submitted an affidavit from the Office of the Pardon Attorney representing that this would have been sufficient time to consider the application and make a recommendation. (*Id.* ¶ 11.)

Even assuming five days were insufficient for meaningful review of his petition, that compressed schedule was largely caused by Plaintiff's delay in filing for clemency. The federal clemency regulations provide that a death row inmate may not file an application "before proceedings on the [inmate's] direct appeal of the judgment of conviction and first petition under 28 U.S.C § 2255 have terminated." 28 C.F.R. § 1.10(b). Plaintiff's appeal of his sentence ended in 1998 when the Supreme Court declined to hear his case, *Hall v. United States*, 526 U.S. 1117 (1998), and his first § 2255 petition was terminated in 2007, *Hall v. United States*, 549 U.S. 1343 (2007). Thus, Plaintiff had thirteen years to file a clemency petition, notwithstanding that his execution had not yet been scheduled. While the regulations also require an applicant to file his clemency petition "no later than 30 days after the [applicant] has received notification . . . of the scheduled date of execution," *see* 28 C.F.R. § 1.10(b), there was nothing to prevent Plaintiff

from filing the application sooner, especially after the BOP gave notice in June 2019 that it was resuming executions under the new Protocol, and after the BOP conducted its first execution in July of this year.

For these reasons, the court is not persuaded that the COVID-19 pandemic has denied Plaintiff access to the clemency process. The government has shown that sufficient procedures are in place to ensure timely processing of Plaintiff's clemency petition, notwithstanding his delayed filing. The Office of the Pardon Attorney offered Plaintiff the opportunity to present his case during a telephone hearing no later than November 6, which would have left more than a week for review. (Gillespie Decl. ¶ 9.) Moreover, courts across the country have declined to delay executions for pandemic-related reasons. *See, e.g.*, *LeCroy v. United States*, 975 F.3d 1192, 1197 (11th Cir. 2020) (rejecting request to stay execution due to counsel's inability to meet with the plaintiff in person); *Peterson v. Barr*, 965 F.3d 549, 551–53 (7th Cir. 2020) (denying motion to stay execution filed by members of victim's family citing COVID-19 concerns). The court finds no basis on which to do so here.

Finally, Plaintiff repeatedly relies on Justice O'Connor's concurrence in *Woodard* to advance his due process claims (both related to clemency and notice), but he omits key language from that opinion. In emphasizing the minimal process required in clemency procedures, Justice O'Connor posited that "[j]udicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring in part). Plaintiff has presented no such arbitrary scenario here. *Woodard* involved an inmate who received a mere ten-day notice of his hearing, whose counsel was unable to attend the hearing, and who was unable to testify or submit

documentary evidence at the hearing. Despite these limitations, Justice O'Connor found that the inmate did *not* present a viable due process claim. *See id.* at 289–90.

For the reasons stated above, Plaintiff has failed to demonstrate a likelihood of success on the merits of his due process claims.

*ii. Statutory Claim*

Plaintiff claims that he has been deprived of the right to counsel set forth in 18 U.S.C. § 3599 because his attorneys are unable to assist him with preparing his clemency application due to the pandemic. Section 3599 provides that each attorney appointed to represent an indigent client must "represent the defendant throughout every subsequent stage of available judicial proceedings . . . and proceedings for executive or other clemency as may be available to the defendant." Plaintiff has failed to demonstrate how the pandemic burdens that right, especially since he could have prepared and filed a clemency application at any point over the past thirteen years, and at least since June 2019, when BOP announced the resumption of executions using the 2019 Protocol. While he may not be able to meet with his attorneys in person, he may communicate with them through other means. *See Lecroy*, 975 F.3d at 1197.

2. Notice Claims

The gravamen of Plaintiff's notice claims is that the Due Process Clause and the Ex Post Facto Clause entitle him to at least ninety days' notice of his execution. This is so, Plaintiff argues, because every version of the BOP's Execution Protocol from at least 1993 to July 31, 2020 provided that death row inmates would receive a ninety-day notice prior to their executions. The 2019 Protocol was changed on July 31, 2020 to provide only fifty days' notice.

*i. Due Process*

Plaintiff's substantive due process claim is not a model of clarity. It appears as a procedural due process claim in the complaint (Count IV) but seems to transform into a substantive due process claim in subsequent filings. Moreover, his substantive due process claim relies on cases involving *procedural* due process violations. (*See* Pl. Mem. at 21 (citing *Wilkinson*, 545 U.S. at 221 (adjudicating procedural due process claim regarding placement in a supermax prison); *Sandlin v. Connor*, 515 U.S. 472, 483–84 (1995) (adjudicating procedural due process claim involving prison disciplinary procedures); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (same)).) Nonetheless, analyzed under both a procedural and substantive due process framework, the claim does not entitle Plaintiff to injunctive relief.

