**United States Court of Appeals**
***For The Eighth Circuit***
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
***Clerk of Court***

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

July 22, 2014

Ms. Kelley J. Henry
FEDERAL PUBLIC DEFENDER'S OFFICE
Capital Habeas Unit
Suite 200
810 Broadway
Nashville, TN 37203

RE: 14-2725 In re: Lisa Montgomery

Dear Counsel:

We have assigned your petition for a writ the case number shown above. Your case will be referred to a panel of judges for review. We will promptly advise you of the Court's ruling.

Please note that service by pro se parties is governed by Eighth Circuit Rule 25B. A copy of the rule and additional information is attached to the pro se party's copy of this notice.

On June 1, 2007, the Eighth Circuit implemented the appellate version of CM/ECF. Electronic filing is now mandatory for attorneys and voluntary for pro se litigants proceeding without an attorney. Information about electronic filing can be found at the court's web site www.ca8.uscourts.gov. In order to become an authorized Eighth Circuit filer, you must register with the PACER Service Center at https://www.pacer.gov/psco/cgi-bin/cmecf/ea-regform.pl. Questions about CM/ECF may be addressed to the Clerk's office.

Michael E. Gans
Clerk of Court

PSA

Enclosure(s)

cc: Ms. Christine M. Blegen
Honorable Gary A. Fenner
Ms. Amy D. Harwell
Ms. Roseann A. Ketchmark
Mr. Philip M. Koppe
Ms. Lisa G. Nouri
Ms. Ann Thompson

District Court/Agency Case Number(s): 4:12-cv-08001-GAF

**Caption For Case Number: 14-2725**

In re: Lisa M. Montgomery

Petitioner

**Addresses For Case Participants: 14-2725**

Ms. Kelley J. Henry
FEDERAL PUBLIC DEFENDER'S OFFICE
Capital Habeas Unit
Suite 200
810 Broadway
Nashville, TN 37203

Ms. Christine M. Blegen
BLEGEN LAW FIRM
Suite 217
230 S.W. Main Street
Lee's Summit, MO 64063

Honorable Gary A. Fenner
Room #8452
U.S. Courthouse
400 E. Ninth Street
Kansas City, MO 64106-2689

Ms. Amy D. Harwell
FEDERAL PUBLIC DEFENDER'S OFFICE
Capital Habeas Unit
Suite 200
810 Broadway
Nashville, TN 37203

Ms. Roseann A. Ketchmark
U.S. ATTORNEY'S OFFICE
5510 Charles Evans Whittaker Courthouse
400 E. Ninth Street
Kansas City, MO 64106-2149

Mr. Philip M. Koppe
U.S. ATTORNEY'S OFFICE
816-426-4288
5510 Charles Evans Whittaker Courthouse
400 E. Ninth Street
Kansas City, MO 64106-2149

Ms. Lisa G. Nouri
2526 Holmes
Kansas City, MO 64108-0000

Ms. Ann Thompson
U.S. DISTRICT COURT- Western Missouri
Western District of Missouri Clerk's Office
Room 1510
400 E. Ninth Street
Kansas City, MO 64106-0000

**CAPITAL CASE**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | | |
|---|---|---|
| **IN RE: LISA MONTGOMERY** | **)** | |
| | **)** | |
| **Petitioner** | **)** | **NO.** |
| | **)** | **UNITED STATES DISTRICT** |
| | **)** | **COURT WESTERN DISTRICT** |
| | **)** | **OF MISSOURI,** |
| | **)** | **NO. 12-08001-CV-W-GAF** |

**PETITION FOR WRIT OF MANDAMUS**
**TO THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOUI**

**ORAL ARGUMENT REQUESTED**

LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

CHRISTINE M. BLEGEN, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
(816) 213-0384

KELLEY J. HENRY, Mo. Bar No. 38849,
Tn. Bar No. 021113
AMY D. HARWELL, Tn. Bar No.18691
FEDERAL PUBLIC DEFENDER'S OFFICE
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

*Attorneys for Petitioner Lisa Montgomery*

## I. RELIEF SOUGHT

In this 28 USC §2255 action and pursuant to the Sixth Amendment to the United States Constitution; 18 U.S.C. 3599(a)(2); 28 U.S.C. §1651 (All Writs Act); and Fed. R. App. P. 21, Petitioner Lisa M. Montgomery seeks a Writ of Mandamus directing the District Court below to vacate his *sua sponte* Order commanding appointed counsel, Christine Blegen, to "conclude her representation of Lisa Montgomery," enjoining Ms. Blegen from "perform[ing] any further services on behalf of [Montgomery] other than as not able to be handled by co-counsel at this time;" and directing her to withdraw from the case "no later than July 28, 2014."

## II. ISSUE PRESENTED

Whether the District Court's *sua sponte* order commanding the withdrawal of appointed counsel and enjoining her from further legal work on the case without notice and over the subsequent objection of Mrs. Montgomery and her lawyers, without finding that the interests of justice would be served by such an order, violates Mrs. Montgomery's statutory and constitutional rights to counsel? *See Martel v. Clair*, 132 S.Ct. 1276 (2012).

## III. FACTS NECESSARY FOR DETERMINATION OF THE ISSUES PRESENTED

Lisa Montgomery is a federal prisoner under sentence of death upon conviction in the United States District Court, Western District of Missouri. Mrs.

Montgomery filed a timely motion in the District Court to vacate, correct, or set aside the judgment in her case pursuant to 28 U.S.C. §2255.

Lisa Nouri and Christine M. Blegen were appointed pursuant to the Criminal Justice Act to represent Mrs. Montgomery on April 17, 2012 (Case No. 05-06002-CR-GAF, Doc. #430). On April 25, 2012, the Court issued an Order Regarding Billing Procedures, Setting of Compensation, and Authorization to Make Interim Payments (Case No. 05-06002-CR-GAF, Doc. #433). An offer by lead counsel Lisa G. Nouri to submit a case budget was declined. Thereafter, all of Ms. Nouri's and all of Ms. Blegen's CJA vouchers were paid in full through March of 2013.[1]

After a painstaking review of the file and in recognition of the need for extraordinary resources unique to this case, Ms. Nouri and Ms. Blegen submitted a detailed proposed budget and request for investigation and expert witness funds in September, 2012 (Doc. #11).[2] In the motion for funds, Ms. Nouri and Ms. Blegen proposed the alternative of appointing the Federal Public Defender's Office for the Middle District of Tennessee to provide the resources needed to investigate and prove Mrs. Montgomery's claims (Doc. #11). The District Court approved the appointment of the Federal Public Defender's Office for the Middle District of

---

[1] The §2255 Motion and a Separate Motion Seeking Reassignment of the Federal District Court Judge were filed on March 19, 2013. *See* Discussion Below.

[2] All document citations from this point forward refer to the docket sheet for Case No. 12-CV-8001-GAF.

Tennessee (Doc. #13) and Kelley Henry entered her appearance on November 1, 2012 (Doc. #20).

On March 19, 2013, the legal team comprised of Ms. Nouri, Ms. Blegen, and Ms. Henry filed Mrs. Montgomery's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. §2255 (Doc. #32). Mrs. Montgomery's attorneys also sought to have the §2255 motion assigned to a different judge, believing the District Court judge to be a witness with regard to certain claims in the §2255 motion (Doc. #41). Following a hearing on May 6, 2013 (Doc. #51), the motion to reassign was denied on June 25, 2013 (Doc. #59).

Three days later, on June 28, 2013, the District Court entered a Notice Concerning Budget and CJA Representation for Movant (Doc. #60, Attachment A), scheduling a meeting with all counsel of record for Lisa Montgomery on July 12, 2013. During the meeting, the District Court initially considered removing both CJA attorneys (Tr. 7/12/13, p. 4, Attachment B). The District Court's alternative suggestion was to remove one CJA attorney (*Id.*, p. 4). Ms. Nouri explained that each attorney was extremely important to the case and that each attorney was taking on different responsibilities in the 2255 litigation (*Id.*, p. 7). Ms. Nouri noted that the removal of any of the attorneys would have a detrimental impact on Lisa Montgomery's case and urged the District Court to leave Mrs. Montgomery's legal team in place (*Id.*, p. 8). Ms. Henry explained that her office is

a small office and that she has a full caseload in addition to her work on Mrs. Montgomery's case (*Id*., p. 10). She expressed that it was never her intent to be lead counsel in this case (*Id.*, p. 10). Ms. Nouri specifically informed this Court that Ms. Blegen is "the premier writer" and that "it would be devastating to lose her from the case" (*Id*., p. 18).

Upon request at the conclusion of the meeting, counsel for Mrs. Montgomery were afforded an opportunity to submit a written response and budget proposal (Doc. #62, Attachment C). In that response, counsel referred the District Court to 18 U.S.C. §3599(e) which states:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, ***each attorney so appointed <u>shall</u> represent the defendant throughout every subsequent stage of available judicial proceedings,*** including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and ***all available post-conviction process***, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(Emphasis supplied). As no attorney had moved to withdraw and Mrs. Montgomery had not moved to have any of her attorneys removed,[3] counsel pointed out that §3599(e) does not permit *sua sponte* removal of one or more of

[3] In fact, Mrs. Montgomery asked the District Court, via declaration, to leave her legal team intact. (Attachment D).

Mrs. Montgomery's attorneys due to budgetary concerns.[4] Counsel provided the District Court with authority from the United States Supreme Court holding that *even where the inmate seeks the removal of counsel*, the Court may not do so without a context specific inquiry and a determination that the interests of justice would be served by the removal of counsel. *Martel v. Clair*, 132 S.Ct. 1276 (2011).

Counsel further directed the District Court's attention to *Stearnes v. Clinton*, 780 S.W.2d 216 (Tx. Ct. App. 1989). In *Stearnes*, the Court held that "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Id*. at 223. *Stearnes* expressly acknowledges that while "an indigent defendant does not have the right to the appointment of a particular attorney . . . once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)).

---

[4] Counsel did not, and does not, challenge the District Court's authority to approve fee vouchers. This is not a voucher fee dispute.

In response to counsel's submission, the District Court issued an Order on July 18, 2013 (Doc. #63, Attachment E). The District Court described the response submitted by counsel for Mrs. Montgomery as a "less than conciliatory challenge to any cost control measures by the Court" and as "inappropriately and unnecessarily argumentative." *Id*. The Order advised CJA counsel representing Mrs. Montgomery "that 25% will be withheld from all CJA vouchers as a cost control mechanism until the case is concluded before the District Court." *Id*. In addition, the District Court capped the total CJA fees in the case. *Id*. Neither Ms. Nouri nor Ms. Blegen have challenged the Order. As of the date of this filing, CJA counsel's fees are well below the cap set by the Court. The Court's July, 2013 order is not the subject of this Writ.

Subsequent to the Court's July, 2013 Order, undersigned counsel prepared and filed Mrs. Montgomery's amended motion. The Government has not yet answered.

Christine M. Blegen, has not submitted a CJA voucher since December of 2013, because minimal work was performed on Mrs. Montgomery's case between January of 2014 and May 30, 2014 as the Government has been waiting on affidavits from two of Mrs. Montgomery's trial attorneys prior to filing the Government's Response to the pending Amended §2255 Motion. In June of 2014, there was litigation over certain requests made by trial counsel Fred Duchardt in

connection with the affidavit he has been ordered by the District Court to file (*See* Docs. #87-100, 104). This litigation led to the filing of a successful Motion to Stay the District Court's discovery order and a Petition for Writs of Mandamus and Prohibition with this Court. The petition for the writs was filed on Friday, June 27, 2014 at approximately 4:00 p.m. (*See* United States Court of Appeals for the Eighth Circuit Case No. 14-2437). Ms. Blegen was the first listed author of the writ, as she was the primary drafter. In accordance with the rules of this Court, a courtesy copy of the writs was emailed to the District Court's chambers.

The following Monday morning, June 30, 2014, at 9:07 a.m., the District Court, without notice or a hearing, *sua sponte* issued an Order commanding Christine Blegen to "file a notice of withdrawal no later than July 28, 2014." (Doc. 114, Attachment F). The stated purpose for the order was to control public-funded representation. *Id*.

Six hours later, at 2:45 p.m., Ms. Blegen filed an *ex parte* motion to vacate the District Court's order (Doc. #115, Attachment G). The motion to vacate objected to the District Court's *sua sponte* action, taken without notice to Mrs. Montgomery or counsel and without affording either counsel or Mrs. Montgomery an opportunity to be heard. The motion recited the history of the case and indicated that the matter of cost containment had already been addressed. The Motion further pointed out that removal of Ms. Blegen would actually waste court resources,

because her knowledge of the case will be lost and that the result of such an order would be duplication of her efforts by other counsel. Further, the motion advised the District Court that the Federal Public Defender in Nashville faces an unprecedented situation where five of its clients face execution over the next twenty months. Ms. Henry is the supervisor of the Capital Habeas Unit and is actively involved in the litigation on behalf of those clients as well as matters pertaining to the method of execution in Tennessee. Ms. Harwell, the assistant federal defender Ms. Henry assigned to help on the case, is similarly encumbered with a high caseload and obligations to work on clemency cases for these clients of the Tennessee-based office.

Moreover, the District Court was reminded of the mandatory language of the statute that once appointed counsel shall continue to represent an indigent death-sentenced inmate. The District Court's attention was directed to the Administrative Office of The Court's Guidelines for Appointment of Counsel Under the CJA which contemplates the removal of counsel ***only*** when it is determined that the individual has resources to retain counsel.

Once again, the Court was reminded of the Supreme Court's decision in *Martel v. Clair*, where the Court interpreted the intent of 18 U.S.C. § 3599 to provide high quality representation in capital cases. The Court's attention was

directed back to the *Stearnes* case as well as Ms. Blegen's ethical and statutory duty to remain on the case.

Finally, the Court was advised of the significant deleterious impact the removal of one of her lawyers – again – by the District Court Judge[5] would have on the attorney/client relationship for the remaining legal team and on Mrs. Montgomery's already fragile mental state.

The motion to reconsider was denied on July 15, 2014 (Doc. #118, Attachment H). Mrs. Montgomery has moved for a stay of the Court's Order (Doc. #119, Attachment I). Attached to the motion for a stay is Mrs. Montgomery's declaration explicitly objecting to the involuntary withdrawal of her lawyer. Mrs. Montgomery states that, "The idea of losing Christine as my lawyer is

[5] There is a disturbing pattern of the removal of female lawyers in this case without prior notice to Mrs. Montgomery. Her first attorney, Anita Burns, was removed by the Federal Public Defender. Then, Judy Clarke was removed in *ex parte* and unrecorded proceedings without notice to Mrs. Montgomery or Ms. Clarke; upon her removal, the District Court also barred Ms. Clarke from any contact with Mrs. Montgomery. At attorney Susan Hunt's urging, Lisa Montgomery wrote to Judge Fenner to express her desire for Ms. Clarke to remain on the case. Attachment J.A month later when attorney Susan Hunt urged the Court to reconsider the removal of Ms. Clarke, the District Court Judge asked her to withdraw.

Mrs. Montgomery has consistently told the Court that she did not want her lawyers removed and that the Court's removal of her lawyers caused her mental anguish (Attachments D, I, J). In the July 12, 2013 hearing, upon hearing about Mrs. Montgomery's position, the Court stated, "I don't know. And, you know, I realize the less I say the better. … But it's not up to Lisa Montgomery. She's not paying the bills." (Attachment B, p. 10). The Judge went on to say, "I don't see the entitlement to that kind of representation." (*Id*., p. 14).

devastating. I don't understand why the Judge wants to keep taking away my attorneys." (Attachment I, p. 13). Mrs. Montgomery does not want any member of her team removed (Attachment I, p. 14).

## IV. ARGUMENT

### A. MRS. MONTGOMERY HAS A CLEAR STATUTORY RIGHT TO COUNSEL.

The Criminal Justice Act, 18 U.S.C. §3599(e) states:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, ***each attorney so appointed <u>shall</u> represent the defendant throughout every subsequent stage of available judicial proceedings,*** including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and ***all available post-conviction process***, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(Emphasis added). In *Martel*, the Supreme Court recognized that this section conveyed a statutory right to counsel. *Martel*, 132 S.Ct. at 1283. Indeed, the Court wrote that the statute provides "enhanced rights of representation." *Id*. at 1284. The Court went on to explain the reasons behind these enhanced rights:

> The new statute grants federal capital defendants and capital habeas petitioners enhanced rights of representation, in light of what it calls "the seriousness of the possible penalty and ... the unique and complex nature of the litigation." § 3599(d) (2006 ed.). **Habeas petitioners facing execution now receive counsel as a matter of right, not an exercise of the court's discretion**. *See* § 3599(a)(2). And the statute aims in multiple ways to improve the quality of representation afforded to capital petitioners and defendants alike. Section 3599

> requires lawyers in capital cases to have more legal experience than § 3006A demands. Compare §§ 3599(b)–(d) with § 3006A(b). Similarly, § 3599 authorizes higher rates of compensation, in part to attract better counsel. Compare § 3599(g)(1) with § 3006A(d) (2006 ed. and Supp. IV). And § 3599 provides more money for investigative and expert services. Compare §§ 3599(f) (2006 ed.), (g)(2) (2006 ed., Supp. IV), with § 3006A(e) (2006 ed. and Supp. IV). As we have previously noted, those measures "reflec[t] a determination that quality legal representation is necessary" in all capital proceedings to foster "fundamental fairness in the imposition of the death penalty." *McFarland*, 512 U.S., at 855, 859, 114 S.Ct. 2568.

*Id*. at 1284-1285 (emphasis supplied).

Section 3599(e) does not permit the *sua sponte* removal of one or more of Mrs. Montgomery's attorneys under any circumstance. The only contemplated circumstances for the removal of counsel are 1) where the attorney seeks to withdraw or 2) the client asks for the attorney's removal. In those situations, the Court has held that an attorney still may not be relieved of her obligation to continue as counsel unless the Court makes a specific finding that the interests of justice would be served by removal of counsel. *Id.* at 1287. No such finding was made here.

## B. MRS. MONTGOMERY HAS A SIXTH AMENDMENT RIGHT TO COUNSEL.

Unlike a Petition for Writ of Habeas Corpus brought under 28 U.S.C. §2254, which is civil in nature, a Motion to Vacate or Correct Judgment and Sentence under 28 U.S.C. §2255 is a continuation of the criminal trial. The Advisory Committee Notes to the §2255 Rules ("Note(s)") repeatedly characterize

proceedings under §2255 as a "continuation of the criminal case." For example, the Note to §2255 Rule 1 states that "a motion under §2255 is *a further step in the movant's criminal case and not a separate civil action*," and the Note to §2255 Rule 11 states that "*a §2255 action is a continuation of the criminal case*." (Emphases added). The Notes actually distinguish §2255 proceedings from civil actions. *See* Note to §2255 Rule 3 (noting change to require no filing fee of movant "*to recognize specifically the nature of a §2255 motion as being a continuation of the criminal case whose judgment is under attack*" (emphasis added)); *id.*, Rule 6 ("This rule differs from the corresponding discovery rule under the §2254 rules in that it includes the processes of discovery available under the Federal Rules of Criminal Procedure as well as the civil. This is because of the nature of a *§2255 motion as a continuing part of the criminal proceeding* . . ." (emphasis added)); *Id.*, Rule 12 (similar).

In a thorough examination of the issue, the Second Circuit recognized §2255 Rules clarify the criminal nature of the proceeding. *Williams v. United States*, 984 F.2d 28, 30 (2d Cir. 1993). Other courts have followed, acknowledging that "it is now clear that 'a motion under §2255 is a further step in the movant's criminal case and not a separate civil action.'" *United States v. Martin*, 226 F.3d 1042, 1047 n.7 (9th Cir. 2000) (quoting Note to § 2255 Rule 1). *See also United States v. Fiorelli*, 337 F.3d 282, 285 (3d Cir.

2003); *United States v. Cook*, 997 F.2d 1312, 1319 (10th Cir. 1993). The First Circuit agrees. *See, e.g.*, *United States v. Quin*¸ 836 F.2d 654, 655 n.2 (1st Cir. 1988) ("Although §2255 proceedings are strictly criminal, and § 2254 (habeas corpus) civil, the Civil Rules are equally applicable [under § 2255 Rule 12]."); *United States v. Gordon*, 634 F.2d 638, 639 (1st Cir. 1980) ("Although a section 2255 motion may possess several characteristics of a separate civil proceeding, procedurally it is a 'further step in the movant's criminal case.'" (quoting Note to § 2255 Rule 1)).

As this proceeding is criminal in nature, the constitutional right to effective assistance of counsel is implicated. *Powell v. Alabama*, 53 S.Ct. 55 (1932); *Gideon v. Wainwright*, 83 S.Ct. 792 (1963). Further, where this proceeding is the only forum for Mrs. Montgomery to raise claims alleging the violation of her Sixth Amendment right to counsel at trial, sentencing, and on appeal, she has the right to effective assistance of counsel under *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) and *Maples v. Thomas*, 132 S.Ct. 912 (2012).[6]

## C. ETHICAL OBLIGATIONS OF COUNSEL PROHIBIT MS. BLEGEN FROM ABANDONING HER CLIENT.

Missouri Rule of Professional Conduct 1.16 governs termination of representation of a client and provides that:

[6] The District Court's June 30, 2014 Order effectively obligates Ms. Blegen to abandon her client in violation of *Maples*.

(b) Except as stated in Rule 4-1.16(c), a lawyer may withdraw from representing a client if:

(1) withdrawal can be accomplished without material adverse effect on the interests of the client;
(2) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;
(3) the client has used the lawyer's services to perpetrate a crime or fraud;
(4) the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement;
(5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;
(6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or
(7) other good cause for withdrawal exists.

None of these conditions exist in the present case. Therefore, Ms. Blegen may not ethically withdraw from this case.

Ms. Blegen has been placed in an impossible position where she is asked to choose between her own interest in not being found in contempt of Court and the interest of her client. Counsel believes that the District Court's directive is in violation of federal law, the Missouri Rules of Professional Responsibility, and Movant's Sixth Amendment right to counsel.

### D. THE DISTRICT COURT CLEARLY ERRED BY COMMANDING APPOINTED COUNSEL TO REMOVE HERSELF FROM THE CASE AND ENJOINING HER FROM FURTHER LEGAL WORK ON BEHALF OF MRS. MONTGOMERY

A plain reading of the text of 18 U.S.C. §3599 indicates that the District Court erred in *sua sponte* removing counsel. The District Court's *sua sponte* action violates Mrs. Montgomery's rights to counsel as outlined above. The United States Supreme Court has interpreted §3599 as guaranteeing the right to counsel from appointment through clemency. *Harbison v. Bell*, 128 S.Ct. 2959 (2008).