As discussed above, a plaintiff alleging a procedural due process violation must identify a cognizable liberty interest arising from the Constitution or "an expectation or interest created by state laws or policies." *See, e.g.*, *Doe v. District of Columbia*, 206 F. Supp. 3d 583, 621 (D.D.C. 2016) (distinguishing procedural from substantive due process claims). Here, Plaintiff argues that earlier versions of the Execution Protocol created an expectation that death row inmates would be notified ninety days before their executions. Thus, having only received a fifty days' notice, he will be deprived of forty days of life.

As the court has already held in the *Execution Protocol Cases* litigation, there is no enforceable notice requirement set forth in the Execution Protocol. The Protocol "explains[] internal government procedures." (Compl. Ex. 2, Execution Protocol at 19.) While those procedures "should be observed and followed as written unless deviation or adjustment is required," the Protocol expressly cautions that it "does not create any legally enforceable rights or obligations." (*Id.*) Accordingly, the D.C. Circuit concluded that the Execution Protocol was a

"procedural rule" that "contains no rights-creating language." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 125–26 (D.C. Cir. 2020) (Katsas, J., concurring); *see id.* at 145 (Rao, J., concurring) (finding that the protocol "possesses the essential features of a procedural rule"); *see also Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (explaining that procedural rules "do not themselves alter the rights or interests of parties"). Thus, as the court has already held, the Execution Protocol does not entitle Plaintiff to notice ninety days before his execution.

Thus, to the extent Plaintiff intended to present the claim in Count IV as a procedural due process violation, he has failed to demonstrate a likelihood of success on the merits.

* * * * * *

Plaintiff's substantive due process claim meets a similar fate. The Due Process Clause of the Fifth Amendment "guarantees more than fair process." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). It "provides heightened protection against government inference with certain fundamental rights and liberty interests . . . [such as] the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity and to abortion." *Id.* at 720 (citations omitted). Because these rights "are not set forth in the language of the Constitution, the Supreme Court has cautioned against expanding the substantive rights protected by the Due Process Clause." *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007). Accordingly, courts must "exercise the utmost care whenever [] asked to break new ground in this field." *Glucksberg*, 521 U.S. at 720.

A substantive due process analysis has "two primary features." *Id.* First, the alleged right must be "objectively, deeply rooted in this Nation's history and tradition and implicit in the

concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720–21 (internal quotation marks and citations omitted). Second, the individual asserting the substantive right must supply "a careful description of the asserted fundamental liberty interest." *Id.*

Mindful of the Supreme Court's directive to proceed cautiously, the court finds that Plaintiff has failed to identify a substantive due process right. The liberty interest at issue here is a narrow one—the right to ninety days' notice before execution. (*See* Pl. Mem. at 21.) While individuals sentenced to death are undoubtedly entitled to some notice before an execution is carried out (to at least provide sufficient time to challenge the sentence), there is certainly no "deeply rooted" history or tradition that they are entitled to ninety days or some other specified period. As far as the court is aware, the practice of providing federal death row inmates with ninety days' notice of execution began in 1993. Since then, the federal government has only executed ten individuals, three of whom received less than ninety days' notice. Furthermore, as discussed above, the Execution Protocol creates no enforceable rights. The only law expressly providing Plaintiff a right to notice of his execution is a 1993 regulation that requires only twenty days' notice. *See* 28 C.F.R. § 26.4(a).

Plaintiff has failed to show that a ninety-day notice is a "deeply rooted" historical practice in this nation's history, and therefore his substantive due process claim fails.

*ii. Ex Post Facto Clause*

The Ex Post Facto Clause prohibits the retroactive application of a "law that changes the punishment, and inflicts greater punishment, than the law annexed to the crime when committed." *Peugh v. United States*, 569 U.S. 530, 532–33 (2013) (discussing U.S. Const. art I,

Case 1:20-cv-03261-RDM-TSC Document 23 Filed 11/16/20 Page 14 of 20

§ 9, cl. 3). This prohibition applies with equal force to changes in legislation, regulations, and guidelines. *See Bailey v. Fulwood*, 793 F.3d 127, 134 (D.C. Cir. 2015).