While Mrs. Montgomery may not have the right to counsel of choice upon appointment,[7] once the appointment has occurred, the Court does not have the

[7] Courts have held that a defendant's preference for appointed counsel should be considered when it is supported by "objective considerations" such as a "relationship of trust and confidence" between the defendant and counsel. *Harris v. People*, 567 P.2d 750, 752 (Cal. 1977) (holding that trial court abused its discretion in denying defendant's preferred choice of counsel, when supported by objective considerations); *Amadeo v. State*, 384 S.E.2d 181, 183 (Ga. 1989) (finding that the trial court's refusal to appoint attorneys who had previously represented the defendant was an abuse of discretion given the prior counsel's knowledge of the defendant's case and the developed relationship and trust between prior counsel and the defendant); *Davis v. Cain*, 662 So.2d 453, 454 (La.1995) (finding that the trial court's denial of a motion for appointment of counsel was an abuse of discretion). Given that a relationship of trust and confidence, as well as knowledge of the case are relevant considerations for the appointment of counsel in the first instance, these considerations should be given even more weight in this instance.

discretion to remove counsel as a cost containment measure[8] or for case management purposes.

*Stearnes v. Clinton* is instructive: the *Stearnes* Court held that "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Stearnes v. Clinton* , 780 S.W.2d 216, 223 (Tx. Ct. App. 1989). *Stearnes* expressly acknowledges that while "an indigent defendant does not have the right to the appointment of a particular attorney," "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)).

The Stearnes Court further recognized that once an attorney has been appointed and an attorney-client relationship has been established, it should be protected. *Id.* at 222. "Once counsel has been validly appointed to represent an indigent defendant and the parties enter into an attorney-client relationship it is no

[8] This is not the same as saying that the Court is without discretion to control costs. The District Court can, and has, set a cap on attorney fees. That is not the issue here.

less inviolate than if counsel is retained." *Id.* at 221-222. No distinction should be made between retained and appointed counsel "because the 'attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service.'" *Id.* (quoting *Smith v. Superior Court of Los Angeles*, 68 Cal. Rptr. 1, 10, 440 P.2d 65, 74 (1968)).

The District Court further erred by failing to use the interests of justice standard adopted in *Martel v. Clair*. Even assuming *arguendo* that the District Court did have the authority to remove counsel without notice or a hearing and over objection, the *Martel* standard would still prevent the removal of Ms. Blegen under the facts here. The *Martel* Court describes the standard:

> As its name betrays, the "interests of justice" standard contemplates a peculiarly context-specific inquiry. So we doubt that any attempt to provide a general definition of the standard would prove helpful. In reviewing substitution motions, the courts of appeals have pointed to several relevant considerations. Those factors may vary a bit from circuit to circuit, but generally include: **the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict).** See, *e.g.*, *United States v. Prime*, 431 F.3d 1147, 1154 (C.A.9 2005); *United States v. Doe*, 272 F.3d 116, 122–123 (C.A.2 2001); *Hunter*, 62 F.3d, at 274; *United States v. Welty*, 674 F.2d 185, 188 (C.A.3 1982).

132 S. Ct. at 1287 (emphasis supplied). None of these factors are implicated here. There is no motion. There was no District Court inquiry. There was no complaint. There is no breakdown in communication or conflict between lawyer and client. In

fact, the opposite is true: the attorney and the client are in accord. The District Court order does not even purport to rest its finding on the "interests of justice" standard.

Finally, *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) suggests that Mrs. Montgomery is entitled to effective assistance of counsel during her Section 2255 proceedings. Based upon *Martinez,* the effectiveness of Mrs. Montgomery's §2255 attorneys may be examined at some point in the future. Disrupting Mrs. Montgomery's current legal team could form the basis of a future claim that Mrs. Montgomery received ineffective assistance of counsel in this proceeding.

### E. DISTRICT COURT'S STATED REASONS FOR REMOVING COUNSEL ARE NOT PERMISSIBLE CONSIDERATIONS; AND THE DISTRICT COURT MISAPPREHENDS THE COMPLEXITY OF THE CASE AND COUNSEL'S ROLE.

In *Martel v. Clair*, 132 S.Ct. 1276 (2012) the United States Supreme Court recognized that 18 U.S.C. §3599 (d) "grants federal capital defendants and capital habeas petitioners enhanced rights of representation, in light of what it calls 'the seriousness of the possible penalty and . . . the unique and complex nature of the litigation.'" *Id*. at 1284-1285. *Martel* states that "Habeas petitioners facing execution now receive counsel as a matter of right, not an exercise of the court's discretion." *Id.* at 1285. The United States Supreme Court noted that §3599 reflects "'a determination that quality legal representation is necessary' in all capital proceedings to foster 'fundamental fairness in the imposition of the death

penalty.'" *Id*. (quoting *McFarland v. Scott*, 512 U.S. 849, at 855, 859 (1994)). *Martel* explains that Congress intended to expend substantial funding in the area of capital representation as a means of attracting qualified counsel to accept representation in these complex matters. The District Court's order is purportedly predicated on the need to limit "public-funded representation" in direct contravention of the policy underlying §3355 and explained in *Martel.*

In addition, the removal of appointed counsel raises equal protection concerns where the United States Attorney's Office has staffed this case with two local attorneys who then have the resources of the Justice Department with which to respond to Mrs. Montgomery's claims. Therefore, having two local attorneys combined with the resources and assistance of the Office of the Federal Public Defender for the Middle District of Tennessee is not unreasonable.

Ms. Blegen has been representing Lisa Montgomery for over two years and has invested over 750 hours learning the case, meeting with Mrs. Montgomery, conducting legal research, and drafting pleadings. On March 19, 2013, Mrs. Montgomery's legal team filed a comprehensive, detailed, and well-supported §2255 motion (Doc. #32). An amended motion was filed on October 1, 2013 (Doc. #72). Several claims in Mrs. Montgomery's §2255 motion relate to the removal of attorneys from her case and the failure of her ultimate trial attorneys to work as a team (Doc. #72). As a result, it is troubling to Mrs. Montgomery (*See*

Attachment I), and her §2255 legal team, that the District Court persists in removing counsel from her legal team.[9] The District Court's Order has exacerbated Mrs. Montgomery's already serious mental illness (*See* Attachment I). Movant's current mental state is extremely fragile and in the aftermath of the District Court's order mental health professionals at the Bureau of Prisons have stepped up her monitoring. (*See* Attachment I).[10]

---

[9] While the District Court cites to control of public funded representation (Doc. #114, Attachment E) and case management (Doc. #118, Attachment G) as the basis for the Order, the record shows that CJA counsel are below the cap set by the Court. Removal of Ms. Blegen wastes the investment already made as she is the most familiar with the §2255 Amended Motion. In addition, her removal will force other counsel to have to shift over to legal research and writing tasks. Placing that burden on out of district federal public defenders is no less a burden on the public fisc. (Attachment B, pp. 9-13, 19-22, 25-26, 28-29). The District Court's invocation of "case management" as the basis for Ms. Blegen's removal is similarly erroneous. Removal of counsel will hamper the efficient litigation of Mrs. Montgomery's claims, impeding the resolution of the case rather than moving the case forward.

Further, given the timing of the Court's order, the Court's pattern of removing counsel in this case, and the fallacy of the Court's citation to cost management, the record suggests that the most recent Order is an attempt to control and/or manage the litigation of Mrs. Montgomery's §2255 motion. The removal of Ms. Blegen, appears to be a sanction for the filing of a successful motion to stay a previous court order and the filing of a subsequent writ in the United States Court of Appeals for the Eighth Circuit – of which Ms. Blegen was the first listed counsel and primary author.

[10] Movant has a history of suicidal behavior including a near successful suicide attempt in June of 2012. Undersigned counsel are profoundly concerned about her current mental condition.

Both Ms. Nouri and Ms. Blegen accepted the District Court's cost containment measures issued last summer. No new resources have been sought from the District Court. Ms. Nouri has not submitted a CJA voucher since February of 2014 and Ms. Blegen has not submitted a voucher since December of 2013. The total combined vouchers submitted by Ms. Nouri and undersigned counsel to date, including withheld funds, are still over $180,000.00 below the cap set by the District Court. Counsel have made every effort to avoid duplication of effort and to work efficiently in this matter. The District Court made no finding that counsel have wasted federal dollars. In fact, in July, 2013, the District Court said, "I'm not accusing either one of you of being greedy. I don't think you're overbilling." (Attachment B, p. 22).

The cost containment of public funded representation cannot justify removal of counsel where no vouchers are pending and CJA counsel are well below the cap set by the District Court. Similarly, as removal of counsel will inevitably impede the progress of the case as other counsel have to assume Ms. Blegen's duties, "case management" considerations cannot justify removal either. Despite this, the District Court has issued a directive commanding Ms. Blegen to involuntarily remove herself from this case and enjoining her work. As the directive came on the first business day following the filing of a writ with the Eighth Circuit, it suggests that the removal of counsel is being used as a sanction.

### F. APPLICATION OF THE *BAUMAN* FACTORS MANDATE A FULL MERITS REVIEW.

This Court has cited the Ninth Circuit's opinion in *Bauman v. United States Dist. Court*, 557 F.2d 650 (9th Cir. 1977) as instructive in making a threshold determination as to whether a petition for writ of mandamus merits full-blown review. *In re Bieter Co.*, 16 F.3d 929, 932 (8th Cir. 1994). The *Bauman* factors are:

> (1) The party seeking the writ has no other adequate means, such as direct appeal, to attain the relief desired. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The District Court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Bauman*, 557 F.2d at 654–55 (citations omitted). Each of these factors will be discussed *seriatim* though it bears keeping in mind that not all five factors must be present to warrant review.

#### 1. Mrs. Montgomery has no other adequate means, such as direct appeal, to attain the relief desired and will be damaged or prejudiced in a way not correctable on appeal (Factors One and Two).

In a well-reasoned opinion, the Ninth Circuit explains that mandamus jurisdiction lies where counsel is wrongfully terminated from a case: "Absent mandamus relief, a counsel's wrongful disqualification, which cannot be immediately appealed, can cause great harm to a litigant." *Cole, supra*, 366 F.3d at 817. The opinion goes on to explain:

> We next address the second *Bauman* factor: whether petitioners will be damaged in a way not correctable through ordinary appeal. This factor is readily shown under the authority of *Christensen*, 844 F.2d at 697(holding that attorney disqualification satisfies the second *Bauman* factor). The damage in this case includes the petitioners' loss of a lead counsel who has been on the case for more than six years. And if Simoncini's knowledge could be gained by another counsel, **another attorney still may not gain the same quality of attorney-client relationship and rapport that Simoncini evidently had with petitioners.** Except for compelling reasons, such as necessary bar admissions, clients should be permitted to have the counsel of their choice. **A lost choice of counsel at trial cannot be remedied on direct appeal.** These same concerns were expressed in *Christensen. Id.* ("Theoretically, Christensen could appeal the disqualification of his counsel after trial. He could not, however, obtain the desired relief on direct appeal because he seeks to be represented by his chosen counsel *at trial*. Once a new attorney is brought in, the effect of the order is irreversible.").

*Cole v. U.S. Dist. Court For Dist. of Idaho*, 366 F.3d 813, 820 (9th Cir. 2004)(emphasis added).

While Mrs. Montgomery did not have the right to select a particular attorney when the District Court was appointing CJA counsel, she now has an established attorney-client relationship with Ms. Nouri and Ms. Blegen as well as with the attorneys from the Federal Public Defender's Office for the Middle District of Tennessee (*See* Attachment I). The District Court should not interfere with that established attorney-client relationship.

Furthermore, Mrs. Montgomery's current attorneys function as a team with each attorney taking on distinct responsibilities. Ms. Blegen's unique role is that of the primary legal research and writing attorney. Ms. Blegen spent over two years in

the criminal appellate division of the Missouri Attorney General's Office and ten years as a career federal law clerk. She specializes in legal research and writing. Mrs. Montgomery will suffer irreparable harm if Ms. Blegen is removed from her §2255 legal team.

The importance of having a skilled legal research and writing attorney in a §2255 case is underscored by the fact that the Government has recently added Phil Koppe to the Government's §2255 legal team. (Doc. #102, Entry of Appearance by Phil Koppe, 6/16/14). Mr. Koppe is an experienced legal research and writing attorney, who worked with Ms. Blegen in the Missouri Attorney General's Office.

**2. The District Court's Order is clearly erroneous (Factor Three).**

As discussed above, *supra*, pp.10-22, the District Court clearly erred by *sua sponte* ordering Ms. Blegen to remove herself from representation of Mrs. Montgomery without affording Ms. Blegen or Mrs. Montgomery due process. Enjoining Ms. Blegen from working on the case is a sanction that requires procedural due process. *Weissman v. Quail Lodge Inc.*, 179 F.3d 1194 (9th Cir. 1999) (attorney ordered to not file objection to class-action settlement was found to be a sanction that required notice and a hearing). The removal of appointed counsel who is the primary research and writing attorney on the team certainly appears to be a sanction. *See Belue v. Leventhal*, 640 F. 3d 567, 576 (9th Cir. 2011)(judge's comments hint at what drove him to disqualify counsel). Imposition of a sanction

against an attorney without notice or a hearing violates due process and is clear error.

In *Cole v. U.S. Dist. Court For Dist. of Idaho*, the Ninth Circuit addressed the clear error which occurs when an attorney is sanctioned by removal from a case without notice and process:

> The magistrate judge clearly erred by not affording procedural due process when imposing the sanction on Simoncini, who was not given notice that he might lose representation over his refusal to file an ordered affidavit, and was not given an opportunity to present argument. Ninth Circuit law does not permit a summary disqualification of counsel; **for the court to sanction an attorney, procedural due process requires notice and an opportunity to be heard.** *See Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir.2000) ("[A]n attorney subject to discipline is entitled to procedural due process, including notice and an opportunity to be heard.") (quoting *Weissman v. Quail Lodge Inc.*, 179 F.3d 1194, 1198 (9th Cir.1999)); *see also Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir.2001) ("We have held that due process requires that courts provide notice and an opportunity to be heard before imposing any kind of sanctions.") (internal quotation marks omitted). The disqualification of Simoncini and revocation of his *pro hac vice* status is, as the magistrate judge conceded, a sanction. *See also Martens*, 273 F.3d at 175 ("[R]evocation of *pro hac vice* status is a form of sanction that cannot be imposed without notice and an opportunity to be heard.").

*Cole v. U.S. Dist. Court For Dist. of Idaho*, 366 F.3d 813, 821 (9th Cir. 2004)(emphasis added).

Here, the District Court's orders purport that the removal of Ms. Blegen is purely ministerial, citing the need to "limit public-funded representation" (Doc.

#114, Attachment E) "as well as the overall management of this case by the Court." (Doc. #118, Attachment G). The record refutes both justifications.

Removal of Ms. Blegen will not control the cost of public funded representation, nor will it speed up the resolution of this case. If Ms. Blegen were to be removed, other (publically funded) counsel will have to assume Ms. Blegen's responsibility as primary drafter of the filings in this matter. *See* ft.nt. 9, *supra*. Likewise, if Ms. Blegen were to be removed, the case's progress through the court would be slowed as other counsel (who have pre-existing obligations) have to take on additional work.[11] The District Court's putative considerations of "case management" and limiting publically funded representation cannot logically account for the court's decision to remove counsel. This factor weighs in favor of granting the writ.

### 3. The District Court's error is an oft-repeated error, or manifests a persistent disregard for the federal rules (Factor Four).

As described earlier, there is a pattern in this case of removing counsel who displease the District Court Judge, but who have not committed misconduct or impeded the progress of the case on the court's docket (*see* ft.nt. 5; see also Doc.#32, setting forth several claims regarding the removal of counsel). This factor

[11] For instance, lead counsel, Ms. Nouri, has accepted appointment in other matters, based upon her assessment of her availability in light of having Ms. Blegen as co-counsel in this case. Ms. Henry and Ms. Harwell have recently accepted appointment in a capital §2254 in Tennessee in reliance on having two co-counsel in Mrs. Montgomery's case.

weighs in favor of this Court exercising its jurisdiction under the All Writs Act.

**4. The District Court's Order raises new and important problems, or issues of law of first impression (Factor Five).**

This District Court's Order sets a precedent that CJA counsel may be appointed and removed at the whim of the District Court without concern for the interests of justice. This violates the express purpose of §3599, ie., to ensure high quality representation in capital cases. As recognized in *Stearnes, supra*, "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Id*. at 223. *Stearnes* expressly held that "once an attorney is serving under a valid appointment by the District Court and an attorney-client relationship has been established, the District Court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)). If the District Court is permitted to remove Ms. Blegen in the name of cost containment where no vouchers are currently pending, no vouchers have been submitted in several months, and CJA counsel's total vouchers are well below the cap set by the District Court, it will undermine the public policy behind §3599:

qualified counsel will be reluctant to accept appointment in such cases and the quality of representation will falter.

It is in the public's best interest to allow Ms. Blegen to remain a member of Mrs. Montgomery's §2255 legal team rather than waste the investment that has been made in Ms. Blegen's services to date. Ms. Blegen is very familiar with the file in this case. In addition, as the primary author of the initial and amended §2255 motions, she is very familiar with Mrs. Montgomery's claims and the materials and legal authority supporting those claims.

It is not the number of attorneys assigned to a case that should concern the District Court, but rather the reasonableness of the total number of hours billed on the case.[12] Undersigned counsel have made a concerted effort to divide responsibilities and coordinate their efforts to efficiently present Mrs. Montgomery's claims to this District Court. It is in the public's interest for the team to remain intact to conclude the representation of Mrs. Montgomery before this District Court.

In reality the District Court's order frustrates the rights of the Government and Mrs. Montgomery because the removal of Ms. Blegen as counsel in the case will result in needless delay in the litigation of this case and interfere with the rights of other capital habeas petitioners represented by Ms. Henry and Ms.

[12] In this case, the District Court has already found that counsel is not overbilling (Attachment B, p.22, "I don't think you are overbilling.")

Harwell whose statutory right to counsel will be compromised by placing a further burden on the federal public defender in Nashville.

### F. INHERENT SUPERVISORY POWERS OF THE COURT

Even if the Court concludes that the issue presented here does not merit review under the *Bauman* factors, it should use its inherent supervisory power to order the District Court to withdraw its directive that Ms. Blegen remove herself from the case and enjoining her from further work on the case. *In Re: Kansas City Star*, 73 F.3d 191 (8th Cir. 1995)(exercising inherent supervisory authority to advise court to tailor its order where exercise of writ jurisdiction unwarranted because district court did not clearly err); *In Re: Jewell Williamson*, 786 F.2d 1336 (8th Cir. 1986)(court exercised supervisory powers to establish procedures for application of *in forma pauperis* status where writ was not warranted).

## IV. CONCLUSION

Accordingly, for the reasons stated above, petitioner Lisa Montgomery respectfully requests that this Court issue a writ of mandamus directing the District Court below to vacate his *sua sponte* Order commanding appointed counsel, Christine Blegen, to "conclude her representation of Lisa Montgomery," enjoining Ms. Blegen from "perform[ing] any further services on behalf of [Montgomery] other than as not able to be handled by co-counsel at this time;" and directing her to withdraw from the case "no later than July 28, 2014."

Respectfully submitted,

/s/ *Lisa G. Nouri*
LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Christine M. Blegen*
CHRISTINE M. BLEGEN, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
(816) 213-0384

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No. 38849
Supervisory Asst. Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER-CAPITAL HABEAS UNIT
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

/s/ *Amy D. Harwell*
Amy D. Harwell, Tn, Bar No. 18691
Asst. Federal Public Defender
OFFICE OF THE FEDERAL PUBLIC DEFENDER-CAPITAL HABEAS UNIT
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

*Attorneys for Movant Lisa Montgomery*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-8001-CV-SJ-GAF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**NOTICE CONCERNING BUDGET AND CJA REPRESENTATION FOR MOVANT**

Please be advised that a meeting has been scheduled for July 12, 2013, at 1:30 p.m., in chambers, on the record, with all counsel of record on behalf of Movant to discuss budget considerations specifically relating to fees for CJA counsel. I would like to discuss counsel's perspective on the number of attorneys necessary from this point forward to adequately represent Movant herein. Counsel for Respondent need not appear.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: June 28, 2013

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY, Movant, | ) | |
| vs. | ) | Case No. 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS

On July 12, 2013, the above-entitled cause came on before the Honorable Gary A. Fenner, United States District Judge, sitting in Kansas City.

APPEARANCES

For the Movant:

Ms. Lisa G. Nouri
Attorney at Law
2526 Holmes
Kansas City, Missouri 64108

Ms. Christine M. Blegen
Blegen Law Firm, LLC
230 Southwest Main Street
Suite 217
Lee's Summit, Missouri 64063

Ms. Kelley J. Henry
Office of the Federal Public Defender
810 Broadway Street
Suite 200
Nashville, Tennessee 37203

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

JULY 12, 2013

(The following proceedings were had in chambers:)

THE COURT: Well, I want to talk to you about the budget in this case and the amount of expenses that we're running up, which I think something needs to be done about the situation, and part of my perspective on it -- I mean, you know, not only just overall the amount of attorneys' fees and expenses in these kind of cases, but I've had two other cases where we've had 2255s on individuals who received the death penalty; Arboleda Ortiz and German Sinisterra.

Ortiz' motion was 38 pages; Sinisterra's motion was 58 pages. In Ortiz, through the notice of appeal in the case -- and there was no public defender representation. It was Kent Gipson and Jay DeHardt. The total attorneys' fees was $172,162 for the whole thing, as I said, up to the notice of appeal through trial and the 2255. Kent Gipson really carried the bulk of the load in that case and his total fee was $149,794

And in Sinisterra through trial of that case, and then Sinisterra died before I entered an order, but through the trial of that case -- and there was public defender representation in that case, John Jenab's total attorney's fee was $118,536.

MS. NOURI: When you say through the trial, you mean through the hearing they had in front of you?

THE COURT: Yes, through the hearing, through the trial on the 2255 motion. And Sinisterra lasted four or five days and I think Ortiz was three or four days.

At any rate, they were both big cases. I mean, any of these cases are big cases but they -- in Sinisterra and Ortiz they were both natives of the country of Colombia, and there was a lot of investigation that had to be done relating to all of that.

Right now in this case, and I know that there are some outstanding requests for fees and I want to talk to you all about this before I do anything on that, but right now -- and I see it as, you know, somewhat of a preliminary position in the case. I know a lot of work's been done to get to this point, but there's a lot of work that remains to be done in the case.

Fees approved and requests outstanding total $330,925, and particularly in light of the budget situation that we face and that the defender service faces, which the CJA funds are all a part of that, and I'm sure Ms. Henry is a lot closer to all of that than I am, but it's tough times in terms of -- you know, it's not a situation where we do not have difficulty getting funds budgeted in relation to the allocation of those funds.