Here again, Plaintiff relies on earlier versions of the Execution Protocol providing ninety days' notice. In his view, the change from ninety to fifty days' notice inflicts greater punishment because "it will shorten his life by a minimum of 40 days." (Pl. Mem. at 25.) The court understands that every day of life is precious to someone facing imminent death. However, it is not clear how forty fewer days of life inflicts a greater punishment on an individual who was sentenced to death twenty-five years ago and who has long since exhausted his appeals. Plaintiff's death sentence will remain the same whether he is given fifty or ninety days' notice of his execution.

In support of his argument that a shortened notice period inflicts a greater punishment, Plaintiff relies on two cases which are more than a century old. In *Rooney v. North Dakota*, the Supreme Court found that a statute which increased the required time between conviction and the implementation of a death sentence was not an ex post facto punishment because it benefitted the prisoner. 196 U.S. 319, 266 (1905). And in *In re Tyson*, 22 P. 810, 812 (Colo. 1889), the Colorado Supreme Court stated, in dicta, that executing a defendant before the expiration of the minimum time required between conviction and execution would constitute an ex post facto punishment.

The court does not share Plaintiff's broad interpretation of these cases. Neither addresses whether reducing the notice period given to an individual already awaiting execution inflicts a greater punishment. *Cf. Peterson*, 965 F.3d at 552–53 ("[I]f a prisoner sued for inadequate notice of an execution date, a court could review that decision. But if the BOP observed the minimal requirements in the regulations . . . then it has the unconstrained discretion to choose a

date for the execution."). Rather, *Rooney* and *Tyson* involved minimum time limits prescribed by statute between judgment and execution. Indeed, an analogous federal law prohibits the execution of a death row inmate less than sixty days after the entry of the judgment of death. *See* 28 C.F.R. § 26.3(a)(1).

As mentioned above, the court does not reach this conclusion lightly—Plaintiff is undoubtedly correct that "[j]ust a few more days of life is of inestimable value to a man who is to be executed." (Pl. Mem. at 24 (quoting *In re Petition of Ellisor*, 140 F. Supp. 720, 727 (S.D. Tex. 1956)).) Nevertheless, Plaintiff has failed to establish that deviation from an unenforceable agency practice inflicts greater punishment on an individual who received the notice to which he was entitled—twenty days' notice in accordance with 28 C.F.R. § 26.4(a) and sixty days between judgment and execution in accordance with 28 C.F.R. § 26.3(a)(1)—and who was sentenced to death more than two decades ago.

3. Equal Protection

Plaintiff alleges that he has been "denied equal protection under the Fifth Amendment as he has not received the same process that other death row prisoners have been afforded to pursue clemency." (Compl. ¶ 184.) The basis of his claim is that Defendants shortened the notice period "affording significantly more process to those scheduled for execution prior to the COVID-19 pandemic than those scheduled for execution during the COVID-19 pandemic." (*Id.* ¶ 180.)

The Fourteenth Amendment prohibits a state from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause applies to the federal government through the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S 497 (1954). Thus, the "[e]qual protection analysis in

Case 1:20-cv-03261-TSC Document 151 Filed 11/16/20 Page 15 of 20

the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

To succeed on an equal protection claim, a plaintiff must "demonstrate that he was treated differently than similarly situated individuals and that [the government's] explanation does not satisfy the relevant level of scrutiny." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1123 (D.C. Cir. 2005). Where, as here, an equal protection claim does not involve a suspect class, the court applies rational basis scrutiny. *See FCC v. Beach Commc'ns., Inc.*, 508 U.S. 307, 313 (1993) (nothing that the government action "must be upheld against equal protection challenge if any reasonably conceivable state of facts could provide a rational basis for the classification"). "Review of an equal protection claim in the context of agency action is similar to that under the APA . . . [that is,] the only question is whether . . . treatment of [the plaintiff] was rational (i.e., not arbitrary and capricious)." *Nazareth Hosp. v. Sec'y. U.S. Dep't of Health and Hum. Servs.*, 747 F.3d 172, 180 (3d Cir. 2014); *see also Cooper Hosp. / Univ. Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016).

The court finds that Plaintiff is unlikely to succeed on his equal protection claim for the same reason his other constitutional claims fail: the Execution Protocol does not bestow enforceable rights on death row inmates. The D.C. Circuit has made it clear that the Protocol is a statement of agency policy. *Execution Protocol Cases*, 955 F.3d at 125–26 (Katsas, J., concurring); *see id.* at 145 (Rao, J., concurring). Accordingly, it is not subject to review under the APA analysis. *See, e.g.*, *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (explaining that an agency's statement of policy is unreviewable); *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 39 (D.C. Cir. 1974) ("A general statement of policy . . . does not establish a binding norm. It is not finally

determinative of the issues or rights to which it is addressed." (internal quotation marks and citations omitted)); *Fed. Law Enf't Officers Ass'n v. Rigas*, 2020 WL 4903843, at *7 (D.D.C. Aug. 20, 2020) (same).