Even if we didn't have budgetary problems, I'd still be concerned about where we're at in terms of the spending in

this case. But particularly in light of where we're at, I'm concerned about, and I feel that I have some responsibility to do something about it, certainly at least to address it. So I wanted to get you all together to talk about it and see what your thoughts and ideas might be.

I'll just throw out to you some of the things that have crossed my mind as potential ways to treat this. One would be assuming that Ms. Henry is qualified under the statute, which with the five years of practice before the Court, and I presume that you are since you were in the State system previously, one would be to just have her take over the case and for the two of you to no longer be involved in it. An alternative approach to it would be to leave one of the two of you, either Lisa or Christine, involved in the case; and if that was to take place, to in some fashion try to limit your involvement so that as much of the work as possible is shifted out of the CJA allocations and away from us having to incur those additional expenses when we've got a salaried public defender involved in it.

And I'll turn to you first, Lisa, to see what, if any, response you have to any of that and what your thoughts are about, one, whether or not this is an issue that needs to be addressed and, if so, how do we do it?

MS. NOURI: Well, I'm glad you had us in because I had been concerned because I think the last bills that

Christine and I had paid were from the beginning of February or end of January, and I had reached out to your staff a couple of times; but when asked should I inform the Judge, of course, I said, No, no thank you. Don't do that. I'll just patiently wait and see what happens. So I'm glad you had us in. I've been concerned about it. And I don't take it lightly. I know it's a lot of money and I know you've entrusted us with this.

But that being said, we've done a lot of work on this case. It is a huge case and we, the three of us, plus the fourth attorney actually, have all put countless hours into this doing different portions of the case. We don't try and double up the same work product.

But I don't know without -- I know those lawyers and I've even talked to a lot of those lawyers how much of it predated when they moved the fee up to 178 an hour. I can't tell you that without looking at those dates. So that is one tiny factor.

THE COURT: When did the fee go up to 178 an hour? I've forgotten.

MS. NOURI: I can't remember.

MS. HENRY: 2010 was the date.

THE COURT: 2010?

MS. NOURI: I've completely forgotten.

THE COURT: In Ortiz, and Ortiz is the oldest one, most of Ortiz was prior to 2010. Sinisterra was later than

that. I can't give you the exact dates in Sinisterra but I'm sure some of it overlapped.

MS. NOURI: Well, of course, because I know they had the hearing after that.

THE COURT: But even at that, I mean, it's like Ortiz was total -- and there was a lot of, you know, post-hearing activity in Ortiz as well and a lot of briefing and different issues that came up and there was some $20,000 worth of fees after the hearing on the motion; but, you know, still you throw another $100,000, you're still $60,000 below where we're at.

MS. NOURI: I understand.

THE COURT: And there was no public defender's assistance in that case.

MS. NOURI: Right. But you saw our motion. I'm not asking you to comment on that, but we put a lot of effort into that. We tried to get as much work as we possibly could done before the deadline because we were very concerned about making sure we raised every claim and not shoot ourselves in the foot, then being found ineffective later for not exploring every issue we could. But all I can tell you is the work that has been billed is legitimate and, frankly, it's, particularly with Christine because we've had these discussions, it's been underbilled. There's a lot of times that we haven't billed things.

But I don't want to say that, well, we can work less or not put the same amount of time in because that's just not true. We're getting up to that October 1st deadline and our position is that all three of us are extremely important to the case. Their office is funding the case. Furthermore, she has the ability to get these experts to take the phone calls that probably Christine and I don't have, but, I mean, I'm in on all the information. I know what's going on. I know what is in the file. I feel like both of us are equally important to the case. We both do completely different things and --

THE COURT: I just really don't see how I can do that, Lisa. I just really don't.

MS. NOURI: I understand what you're saying. I'll give you some cases and the statute and all that because I want to cover myself. I'm not trying to offend you. I do think that would be a mistake to remove one of us. For one thing, all the money either one of us have been paid to this point is almost sort of worthless because then the other one has to pick up the slack of whatever that person was working on.

We have many ongoing projects that we're working on that are different but are supportive of our amendment and then ongoing projects from there. I guess if you were really inclined to do that, before we get down that road, I had two thoughts. One is if you are really inclined to do that, I'd like to have a hearing, a real hearing before we did that

because we would bring an expert in to talk about that; and if that's going to offend you and you don't want to do that, that's fine. It just seems like it's going to be another issue that is going to be analyzed to death later.

And I know -- I know it's a lot of money. I know everybody's in a budget situation. Their office is. Everybody is. But I'm saying that the removal of any one of us is going to be detrimental to the client, going to be detrimental to the case. I would hate for you to take that step until you're really sure that that's what you want to do.

Another thought I had is why don't you wait until after the October 1st deadline that we have right now and then revisit that with us or we set it for hearing at that point.

THE COURT: Well, you know, I just -- to me it's kind of we're bleeding money here that we don't have, and the longer I put that off and the more time and effort we spend to contemplate that decision or the legitimacy of that decision the more we compound the problem, and I just -- I mean, I don't see how anybody can legitimately argue that you have to have four capable attorneys representing someone in this case. I don't see how you can convince me that that's a legitimate or a position that has merit to it. I mean, it's like -- you know, everybody's got a -- I mean, we could have ten attorneys and if you were Warren Buffett, you might choose to have ten attorneys represent you if that was your choice but that's not the world

we live in.

MS. NOURI: Right. But the U.S. attorneys have two attorneys. They have significant staff. They have D.C. backing them and helping them with all the documents that they file and it's trying to keep our playing field level also, Your Honor.

MS. HENRY: Your Honor, if I could just add a few things from the perspective of the PD's office, and I know the lawyers in Sinisterra very well. Actually, I'm sort of aware of that case and how it progressed and how they worked it up. I know that local counsel is familiar with John Jenab.

THE COURT: He was great too. That guy was -- I've forgotten his name.

MS. HENRY: Tim Gabrielsen.

THE COURT: He was a wonderful lawyer and just a pleasure to deal with.

MS. HENRY: He actually took my place when I left the Arizona PD, Leticia Marquez who helped him. I was on the committee that hired her in the Arizona PD. I know them very well. I know that they were in a position, the Arizona office, which I used to be in and am no longer, is a significantly different office than mine.

The 2255 project has approached my office for years asking us to take these cases and we have always resisted because we have told them that we don't -- we're not an

Arizona. We're not a Philadelphia. We're a small office. Every lawyer in my office has way beyond the maximum we're supposed to. I personally have 16 cases. I have a client who's facing an execution date in October. It was never our intention to come into this case and be lead counsel. We have always counted on Lisa and Christine to be the lead counsel with our office providing support.

Now, we did reduce what would have been billed by CJA counsel because at one point there were probably 20 people in my office working on this case to get to the March filing deadline, but they're not up to speed. They haven't read everything. There are over a hundred thousand pages of documents that came with the case. That's not counting the documents we've gotten since that time, and so I know that these numbers seem big and I think that we're all willing to sit down and come up with a budget, but I feel like this case would be seriously disrupted if we were to lose either Lisa or Christine. They each have an important role with the client. The client is close with them and wants them on the team and is happy with the team as it is currently constructed. And my --

THE COURT: I don't know. And, you know, I realize that the less I say the better.

MS. NOURI: Sure. I understand.

THE COURT: But it's not up to Lisa Montgomery. She's not paying the bills. I feel some responsibility to keep

it reasonable and to not just give you all a blank check to go out and spend as much money as can possibly be spent.

MS. NOURI: Well, we would be happy to submit a budget if that's what would help.

THE COURT: We're already at $330,000 so how much room do you have to budget in the case? I mean, you know, the trial of the case was -- I mean, you know, Fred's fee was close to 500,000 I think. What was it? 700,000 for the trial of the case or something?

MS. NOURI: I think it was more than that.

THE COURT: But in that ballpark. We're not retrying the case. I mean, we are in the sense that we are reviewing the trial proceeding but we're not starting from scratch.

MS. NOURI: I understand.

MS. HENRY: Nationally, Judge, those numbers are pretty low as far as what is typically spent on these types of cases. My husband's also a capital trial lawyer who accepts cases.

THE COURT: You know, Kelley, if you don't mind me calling you Kelley.

MS. HENRY: Please.

THE COURT: It's not California. We're not in California. We're not in New York.

MS. HENRY: I'm talking Tennessee.

THE COURT: In where?

MS. HENRY: Tennessee. Trials in these cases in Tennessee go for well over 2, 3 million dollars. I've seen these women work, and I can personally vouch for the fact that they would not overbill the court. I know that they are very conscious of being stewards of the court's money and we've been trying really hard to make sure that happens, but at the same time recognizing that Lisa and Christine are lead counsel. I think Tim Gabrielsen sort of came in and became lead counsel in Sinisterra, and I think he did a really good job and he is a great lawyer and great sense. I really respect Christine and Lisa's perspective on these things.

Like I said, with everything else, we're aware of the budget stuff. I've spoken with the Administrative Office of the courts and the defender services. They are aware of this case and they are aware of how expensive it is. They asked us to get involved for that reason, but I -- I think that they're also aware this is going to be part of the CJA appropriation next year as far as attorneys' fees and everything. They know that. There's a special fund for these sorts of cases, and I think that Lisa and Christine, we could all sit down and talk about how to minimize their expenses going forward and ways that my office could help, but I don't want to sit here today and tell you my office can absorb their work.

We're not the primary authors of anything. They're the ones that do the writing. Lisa knows every document in this case and is the one when we're going through the motion that says, Okay, wait a minute. You've put this fact down right here. Show me that document. I want to make sure that we can prove it. She's there on everything. She has the relationship with the client's family. I've never met the client's family. Neither has my cocounsel, Ms. Harwell. We don't have those relationships so we would be starting over again.

There is no way I can meet an October 1st deadline. I've already broached that with Christine and Lisa and they said, No, we're going to meet the deadline. I can't, not with a client with an execution date. I simply can't. And it was never ever our intention to come in and take this case. We're not Philly. We're not Arizona.

Obviously, Your Honor, I will do what I have to do to represent our client, and I think that --

THE COURT: You're not the public defender that called me before counsel was appointed in the case and sought appointment?

MS. HENRY: No, sir.

MS. BLEGEN: No, Your Honor. That wasn't their office.

THE COURT: Do you know who that was?

MS. BLEGEN: That was Ruth Friedman out of Washington, D.C. and Fred sought to have her appointed. And, Judge, if I might, just to draw a comparison, Lisa Montgomery is one of two women on death row right now in the federal system. The other one is Angela Johnson. Her case is pending in Iowa right now. She originally had a team of three CJA-appointed attorneys. The judge in Iowa ended up throwing them off the case for ineffectiveness, and her current CJA team is comprised of six appointed attorneys who filed a motion very similar in length to ours and who were ultimately awarded a hearing, and they started the hearing, I believe, set for a couple of days and as the judge heard evidence, he kept granting them more hearing days and more hearing days.

THE COURT: I'm a little bit familiar with that case, and I know some local attorneys who were involved and I know the judge who was involved. I mean, everybody's different. And everybody looks at things differently. And I'm telling you how I'm looking at this and it is troubling to me the amount of money that we're spending in this case, and I don't see the entitlement to that kind of representation in the case, and I know that there are a lot of issues that you raised and that the mental health questions are ones that are complex and difficult and expensive to pursue, and I understand and accept all of that, but I have real difficulty in approving these kinds of expenses in the case. And, as I said, it would

be troubling to me regardless, but it's particularly troubling to me when the public defender's budget's losing $100 million and, you know, 90 percent of the money is to fix costs, then the rest of it is to include the CJA fees and all the other miscellaneous items that have to be spent, and it's like I just don't know how we can do that.

My inclination right now is just in this brief talk to you -- and I'm not saying what I'm going to do. I'm just talking. I'm talking to you all so that I can get your input and that hopefully, recognizing my concerns, we can all come to some way to deal with this.

Hearing Ms. Henry tell me that she can't take it on, I would not be inclined to direct her to do that. That's not my inclination right now. But I just -- I don't see how I can justify spending half a million dollars on a 2255 case for CJA attorneys, and we're going to be there before we turn around. We're already at 331,000.

MS. NOURI: That's probably true. But, nonetheless, we still have to keep working, Your Honor, and we continue to work, particularly with our deadline looming. We've had an expert with the client -- it was Thursday. That was yesterday. I had an expert in here Monday and Tuesday meeting with another witness. We're working a lot on this case right now, and we kind of let things die down in June. We all took a little bit of a break, and we anticipate August -- our thought was,

because I actually opened an office right next to hers to make it easier to not waste time, maybe 20 hours a week in August and maybe 30 in September, and it might be 20 to 30 and 30 to 40. We don't know until we get some of our reports back where things stand, but we're trying to do everything we can to not waste money. I'm very conscious of that. I am a tightwad myself so I don't like to waste other people's money either, but I'm also conscious of I know what all these national people talk about. I follow it religiously now. I know Lisa Montgomery right now is really the only female on death row. All these people are interested in our case, and I want to make sure our work product is up to snuff with what these people are looking at, and that's the methodology we've been using and that's how we intend to keep proceeding.

I have a lot of documents that I was going to have marked as exhibits if we're going to get to that point and it sounds like we're not at that point.

THE COURT: Get to what point, Lisa?

MS. NOURI: Where you're going to say today what you are going to do. You're not going to do that. I can tell. And that's fine.

THE COURT: You know, I wouldn't necessarily go there. I mean, I don't think I probably am but that doesn't mean that we're necessarily going to meet again or that you will get your hearing or whatever, because I may, you know,

think about it. I may say, You know, let's have a telephone conference a week from now or whatever to see what you come up with. I don't know.

MS. NOURI: Right.

THE COURT: And I may -- I don't know what I'm going to do. I feel I need to do something and I am going to do something. I don't know for sure what it is going to be. I feel I need to do something to exercise some cost controls in this case.

MS. NOURI: I understand. Again, if you want a specific budget between her and I, we will do that if that's going to make your thought process easier.

I'm going to go ahead, then, and let the judge have these documents in case he makes a decision and we don't ever get to talk again. I don't have any of this marked but I'm going to tell you what it is. The first document is a letter from Lisa Montgomery. The second one is the transcript of the May 6th proceedings that are Doc 53 in the civil case. The next one is Doc 11 in the civil case. That's the ex parte motion where we had filed our initial budget then the alternative asked for the Nashville Federal Public Defender. The next one is the ex parte order appointing Ms. Henry's office. That's Doc 13 in the civil case. The next one is -- it's written over but it was in the criminal and civil case. I can't see the exact number, but that's the actual order that

appointed Christine Blegen and myself. The next document in the criminal case is Document 431, which is the motion filed to set the billing procedure and compensation limits. And then the next document is 433, the order in the criminal case approving that motion.

Then there's three specific cases, Your Honor; the Martinez v. Ryan case, the U.S. v. Gonzalez-Lopez case. But here's the real important case we would really like you to take a look at, Your Honor, Martel v. Clair. It was decided in 2012 by the Supreme Court. And on page 6 under the Roman Numeral II heading, it talks about the statute 18 U.S.C. 3599 and all about the attorneys on habeas cases. So I think this is probably something worth you also considering looking at, Your Honor, before you make a decision.

Mainly it gets down to we all have relationships with the client. They're different types of relationships. It would probably set her back mental health wise significantly to lose either Christine or myself; and with regard to different experts or different witnesses or different family members, it would just severely impair what we're trying to do for Mrs. Montgomery.

Furthermore, let's be frank about it, Christine Blegen is the premier writer and she is incredible, and it would be devastating to lose her from the case, Your Honor.

We will do a budget. You do what you need to do or

decide what you need to decide but we are willing to submit something to you; and if you don't like it, please speak to us or let us know.

MS. BLEGEN: Judge, I'd also ask that we provide you -- I don't know if you want to mark this as an exhibit or not. We compiled a list of the pending 2255 cases in the Eighth Circuit for the last several years, and I think it demonstrates that it is not at all unusual to have two CJA attorneys working with the Federal Defender Office. So if you would like to have that for your review as well, we can provide a copy to you.

MS. HENRY: One more thing. I think I was not very articulate before, Your Honor, when I was talking about the fees in this case and how they would compare because $330,000, of course, sounds like a lot of -- to any of us it sounds like a lot, but I guess my point was that it would have been so much more if we hadn't worked together as a team and worked the case up as we did, and so you can't sort of look at them in comparison to Ortiz or Sinisterra. I mean, I looked at the Sinisterra petition and thought there's so much more that should have been done here. I looked at the Ortiz petition and thought there's so much more that should have been done here.

This case is -- it is huge. I have done, I tried to count up this morning, more than two dozen capital habeas cases since I started doing capital habeas work solely in 1997. This

is the biggest case I've ever worked on, and I've worked on some really big cases. I've worked on high-profile cases. I have a client now, probably my closest analogy to this, where he has seven death sentences and he's got part of his temporal lobe missing, and his case isn't as big as this case.

So though the numbers seem high, Lisa and Christine were good lawyers who came to the court and said, Hey, these numbers are high. We need a lot of money so we need the help of the federal defender to keep the numbers down because if they wanted to be selfish about it, they could have said, Wow, look at this and their bills would have been five times as much to try to meet that filing deadline. So we really have tried to keep the cost down as much as we can.

I'm somewhat familiar with the process of getting cases declared as mega cases if that's what needs to happen here. I can certainly help Christine and Lisa do that so the Eighth Circuit can have -- I don't know if the Eighth Circuit has a budget analyst or the Sixth Circuit does, but there we have a budget analyst where private attorneys submit something. It gets all approved and that sort of thing. We could do all those things.

I think it's important for the record to also reflect that there's no lawyer here who wants out of the case and the client doesn't want anyone out of the case; and as I read the appointment statute, once counsel's appointed, that's

really the only way for counsel to be out of the case is if a lawyer asked for it or if the client asked for it and that's not the situation we have here.

We have a committed team of people who are doing their very best to bring to you Mrs. Montgomery's claims, and it is unfortunate these capital cases cost as much but they just do; and if we had the opportunity, we would bring in -- this was set for a meeting, which we talked about should we bring in witnesses today because I could have asked Ruth Friedman, who is the head of the 2255 project to come in bringing the numbers. She won't give us the numbers. We asked. All these budgets are under seal. But we could have asked her to come under a subpoena and give you a cost comparison, not of what happens in California or New York. I understand that's different. But what's happening in the Eighth Circuit, what's happening in the Second Circuit, Third Circuit. These cases grow. They don't shrink. That's the trend.

And so believe me, my office is dealing with it. I'm on furlough today. We've had 20 days of furlough. I personally have lost salary over the last few months. So I get it personally.

THE COURT: It's going to get tougher.

MS. HENRY: And it is but that's something, you know, I'm prepared to shoulder. I know that Lisa and Christine

are prepared to give you a reasonable budget. I just think that -- and in the long run if one of them has to step in and do the other's work, the money is still going to get spent. Like they said, they're not doing the same thing. Lisa has on her task declarations that she's working with our two standard of care experts to get those prepared by October 1st. Christine's writing motions. I'm doing things. Amy Harwell's doing other things. We're trying to put a lot of work into our office, but we couldn't lose those two. It would just be awful.

THE COURT: I get all of that. I'm not accusing either one of you of being greedy. I don't think you're greedy. I don't think you're overbilling. I'm talking about cost controls in a case that I believe that the costs need to be dealt with, and I'm looking for a way to do that and, you know, I don't want to get to a point where I say, I don't think you should have done this or I don't think you should have done that, this doesn't have any merit, that doesn't have any merit. I took some fees out of the Ortiz case because I found that was the case, not much, 5 or $6,000 but, I mean, percentage wise if I did that here, but that's always an option that I could exercise, and I do think that probably -- I mean, to some extent sometimes the more time people have to spend, the more time they spend and the less time they have to spend the more efficient they are in terms of what they have to do and what

they have to get done.

And, quite frankly, you know, it would not -- well, I would be surprised if either one of you, all other considerations to the side, if you had the opportunity to get out of it, you'd probably just as soon get out of it right now because I'm sure that it's burdensome on you all in terms of the amount of time and the issues that you have to deal with; but, you know, I know you are not asking that and I know that you want to stay in.

You can give me a budget. I just -- I'm going to be real surprised if you can come up with a budget that I'm going to think works. Maybe so. You all know more about what you're doing and the issues you're dealing with.

You know, at this point I don't see this case as all that overwhelmingly all that complex than any of the death penalty cases that I've had. You know, they're all hard. They're all tough. They've all got mental issues in them and difficulties with witnesses and clients and family members. You know, they're just -- they're not good situations. None of them are.

MS. BLEGEN: May I speak briefly to that? One thing I think is interesting in this case, as you know, we've raised a claim related to it, there's a lot of changeover in the counsel in this case, and I know when Lisa and I first got in, a large part of time at the outset of the case last summer was

spent simply getting the file in this case. Because of the nature in which the attorneys operated with the Federal Public Defender's Office and Mr. Duchardt and Mr. O'Connor, we essentially had files from three separate law firms together and to go through and to see and sort out what different people did in the case. So there was an overwhelming amount of documentation and evidence to go through and just to sort out what was there, and I think in that regard it was a little complicated, and then just getting into the actual issues in the case and trying to develop the support for them.

THE COURT: Well, let me look at what you're giving me there. Is there anything in particular other than the Supreme Court case, the Martel case, is there anything about any of the rest of the documents that you gave me, Lisa, that --

MS. NOURI: I think essentially what the Martel case says in a nutshell is what Kelley had just said, that unless the attorney is asking to get out or get rid of someone or the client is, then that should not happen. That's how we read that case, Your Honor, and we're not asking to get out and we know the client doesn't want to lose any of us.

I appreciate your position. I understand that the budget is always an overriding consideration. But we have to do the work. We have to represent the client. We have to just keep proceeding with working on our case, and that's what we

just keep doing, Your Honor. These other documents are just showing the order of the appointments, et cetera.

MS. HENRY: I think it's also interesting about the Martel vs. Clair case is that it talks about Congress' intent with respect to the appointment of counsel in habeas cases, in capital habeas cases, and the Supreme Court sort of reaffirms that Congress intended for the lawyers in the capital postconviction cases, and Martel vs. Clair is a 2254, but it's equally applicable to the 2255, probably more so really, is that they wanted to have high quality counsel, and they talk about expenses in Martel vs. Clair and they talk about how Congress knew that there were more expenses with these capital cases. So I feel like that is particularly on point.

Martinez vs. Ryan is another case that I think Your Honor --

THE COURT: I've already read that and I don't find it controlling on this.

MS. HENRY: Well, I guess the point maybe that I would like to make about that, Your Honor, is that the law has not fully developed in the area of 2255s, and so if we're looking on down the road to people coming back and challenging the representation that Mrs. Montgomery got at this proceeding, there are many people in the capital defense community who believe that Martinez vs. Ryan is going to provide a remedy, so it is important that Mrs. Montgomery get this first opportunity

to attack her assistance of counsel at trial in this proceeding because there could be people on down the road who could say that interference with counsel at this point gives her yet another motion.

THE COURT: I understand.

MS. HENRY: So we feel like that is also relevant.

THE COURT: All right. I mean, I have real reservations that a budget is going to resolve things for me, but why don't the two of you put together a bare bones proposition. And how long do you want to do that?

MS. NOURI: You tell me.

MS. BLEGEN: Judge, we can have it done by Monday. We'll provide it to your chambers on Monday.

THE COURT: Okay. Well, let's say Wednesday of next week. I mean Monday's fine. I mean, I'm not looking for you to work all weekend on it or anything.

MS. BLEGEN: I wasn't planning to, Judge.

THE COURT: Wednesday of next week.

MS. BLEGEN: We'll provide it as soon as we have it ready.

THE COURT: And then, you know, I'll look at what you gave me and I'll see what you submit and if I have more questions or concerns that I want to discuss with you, then I'll probably just do a telephone conference with everybody and see where we go from there.

But, I mean, and I know Ms. Henry doesn't know me but you all do and, you know, it's not an issue that's going to go away for me. It's not going away. And I understand that, you know, that I could be cited with examples of what Judge Bennett's done in Iowa or this and that, but Judge Bennett is not me and he may see his responsibilities differently than I do. And you in comparing cases and how judges handle their cases and how they see their responsibility, there are a lot of differences in a lot of that and I feel a responsibility to control the costs in this case. So tell me what we can do.

MS. NOURI: We will try, Your Honor.

MS. BLEGEN: Judge, I know we did this on the record and we provided some exhibits. I assume since this has to do with defense budgeting that this would be kept under seal from the government should we ever need the transcript?

THE COURT: Yeah, I can do that. I don't see any big advantage to the government to know what we're talking about but that's fine. They're not here so they understand it's not their situation.

Anything else?

MS. NOURI: Oh, boy. Let me double-check. I think we've covered it. I just really am more concerned about the impact on one or the other of us, Your Honor, and how that's going to play out with the representation of Mrs. Montgomery.

THE COURT: I understand your concern. It's not a

perfect world and everybody doesn't always get what they want.

MS. NOURI: You know I respect you. I've known you a long time and I know this is a priority --

THE COURT: And I appreciate that.

MS. NOURI: -- with everyone in the building. It's a very, very stressful time for everybody right now, and it's just not going to improve in the next year I don't think. I don't know if it will ever improve.

THE COURT: Yeah, it's not real hopeful, quite frankly. I mean, the projections I've seen for next year, you know, particularly with the federal defender service are like losing a third of staff.

MS. HENRY: I should say, though, that for me, looking at it with the potential of losing a third of staff, which I hope is not going to come to pass, I guess we'll find out on August 15th when the judicial conference meets. I know that they're reconsidering all of that. But removing one, Lisa or Christine, would make it even harder on us; and, like I said, but for the fact that this was a woman and I had some high-profile cases and it was Missouri and so I felt an affinity for my hometown. Ms. Harwell in my case has actually had a couple of clients with pseudocyesis so we felt like, okay, fine, we'll take this case.

It has been wonderful working with these lawyers who are just the utmost professionals. I don't know what Ruth told

you when she called you and talked about taking these cases, but I know that there was some concern about the lawyers not having death penalty cases. I can tell you that Christine and Lisa have been the utmost professionals, and it would just be devastating to the case, and I don't know what my office would do if we had to shoulder this. I mean, I could have a mutiny with my staff because of us going out of district and we've got all of our own clients and Tennessee looking to try to execute six people next year.

So I know it's hard on everybody. There could be other creative ways once we have some deadlines for amendments; but after that, there's going to be a period of not a lot of activity going on unless and until there's an evidentiary hearing, so expenses in this case could be sort of drawn out for a period of time where there will be some inactivity. I mean, these cases have times when there's a lot going on and times when there's not a lot going on. March there was a lot going on, but I don't think we're ever going to have a period of activity like we had in March again until we get ready for a hearing if the Court were to grant one. I appreciate the opportunity to have worked with these ladies.

MS. NOURI: Thank you, Judge.

MS. BLEGEN: Thank you.

THE COURT: Thank you.

(Adjournment)

REPORTER'S CERTIFICATE

I, Katherine A. Calvert, Registered Merit Reporter, hereby certify that I am a duly appointed, qualified, and acting official court reporter for the Western District of Missouri; that on July 12, 2013, I was present and reported all of the proceedings in LISA M. MONTGOMERY, Movant, vs. UNITED STATES OF AMERICA, Respondent, No. 12-CV-08001-GAF.

________________________________, RMR
Registered Merit Reporter

Dated this 18th day of September, 2013.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| *Defendant/Movant,* | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-8001-SJ-GAF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff/Respondent.* | ) | |

LISA MONTGOMERY BUDGET MEMORANDUM

I. Background

As this Court is aware, Lisa Nouri and Christine Blegen were appointed to represent Mrs. Montgomery in this 2255 proceeding (Case No. 05-6002-CR-SJ-GAF, Doc. #430). A motion was filed to set billing procedures and authorize interim payments for counsel (Case No. 05-6002, Doc. #431). This motion was approved. Counsel inquired as to whether a case budget should be submitted and that offer was declined by the Court. Both Ms. Nouri and Ms. Blegen submitted several interim vouchers in this matter. All of the vouchers submitted prior to the filing of Mrs. Montgomery's 2255 Motion were paid in full and without delay. At no time did the Court contact either Ms. Nouri or Ms. Blegen prior to the filing of the 2255 Motion and question the amount of time being spent on Mrs. Montgomery's case.

In late March and/or early April, both Ms. Nouri and Ms. Blegen submitted vouchers for the approximately six weeks leading up to the filing of the 2255 motion. Certainly these vouchers were larger than ones previously submitted as significant work was put into the filing of a quality motion that raised all of Mrs. Montgomery's potential 2255 claims. The vouchers that were

submitted in late March and/or early April remain unpaid. Similarly, vouchers submitted by both attorneys at the end of May and/or early June remain unpaid.

Between the time the pending unpaid vouchers were submitted and June 28, 2013, no request was made of counsel to discuss the pending vouchers or a case budget. Instead, on June 28, 2013, a notice was issued that all counsel of record for Mrs. Montgomery were to appear in chambers on Friday, July 12, 2013, for a meeting "to discuss budget considerations specifically relating to fees for CJA counsel." (Case No. 12-8001-CV-SJ-GAF, Doc. #60). The Notice indicated that the Court wished to discuss the "number of attorneys necessary from this point forward to adequately represent Movant herein." (Doc. #60).

During the meeting on July 12, 2013, the Court initially suggested the idea of removing both Ms. Nouri and Ms. Blegen and having the Office of the Federal Public Defender for the Middle District of Tennessee's Habeas Unit take over the entirety of Mrs. Montgomery's representation. Upon being informed by Ms. Henry that this was not a feasible option for her office in light of her caseload and budget issues within her office, the Court indicted that the alternative step would be to remove one of Mrs. Montgomery's CJA-appointed attorneys, either Ms. Nouri or Ms. Blegen.

While the Court initially proposed removing both of Mrs. Montgomery's local attorneys on July 12, 2013, during the proceedings on May 11, 2013, both Judge Maughmer and this Court emphasized the preference that exists within the Western District of Missouri for having cases handled by local counsel. In fact, when Fred Duchardt initially moved to appoint 2255 counsel he suggested Ruth Friedman, the Director of the Federal Capital Habeas Project at the Office of the Federal Public Defender for the District of Maryland, Southern Division. Ms. Friedman and her office were willing to accept appointment, and this option would have cost the Court nothing

in CJA funds. Yet, the Court opted to appoint two local attorneys and informed Ms. Friedman of the preference for having local attorneys handle cases within this District.

During the meeting on July 12, 2013, the Court acknowledged that he believes the work billed for has been performed and has been legitimate work. All counsel for Mrs. Montgomery agree with this assessment. As a result, the Court's proposed *sua sponte* action of removing one of Mrs. Montgomery's CJA attorneys is both drastic and unprecedented, particularly with a pending deadline of October 1, 2013 to file an Amended 2255 Motion on behalf of Mrs. Montgomery.

It should be noted that a significant amount of work was performed by all counsel in order to file a thorough and nearly complete 2255 Motion on behalf of Mrs. Montgomery in March of 2013. Counsel have been consistently mindful of budget considerations and have sought to minimize costs to the Court wherever possible. At the same time, counsel have been aware of the Court's explicit instruction that local counsel were to remain lead counsel in this matter and have acted as such. Limited mitigation work is currently being performed to develop additional support for certain claims. In addition, expert evaluations have been taking place this summer. Neither of these matters has required a great deal of local attorney time in June or July.

It is anticipated that in August and September Ms. Nouri will be working with experts to obtain declarations in further support of Mrs. Montgomery's 2255 motion. As expert reports and declarations are obtained, Ms. Blegen will be revising and finalizing Mrs. Montgomery's Amended 2255 motion. Certainly all of Mrs. Montgomery's attorneys are involved in each part of this case; however, in light of the concerns expressed by the Court on July 12, all counsel are committed to efficiently and diligently working to file Mrs. Montgomery's Amended 2255 Motion by the October 1, 2013 amendment deadline.

The current team believes that all of the present attorneys are necessary "to adequately represent Movant herein" both historically and as we move forward with this case. Each attorney has developed a relationship with Mrs. Montgomery and each plays a unique role on the team representing Mrs. Montgomery in this matter. Furthermore, removing an attorney at this stage seems like a huge waste of the resources already invested as the defense team would lose the knowledge said attorney has already gained through participation in this case. Such a disruption in the defense team would be detrimental to Mrs. Montgomery's case as it moves forward.

II. Legal Analysis

Pursuant to 18 U.S.C. §3599 (a)(2), Mrs. Montgomery was entitled to the appointment of one or more attorneys. This Court appointed Ms. Nouri and Ms. Blegen. Then, the Office of the Federal Public Defender for the Middle District of Tennessee was appointed to assist with the mitigation investigation in this case (Case No. 12-8001-CV-SJ-GAF, Doc. #13). Two attorneys from that office, Kelley Henry and Amy Harwell, have become actively involved in this case, particularly with respect to the mitigation investigation and coordinating expert services in support of Mrs. Montgomery's 2255 claims; however, due to sequestration, Ms. Henry and Ms. Harwell are currently on furlough each Friday. In addition, both Ms. Henry and Ms. Harwell have numerous other cases for which they are responsible in their own District.

Moreover, 18 U.S.C. §3599(e) states:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, ***each attorney so appointed <u>shall</u> represent the defendant throughout every subsequent stage of available judicial proceedings,*** including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and ***all available post-conviction process***, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(Emphasis added). As no attorney has moved to withdraw and Mrs. Montgomery has not moved to have any of her attorneys removed, the attorneys for movant respectfully submit that Section 3599(e) does not permit *sua sponte* removal of one or more of Mrs. Montgomery's attorneys due to budgetary concerns.

As noted above and recognized by the Court, appointed counsel for Mrs. Montgomery have been diligently working on Mrs. Montgomery's claims. At no time prior to July 12, 2013 had the Court raised any concern about the time counsel was spending on this case. Upon bringing this matter to counsel's attention for the first time, the Court's proposed remedy was to remove one of Mrs. Montgomery's attorneys. When counsel advised the Court that they would be more than willing to submit a proposed case budget, the Court agreed to review such a budget, but stated on the record that he was doubtful any proposed budget would alleviate his concern about the effort being expended on Mrs. Montgomery's behalf.

The Court's recent and unexpected change in approach to the budget in this case is perplexing. The Court apprised counsel of its concern for the first time on July 12, 2013, after fifteen months of work on the case, and it seems that the only solution the Court deems acceptable is removing one of Mrs. Montgomery's CJA-appointed attorneys. It is unclear how this will save any funds as the pending investigation and expert reports will still need to be completed and the remaining counsel will need to incorporate those materials into an amended 2255 motion to be filed by October 1, 2013. Whether the hours necessary for the submission of the filing are performed by Ms. Nouri or Ms. Blegen or split between them does not change the work required for the adequate representation of Mrs. Montgomery in this case.

Moreover, the attorneys representing Mrs. Montgomery submit that *Stearnes v. Clinton*, 780 S.W.2d 216 (Tx. Ct. App. 1989) prevents the Court from removing any of Mrs.

Montgomery's attorneys. In *Stearnes*, the Court held that "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Id*. at 223. *Stearnes* expressly acknowledges that while "an indigent defendant does not have the right to the appointment of a particular attorney," "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)). Both of Mrs. Montgomery's attorneys hereby object to removal and have filed a declaration with the Court from Mrs. Montgomery voicing her strong objection to the removal of any of her attorneys.

The Court in *Stearnes* further recognized that once an attorney has been appointed and an attorney-client relationship has been established, it should be protected. *Id.* at 222. "Once counsel has been validly appointed to represent an indigent defendant and the parties enter into an attorney-client relationship it is no less inviolate than if counsel is retained." *Id.* at 221-222. No distinction should be made between retained and appointed counsel "because the 'attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service.'" *Id.* (quoting *Smith v. Superior Court of Los Angeles*, 68 Cal. Rptr. 1, 10, 440 P.2d 65, 74 (1968)).

In this case, the Court has not suggested that any of Mrs. Montgomery's attorneys have done anything wrong in representing Mrs. Montgomery. The Court's concern is premised solely on the fees accruing for said representation. Yet in *Martel v. Clair*, 132 S.Ct. 1276 (2012) the

United States Supreme Court recognized that 18 U.S.C. §3599 (d) "grants federal capital defendants and capital habeas petitioners enhanced rights of representation, in light of what it calls 'the seriousness of the possible penalty and . . . the unique and complex nature of the litigation.'" *Id*. at 1284-1285. *Martel* states that "habeas petitioners facing execution now receive counsel as a matter of right, not an exercise of the court's discretion." *Id.* at 1285. The United States Supreme Court noted that §3599 reflects "'a determination that quality legal representation is necessary' in all capital proceedings to foster 'fundamental fairness in the imposition of the death penalty.'" *Id*. (quoting *McFarland v. Scott*, 512 U.S. 849, at 855, 859 (1994)). *Martel* explains that Congress intended to expend substantial funding in the area of capital representation as a means of attracting qualified counsel to accept representation in these complex matters. Undersigned counsel have endeavored to provide Mrs. Montgomery with quality legal representation in this 2255 proceeding as reflected by the initial motion and supporting exhibits filed in March.

Finally, as counsel noted to the Court during the meeting on July 12, 2013, *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) suggests that Mrs. Montgomery is entitled to effective assistance of counsel during her Section 2255 proceedings. Based upon *Martinez*, the effectiveness of Mrs. Montgomery's 2255 attorneys may be examined at some point in the future. Disrupting Mrs. Montgomery's current legal team could form the basis of a future claim that Mrs. Montgomery received ineffective assistance of counsel in this proceeding.

III. <u>Comparison to Other Cases</u>

In the July 12, 2013 hearing, the Court referenced both the Arboleda Ortiz and German Sinisterra cases and informed counsel of the total CJA fees billed in each case. On Monday, July 15, 2013, the Court issued a "Memo to Movant's Counsel" explaining that the docket sheet entries in each

of these cases do not reflect the actual involvement of counsel. Unfortunately, undersigned counsel are at a disadvantage in responding to the Court's assessment of those records or in performing any additional analysis as the billing records in those cases are under seal and unavailable to counsel. The Court's reliance on facts known only to the Court and outside the record of this case is a violation of Mrs. Montgomery's rights to due process. *See Gardner v. Florida*, 430 U.S. 349 (1977).

A. Arboleda Ortiz – *Case No. 04-8001-CV-GAF*

Undersigned counsel concede that the only knowledge they have of this case is what may be gleaned from the Court's docket sheet. Many documents are filed *ex parte* or otherwise under seal and there is no way of knowing from the Court's docket sheet how much time each attorney spent working on this particular case.

The docket sheet shows that two local CJA attorneys were appointed: Jay DeHardt and Kent Gipson. They filed an initial 2255 Motion on behalf of Mr. Ortiz on December 7, 2004 (Doc. #30). This initial motion is 20 pages in length. A First Amended Motion was filed on August 8, 2005 (Doc. #43). This document is 38 pages in length. Finally, on May 8, 2006, a Second Amended Motion was filed (Doc. #54). This document was an additional 10 pages adding one claim.

As the Court has pointed out to undersigned counsel, one cannot tell from a docket sheet exactly what was done in the case or how many hours each attorney worked on the case. It is unclear what size file the attorneys had to review, how much investigation the attorneys in the Ortiz case conducted, or how many experts they retained. It appears they did retain at least one expert who filed a report. There was three-day hearing in Ortiz. Beyond that docket sheet information, undersigned counsel know nothing about how this case was handled.

It is accurate that the Eastern District of Pennsylvania Federal Community Defender's Office became involved at the appellate stage; however, since the involvement of that office, both of the local CJA attorneys have remained active in the case.

B. <u>German Sinisterra – *Case No. 04-8003-CV-GAF*</u>

Mr. Sinisterra initially had two appointed CJA attorneys, John Jenab and William Shull. The Court has now informed undersigned counsel in his "Memo to Movant's Counsel" that Mr. Shull was "only briefly involved in the case" and "did not seek compensation for his minimal participation." Again, undersigned counsel had no way of knowing the extent to which Mr. Shull participated or why he had only "minimal involvement." Undersigned counsel are aware that Mr. Jenab had limited contact with his client and limited funds for a mitigation investigation prior to the filing of his initial 2255 motion on behalf of Mr. Sinisterra. The initial 2255 motion was filed on December 7, 2004 and was 48 pages in length (Doc. #11). Approximately fifteen months later, an amended 2255 motion was filed (Doc. #41). This amended motion was 57 pages in length.

Prior to an appeal, Mr. Sinisterra was not granted a hearing on his 2255 motion. While the case was pending on appeal, the office of the Arizona Federal Public Defender entered the case. Upon information and belief, after the entry of the office of the Arizona Federal Public Defender, Tim Gabrielson from that office took on a leading role in the case. While Mr. Jenab remained involved and invested in the case, a significant amount of work was performed by Mr. Gabrielson and members of his office.

Again, undersigned counsel have no way of knowing exactly what was done in the Sinisterra case in terms of file review, mitigation investigation, and retention of experts by local CJA counsel or how many hours each attorney worked on the case.

C. Lisa Montgomery

Undersigned counsel mean no disrespect to the local attorneys mentioned above who handled these difficult 2255 cases; however, both Lisa Nouri and Christine Blegen, working in conjunction with Kelley Henry, Amy Harwell, and the staff at the Office of the Federal Public Defender for the Middle District of Tennessee have produced a significantly different 2255 motion in this case than those filed in either the Ortiz or Sinisterra cases. Mindful of the requirement that *all* of Mrs. Montgomery's claims had to be raised in her initial 2255 motion, and with a budget specifically authorized by the Administrative Office of the United States Courts, the attorneys in this case were able to hire mitigation specialists, utilize investigators, and retain experts prior to filing the initial 2255 motion. The coordination of this type of team effort and the production of the resulting 230-page initial motion with its supporting declarations and exhibits differs greatly from the approach taken in either Ortiz or Sinisterra at the initial district court stage as best undersigned counsel can determine from reviewing the Court's docket sheet and the motions filed.

In addition, Mrs. Montgomery's case was complicated by the number of attorneys who worked on her case at the trial level. As the Court is aware, the primary issue in a 2255 motion is a determination of whether or not Mrs. Montgomery received effective assistance of counsel at the trial and appellate levels. Thus, undersigned counsel had to obtain the files from (1) Anita Burns; (2) Susan Hunt; (3) David Owen; (4) Judy Clarke; (5) Fred Duchardt; (6) John O'Connor; (7) Larry Pace; and (8) John Gromowsky. After initially being led to believe that the complete trial file had been stored at the Office of the Federal Public Defender at the conclusion of the trial, undersigned counsel learned that Ms. Hunt, Ms. Clarke, Mr. Duchardt, and Mr. O'Connor each had additional files of their own pertaining to Mrs. Montgomery's case.

Therefore, merely reviewing the extensive file was time consuming. Undersigned counsel also interviewed six of the eight attorneys identified above.[i] In addition to the attorneys, four mitigation specialists worked on the case and each had her own file. Counsel also interviewed each mitigation specialist as well as two of the three fact investigators who did work on the case. There was also a file review at the Office of the United States Attorney as well as an evidence review at the FBI office in Kansas City, Missouri. Mrs. Montgomery's records from CCA in Leavenworth and from Carswell were obtained and reviewed for possible mental health evidence. In sum, obtaining and reviewing the record in this case consumed a great deal of time.

Again, with no disrespect intended, undersigned counsel submit that the file review, additional mitigation investigation, expert retention matters, and drafting of a thorough 2255 motion on behalf of Mrs. Montgomery has differed significantly from that in both Ortiz and Sinisterra due to the nature and complexity of Mrs. Montgomery's case.

In addition, the United States Attorney's Office has staffed this case with two local attorneys who then have the resources of the Justice Department with which to respond to Mrs. Montgomery's claims. Therefore, having two local attorneys combined with the resources and assistance of the Office of the Federal Public Defender for the Middle District of Tennessee does not seem unreasonable.

D. Angela Johnson – *Northern District of Iowa*

As counsel noted to the Court during the meeting on July 12, 2013, Ms. Johnson's case is pending in the Eighth Circuit and her 2255 team has been comprised of as many as six CJA-appointed attorneys. Again, undersigned counsel have no knowledge as to how many attorneys are actively working on Ms. Johnson's case at this time or how many hours her CJA-appointed attorneys have billed to date as those records are under seal. Counsel are aware that Ms.

Johnson's final 2255 motion was over 200 pages in length and that after complete briefing the hearing on her motion was extended several times. Ms. Johnson is the only other female inmate on federal death row and her case seems more comparable to Mrs. Montgomery's than either the Ortiz or Sinisterra cases.

E. Equal Protection Considerations

In the Memo to Counsel issued on July 15, 2013, the Court states, "I am not as concerned about other cases as I am the matter currently before us." Yet, the Court has consistently compared this case to those of Ortiz and Sinisterra. Counsel for Mrs. Montgomery concede that comparisons to other cases may be relevant, but neither Ortiz nor Sinisterra provide a good basis for comparison.

This Court has some limited experience with 2255 cases and it appears those experiences have colored the Court's expectations. Undersigned counsel have consulted with attorneys who are experts in the area of capital litigation and would submit that we are acting in conformity with prevailing professional norms governing counsel in federal 2255 litigation. This is Mrs. Montgomery's only opportunity to challenge the effectiveness of her lawyers and any constitutional errors which infected her trial. As discussed above, undersigned counsel have no way of knowing what type of files existed in Ortiz or Sinisterra or the issues available for 2255 litigation. The motions filed in those cases may have been appropriate; however, that does not mean that those cases should be used as a benchmark for what counsel should be doing or should be filing in this case.

Just as this Court can point to two unsuccessful cases where the attorney time was limited, undersigned counsel could identify cases where the attorney time was far more than that expended by local counsel here. The jurisdiction here is a national jurisdiction. Mrs.

Montgomery should not be held to a Western District of Missouri standard where the sovereign is the United States of America. To do so places her in an unequal position with other federal capital prisoners and violates her right to due process and equal protection under the law.

IV. Conclusion

Undersigned counsel respectfully submit that both pursuant to 18 U.S.C. §3599(e) and relevant case law, this Court cannot remove either of Mrs. Montgomery's CJA-appointed attorneys. To do would disrupt a valid attorney-client relationship. It would also violate Mrs. Montgomery's rights under the Due Process Clause and the Equal Protection Clause.

Attached to this memorandum is the proposed budget of CJA-appointed counsel Lisa Nouri and Christine Blegen through filing of the Amended 2255 Motion due on October 1, 2013. Counsel respectfully request the opportunity to submit an additional budget for filing a Traverse and for hearing after the Government has filed its response to the planned First Amended 2255 Motion as counsel will then be in a better position to evaluate the amount of attorney time needed to adequately represent Mrs. Montgomery.

While all counsel for Mrs. Montgomery are well aware of the current budget issues within our court system, counsel submit that Mrs. Montgomery is entitled to the quality legal representation contemplated by 18 U.S.C. §3599 in this 2255 proceeding and ask that the attached budget be approved.

Respectfully submitted,

/s/ *Lisa G. Nouri*
LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Christine M. Blegen*
CHRISTINE M. BLEGEN, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
(816) 213-0384

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No.
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

*Attorneys for Movant Lisa Montgomery*

[i] Counsel did not manage to coordinate an interview with Mr. O'Connor prior to the filing deadline. Counsel have not yet sought an interview with John Gromowsky.

PROPOSED BUDGET FOR CJA COUNSEL THROUGH OCTOBER 1, 2013

| | |
|---|---|
| In Court Hearings | None anticipated |
| Interviews and Conferences with Client | |
| - Lisa Nouri to visit client on August 27, 2013 | 5.0 hours |
| - Telephone calls with client to discuss motions | 3.0 hours |
| Witness Interviews | 10.0 hours |
| Consultations with Investigators and Experts | 45.0 hours |
| Obtaining and Reviewing Documents and Evidence | 10.0 hours |
| Consulting with Expert Counsel | 10.0 hours |
| Legal Research and Writing | 90.0 hours |
| Travel – Lisa Nouri visit to client on 8/27/13 | 6.0 hours |

I, Lisa Marie Montgomery, declare as follows

1) I am incarcerated under sentence of death in at the Federal Medical Facility Carswell in Fort Worth, Texas.

2) In May 2006, before my trial, my attorney, Judy Clarke, was removed from my case.

3) At the time that happened, I did not know what was going on.

4) The first I knew about the judge removing Judy from the case was the day she was to visit me and was not allowed. Ron Niemire, the investigator, visited with me without Judy that day, but he claimed to not know why Judy was not allowed into the facility.

5) I was brought to court the next day or so, and the judge talked to me about how he had taken Judy off my case. The judge said it was his decision.

6) I was not able to talk to the judge about how I felt about his decision. I was too devasted and confused. It did not seem to me that anyone cared what I thought about what had happened. Even if I had thought the court was asking my opinion, I would never have been able to express how I felt to him in court like that. I am not very good

(2)

at speaking in public, and back then my mind was too confused for me to dare speak up.

7) At some point after the court hearing, Susan Hunt suggested that I write down how I felt about the judge removing Judy from my case.

8) I wrote a three page letter that Susan Hunt told me she would give it to the judge, trying to tell the court how ~~[illegible]~~ devastated I was to lose Judy from my case.

9) I explained to the court that of all the attorneys I had had up to the point, I felt the most comfortable with Judy. I told the Judge that I trusted Judy, even to the point, I felt the most comfortable with Judy. I told the Judge that I trusted Judy, even to the point of agreeing to take the psychotropic medication prescribed by the jail doctors, because Judy advised that I try it. As I explained at that time, Judy answered my questions in ways that I understood and that allowed me to trust her.

10) I told the judge that without Judy I did not have any confidence in the future of the ~~cour~~ case. I told him that I no longer felt I could trust my lawyers, because Judy-

the lawyer in whom I had placed my trust – had been removed without my consent.

11) After Judy was removed, Susan Hunt was also removed from my case. That was also very very hard for me. Even though I did not rely on Susan like I had Judy, she was the attorney I related to best after Judy was removed.

12) When Susan quit being my lawyer, I just never heard from her again. She had told me that the judge would decide whether she and Judy would be my lawyers or whether Dave Owen would keep being my lawyer. I guess the judge decided on Dave. The judge never gave me any say in that. I would have picked Judy or even Susan in a heartbeat.

13) Maybe it is obvious that I felt more comfortable with the women lawyers than the men. I've just had a lot of experiences with men that make it hard for me to trust them. Especially men I don't know very well or haven't known for a very long time. Sometimes when I sit in a room with a man, if he sits between me and the door, I break out in hives. That has even happened with some of the doctors here at the BOP. Back before I was on Risperdal that was even worse.

(4)

14) It was very hard for me to organize my thoughts before I started the Risperdal. I had trouble knowing what was real and what was not real. It seemed impossible that the judge would take all my women lawyers away, but I guess that is what he did.

15) After Mr. Duchardt was appointed, I tried very hard to get along with him. I did not want any more new lawyers, and I was scared that I would be left without a lawyer. Even so, there were things I just couldn't talk to him about.

16) It was pretty obvious to me that Mr. Duchardt and Mr. Owen didn't really work together very well. I only barely met Mr. O'Connor and never understood what his role was in my case.

17) Now I have a team of women lawyers that I am very comfortable with. They have taken the time to get to know me and my family, and I feel trusting of them. Each of them has visited me, and I understand that they each have different roles in my case.

18) Because I am comfortable with my lawyers, I am able to discuss things with them that I

really never talked to anyone much about before. Things about sexual abuse.

19) These lawyers make sure that I know when a doctor is going ~~to~~ to come talk to me. One of them always stays with me if the doctor is a man so that I am not uncomfortable or afraid. Even though it has been hard, because of these lawyers and because of my medication, I've been able to even tell the doctors more of the details of the abuse I suffered.

20) I do not want the judge to remove any of my lawyers from my case. My lawyers tell me that they work very well together, and I am very happy to finally have a team of lawyers who like each other and all work together.

21) If the court were to take any of my lawyers away, I would be frightened. I count on each of them to handle this case for me. My life is in their hands.

The foregoing is true & correct to the best of my knowledge and belief. I am signing under penalty of perjury.

Lisa Marie Montgomery
July 10, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-8001-CV-W-GAF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ORDER**

On July 12, 2013, I met with Movant's counsel to discuss my concern over CJA costs in this matter. As expressed at the meeting, the Court was seeking input and suggestions from counsel on how to control and reduce the CJA expenses. I spoke to some thoughts I had as to what might be done. Counsel requested an opportunity to submit a proposed budget which request was granted. Subsequently, I received a 14 page Budget Memorandum (Doc. #62) which took the tone of a less than conciliatory challenge to any cost control measures by the Court.

While there are many aspects of the memo that I find inappropriately and unnecessarily argumentative, one matter that I feel compelled to comment on is that while I have no reason to believe that counsel have billed for time not spent, I have not taken the position that the billings herein have been "legitimate."

Along with the Movant's Budget Memorandum was a two month budget proposal which projects the need to spend $31,862 in the next two months. This proposal is in addition to the $336,925.18 in CJA vouchers paid or submitted to date.

Counsel's suggestions for cost control are not helpful and from counsel's memo it appears that there is not a desire to engage in a meaningful discussion of cost control. As a

result, counsel is advised that 25% will be withheld from all CJA voucher requests as a cost control mechanism until the case is concluded before the District Court. Before any withheld funds are approved, a review of the merits of counsel's request will be undertaken. Any request for compensation for preparation of Movant's Budget Memorandum (Doc. #62) is to be specifically and clearly so identified and it will be denied.

CJA requests will be reviewed for payment on a three month cycle beginning August 1, 2013. Furthermore, total CJA fees in this matter will be capped at $550,000.00.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 18, 2013

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-8001-CV-W-GAF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ORDER LIMITING PUBLIC FUNDED REPRESENTATION**

Having fully considered the status of Movant's Motion for Collateral Relief to Vacate, Set Aside or Correct Sentence and for New Trial (Doc. #71), the court believes that it is no longer required that Movant have the assistance of three public funded attorneys as well as support staff of the Federal Public Defender to adequately pursue her claims. Initially, two CJA Attorneys, Ms. Lisa Nouri and Ms. Christine Blegen, were named to represent Movant in her post-conviction request for relief from judgment and sentence. Ms. Nouri was considered by the court to be lead counsel. Subsequent to their appointment, Ms. Nouri and Mr. Blegen asked that Ms. Kelley Henry, Federal Public Defender from Nashville, Tennessee, be appointed to assist them. Ms. Henry and the staff of her office were to provide legal support and budget assistance to undertake discovery, retain experts and generally prepare for hearing.

Initially, the court was persuaded that to conduct a preliminary investigation and develop viable claims on behalf of Movant, the request for three public funded attorneys would be allowed. However, at this stage of the proceeding, one CJA attorney along with the Office of the Federal Public Defender are deemed to be more than capable of moving forward herein.

Wherefore, in the interest of allowing Movant to be adequately represented but also to appropriately shepherd the expenditure of public funds, Ms. Christine Blegen is to conclude her representation of Movant in an orderly fashion.

Ms. Blegen is not to perform any further services on behalf of Movant other than as not able to be handled by co-counsel at this time. Ms. Blegen is to file a notice of withdrawal no later than July 28, 2014.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: June 30, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| *Defendant/Movant,* | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-8001-SJ-GAF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff/Respondent.* | ) | |

*EX PARTE* MOTION FOR RECONSIDERATION OF COURT'S JUNE 30, 2014 ORDER LIMITING PUBLIC FUNDED REPRESENTATION

COMES NOW Movant, by and through undersigned counsel, and respectfully requests reconsideration of the Court's *sua sponte* Order Limiting Public Funded Representation (Doc. #114).[1] This morning the Court issued an Order expressing the opinion that "it is no longer required that Movant have the assistance of three public funded attorneys as well as support staff of the Federal Public Defender to adequately pursue her claims." The Court stated that "at this stage of the proceeding, one CJA attorney along with the Office of the Federal Public Defender are deemed more than capable of moving forward herein" and directed undersigned counsel Christine Blegen to file a notice of withdrawal no later than July 28, 2014.

Last July, after the filing of Movant's initial 2255 Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for New Trial (Doc. #32) and Motion to Re-Assign the Case (Doc. #41), the Court asked to meet with counsel for movant to discuss concerns over the case budget. This meeting took place on July 12, 2013. Following the meeting, undersigned counsel were allowed to submit a written memorandum and proposed case budget (Doc. #62). Counsel

[1] The Court's order came without prior notice or an opportunity to be heard.

were under the impression that the matter had concluded with the Court's Order issued on July 18, 2013 (Doc. #63) setting a maximum allowable amount for CJA fees in this case.

As undersigned counsel explained to the Court in July of last year, pursuant to18 U.S.C. §3599 (a)(2), Mrs. Montgomery was entitled to the appointment of one or more attorneys. This Court appointed Ms. Nouri and Ms. Blegen. The Office of the Federal Public Defender for the Middle District of Tennessee was later appointed to assist with the case (Doc. #13). Two attorneys from that office, Kelley Henry and Amy Harwell, have become actively involved in this case; however, both Ms. Henry and Ms. Harwell have numerous other cases for which they are responsible in their own District.[2]

Moreover, 18 U.S.C. §3599(e) states:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, ***each attorney so appointed <u>shall</u> represent the defendant throughout every subsequent stage of available judicial proceedings,*** including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and ***all available post-conviction process***, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(Emphasis added). As no attorney has moved to withdraw and Mrs. Montgomery has not moved to have any of her attorneys removed, the attorneys for Movant respectfully submit that Section 3599(e) does not permit *sua sponte* removal of one or more of Mrs. Montgomery's attorneys. The Administrative Office of the Court's cites only one reason for the removal of CJA counsel: when it is determined that the individual has resources for paid counsel.

[2] The State of Tennessee has set an unprecedented ten execution dates beginning October 23, 2014 through March, 2016. The Nashville FPD represents five of those inmates. Ms. Henry, as the Supervisor of her unit, is counsel in all five cases. Ms. Harwell is also assisting in the litigation and clemency matters in these cases.

http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/CJAGuidelinesForms/vol7PartA/vol7PartAChapter2.aspx (last checked 6/30/2014). That is not the case here.

In addition, *Stearnes v. Clinton*, 780 S.W.2d 216 (Tx. Ct. App. 1989) prevents the Court from removing any of Mrs. Montgomery's attorneys. In *Stearnes*, the Court held that "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Id*. at 223. *Stearnes* expressly acknowledges that while "an indigent defendant does not have the right to the appointment of a particular attorney," "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)). Lisa Montgomery objects to the Court's order directing Christine Blegen to withdraw from her representation of Mrs. Montgomery. Last July, when this issue was first raised by the Court, a declaration was filed with the Court from Mrs. Montgomery voicing her strong objection to the removal of any of her attorneys. Mrs. Montgomery's position is unchanged. Because this morning's order was *sua sponte* and without notice, it is impossible to obtain a renewed affidavit from Mrs. Montgomery in short order. In addition, current counsel for Mrs. Montgomery object to the removal of any of the attorneys currently representing Mrs. Montgomery in her 2255 litigation.

The Court in *Stearnes* further recognized that once an attorney has been appointed and an attorney-client relationship has been established, it should be protected. *Id.* at 222. "Once counsel has been validly appointed to represent an indigent defendant and the parties enter into

an attorney-client relationship it is no less inviolate than if counsel is retained." *Id.* at 221-222. No distinction should be made between retained and appointed counsel "because the 'attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service.'" *Id.* (quoting *Smith v. Superior Court of Los Angeles*, 68 Cal. Rptr. 1, 10, 440 P.2d 65, 74 (1968)) (*See also, Martel v. Clair*, 132 S.Ct. 1276, 1284-1285 (2012) in which the United States Supreme Court recognized that 18 U.S.C. §3599 (d) "grants federal capital defendants and capital habeas petitioners enhanced rights of representation, in light of what it calls 'the seriousness of the possible penalty and . . . the unique and complex nature of the litigation.'").

An attorney-client relationship has been established between Ms. Blegen and Movant Lisa Montgomery. Pursuant to 18 U.S.C. §3599(e) and the holding of *Stearnes v. Clinton*, 780 S.W.2d 216 (Tx. Ct. App. 1989), this Court lacks the authority to disrupt that attorney-client relationship.

In addition, while the Court's current Order is titled as "Order Limiting Public Funded Representation," the Court has already limited the funding in this case. Last July, after conferring with counsel for Movant Montgomery, the Court began withholding 25% from each voucher request and set a cap on the total CJA fees in this matter of $550,000. Thus, the funding of this matter has already been limited. In light of the Order last July, it is unclear why the Court would *sua sponte* direct one of Mrs. Mongomery's attorneys to withdraw from this case. In reality, no funds will be spared because Ms. Blegen's, whose work is critical to the case, will have to be performed by another publicly funded lawyer. Whether Ms. Nouri is on the case with Ms. Blegen or not, the amount of money spent from the CJA budget remains the same. There will be no cost savings.

The current team representing Mrs. Montgomery believes that all of the present attorneys are essential "to adequately represent movant herein" both historically and as we move forward with this case. Each attorney has developed a relationship with Mrs. Montgomery and each plays a unique role on the team representing Mrs. Montgomery in this matter. As Ms. Henry explained to the Court during the meeting last July (Attachment A, Tr. p. 10), her office is a small office and she has a full caseload in addition to assisting with this 2255 case. She never intended to be one of the lead attorneys in this case (*Id.*)(*See also* Fn. 2, *supra*.).

Removing an attorney would be a huge waste of the resources already invested as the defense team would lose the knowledge that said attorney has already gained through participation in this case while the same amount of work will remain to be performed in the case. Finally, as counsel noted to the Court during the meeting on July 12, 2013, *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) suggests that Mrs. Montgomery is entitled to effective assistance of counsel during her Section 2255 proceedings. Based upon *Martinez*, the effectiveness of Mrs. Montgomery's 2255 attorneys may be examined at some point in the future. Disrupting Mrs. Montgomery's current legal team could form the basis of a future claim that Mrs. Montgomery received ineffective assistance of counsel in this proceeding.

The Court's repeated efforts to disrupt Mrs. Montgomery's current legal team and to remove one of her attorneys are all the more troubling given certain claims raised in the pending Amended Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for New Trial (Doc. #72). Fred Duchardt has described Mrs. Montgomery as being "devastated" by the removal of Judy Clarke from her trial legal team (*See* Attachment B, Dec. of Chris Armstrong pertaining to interview of Fred Duchardt, p. 1). The removal of Ms. Clarke caused Mrs. Montgomery to lose confidence in her trial team (*Id.*). In fact, the removal of Judy Clarke had

caused an implosion of the trial team. Fred Duchardt has described it as "having walked into a bomb scene." (*Id.*). Removing an attorney from the 2255 team would be no less upsetting to Mrs. Montgomery as Ms. Nouri explained to the Court in the meeting last July:

> Mainly it gets down to we all have relationships with the client. They're different types of relationships. It would probably set her back mental health wise significantly to lose either Christine or myself; and with regard to different experts or different witnesses or different family members, ***it would just severely impair what we're trying to do for Mrs. Montgomery***. Furthermore, let's be frank about it, Christine Blegen is the premier writer and she is incredible, and it would be devastating to lose her from the case, Your Honor.

(Attachment A, p. 18)(empahasis added).

Ms. Blegen has visited Mrs. Montgomery at Carswell several times in addition to corresponding with Mrs. Montgomery. An attorney-client relationship exists and there is no valid reason for disrupting that relationship. Neither Ms. Nouri nor Ms. Blegen has submitted a CJA voucher in this case for approximately six months. The reason for this is that very limited work has been performed while awaiting the Government's response to the Amended Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for New Trial (Doc. #72).[3] More work has been performed in the past three weeks due to Mr. Duchardt's efforts to seek discovery in this matter. Mrs. Montgomery should not be penalized for Mr. Duchardt's actions by having one of her attorneys and 2255 team members removed from this litigation. To the extent that the Court is concerned about the budget, the Court has already implemented cost-containment measures by withholding a percentage of the CJA funds and setting a cap on the total amount of CJA funds to be expended in this case.

[3] The Office of the United States Attorney has staffed this case with two local attorneys, Roseann Ketchmark and Phil Koppe. They have available to them the resources of the Department of Justice. This is comparable to Mrs. Montgomery having two local attorneys and the assistance of the Federal Defender's Office.

Accordingly, for all of these reasons, undersigned counsel respectfully request that the Court reconsider and vacate its Order of June 30, 2014, and retract the directive that Ms. Blegen file a Notice of Withdrawal by July 28, 2014.

Respectfully submitted,

/s/ *Christine M. Blegen*
CHRISTINE M. BLEGEN, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
(816) 213-0384

/s/ *Lisa G. Nouri*
LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No. 38849,
Tn. Bar No. 021113
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS

On July 12, 2013, the above-entitled cause came on before the Honorable Gary A. Fenner, United States District Judge, sitting in Kansas City.

APPEARANCES

For the Movant:

Ms. Lisa G. Nouri
Attorney at Law
2526 Holmes
Kansas City, Missouri 64108

Ms. Christine M. Blegen
Blegen Law Firm, LLC
230 Southwest Main Street
Suite 217
Lee's Summit, Missouri 64063

Ms. Kelley J. Henry
Office of the Federal Public Defender
810 Broadway Street
Suite 200
Nashville, Tennessee 37203

Katherine A. Calvert, RMR
United States District Court Reporter
Charles Evans Whittaker Courthouse
400 East Ninth Street
Kansas City, Missouri 64106
(816) 512-5741

JULY 12, 2013

(The following proceedings were had in chambers:)

THE COURT: Well, I want to talk to you about the budget in this case and the amount of expenses that we're running up, which I think something needs to be done about the situation, and part of my perspective on it -- I mean, you know, not only just overall the amount of attorneys' fees and expenses in these kind of cases, but I've had two other cases where we've had 2255s on individuals who received the death penalty; Arboleda Ortiz and German Sinisterra.

Ortiz' motion was 38 pages; Sinisterra's motion was 58 pages. In Ortiz, through the notice of appeal in the case -- and there was no public defender representation. It was Kent Gipson and Jay DeHardt. The total attorneys' fees was $172,162 for the whole thing, as I said, up to the notice of appeal through trial and the 2255. Kent Gipson really carried the bulk of the load in that case and his total fee was $149,794

And in Sinisterra through trial of that case, and then Sinisterra died before I entered an order, but through the trial of that case -- and there was public defender representation in that case, John Jenab's total attorney's fee was $118,536.

MS. NOURI: When you say through the trial, you mean through the hearing they had in front of you?

THE COURT: Yes, through the hearing, through the trial on the 2255 motion. And Sinisterra lasted four or five days and I think Ortiz was three or four days.

At any rate, they were both big cases. I mean, any of these cases are big cases but they -- in Sinisterra and Ortiz they were both natives of the country of Colombia, and there was a lot of investigation that had to be done relating to all of that.

Right now in this case, and I know that there are some outstanding requests for fees and I want to talk to you all about this before I do anything on that, but right now -- and I see it as, you know, somewhat of a preliminary position in the case. I know a lot of work's been done to get to this point, but there's a lot of work that remains to be done in the case.

Fees approved and requests outstanding total $330,925, and particularly in light of the budget situation that we face and that the defender service faces, which the CJA funds are all a part of that, and I'm sure Ms. Henry is a lot closer to all of that than I am, but it's tough times in terms of -- you know, it's not a situation where we do not have difficulty getting funds budgeted in relation to the allocation of those funds.

Even if we didn't have budgetary problems, I'd still be concerned about where we're at in terms of the spending in

this case. But particularly in light of where we're at, I'm concerned about, and I feel that I have some responsibility to do something about it, certainly at least to address it. So I wanted to get you all together to talk about it and see what your thoughts and ideas might be.

I'll just throw out to you some of the things that have crossed my mind as potential ways to treat this. One would be assuming that Ms. Henry is qualified under the statute, which with the five years of practice before the Court, and I presume that you are since you were in the State system previously, one would be to just have her take over the case and for the two of you to no longer be involved in it. An alternative approach to it would be to leave one of the two of you, either Lisa or Christine, involved in the case; and if that was to take place, to in some fashion try to limit your involvement so that as much of the work as possible is shifted out of the CJA allocations and away from us having to incur those additional expenses when we've got a salaried public defender involved in it.

And I'll turn to you first, Lisa, to see what, if any, response you have to any of that and what your thoughts are about, one, whether or not this is an issue that needs to be addressed and, if so, how do we do it?

MS. NOURI: Well, I'm glad you had us in because I had been concerned because I think the last bills that

Christine and I had paid were from the beginning of February or end of January, and I had reached out to your staff a couple of times; but when asked should I inform the Judge, of course, I said, No, no thank you. Don't do that. I'll just patiently wait and see what happens. So I'm glad you had us in. I've been concerned about it. And I don't take it lightly. I know it's a lot of money and I know you've entrusted us with this.

But that being said, we've done a lot of work on this case. It is a huge case and we, the three of us, plus the fourth attorney actually, have all put countless hours into this doing different portions of the case. We don't try and double up the same work product.

But I don't know without -- I know those lawyers and I've even talked to a lot of those lawyers how much of it predated when they moved the fee up to 178 an hour. I can't tell you that without looking at those dates. So that is one tiny factor.

THE COURT: When did the fee go up to 178 an hour? I've forgotten.

MS. NOURI: I can't remember.

MS. HENRY: 2010 was the date.

THE COURT: 2010?

MS. NOURI: I've completely forgotten.

THE COURT: In Ortiz, and Ortiz is the oldest one, most of Ortiz was prior to 2010. Sinisterra was later than

that. I can't give you the exact dates in Sinisterra but I'm sure some of it overlapped.

MS. NOURI: Well, of course, because I know they had the hearing after that.

THE COURT: But even at that, I mean, it's like Ortiz was total -- and there was a lot of, you know, post-hearing activity in Ortiz as well and a lot of briefing and different issues that came up and there was some $20,000 worth of fees after the hearing on the motion; but, you know, still you throw another $100,000, you're still $60,000 below where we're at.

MS. NOURI: I understand.

THE COURT: And there was no public defender's assistance in that case.

MS. NOURI: Right. But you saw our motion. I'm not asking you to comment on that, but we put a lot of effort into that. We tried to get as much work as we possibly could done before the deadline because we were very concerned about making sure we raised every claim and not shoot ourselves in the foot, then being found ineffective later for not exploring every issue we could. But all I can tell you is the work that has been billed is legitimate and, frankly, it's, particularly with Christine because we've had these discussions, it's been underbilled. There's a lot of times that we haven't billed things.

But I don't want to say that, well, we can work less or not put the same amount of time in because that's just not true. We're getting up to that October 1st deadline and our position is that all three of us are extremely important to the case. Their office is funding the case. Furthermore, she has the ability to get these experts to take the phone calls that probably Christine and I don't have, but, I mean, I'm in on all the information. I know what's going on. I know what is in the file. I feel like both of us are equally important to the case. We both do completely different things and --

THE COURT: I just really don't see how I can do that, Lisa. I just really don't.

MS. NOURI: I understand what you're saying. I'll give you some cases and the statute and all that because I want to cover myself. I'm not trying to offend you. I do think that would be a mistake to remove one of us. For one thing, all the money either one of us have been paid to this point is almost sort of worthless because then the other one has to pick up the slack of whatever that person was working on.

We have many ongoing projects that we're working on that are different but are supportive of our amendment and then ongoing projects from there. I guess if you were really inclined to do that, before we get down that road, I had two thoughts. One is if you are really inclined to do that, I'd like to have a hearing, a real hearing before we did that

because we would bring an expert in to talk about that; and if that's going to offend you and you don't want to do that, that's fine. It just seems like it's going to be another issue that is going to be analyzed to death later.

And I know -- I know it's a lot of money. I know everybody's in a budget situation. Their office is. Everybody is. But I'm saying that the removal of any one of us is going to be detrimental to the client, going to be detrimental to the case. I would hate for you to take that step until you're really sure that that's what you want to do.

Another thought I had is why don't you wait until after the October 1st deadline that we have right now and then revisit that with us or we set it for hearing at that point.

THE COURT: Well, you know, I just -- to me it's kind of we're bleeding money here that we don't have, and the longer I put that off and the more time and effort we spend to contemplate that decision or the legitimacy of that decision the more we compound the problem, and I just -- I mean, I don't see how anybody can legitimately argue that you have to have four capable attorneys representing someone in this case. I don't see how you can convince me that that's a legitimate or a position that has merit to it. I mean, it's like -- you know, everybody's got a -- I mean, we could have ten attorneys and if you were Warren Buffett, you might choose to have ten attorneys represent you if that was your choice but that's not the world

we live in.

MS. NOURI: Right. But the U.S. attorneys have two attorneys. They have significant staff. They have D.C. backing them and helping them with all the documents that they file and it's trying to keep our playing field level also, Your Honor.

MS. HENRY: Your Honor, if I could just add a few things from the perspective of the PD's office, and I know the lawyers in Sinisterra very well. Actually, I'm sort of aware of that case and how it progressed and how they worked it up. I know that local counsel is familiar with John Jenab.

THE COURT: He was great too. That guy was -- I've forgotten his name.

MS. HENRY: Tim Gabrielsen.

THE COURT: He was a wonderful lawyer and just a pleasure to deal with.

MS. HENRY: He actually took my place when I left the Arizona PD, Leticia Marquez who helped him. I was on the committee that hired her in the Arizona PD. I know them very well. I know that they were in a position, the Arizona office, which I used to be in and am no longer, is a significantly different office than mine.

The 2255 project has approached my office for years asking us to take these cases and we have always resisted because we have told them that we don't -- we're not an

Arizona. We're not a Philadelphia. We're a small office. Every lawyer in my office has way beyond the maximum we're supposed to. I personally have 16 cases. I have a client who's facing an execution date in October. It was never our intention to come into this case and be lead counsel. We have always counted on Lisa and Christine to be the lead counsel with our office providing support.

Now, we did reduce what would have been billed by CJA counsel because at one point there were probably 20 people in my office working on this case to get to the March filing deadline, but they're not up to speed. They haven't read everything. There are over a hundred thousand pages of documents that came with the case. That's not counting the documents we've gotten since that time, and so I know that these numbers seem big and I think that we're all willing to sit down and come up with a budget, but I feel like this case would be seriously disrupted if we were to lose either Lisa or Christine. They each have an important role with the client. The client is close with them and wants them on the team and is happy with the team as it is currently constructed. And my --

THE COURT: I don't know. And, you know, I realize that the less I say the better.

MS. NOURI: Sure. I understand.

THE COURT: But it's not up to Lisa Montgomery. She's not paying the bills. I feel some responsibility to keep

it reasonable and to not just give you all a blank check to go out and spend as much money as can possibly be spent.

MS. NOURI: Well, we would be happy to submit a budget if that's what would help.

THE COURT: We're already at $330,000 so how much room do you have to budget in the case? I mean, you know, the trial of the case was -- I mean, you know, Fred's fee was close to 500,000 I think. What was it? 700,000 for the trial of the case or something?

MS. NOURI: I think it was more than that.

THE COURT: But in that ballpark. We're not retrying the case. I mean, we are in the sense that we are reviewing the trial proceeding but we're not starting from scratch.

MS. NOURI: I understand.

MS. HENRY: Nationally, Judge, those numbers are pretty low as far as what is typically spent on these types of cases. My husband's also a capital trial lawyer who accepts cases.

THE COURT: You know, Kelley, if you don't mind me calling you Kelley.

MS. HENRY: Please.

THE COURT: It's not California. We're not in California. We're not in New York.

MS. HENRY: I'm talking Tennessee.

THE COURT: In where?

MS. HENRY: Tennessee. Trials in these cases in Tennessee go for well over 2, 3 million dollars. I've seen these women work, and I can personally vouch for the fact that they would not overbill the court. I know that they are very conscious of being stewards of the court's money and we've been trying really hard to make sure that happens, but at the same time recognizing that Lisa and Christine are lead counsel. I think Tim Gabrielsen sort of came in and became lead counsel in Sinisterra, and I think he did a really good job and he is a great lawyer and great sense. I really respect Christine and Lisa's perspective on these things.

Like I said, with everything else, we're aware of the budget stuff. I've spoken with the Administrative Office of the courts and the defender services. They are aware of this case and they are aware of how expensive it is. They asked us to get involved for that reason, but I -- I think that they're also aware this is going to be part of the CJA appropriation next year as far as attorneys' fees and everything. They know that. There's a special fund for these sorts of cases, and I think that Lisa and Christine, we could all sit down and talk about how to minimize their expenses going forward and ways that my office could help, but I don't want to sit here today and tell you my office can absorb their work.

We're not the primary authors of anything. They're the ones that do the writing. Lisa knows every document in this case and is the one when we're going through the motion that says, Okay, wait a minute. You've put this fact down right here. Show me that document. I want to make sure that we can prove it. She's there on everything. She has the relationship with the client's family. I've never met the client's family. Neither has my cocounsel, Ms. Harwell. We don't have those relationships so we would be starting over again.

There is no way I can meet an October 1st deadline. I've already broached that with Christine and Lisa and they said, No, we're going to meet the deadline. I can't, not with a client with an execution date. I simply can't. And it was never ever our intention to come in and take this case. We're not Philly. We're not Arizona.

Obviously, Your Honor, I will do what I have to do to represent our client, and I think that --

THE COURT: You're not the public defender that called me before counsel was appointed in the case and sought appointment?

MS. HENRY: No, sir.

MS. BLEGEN: No, Your Honor. That wasn't their office.

THE COURT: Do you know who that was?

MS. BLEGEN: That was Ruth Friedman out of Washington, D.C. and Fred sought to have her appointed. And, Judge, if I might, just to draw a comparison, Lisa Montgomery is one of two women on death row right now in the federal system. The other one is Angela Johnson. Her case is pending in Iowa right now. She originally had a team of three CJA-appointed attorneys. The judge in Iowa ended up throwing them off the case for ineffectiveness, and her current CJA team is comprised of six appointed attorneys who filed a motion very similar in length to ours and who were ultimately awarded a hearing, and they started the hearing, I believe, set for a couple of days and as the judge heard evidence, he kept granting them more hearing days and more hearing days.

THE COURT: I'm a little bit familiar with that case, and I know some local attorneys who were involved and I know the judge who was involved. I mean, everybody's different. And everybody looks at things differently. And I'm telling you how I'm looking at this and it is troubling to me the amount of money that we're spending in this case, and I don't see the entitlement to that kind of representation in the case, and I know that there are a lot of issues that you raised and that the mental health questions are ones that are complex and difficult and expensive to pursue, and I understand and accept all of that, but I have real difficulty in approving these kinds of expenses in the case. And, as I said, it would

be troubling to me regardless, but it's particularly troubling to me when the public defender's budget's losing $100 million and, you know, 90 percent of the money is to fix costs, then the rest of it is to include the CJA fees and all the other miscellaneous items that have to be spent, and it's like I just don't know how we can do that.

My inclination right now is just in this brief talk to you -- and I'm not saying what I'm going to do. I'm just talking. I'm talking to you all so that I can get your input and that hopefully, recognizing my concerns, we can all come to some way to deal with this.

Hearing Ms. Henry tell me that she can't take it on, I would not be inclined to direct her to do that. That's not my inclination right now. But I just -- I don't see how I can justify spending half a million dollars on a 2255 case for CJA attorneys, and we're going to be there before we turn around. We're already at 331,000.

MS. NOURI: That's probably true. But, nonetheless, we still have to keep working, Your Honor, and we continue to work, particularly with our deadline looming. We've had an expert with the client -- it was Thursday. That was yesterday. I had an expert in here Monday and Tuesday meeting with another witness. We're working a lot on this case right now, and we kind of let things die down in June. We all took a little bit of a break, and we anticipate August -- our thought was,

because I actually opened an office right next to hers to make it easier to not waste time, maybe 20 hours a week in August and maybe 30 in September, and it might be 20 to 30 and 30 to 40. We don't know until we get some of our reports back where things stand, but we're trying to do everything we can to not waste money. I'm very conscious of that. I am a tightwad myself so I don't like to waste other people's money either, but I'm also conscious of I know what all these national people talk about. I follow it religiously now. I know Lisa Montgomery right now is really the only female on death row. All these people are interested in our case, and I want to make sure our work product is up to snuff with what these people are looking at, and that's the methodology we've been using and that's how we intend to keep proceeding.

I have a lot of documents that I was going to have marked as exhibits if we're going to get to that point and it sounds like we're not at that point.

THE COURT: Get to what point, Lisa?

MS. NOURI: Where you're going to say today what you are going to do. You're not going to do that. I can tell. And that's fine.

THE COURT: You know, I wouldn't necessarily go there. I mean, I don't think I probably am but that doesn't mean that we're necessarily going to meet again or that you will get your hearing or whatever, because I may, you know,

think about it. I may say, You know, let's have a telephone conference a week from now or whatever to see what you come up with. I don't know.

MS. NOURI: Right.

THE COURT: And I may -- I don't know what I'm going to do. I feel I need to do something and I am going to do something. I don't know for sure what it is going to be. I feel I need to do something to exercise some cost controls in this case.

MS. NOURI: I understand. Again, if you want a specific budget between her and I, we will do that if that's going to make your thought process easier.

I'm going to go ahead, then, and let the judge have these documents in case he makes a decision and we don't ever get to talk again. I don't have any of this marked but I'm going to tell you what it is. The first document is a letter from Lisa Montgomery. The second one is the transcript of the May 6th proceedings that are Doc 53 in the civil case. The next one is Doc 11 in the civil case. That's the ex parte motion where we had filed our initial budget then the alternative asked for the Nashville Federal Public Defender. The next one is the ex parte order appointing Ms. Henry's office. That's Doc 13 in the civil case. The next one is -- it's written over but it was in the criminal and civil case. I can't see the exact number, but that's the actual order that

appointed Christine Blegen and myself. The next document in the criminal case is Document 431, which is the motion filed to set the billing procedure and compensation limits. And then the next document is 433, the order in the criminal case approving that motion.

Then there's three specific cases, Your Honor; the Martinez v. Ryan case, the U.S. v. Gonzalez-Lopez case. But here's the real important case we would really like you to take a look at, Your Honor, Martel v. Clair. It was decided in 2012 by the Supreme Court. And on page 6 under the Roman Numeral II heading, it talks about the statute 18 U.S.C. 3599 and all about the attorneys on habeas cases. So I think this is probably something worth you also considering looking at, Your Honor, before you make a decision.

Mainly it gets down to we all have relationships with the client. They're different types of relationships. It would probably set her back mental health wise significantly to lose either Christine or myself; and with regard to different experts or different witnesses or different family members, it would just severely impair what we're trying to do for Mrs. Montgomery.

Furthermore, let's be frank about it, Christine Blegen is the premier writer and she is incredible, and it would be devastating to lose her from the case, Your Honor.

We will do a budget. You do what you need to do or

decide what you need to decide but we are willing to submit something to you; and if you don't like it, please speak to us or let us know.

MS. BLEGEN: Judge, I'd also ask that we provide you -- I don't know if you want to mark this as an exhibit or not. We compiled a list of the pending 2255 cases in the Eighth Circuit for the last several years, and I think it demonstrates that it is not at all unusual to have two CJA attorneys working with the Federal Defender Office. So if you would like to have that for your review as well, we can provide a copy to you.

MS. HENRY: One more thing. I think I was not very articulate before, Your Honor, when I was talking about the fees in this case and how they would compare because $330,000, of course, sounds like a lot of -- to any of us it sounds like a lot, but I guess my point was that it would have been so much more if we hadn't worked together as a team and worked the case up as we did, and so you can't sort of look at them in comparison to Ortiz or Sinisterra. I mean, I looked at the Sinisterra petition and thought there's so much more that should have been done here. I looked at the Ortiz petition and thought there's so much more that should have been done here.

This case is -- it is huge. I have done, I tried to count up this morning, more than two dozen capital habeas cases since I started doing capital habeas work solely in 1997. This

is the biggest case I've ever worked on, and I've worked on some really big cases. I've worked on high-profile cases. I have a client now, probably my closest analogy to this, where he has seven death sentences and he's got part of his temporal lobe missing, and his case isn't as big as this case.

So though the numbers seem high, Lisa and Christine were good lawyers who came to the court and said, Hey, these numbers are high. We need a lot of money so we need the help of the federal defender to keep the numbers down because if they wanted to be selfish about it, they could have said, Wow, look at this and their bills would have been five times as much to try to meet that filing deadline. So we really have tried to keep the cost down as much as we can.

I'm somewhat familiar with the process of getting cases declared as mega cases if that's what needs to happen here. I can certainly help Christine and Lisa do that so the Eighth Circuit can have -- I don't know if the Eighth Circuit has a budget analyst or the Sixth Circuit does, but there we have a budget analyst where private attorneys submit something. It gets all approved and that sort of thing. We could do all those things.

I think it's important for the record to also reflect that there's no lawyer here who wants out of the case and the client doesn't want anyone out of the case; and as I read the appointment statute, once counsel's appointed, that's

really the only way for counsel to be out of the case is if a lawyer asked for it or if the client asked for it and that's not the situation we have here.

We have a committed team of people who are doing their very best to bring to you Mrs. Montgomery's claims, and it is unfortunate these capital cases cost as much but they just do; and if we had the opportunity, we would bring in -- this was set for a meeting, which we talked about should we bring in witnesses today because I could have asked Ruth Friedman, who is the head of the 2255 project to come in bringing the numbers. She won't give us the numbers. We asked. All these budgets are under seal. But we could have asked her to come under a subpoena and give you a cost comparison, not of what happens in California or New York. I understand that's different. But what's happening in the Eighth Circuit, what's happening in the Second Circuit, Third Circuit. These cases grow. They don't shrink. That's the trend.

And so believe me, my office is dealing with it. I'm on furlough today. We've had 20 days of furlough. I personally have lost salary over the last few months. So I get it personally.

THE COURT: It's going to get tougher.

MS. HENRY: And it is but that's something, you know, I'm prepared to shoulder. I know that Lisa and Christine

are prepared to give you a reasonable budget. I just think that -- and in the long run if one of them has to step in and do the other's work, the money is still going to get spent. Like they said, they're not doing the same thing. Lisa has on her task declarations that she's working with our two standard of care experts to get those prepared by October 1st. Christine's writing motions. I'm doing things. Amy Harwell's doing other things. We're trying to put a lot of work into our office, but we couldn't lose those two. It would just be awful.

THE COURT: I get all of that. I'm not accusing either one of you of being greedy. I don't think you're greedy. I don't think you're overbilling. I'm talking about cost controls in a case that I believe that the costs need to be dealt with, and I'm looking for a way to do that and, you know, I don't want to get to a point where I say, I don't think you should have done this or I don't think you should have done that, this doesn't have any merit, that doesn't have any merit. I took some fees out of the Ortiz case because I found that was the case, not much, 5 or $6,000 but, I mean, percentage wise if I did that here, but that's always an option that I could exercise, and I do think that probably -- I mean, to some extent sometimes the more time people have to spend, the more time they spend and the less time they have to spend the more efficient they are in terms of what they have to do and what

they have to get done.

And, quite frankly, you know, it would not -- well, I would be surprised if either one of you, all other considerations to the side, if you had the opportunity to get out of it, you'd probably just as soon get out of it right now because I'm sure that it's burdensome on you all in terms of the amount of time and the issues that you have to deal with; but, you know, I know you are not asking that and I know that you want to stay in.

You can give me a budget. I just -- I'm going to be real surprised if you can come up with a budget that I'm going to think works. Maybe so. You all know more about what you're doing and the issues you're dealing with.

You know, at this point I don't see this case as all that overwhelmingly all that complex than any of the death penalty cases that I've had. You know, they're all hard. They're all tough. They've all got mental issues in them and difficulties with witnesses and clients and family members. You know, they're just -- they're not good situations. None of them are.

MS. BLEGEN: May I speak briefly to that? One thing I think is interesting in this case, as you know, we've raised a claim related to it, there's a lot of changeover in the counsel in this case, and I know when Lisa and I first got in, a large part of time at the outset of the case last summer was

spent simply getting the file in this case. Because of the nature in which the attorneys operated with the Federal Public Defender's Office and Mr. Duchardt and Mr. O'Connor, we essentially had files from three separate law firms together and to go through and to see and sort out what different people did in the case. So there was an overwhelming amount of documentation and evidence to go through and just to sort out what was there, and I think in that regard it was a little complicated, and then just getting into the actual issues in the case and trying to develop the support for them.

THE COURT: Well, let me look at what you're giving me there. Is there anything in particular other than the Supreme Court case, the Martel case, is there anything about any of the rest of the documents that you gave me, Lisa, that --

MS. NOURI: I think essentially what the Martel case says in a nutshell is what Kelley had just said, that unless the attorney is asking to get out or get rid of someone or the client is, then that should not happen. That's how we read that case, Your Honor, and we're not asking to get out and we know the client doesn't want to lose any of us.

I appreciate your position. I understand that the budget is always an overriding consideration. But we have to do the work. We have to represent the client. We have to just keep proceeding with working on our case, and that's what we

just keep doing, Your Honor. These other documents are just showing the order of the appointments, et cetera.

MS. HENRY: I think it's also interesting about the Martel vs. Clair case is that it talks about Congress' intent with respect to the appointment of counsel in habeas cases, in capital habeas cases, and the Supreme Court sort of reaffirms that Congress intended for the lawyers in the capital postconviction cases, and Martel vs. Clair is a 2254, but it's equally applicable to the 2255, probably more so really, is that they wanted to have high quality counsel, and they talk about expenses in Martel vs. Clair and they talk about how Congress knew that there were more expenses with these capital cases. So I feel like that is particularly on point.

Martinez vs. Ryan is another case that I think Your Honor --

THE COURT: I've already read that and I don't find it controlling on this.

MS. HENRY: Well, I guess the point maybe that I would like to make about that, Your Honor, is that the law has not fully developed in the area of 2255s, and so if we're looking on down the road to people coming back and challenging the representation that Mrs. Montgomery got at this proceeding, there are many people in the capital defense community who believe that Martinez vs. Ryan is going to provide a remedy, so it is important that Mrs. Montgomery get this first opportunity

to attack her assistance of counsel at trial in this proceeding because there could be people on down the road who could say that interference with counsel at this point gives her yet another motion.

THE COURT: I understand.

MS. HENRY: So we feel like that is also relevant.

THE COURT: All right. I mean, I have real reservations that a budget is going to resolve things for me, but why don't the two of you put together a bare bones proposition. And how long do you want to do that?

MS. NOURI: You tell me.

MS. BLEGEN: Judge, we can have it done by Monday. We'll provide it to your chambers on Monday.

THE COURT: Okay. Well, let's say Wednesday of next week. I mean Monday's fine. I mean, I'm not looking for you to work all weekend on it or anything.

MS. BLEGEN: I wasn't planning to, Judge.

THE COURT: Wednesday of next week.

MS. BLEGEN: We'll provide it as soon as we have it ready.

THE COURT: And then, you know, I'll look at what you gave me and I'll see what you submit and if I have more questions or concerns that I want to discuss with you, then I'll probably just do a telephone conference with everybody and see where we go from there.

But, I mean, and I know Ms. Henry doesn't know me but you all do and, you know, it's not an issue that's going to go away for me. It's not going away. And I understand that, you know, that I could be cited with examples of what Judge Bennett's done in Iowa or this and that, but Judge Bennett is not me and he may see his responsibilities differently than I do. And you in comparing cases and how judges handle their cases and how they see their responsibility, there are a lot of differences in a lot of that and I feel a responsibility to control the costs in this case. So tell me what we can do.

MS. NOURI: We will try, Your Honor.

MS. BLEGEN: Judge, I know we did this on the record and we provided some exhibits. I assume since this has to do with defense budgeting that this would be kept under seal from the government should we ever need the transcript?

THE COURT: Yeah, I can do that. I don't see any big advantage to the government to know what we're talking about but that's fine. They're not here so they understand it's not their situation.

Anything else?

MS. NOURI: Oh, boy. Let me double-check. I think we've covered it. I just really am more concerned about the impact on one or the other of us, Your Honor, and how that's going to play out with the representation of Mrs. Montgomery.

THE COURT: I understand your concern. It's not a

perfect world and everybody doesn't always get what they want.

MS. NOURI: You know I respect you. I've known you a long time and I know this is a priority --

THE COURT: And I appreciate that.

MS. NOURI: -- with everyone in the building. It's a very, very stressful time for everybody right now, and it's just not going to improve in the next year I don't think. I don't know if it will ever improve.

THE COURT: Yeah, it's not real hopeful, quite frankly. I mean, the projections I've seen for next year, you know, particularly with the federal defender service are like losing a third of staff.

MS. HENRY: I should say, though, that for me, looking at it with the potential of losing a third of staff, which I hope is not going to come to pass, I guess we'll find out on August 15th when the judicial conference meets. I know that they're reconsidering all of that. But removing one, Lisa or Christine, would make it even harder on us; and, like I said, but for the fact that this was a woman and I had some high-profile cases and it was Missouri and so I felt an affinity for my hometown. Ms. Harwell in my case has actually had a couple of clients with pseudocyesis so we felt like, okay, fine, we'll take this case.

It has been wonderful working with these lawyers who are just the utmost professionals. I don't know what Ruth told

you when she called you and talked about taking these cases, but I know that there was some concern about the lawyers not having death penalty cases. I can tell you that Christine and Lisa have been the utmost professionals, and it would just be devastating to the case, and I don't know what my office would do if we had to shoulder this. I mean, I could have a mutiny with my staff because of us going out of district and we've got all of our own clients and Tennessee looking to try to execute six people next year.

So I know it's hard on everybody. There could be other creative ways once we have some deadlines for amendments; but after that, there's going to be a period of not a lot of activity going on unless and until there's an evidentiary hearing, so expenses in this case could be sort of drawn out for a period of time where there will be some inactivity. I mean, these cases have times when there's a lot going on and times when there's not a lot going on. March there was a lot going on, but I don't think we're ever going to have a period of activity like we had in March again until we get ready for a hearing if the Court were to grant one. I appreciate the opportunity to have worked with these ladies.

MS. NOURI: Thank you, Judge.

MS. BLEGEN: Thank you.

THE COURT: Thank you.

(Adjournment)

REPORTER'S CERTIFICATE

I, Katherine A. Calvert, Registered Merit Reporter, hereby certify that I am a duly appointed, qualified, and acting official court reporter for the Western District of Missouri; that on July 12, 2013, I was present and reported all of the proceedings in LISA M. MONTGOMERY, Movant, vs. UNITED STATES OF AMERICA, Respondent, No. 12-CV-08001-GAF.

________________________________, RMR
Registered Merit Reporter

Dated this 18th day of September, 2013.

# DECLARATION OF CHRIS ARMSTRONG

I, CHRIS ARMSTRONG, declare as follows:

I am an investigator in the Office of the Federal Public Defender for the Middle District of Tennessee in Nashville. As part of my employment, I traveled to Kansas City, Missouri and witnessed the interview of Fred Duchardt by attorneys for Lisa Montgomery on the morning of March 12, 2013. The following is what Mr. Duchardt related to counsel regarding his representation of Lisa Montgomery.

Mr. Duchardt explained that he came to be involved in the Lisa Montgomery case when he was contacted by attorney John O'Connor on May 16, 2005. Mr. O'Connor specified that he was soliciting Mr. Duchardt's involvement in the case, because of his "familiarity with dealing with mental health issues." Mr. Duchardt clarified that Mr. O'Connor was uncomfortable with the mental health aspect of Ms. Montgomery's case and specifically wanted Mr. Duchardt to handle that aspect of the case. At the time of his initial involvement, Mr. O'Connor made Mr. Duchardt aware that the Office of the Federal Public Defender for the Western District of Missouri (hereafter FPD) was reluctant to work with him. Mr. Duchardt honestly does not know why that was the case. He had never before worked directly with that office, but laughingly speculated, "I guess my reputation precedes me."

Mr. Duchardt and Mr. O'Connor had previously worked together on the Demetrius Hargrove case, but they had also known each other for years before that. Their acquaintanceship dated back to Mr. O'Connor's days as a prosecutor in Jackson County. Mr. Duchardt characterized their partnership as having an "approach" which was "to roll up our sleeves and get to work." When asked who took the lead counsel role, Mr. Duchardt explained, "for the most part, no one is a chief or an indian."

At the time Mr. Duchardt first met Ms. Montgomery, she was "devastated" by the loss of Ms. Clarke as her counsel. Ms. Montgomery was suffering the after-effects of having lost confidence in her trial team and was "very guarded" with him initially. As he explained, Ms. Montgomery has to deal with what he called "her demons" constantly, but she was dealing with a lot more back then than she is now. Mr. Duchardt "worked like hell to get her say what the hell she meant," because expressing herself was very difficult for Ms. Montgomery. Ms. Montgomery had been "in no way in the loop" about the events which led to the loss of Ms. Clarke as her counsel and had had no interaction with Ms. Clarke since Ms. Clarke's dismissal. As Mr. Duchardt worked with Ms. Montgomery it became clear to him what a nice relationship Ms. Clarke had developed with Ms. Montgomery.

On May 16, 2007, Mr. Duchardt called former counsel Judy Clarke. As he explained, at that point he was trying to piece together what had happened. He likened the situation to his having walked into a bomb scene: the case had exploded and he was trying to figure out what triggered the entire problem. He was trying to get everybody's side. Ms. Clarke explained that

Ms. Montgomery was being denied her right to counsel. Mr. Duchardt felt that as Ms. Clarke had been admitted *pro hac vice*, she did not have a leg to stand on, legally. He told Ms. Clark to get herself admitted to practice in the Western District of Missouri and they could talk further. Mr. Duchardt characterized Ms. Clarke as "a delight and smart as all get-out."

Mr. Duchardt related that he also talked with his co-counsel, FPD David Owen, regarding what had happened to cause the breakup of the first defense team. Mr. Owen told Mr. Duchardt that Ms. Clarke was "condescending" and "emasculating." Mr. Duchardt felt that Mr. Owen, "had issues along those lines, because he voiced them. It struck [Mr. Duchardt] that that said volumes more about [Mr. Owen] than it did Judy [Clarke]." Mr. Duchardt explained further that Mr. Owen is not the easiest person to get along with "as Judy learned." But Mr. Duchardt made the best of the situation, because Mr. Owen was willing to work and it was, in Mr. Duchardt's opinion, better for the case to be funded by the FPD than to have to seek funding from the court.

When asked whether he perceived that there was some sort of gender war going on at the FPD at the time of the Montgomery case, Mr. Duchardt responded "Dave's issues were not just gender. Dave is very proud of Dave's capabilities and can be very abrasive." Mr. Duchardt defended Mr. Owen saying that Mr. Owen had a right to "be at least grumpy" about the fact that Ms. Clarke had not hired any experts at the time she was taken off the case. Mr. Duchardt said he was unaware of the two contracts Ms. Clarke had sent to experts before she was removed from the case and expressed that he "essentially started from scratch" upon entering his appearance.

At the time he entered the case, Mr. Duchardt knew that he wanted to get Dr. Ruben Gur involved. He had "wanted to use Ruben in a previous case and the opportunity just did not work out." Though Mr. Duchardt did not have a social history or any specific concern or symptom that indicated that Ms. Montgomery had a brain injury which needed investigation, he "figured that if anybody was going to find an issue here, it was Ruben." Mr. Duchardt further explained, "Basically where we were with Lisa is that we were making it up as we went along, because there was nothing obvious wrong with her except her suicide [attempts]."

Though other experts examined Ms. Montgomery prior to Dr. Ramachandran's entrance into the case, Mr. Duchardt explained that Drs. Logan and Gur "had none of that pseudocyesis stuff 'till we got Ramachandran." Mr. Duchardt knew that Dr. Logan would be an expert for the defense based on his 2005 evaluation of Ms. Montgomery: "I knew that we had Bill [Logan] kinda in good shape, because of his competency to proceed evaluation." Mr. Duchardt said that he looked into other experts, because "quite frankly we had the money to spend and I was looking for additional ideas."

Mr. Duchardt recalled that Mr. Owen was the team member who found Dr. Ruth Kuncel. Mr. Duchardt was not pleased with Dr. Kuncel's work on the case, saying "in hindsight, Ruth did not do a very good job." Mr. Duchardt indicated that perhaps what Dr. Kuncel finds works in Chicago state courts just does not play well in Federal Court. Mr. Duchardt said that though Dr.

Kuncel "talked a good game" she did not do well on the witness stand. As Mr. Duchardt said, "I mean, in juvenile court, she'd probably do just fine, but she was in the big leagues."

Mr. Duchardt said that Dave Owen was the originator of the theory of pseudocyesis. "Dave never could pronounce that word to save his life, but he came up with that thought from day one." Mr. Duchardt took Mr. Owen's idea and "chased it down." Addressing how he located Dr. Ramachandran, Mr. Duchardt said, "If you look up pseudocyesis, you find Ramachandran." Mr. Duchardt found Dr. Ramachandran to be "just a delight." Mr. Duchardt was unaware of where Mr. Owen might have learned about pseudocyesis, but thinks that it was the best diagnosis, "That got us as close to having a finger on the pulse as anything."

Mr. Duchardt used an electronic copy of the FPD file provided to him on a hard drive. As he explained, "everything I needed was there electronically." Mr. Duchardt was the person on the team in charge of determining what materials were provided to experts, but his memory (of which he admitted he is not completely certain) is that the copies of the materials were made at the FPD and sent out from that office.

In 2006, Mr. Duchardt had two capital jury trials for Phil Street. As he said, "there were a lot of eighty hour weeks in those times." His work load for that year was, "primarily it was Lisa [Montgomery] and Phil [Street]."

With regard to how the defense team functioned, Mr. Duchardt explained that he was "not a big meetings guy." If he needed something from someone on the team, he would email or call that person rather than consult the whole team. "If I thought of something I thought needed to be done, I would call Ron [Ninemire, investigator with the FPD] and he would be on it." He was unaware whether there was a chain of command at the FPD; he indicated that there may have been some process by which Mr. Ninemire sought approval before doing the tasks Mr. Duchardt requested, but that the process always seemed seamless to Mr. Duchardt. Though Mr. Duchardt acknowledged that he would have been the person in charge of the mental health investigation, including the work by the mitigation specialist, he remembered, "Dani [Waller, the investigation specialist,] did not come on 'till later."

"Someone calling themselves a mitigation expert is almost laughable," said Mr. Duchardt. He feels that death qualified attorneys are the mitigation specialists. In this case, he was the death qualified attorney, "so, yeah, I would have been the mitigation specialist." The FPD hired Dani Waller as a mitigation specialist, and Mr. Duchardt was ok with that, though he unequivocally states that he was the person in charge of mitigation. Mr. Duchardt explained that he "did not really have a lot of a relationship with Dani Waller," though he characterized her as a "good gal." He said Ms. Waller did what she was asked to do. He recalled that Dave Owen was the person who primarily assigned tasks to Ms. Waller; Mr. Duchardt did not recall asking Ms. Waller to do very much. He recalled that Ms. Waller "had a nice rapport she developed with

Lisa," but went on to say that Ms. Waller's "role in terms of what I was doing was not a whole lot."

Mr. Duchardt recognized that Ms. Montgomery had serious issues in even being in a room with a man. As he said, "God bless Park Dietz, he finally figured one thing out:" Lisa had post-traumatic stress disorder at being in the room with one man by herself much less two men. Mr. Duchardt said, "Literally what Lisa always felt is that every guy always wanted something from her. I had to figure out a way that wasn't an issue." Mr. Duchardt worked hard at getting Ms. Montgomery to "not think of me as a guy." He said that it took a long time to accomplish that – indicating that one should "look at the time sheets" to see how much work he invested visiting with her. One of the ways he attempted to alleviate Ms. Montgomery's stress was that when they had long sessions together, he would bring his wife, Ryland Duchardt. He said Ms. Duchardt has a masters in counseling and a social work type background, and Ms. Montgomery "took to her like a second mom type thing." Despite his perception that Ms. Montgomery was comfortable with him when Ms. Duchardt was in the room, he admitted, "It was only after trial that Lisa began to open up about things related to the case."

Mr. Duchardt explained it was a great effort to explain to Ms. Montgomery the process of a trial and what she was facing, "so much of [our effort] was us being able to communicate to her; we could only get so far before she shut down." Mr. Duchardt explained that the way Ms. Montgomery learned to cope with bad stuff was to put it in a room inside herself and shut the door and never open that door again. He spent a lot of time telling her that they had to open the door and have a look at what was inside. Because Ms. Montgomery could not disclose the extent of her trauma, he did not have much information to provide to the experts, "there wasn't a hell of a lot to share." Mr. Duchardt said that he got social history information from Ms. Montgomery during a long interview with her while she was in Pennsylvania for testing "and really that was the script."

Mr. Duchardt "absolutely" agreed that Ms. Montgomery functions much better since her transfer to the Bureau of Prisons where she was placed on new psychotropic medication. He said she got some better while at Corrections Corporation of America (CCA) when the psychiatrist there got "on board that there are more issues [with Ms. Montgomery] than meets the eye."

Regarding whose idea it was to have the CCA psychiatrist testify at trial, Mr. Duchardt said that, "basically Dr. McCandless presented herself with those ideas." Her testimony sort of "fell into our lap." Dr. McCandless made notes to her file and Duchardt read them "and that's literally in the middle of trial." When asked how it was that he got Dr. McCandless' notes over a weekend during the trial, Mr. Duchardt said he kept a "free flow of that stuff coming to [him]" from CCA.

Dr. Logan told Mr. Duchardt that he [ Logan] could only provide the team mitigating evidence, as Mr. Duchardt put it, Dr. Logan said he couldn't give the team a "first phase"

defense. Based on Logan's inability to find a psychiatric disorder which would support insanity, Mr. Duchardt provided Dr. Logan Dr. Ramachandran's report, and Dr. Logan was able to support Dr. Ramachandran's analysis.

Duchardt clarified that the theory presented at trial was that Lisa believed that Bobbie Jo Stinnett's baby was, in Lisa's delusional mind, Lisa's baby. Of this theory Mr. Duchardt said, "Frankly I think it was every bit as good as the government's theory."

Regarding the presentation of the defense, Mr. Duchardt explained that Mr. O'Connor "exercised discretion as lead counsel" in only a few instances. One of those decisions was to not go with what has come to be known as "the Tommy defense." Mr. Duchardt expressed that he, himself, has "no doubt" that Ms. Montgomery's brother Tommy Kleiner was present during the killing of Ms. Stinnett. He "absolutely believe[s]" that Mr. Kleiner's probation officer fudged her records, thereby providing Mr. Kleiner's alibi. Mr. Duchardt explained that Mr. Kleiner told John O'Connor that Mr. Kleiner left court and returned a week later to visit his probation officer; Mr. Duchardt does not believe the probation officer made contemporaneous notations as she was supposed to do and later entered the date wrong when she went back to do her computer records. He does not believe she doctored the records to deliberately affect this case. Mr. Duchardt was disappointed in Mr. O'Connor's decision to not present this defense to the jury. As he put it, had it been Mr. Duchardt's decision, he would still be arguing that Tommy Kleiner was there.

When questioned, about how 'the Tommy defense' could have fit with the not guilty by reason of insanity/pseudocyesis defense, Mr. Duchardt said that "I've no doubt Lisa [Montgomery] got into the situation, had the baby dropped into her lap and carried on." Mr. Duchardt continued, explaining that pseudocyesis works as a defense no matter who did the killing, "in Lisa's own mind the way she envisions the situation, she was Florence Nightingale who saved the baby."As to what his theory was as to why Tommy Kleiner (against whom Ms. Montgomery had a restraining order) would have gone to Bobbie Jo Stinnett's house with Ms. Montgomery, Mr. Duchardt suggested that we should "sit down and talk to Tommy for awhile; he did not need a lot of reason to do bad shit." He pointed out that both of Ms. Montgomery's brothers, Teddy and Tommy, are a piece of work; "those guys are just louses."

When asked about how the defense team thought it could keep 'the Tommy defense' out of the trial, given that the experts had been provided information about Tommy being there, Mr. Duchardt referred us to Mr. O'Connor as the best source of an explanation for how that could possibly have worked. Mr. Duchardt characterized Mr. O'Connor's position as being that Ms. Montgomery is crazy and her belief that her brother may have been present was yet another manifestation of her mental illness. Mr. Duchardt disagreed with Mr. O'Connor's strategy and wanted to take it on the chin and battle it out – presenting the theory to the jury that Tommy Kleiner was the actual killer.

Mr. Duchardt had one fairly long meeting with Ms. Montgomery's mother, Judy Shaughnessy, to size her up. He related that Mr. Owen had spent a lot of time with Ms. Shaughnessy, trying to butter her up, but Mr. Duchardt took a more direct approach with Ms. Shaughnessy: "She did not like that." Mr. Duchardt was left with the impression "she's only interested in Judy and had no problem having Lisa sold down the river." When asked how the decision was made as to who would do Ms. Shaughnessy's direct examination, Mr. Duchardt said he would not have let anyone else cross Judy, besides "John did not give a shit."

Mr. Duchardt pointed to two other decisions that Mr. O'Connor made as lead counsel with which he, Mr. Duchardt, disagreed. Mr. Duchardt disagreed with Mr. O'Connor's decision to abandon the pursuit of the information from Ms. Shaughnessy's divorce attorney. He also disagreed with Mr. O'Connor's decision regarding not cross-examining the government's expert psychiatrist, Park Dietz, regarding his failure to look at any of the physical manifestations Ms. Montgomery exhibited of pregnancy. Mr. O'Connor thought Dr. Dietz's failures were better exploited through arguing them to the jury in closing argument; Mr. Duchardt thought that he needed to have at Dr. Dietz right there.

Mr. Duchardt did not recall knowing of any disturbance caused by Ms. Shaughnessy in the hallway of the courthouse. Having met her, he could imagine that such a thing happened, but did not specifically recall anyone telling him she was intimidating witnesses.

Mr. Duchardt expressed his belief that Dr. Ramachandran's testimony went very well. As Mr. Duchardt explained, "the good thing about Dr. Ramachandran is that he is not afraid to embrace the frailties of the entire defense." According to Duchardt, Dr. Ramachandran saw the frailties of the case as facts that could go either way. Mr. Duchardt believes that the key issue that was always in Dr. Ramachandran's favor was that Ms. Montgomery had physical manifestations of pregnancy; Mr. Duchardt said that Dr. Dietz never addressed that in any way.

Mr. Duchardt did not see his guilt/innocence phase defense as compromised by the loss of Dr. Gur's proffered testimony. "To me he was not as important to the pseudocyesis defense as he would've been to a general penalty phase defense." Mr. Duchardt felt that Dr. Gur's testimony certainly would have given physiological credence to pseudocyesis and for that reason, he argued vigorously for its admission. Mr. Duchardt mostly wanted Dr. Gur's "pretty pictures" of Ms. Montgomery's brain damage admitted. Mr. Duchardt recalls that "we won the motion [to exclude based on *Daubert*] on the merits" conditional upon Dr. Gur getting get raw raw data to the prosecution. He said they spent several weeks with Dr. Gur providing data and the government protesting that the data was insufficient. On the eve of trial, the court decided not to allow Dr. Gur's testimony. Mr. Duchardt did not feel he needed a continuance to make things better, because "it wasn't that any time was going to change that." The Judge was going to allow the PET so Mr. Duchardt's argument was going to be that not only the PET should be admissible, but that under the lesser standard of admissibility at the penalty phase, the other

evidence should be admitted as well. The judge's decision to not admit any of Dr. Gur's testimony thwarted Mr. Duchardt's plan.

When Ms. Montgomery was first tested at Dr. Gur's lab in Philadelphia, pseudocyesis was not yet a working theory. Mr. Duchardt clarified that Dr. Gur was "brought along" on pseudocyesis just as Dr. Logan was. Mr. Duchardt explained that when Dave Owen introduced the idea of pseudocyesis, "It was like a light bulb came on."

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Chris Armstrong

Signed this 15th day of March, 2013.

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-8001-CV-W-GAF** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**ORDER**

Now pending before the Court is Movant's *Ex Parte* Motion for Reconsideration of Court's June 30, 2014 Order Limiting Public Funded Representation (Doc. #115). Having fully considered Movant's motion, it is

ORDERED that Movant's *Ex Parte* Motion for Reconsideration of Court's June 30, 2014 Order Limiting Public Funded Representation (Doc. #115) is denied for the reasons stated in the Court's Order Limiting Public Funded Representation (Doc. #114), as well as the overall management of this case by the Court. Counsel prevailed on the Court for additional resources to perfect Movant's claim and that consideration was granted. As stated in the Order Limiting Public Funded Representation (Doc. #114), at this stage one CJA attorney together with the resources of the Office of the Federal Public Defender, which office, counsel acknowledges, has two attorneys actively assisting Movant (Movant's *Ex Parte* Motion for Reconsideration of

Court's June 30, 2014 Order Limiting Public Funded Representation (Doc. #115)), are more than sufficient to capably and effectively represent Movant.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 15, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| *Defendant/Movant,* | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-8001-SJ-GAF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff/Respondent.* | ) | |

MOTION TO STAY COURT'S JUNE 30, 2014 ORDER

COMES NOW Lisa Montgomery, by counsel, Christine M. Blegen, Lisa Nouri, and Kelley Henry, pursuant to Fed. R. App. P. 8, and moves this Court to stay the effect of its June 30, 2014 Order directing counsel Christine M. Blegen to involuntarily file a notice of withdrawal no later than July 28, 2014 (Doc. #114) so that undersigned counsel may seek a writ of mandamus in the United States Court of Appeals for the Eighth Circuit.[1] Respectfully, undersigned counsel Christine M. Blegen, does not believe that she can ethically comply with the Court's order. In support of this Motion, Movant states the following:

I. Factual Background

Lisa Nouri and Christine M. Blegen were appointed to represent Mrs. Montgomery on April 17, 2012 (Case No. 05-06002-CR-GAF, Doc. #430). On April 25, 2012, the Court issued an Order Regarding Billing Procedures, Setting of Compensation, and Authorization to Make Interim Payments (Case No. 05-06002-CR-GAF, Doc. #433). An offer by lead counsel Lisa

[1] Orders removing counsel are reviewable under the All Writs Act. 28 U.S.C. Sec. 1651. *Cole v. U.S. Dist. Court for Dist. Of Idaho*, 366 F.3d 813,816 (9th Cir. 2004).

Nouri to submit a case budget was declined. Thereafter, all of Ms. Nouri's and all of Ms. Blegen's CJA vouchers were paid in full through March of 2013.

In September of 2012, Ms. Nouri and Ms. Blegen did submit a detailed proposed budget and request with regard to investigative expenses and expert witness funds (Doc. #11).[2] In the motion for funds, Ms. Nouri and Ms. Blegen proposed the alternative of appointing the Federal Public Defender's Office for the Middle District of Tennessee to provide the resources needed to investigate and prove Mrs. Montgomery's claims (Doc. #11). This Court approved the appointment of the Federal Public Defender's Office for the Middle District of Tennessee (Doc. #13) and Kelley Henry entered her appearance on November 1, 2012 (Doc. #20).

On March 19, 2013, the legal team comprised of Ms. Nouri, Ms. Blegen, and Ms. Henry filed Mrs. Montgomery's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. §2255 (Case No. 12-CV-8001-GAF, Doc. #32). Mrs. Montgomery's attorneys also sought to have the §2255 motion assigned to a different judge, believing Your Honor to be a witness with regard to certain claims in the §2255 motion (Doc. #41). Following a hearing on May 6, 2013 (Doc. #51), the motion was denied on June 25, 2013 (Doc. #59).

Three days later, on June 28, 2013, the Court sent out a Notice Concerning Budget and CJA Representation for Movant (Doc. #60), scheduling a meeting with counsel of record for Lisa Montgomery on July 12, 2013. During the meeting, the Court's initial suggestion was to remove both CJA attorneys, Ms. Nouri and Ms. Blegen (Tr. 7/12/13, p. 4). The Court's alternative suggestion was to remove one CJA attorney (Tr. 7/12/13, p. 4). Ms. Nouri explained that each attorney was extremely important to the case and that each attorney was taking on different responsibilities in the 2255 litigation (Tr. 7/12/13, p. 7). Ms. Nouri noted that the removal of any

[2] All document citations from this point forward refer to the docket sheet for Case No. 12-CV-8001-GAF).

of the attorneys would have a detrimental impact on Lisa Montgomery's case and urged the Court to leave Mrs. Montgomery's legal team in place (Tr. 7/12/13, p. 6-7, 8). The Court responded, "I just really don't see how I can do that, Lisa. I just really don't." (Tr. 7/12/13, p. 7). Ms. Henry explained that her office is a small office and that she has a full caseload in addition to her work on Mrs. Montgomery's case (Tr. 7/12/13, p. 10). She expressed that it was never her intent to be lead counsel in this case (Tr. 7/12/13, p. 10). Ms. Nouri specifically informed this Court that Ms. Blegen is "the premier writer" and that "it would be devastating to lose her from the case." (Tr. 7/12/13, p. 18).

At the conclusion of the meeting, and upon our request, counsel for Mrs. Montgomery were afforded an opportunity to submit a written response and budget proposal (Doc. #62). In that response, counsel referred the Court to 18 U.S.C. §3599(e) which states:

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, ***each attorney so appointed <u>shall</u> represent the defendant throughout every subsequent stage of available judicial proceedings,*** including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and ***all available post-conviction process***, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(Emphasis added). As no attorney had moved to withdraw and Mrs. Montgomery had not moved to have any of her attorneys removed,[4] counsel suggested that Section 3599(e) does not permit *sua sponte* removal of one or more of Mrs. Montgomery's attorneys due to budgetary concerns.[5] Counsel provided the Court with additional authority from the United States Supreme Court. *Martel v. Clair*, 132 S.Ct. 1276 (2011).

[4] In fact, Mrs. Montgomery asked the Court, via declaration, to leave her legal team intact.
[5] Counsel did not, and does not, challenge the Court's authority to approve fee vouchers. This is not a voucher fee dispute.

Counsel further directed the Court's attention to *Stearnes v. Clinton,* 780 S.W.2d 216 (Tx. Ct. App. 1989) as authority that prevented the Court from removing any of Mrs. Montgomery's attorneys. In *Stearnes*, the Court held that "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." *Id*. at 223. *Stearnes* expressly acknowledges that while "an indigent defendant does not have the right to the appointment of a particular attorney," "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)).

In response to counsel's submission, the Court issued an Order on July 18, 2013 (Doc. #60). The Court described the response submitted by counsel for Mrs. Montgomery as a "less than conciliatory challenge to any cost control measures by the Court" and as "inappropriately and unnecessarily argumentative" (Doc. #60). The Order advised CJA counsel representing Mrs. Montgomery "that 25% will be withheld from all CJA vouchers as a cost control mechanism until the case is concluded before the District Court." (Doc. #60). In addition, the Court capped the total CJA fees in the case (Doc. #60). Neither Ms. Nouri nor Ms. Blegen have challenged or questioned that Order. As of the date of this filing, CJA counsel's fees are well below the cap set by the Court.

Moreover, undersigned counsel Christine M. Blegen has not submitted a CJA voucher since December of 2013. This is because minimal work was performed on Mrs. Montgomery's case

between January of 2013 and May 30, 2014 as the Government has been waiting on affidavits from two of Mrs. Montgomery's trial attorneys prior to filing the Government's Response to the pending Amended §2255 Motion. In June of 2014, there was litigation over certain requests made by trial counsel Fred Duchardt in connection with the affidavit he has been ordered by this Court to file (*See* Docs. #87-100, 104). This litigation led to the filing of a Motion for Writs of Mandamus and Prohibition with the United States Court of Appeals on Friday, June 27, 2014 at approximately 4:00 p.m. (*See* United States Court of Appeals for the Eighth Circuit Case No. 14-2437).

The following Monday morning, June 30, 2014, at 9:07 a.m., the Court, without notice or a hearing, *sua sponte* issued an Order directing undersigned counsel Christine Blegen to "file a notice of withdrawal no later than July 28, 2014."[6] With all due respect to this Court, Ms. Blegen cannot ethically comply with this Order. Ms. Blegen does not want to defy a court order. However, Ms. Blegen's client explicitly objects to the involuntary withdrawal of her lawyer. Ms. Montgomery states that, "The idea of losing Christine as my lawyer is devastating. I don't understand why the Judge wants to keep taking away my attorneys." (Attachment A, Declaration of Lisa Marie Montgomery, p. 1). Mrs. Montgomery does not want any member of her team removed (Attachment A, p. 2). Ms. Blegen has thus been placed in an impossible position where she is asked to choose between her own interest in not being found in contempt of Court and the interests of her client. Ms. Blegen is prioritizing the needs of her client. Therefore, counsel seeks an order staying the effect of the Court's June 30, 2014 order where counsel believes that the

[6] An Ex Parte Motion to Vacate this Order was filed on June 28, 2014 (Doc. #115). The Motion was denied on July 15, 2014 (Doc. #118).

directive is in violation of federal law, the Missouri Rules of Professional Responsibility,and Movants Sixth Amendment right to counsel.[7]

## II. Discussion

The Rules of Appellate Procedure require Movant to first seek a stay from this Court before seeking a stay in the Court of Appeals. Further, Ms. Blegen is seeking a stay of this Court's Order prior to July 28, 2014 as she cannot ethically comply and cannot withdraw on that date.

Courts use a five part test which balances the equities when considering whether to grant a stay. The five factors are not equal and one factor can outweigh the other four. Here, all factors favor a stay.

### A. REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS

It is reasonably likely that the Court of Appeals will entertain this matter via the All Writs Act. *See Cole v. U.S. Dist. Court for Dist. Of Idaho*, supra. "The rule is that a writ of mandamus may be used to review the disqualification of counsel." Id. 366 F.3d, p. 816 (citing *Christensen v. United States Dist. Court*, 844 F.2d 694, 697 & n.5 (9th Cir. 1988)). "The reason is because the harm of such disqualification cannot be corrected with an ordinary appeal." Id.

Ms. Blegen has been representing Lisa Montgomery for over two years and has invested over 750 hours learning the case, meeting with Mrs. Montgomery, conducting legal research, and drafting pleadings. On March 19, 2013, Mrs. Montgomery's legal team filed a comprehensive, detailed, and well-supported Section 2255 motion (Doc. #32). An amended motion was filed on October 1, 2013 (Doc. #72). Several claims in Mrs. Montgomery's Section 2255 motion relate to the removal of attorneys from her case without her consent and the failure of her ultimate trial

---

[7] The Court's Order directing Ms. Blegen to withdraw is interpreted as an Order removing her. Undersigned assumes that if Ms. Blegen does not withdraw then the Court will enter a further explicit Order of removal.

attorneys to work as a team (Doc. #72). As a result, it is all the more troubling to Mrs. Montgomery (*See* Attachment A), as well as to her 2255 legal team, that this Court continues to try to remove one or more attorneys from her current team.[8] The Court's Order has exacerbated Mrs. Montgomery's already serious mental illness (*See* Attachment A). Movant's current mental state is extremely fragile and in the aftermath of the Court's order mental health professionals at Carswell have stepped up her monitoring. (*See* Attachment A).[9]

Both Ms. Nouri and Ms. Blegen accepted the Court's cost containment measures issued last summer. No new resources have been sought from the Court. Ms. Nouri has not submitted a CJA voucher since February of 2014 and Ms. Blegen has not submitted a voucher since December of 2013. The total combined vouchers submitted by Ms. Nouri and undersigned counsel to date, including withheld funds, are still well below the cap set by this Court. Counsel have been making every effort to avoid duplication of effort and to work efficiently in this matter. It is somewhat baffling to counsel that at a point in time where no vouchers are pending and CJA counsel are well below the cap set by this Court, a directive has been issued for Ms.

[8] While the Court cites to control of public funded representation and case management as the basis for the Order, the record shows that CJA counsel are below the cap set by the Court. Removal of Ms. Blegen wastes the investment already made as she is the most familiar with the 2255 Amended Motion. In addition, her removal will force other counsel to have to shift over to legal research and writing tasks. Placing that burden on out of district federal public defenders is no less a burden on public funds. Further, given the timing of the Court's order, and the Court's pattern of removing counsel in this case over movant's objections, the record suggests that the most recent Order is an attempt to control and/or manage the litigation of Mrs. Montgomery's 2255 motion. The removal of the primary author in the case appears to be a sanction for the filing of a successful motion to stay a previous court order and the filing of a subsequent writ in the United States Court of Appeals for the Eighth Circuit. Undersigned counsel have not impeded the progress of this case on the Court's docket. Rather, counsel have responded to the actions taken by Mrs. Montgomery's trial attorneys in a good faith effort to protect Mrs. Montgomery's claims for proper review.

[9] Movant has a history of suicidal behavior including a near successful suicide attempt in June of 2012. Undersigned counsel are profoundly concerned about her current mental condition.

Blegen to involuntarily remove herself from this case. As the directive came on the first business day following the filing of a writ with the Eighth Circuit, it suggests that the removal of counsel is again being used as a sanction.

With all due respect to this Court, Ms. Blegen cannot ethically withdraw from her representation of Mrs. Montgomery. Ms. Blegen is invested in this case and has developed an attorney-client relationship with Mrs. Montgomery. Undersigned counsel has been to visit Mrs. Montgomery and to discuss her case numerous times, beginning in May of 2012 and continuing throughout the case. For the two most recent visits, undersigned counsel has covered her own expenses, billing only for the time spent meeting with the client and driving time to and from airports.[10]

More importantly, undersigned counsel has both a statutory and ethical duty to continue to represent Mrs. Montgomery. Pursuant to 18 U.S.C. §3599(e):

> Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, ***each attorney so appointed <u>shall</u> represent the defendant throughout every subsequent stage of available judicial proceedings,*** including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and ***all available post-conviction process***, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(Emphasis added). Attached to this Response is a declaration from Mrs. Montgomery stating that she wants undersigned counsel to remain as one of her attorneys (Attachment A). Mrs. Montgomery has certainly not filed a motion asking that undersigned counsel be removed or replaced. Ms. Blegen has not sought to withdraw from the case.

---

[10] Undersigned counsel views this as no different than billing for travel time as if Mrs. Montgomery were being held at CCA or one of the other detention centers used by the Court.

In addition, Missouri Rule of Professional Conduct 1.16 governs termination of representation of a client and provides that:

> (b) Except as stated in Rule 4-1.16(c), a lawyer may withdraw from representing a client if:
>
> (1) withdrawal can be accomplished without material adverse effect on the interests of the client;
>
> (2) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;
>
> (3) the client has used the lawyer's services to perpetrate a crime or fraud;
>
> (4) the client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement;
>
> (5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;
>
> (6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or
>
> (7) other good cause for withdrawal exists.

None of these conditions exist in the present case. In fact, as there would be a material adverse effect on the interests of Mrs. Montgomery if Ms. Blegen were to withdraw, Ms. Blegen would be violating Rule 1.16(1) if she complied with the Court's Order. Therefore, Ms. Blegen does not believe that she may ethically withdraw from this case in light of Mrs. Montgomery's desire for her to remain on this case.

Undersigned counsel also believe that Mrs. Montgomery's Sixth Amendment rights would be violated if Ms. Blegen complied with the Court's Order.

Undersigned counsel believe that given all of the facts and authorities set forth above, there is a reasonable likelihood of success on the merits.

B. IRREPARABLE HARM

"Absent mandamus relief, a counsel's wrongful disqualification, which cannot be immediately appealed, can cause great harm to a litigant." *Cole*, *supra*, 366 F.3d at 817. While Mrs. Montgomery did not have the right to select a particular attorney when the Court was appointing CJA counsel, she now has an established attorney-client relationship with Ms. Nouri and Ms. Blegen as well as with the attorneys from the Federal Public Defender's Office for the Middle District of Tennessee. (*See* Attachment A). The Court should not interfere with that attorney-client relationship.

Furthermore, Mrs. Montgomery's current attorneys function as a team with each attorney taking on distinct responsibilities. Ms. Blegen's unique role is that of the primary legal research and writing attorney. Ms. Blegen spent over two years in the criminal appellate division of the Missouri Attorney General's Office and ten years as a career law clerk. She specializes in legal research and writing. Mrs. Montgomery will suffer irreparable harm if Ms. Blegen is removed from her 2255 legal team.

The importance of having a skilled legal research and writing attorney in a 2255 case is underscored by the fact that the Government has recently added Phil Koppe, an experienced legal research and writing attorney who worked with Ms. Blegen in the Missouri Attorney General's Office, to the Government's 2255 legal team (Doc. #102, Entry of Appearance by Phil Koppe, 6/16/14).

C. HARM TO OTHERS

This Court should not set a precedent that CJA counsel may be appointed and removed at the discretion of the Court. As recognized in *Stearnes, supra*, "the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove

counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality." Id. at 223. *Stearnes* expressly held that "once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Id*. at 221 (citing *Malcom v. State*, 628 S.W.2d 790 (Tex.Cr.App. 1982) and *Harling v. United States*, 387 A.2d 1101, 1102 (D.C. Cir. 1978)). If the Court is permitted to remove Ms. Blegen, allegedly over cost containment where no vouchers are currently pending, no vouchers have been submitted in several months, and CJA counsel's total vouchers are well below the cap set by this Court, it will undermine the confidence of others in court-appointed counsel.

D. PUBLIC INTEREST

It is in the public's best interest to allow Ms. Blegen to remain a member of Mrs. Montgomery's 2255 legal team rather than waste the investment that has been made in Ms. Blegen's services to date. Ms. Blegen is very familiar with the file in this case. In addition, as the primary author of the initial an amended 2255 motions, she is very familiar with Mrs. Montgomery's claims and the materials and legal authority supporting those claims. Not only is Mrs. Montgomery's 2255 team planning to have her write the traverse in this case, her knowledge of the file and the claims will be valuable in the event of an evidentiary hearing or, in the alternative, in future appellate practice should Mrs. Montgomery's claims be denied without a hearing.

It is not the number of attorneys assigned to a case that should concern this Court, but rather the total number of hours spent on the case. Undersigned counsel have made a concerted effort to divide responsibilities and coordinate their efforts to efficiently present Mrs. Montgomery's

claims to this Court. It is in the public's interest for the team to remain intact to conclude the representation of Mrs. Montgomery before this Court.

## III. Conclusion

For the reasons stated above, Ms. Blegen finds herself statutorily, ethically, and Constitutionally unable to comply with this Court's June 30, 2014 Order directing her to remove herself from this case. To be perfectly clear, Mrs. Montgomery wants Ms. Blegen to continue as one of her attorneys and Ms. Blegen wants to continue representing Mrs. Montgomery. As Ms. Blegen does not wish to be found in contempt of this Court's Order, undersigned counsel ask the Court to stay the June 30, 2014 Order so that counsel may seek a writ of prohibition from the United States Court of Appeals for the Eighth Circuit.

Respectfully submitted,

/s/ *Christine M. Blegen*
CHRISTINE M. BLEGEN, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
(816) 213-0384

/s/ *Lisa G. Nouri*
LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No. 38849,
Tn. Bar No. 021113
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff/Respondent,* | ) | |
| v. | ) | Case No. 12-CV-8001-SJ-GAF |
| LISA M. MONTGOMERY, | ) | |
| *Defendant/Movant.* | ) | |

**DECLARATION OF LISA MARIE MONTGOMERY**

I, LISA MARIE MONTGOMERY, declare as follows:

I am incarcerated under sentence of death at the Federal Medical Facility Carswell in Fort Worth, Texas. I am challenging my conviction and sentence in court. The court appointed two lawyers to assist me with my case: Lisa Nouri and Christine Blegen.

I first met Lisa and Christine in May 2012. Lisa and Christine have each visited with me several times. Sometimes they come together and sometimes they come alone or with another member of the team. About six months after I met Lisa and Christine, the court appointed Kelley Henry and the Office of the Federal Public Defender in Nashville to assist Christine and ~~[illegible]~~ Lisa with my case. Since then Kelley and Amy Harwell from the FPD have joined the team and have been visiting me along with Lisa and Christine.

I talk to someone from the team every week. This contact is very important to me. The contact I have with all of my lawyers lets to know what is going on in my case and also to know that I am not alone, that my team is fighting for me.

Earlier this month, the team told me that the judge ordered that Christine Blegen to withdraw from my case. The idea of losing Christine as my lawyer is devastating. I don't understand why the judge wants to keep taking away my attorneys. Not only do I depend on Christine as my counsel, she has been faithful in visiting

me and in supporting me through hard times in my case.

It is hard for me to describe blow the news about the court's order was. Even though my team told me that they would do everything they could to challenge the court's order, I began crying uncontrollably. The prison guards called for a psych consult, because they were afraid I might become suicidal or hurt myself.

I have met with the psych counselor numerous times since this news. Not only is it hard for me to fathom losing Christine, the idea that the judge might remove one of my lawyers — again — just throws me back to that horrible time before my trial when he removed my trial lawyers, first Judy Clarke, then Susan Hunt.

The news that the court is trying to take away one of my lawyers has shaken my confidence in how my case will be handled from here on out. I am afraid because my attorneys work as a team. I have grown to trust them all. I wasn't given any chance to tell the judge how I feel about my attorneys before he ordered Christine to withdraw. I wanted to let someone know how I am feeling.

I declare under the laws of the United States and the penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

Dated this 16th day of July, 2014.

Lisa M. Montgomery

LEGAL MAIL

David

Since I have trouble expressing myself verbally even in the best of circumstances, and especially so when I am upset or distressed, it was suggested to me that perhaps I could put in writing how I am feeling about Ms. Clarke being removed from my defense team.

At first, I thought - no problem. Surely I can write down how I feel about it. But I have found it very hard to put my thoughts and emotions into writing. I have never been a confrontational type person, and especially not so in a negative way. So this is hard for me to do.

But I asked myself if I would have regrets later on by not making a stand now? Would those regrets possibly be strong enough that I would feel the need now to say something, no matter how much it troubles me to do so? I feel the answer to that would be yes, and so I'm writing this.

Due to a history of ~~[illegible]~~ problems with lawyers in family courts, I have not trusted lawyers, even the ones appointed to me in this case. I have struggled greatly with being able to trust them.

I've already lost several team members without explanation: Anita Burns, one of the first attorneys appointed, and then Lisa Rickert, an investigator. Because of these losses, I have had to struggle with trusting that members of my team would

LEGAL MAIL

Susan Hunt

Page 2

stay after building a relationship with them.

When Judy was first appointed, I went through much of the same struggles with her. I have done my utmost to overcome these issues and learn to trust my attorneys again. Of all the lawyers I have had to date, I have felt the most comfortable with Judy.

I have felt she answered me in ways I could understand and I had started to feel a part of what was going on. I had even agreed to a trial period on medication that I had previously fought taking. I trusted in her advice that I should at least give it a try and when I wanted to quit taking it, her encouragement to keep trying showed she truly cared about my well-being. Being able to find an attorney that understands me and I in turn understand them is a difficult task. I felt I had found this combination in Judy.

And then on April 20, I was looking forward to a much anticipated visit with Judy. Only minutes before the visit I found out she had been removed from my defense team. No explanation was given to me. When I asked what was going on, I feel that information was being withheld from me.

Had I done something wrong? I was not aware of any problems with her, either with the rest of my defense team or myself. And so I have had trouble accepting what has

LEGAL MAIL

Hunt

Page 3

happened. I have spent most of this past week in a state of shock. Little things have seemed to overwhelm me. I've had trouble sleeping, yet I don't want to get out of bed to do anything. I've missed out on activities that I once enjoyed because of this. I'm having trouble eating, only forcing myself to do so because I have to. The women here in the pod where I live have noticed changes in me and have expressed concern for my well-being. When I was asked what was wrong, I replied that I had lost all hope.

With Judy gone, it's difficult to have any confidence in the future of my case. Particularly since the decision to remove her was made without any input from me or any prior knowledge of it by me. Am I to now expect the same thing to happen in any other decisions to be made? Removing Judy from my team has been a devastating blow to me. This is a critical time in my life and I need to be surrounded by professionals who I can fully trust and I no longer feel that way.

Throughout this past week, Susan has shown a genuine concern for how I was feeling about this decision and I appreciate her effort to do so.

Lisa Montgomery