Ultimately, the law provides that all inmates executed under the 2019 Execution Protocol be given at least twenty days' notice of their executions, and Defendants have complied with that law.

4. Ultra Vires Agency Action

Plaintiff also argues that the 2019 Execution Protocol conflicts with the FDPA, 18 U.S.C. § 3596, by purportedly displacing the U.S. Marshal Service from its statutorily assigned role to "supervise implementation" of a federal death sentence. (*See* Compl. ¶¶ 173–78.) The court has already rejected this claim in the *Execution Protocol Cases* litigation.

Section 3596 of the FDPA requires that in carrying out a death sentence, "the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). The critical word here is "supervise,"[2] which is undefined in the statute. The court must therefore rely on its plain meaning. "To 'supervise' is to 'superintend' or 'oversee,'" but not to "formulate," "determine," or "select" the manner of federal execution. *Execution Protocol Cases*, 955 F.3d at 134 (Rao, J., concurring) (citing Supervise, Merriam Webster's Collegiate Dictionary (11th ed. 2014)).

The legislative history of the federal death penalty indicates that "supervise" does not mean the U.S. Marshal has the exclusive authority to carry out federal executions or to institute

---

[2] As Judge Rao explained in her concurrence, "[t]he ordinary meaning of 'implementation of the sentence' includes more than 'inflicting the punishment of death.'" *Execution Protocol Cases*, 955 F.3d at 133 (Rao, J., concurring).

procedures for doing so. In prior federal death penalty statutes, Congress used more expansive language to describe the U.S. Marshal's duties during an execution. For instance, in the 1937 version, Congress provided that the U.S. Marshal was "charged with the execution of the sentence." *See* 50 Stat. at 304.

The 2019 Protocol does not divest the U.S. Marshal of this supervisory authority. In fact, it mandates that the U.S. Marshal "oversee the execution and to direct which other personnel may be present at it." *Execution Protocol Cases*, 955 F.3d at 124 (Katsas, J.). The execution cannot begin without the Marshal's approval, and it is the Marshal who certifies that the execution has been carried out. *Id.* The court therefore concludes that the U.S. Marshal supervises—i.e., oversees and superintends over—the execution.

Furthermore, the fact that the U.S. Marshal must supervise an execution does not preclude other DOJ components from participating. Indeed "all functions of agencies and employees of the Department of Justice"—of which both the Marshal Service and the BOP are parts—"are vested in the Attorney General." Thus, any authority inherent in the Attorney General's power to enforce a death sentence that has not been specifically assigned to a DOJ component may be delegated. *See* 28 U.S.C. §§ 509, 510; *United States v. Giordano*, 416 U.S. 505, 514 (1974) (finding unexceptional the proposition that the Attorney General may freely delegated his power where Congress does not say otherwise).

The 2019 Protocol, as written, still provides the U.S. Marshal the power to supervise the implementation of a death sentence. Therefore, the court finds that the 2019 Protocol does not improperly delegate authority to the BOP.

**C. Remaining Factors for Injunctive Relief**

Having concluded that none of Plaintiff's claims are likely to succeed on the merits, the court need not balance the remaining factors. *See Greater New Orleans Fair Hous. Action Center v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) (noting that a substantial likelihood of success the merits is often dispositive); *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 29 (D.C. Cir. 2010) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)) ("[A]bsent a 'substantial indication' of likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'"). Plaintiff is not entitled to the injunctive relief sought.

**D. Emergency Motion for a Hearing**

Plaintiff has also filed an emergency motion for a hearing. (ECF No. 14.) The court finds that such a hearing is not necessary given that Plaintiff has presented no disputed issues of fact that need be resolved. *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) ("[I]f there are genuine issues of material fact raised in opposition to a motion for a preliminary injunction, an evidentiary hearing is required."); *see also* LCvR 65.1(d) ("[A] hearing on an application for preliminary injunction shall be set by the Court no later than 21 days after its filing, unless the Court decides the motion on the papers"). Thus, Plaintiff's emergency motion for a hearing will be denied.

**III. CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a temporary restraining order/preliminary injunction and emergency motion for a hearing must be DENIED. The court will issue an accompanying order accordingly.

Date: November 16, 2020

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge