**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY** | ) | |
| | ) | |
| *Petitioner* | ) | |
| | ) | |
| **v.** | ) | Case No. 12-8001-CV-SJ-GAF |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *Respondent* | ) | **FILED UNDER SEAL** |
| | ) | |

***EX PARTE MOTION TO APPROVE ADDITIONAL INVESTIGATION BUDGET THROUGH MARCH 22, 2013***

Comes now, Petitioner, Lisa M. Montgomery, by and through her undersigned appointed counsel and pursuant to § 640 of Part A Guidelines for Administering the CJA and Related Statues, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representation, 21 U.S.C. §3599(a)(2), and the 5th, 6th, and 8th Amendments, and submits this motion for approval of an additional investigation budget. In the alternative, petitioner asks the Court to consider appointing a Federal Public Defender office to assist undersigned counsel by providing the resources necessary for a mitigation investigation.

## I. Introduction

As this Court is well aware, there is a strict one-year statute of limitations for filing a motion pursuant to 28 U.S.C. §2255. Mrs. Montgomery's *Petition for Writ of* Certiorari was denied on March 22, 2012 making her §2255 motion due on March 22, 2013. Both undersigned counsel were appointed to represent Mrs. Montgomery on April 14, 2012. By that date, twenty-six days had already run on Mrs. Montgomery's one-year window for filing a §2255 motion. Counsel sought the approval of a mitigation specialist on June 26, 2012 (Doc. #436). This Court approved one mitigation specialist on July 23, 2012, with a $10,000 budget to conduct a

preliminary assessment of the investigation that needs to be completed to support the likely §2255 claims (Doc. #441). By that time, 124 days had run on the 365-day statute of limitations for filing Mrs. Montgomery's 2255 motion.

In recognition of the need for adequate resources to ensure fair and reliable post-conviction adjudications in complex capital cases, Congress requires that courts authorize funds that are reasonably necessary to properly raise issues cognizable under 28 U.S.C. §2255:

> In any post-conviction proceeding under section 2254 or 2255 of Title 28 seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with subsections (b) through (f).

21 U.S.C. §3599(a)(2). In determining Congressional intent for this section, the United States Supreme Court found that the services of investigators and experts may be critical in researching and identifying possible claims for relief in habeas corpus proceedings challenging a sentence of death. *McFarland v. Scott*, 512 U.S. 849, 855 (1994). Other courts have observed that "it makes little sense to force [a prisoner] to first try to make a good faith claim of a constitutional violation before supplying him with the resources to investigate [the] claim's factual basis and validity." *Patterson v. Johnson*, 2000 WL 1234661, *2 ((N.D. Tex. 2000), relying on *McFarland v. Scott*, *supra*. The "established habeas corpus and death penalty precedent suggests Congress intended to provide prisoners with 'all resources needed to discover, plead, develop, and present evidence determinative of their 'colorable' constitutional claims.'" *Patrick v. Johnson*, 48 F.Supp.2d 645, 646 (N.D. Tex. 1999).

The policies favoring provision of financial services for investigation and experts are even stronger in capital cases because the "finality" of death and its "qualitative [] difference from a sentence of imprisonment, however long," magnifies the "need for reliability" and,

accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Principles of fundamental fairness guaranteed by the Due Process Clause entitle indigent defendant to the assistance of government-funded experts "to present their claims fairly in an adversary system." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985).

Before asking for additional funding, undersigned counsel thought it would be prudent to provide the Court with a brief overview of what has been accomplished to date. Undersigned counsel submits this request for additional funding based on the needs revealed by our preliminary work and that of our mitigation specialist.

Almost immediately upon being appointed in this case, undersigned counsel were provided with a case file from the Federal Public Defender's Office. Both undersigned counsel were told that this file constituted the entire case file. As this Court is well aware, Mrs. Montgomery was represented by numerous attorneys at the trial level. Undersigned counsel were given the impression that the complete trial level file had been consolidated at the Federal Public Defender's Office. The file was initially produced to counsel in electronic format on an external hard drive. In addition, undersigned counsel participated in a brief meeting with Fred Duchardt, John O'Connor, and members of the Federal Public Defenders Office on May 3, 2012.

Undersigned counsel reviewed the complete trial transcript and appellate documents in May of 2012 in addition to beginning a review of the case file produced by the Federal Public Defender's Office. In reviewing these materials it became evident to undersigned counsel early on that among other issues, the mental health history and status of the client were going to be major concerns along with the manner in which the mitigation investigation was conducted.

Trial counsel did present some mental health evidence at trial as well as some penalty phase evidence. In an effort to obtain professional guidance on the manner in which trial counsel

approached these two areas, undersigned counsel sought guidance from a consulting clinical psychologist and a mitigation specialist.

The mitigation specialist, Lindsay Runnels, was located first. Ms. Runnels resides in Kansas City, Missouri and specializes in mitigation investigations. Ms. Runnels was a member of the 2255 team that recently obtained a new penalty phase for the only other female death row inmate in the federal system, Angela Johnson. *See Angela Johnson v. United States*, 2012 WL 992109, *208.

After meeting with Ms. Runnels and giving her some background on the case, Ms. Runnels expressed skepticism to counsel that the complete trial file was contained in the electronic production as well as whether the complete trial file could be contained in only the 23 file boxes counsel had seen at the Federal Public Defender's Office based upon her work on other death penalty cases. As a result, undersigned counsel, assisted by Ms. Runnels, went to the Federal Public Defender's Office to review the hard copy of the file. This subsequent review of the hard copy of the file revealed that many case-related documents and items had not been made a part of the electronic format production. Counsel obtained the agreement of the Federal Public Defender's Office to take possession of the complete hard copy file on or about June 19, 2012.

In reviewing the file from the Federal Public Defender's Office in more detail, it became apparent to undersigned counsel that very little work product from trial attorneys John O'Connor or Fred Duchardt had been incorporated into the Federal Public Defender file. Letters requesting the files of these trial attorneys, along with signed releases from the client, were mailed out on July 25, 2012. Mr. O'Connor produced his file, consisting of five additional file boxes, the following week. Mr. Duchardt produced his hard copy file, consisting of eight file boxes, the following week and produced his electronic files on or about August 14, 2012.

Undersigned counsel had met with Susan Hunt in early June and she voluntarily produced her file at that time. Counsel met with Judy Clarke and her investigator this summer. Both Ms. Clarke and her investigator have produced their files to undersigned counsel.

The remaining trial attorney to be interviewed is David Owen. Counsel have made arrangements to interview Mr. Owen in September. It is not yet known if Mr. Owen maintained an additional file on the case.

In sum, undersigned counsel have requested files from all of the attorneys who worked on Mrs. Montgomery's case at the trial level. While voluminous materials have been produced, undersigned counsel are not entirely confident that they have the complete case file even at this time, 169 days into the 365-day statute of limitations.

Present counsel for Ms. Montgomery are continuing their review of the file and diligently investigating the case in furtherance of their duty under *McCleskey v. Zant*, 499 U.S. 467, 497 (1991), to raise and pursue "all claims which counsel knows or could discover upon reasonable investigation" and as required by the provisions of the AEDPA. Much work remains to be done to ensure that all viable claims are raised on Mrs. Montgomery's behalf within the statutory time period.

Neither appointed counsel in this case is an expert in mental health. We sought initial assistance from a mental health professional to help us identify potential problems and "red flags" in the record. Undersigned counsel were fortunate to be able to obtain an initial preliminary opinion on a *pro bono* basis. Counsel consulted with Kathleen Wayland, a Clinical Psychologist with a Ph. D. from Duke University who currently maintains a private practice. Dr. Wayland graciously reviewed portions of the trial transcript as well as certain interview reports concerning the interviews with family members and the list of materials provided to the

evaluating mental health experts at the trial level. Dr. Wayland has indicated that, based upon a preliminary review of portions of the file, and discussions with undersigned counsel and our mitigation specialist, the mental health issues were not correctly analyzed and presented in Mrs. Montgomery's case, aspects of the interviews related to Mrs. Montgomery's childhood and family were handled incorrectly, critical information was not obtained from family members, and important information, some already in the possession of trial counsel, was not provided to the mental health experts at the trial level thereby negatively impacting their evaluations of Mrs. Montgomery.

This help has proved invaluable to undersigned counsel in their identification of flaws in trial counsel's performance. Unfortunately, Dr. Wayland is not available to be hired for this case due to her existing caseload; however, she has recommended that undersigned counsel retain an expert in the standard of care for mental health investigations, who is qualified to screen individuals for the presence of mental or psychological disorders or impairments, to work with our mitigation specialist on developing the family history and related mental health issues that were inadequately investigated in this case and to coordinate efforts to revisit the mental health experts who were utilized at the trial level once this new information is fully developed.

Finally, our mitigation specialist has managed to have the entire case file scanned into an electronic format free of charge through a local non-profit organization. The purpose of this scan was two-fold. First, it will serve to document exactly the materials undersigned counsel received from the various trial and appellate attorneys as well as the manner in which the files were received. Second, it will make the file easy to search, allowing counsel to save time when locating important documents while drafting the 2255 claims. Our mitigation specialist has suggested that it is necessary, and would be more efficient, to retain the services of a paralegal to

organize and manage the file, thereby allowing the mitigation specialist to focus on witness interviews and document collection. Given the sheer size of this case, the volume of varied sources comprising the trial file, and the records yet to be obtained, undersigned counsel will need cost-effective assistance managing and organizing the documents in this case.

In sum, having undertaken the above efforts to date, undersigned counsel now ask the Court to approve additional funding for the mitigation investigation that must be done, to approve an expert in the standard of care for mental health investigations, qualified by training and experience to assist in the identification of mental or psychological disorders or impairments [*See* ABA Guideline 4.1(A)(2)], and to approve the services of one paralegal to assist in file organization and retrieval of documents.

## II. Suggestions in Support

Undersigned counsel are well aware of the expenses associated with capital litigation and are making every effort to approach this case in a methodical and prudent manner in an effort to avoid unnecessary expenses. That said, the Supreme Court has acknowledged that a thorough investigation of the client's life history is "standard practice" in death penalty cases, and has found that counsel who failed to conduct such an investigation "fell short of the professional standards that prevailed . . . in 1989." *Wiggins v. Smith,* 539 U.S. 510, 524 (2003). Recently, in *Angela Johnson v. United States*, 2012 WL 992109, at *208, District Judge Mark W. Bennett of the Northern District of Iowa, found that Ms. Johnson had received ineffective assistance of counsel during the pendency of her capital murder case and granted Ms. Johnson relief from her four death sentences. Key issues in Ms. Johnson's case were trial counsel's effectiveness, particularly during the mitigation phase of the case. *Id*. Similarly, in *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010), the United States Court of Appeals for the Eighth Circuit

concluded that Mr. Sinisterra's claim of ineffective assistance of counsel for failing to investigate and present mitigation evidence merits further review and remanded the case for the development of evidence. *See also, United States v. Sampson*, 820 F.Supp.2d 202, 242 (D.Ct. Mass. 2011)(citing need for evidentiary hearing on *inter alia* claims regarding trial counsel's failure to appropriately handle mental health impairments and mitigation investigation); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2530, 156 L.Ed.2d 471 (2003)("Counsel did not conduct a reasonable investigation."). As in Mrs. Montgomery's case, these were all cases in which considerable evidence was presented at trial, but in which counsel's performance in representing the client appears to have fallen short.

Based upon their preliminary review, undersigned counsel and their mitigation specialist have serious concerns about the manner in which Mrs. Montgomery's mental health issues and mitigation evidence were explored or neglected by trial counsel and have already identified potential meritorious claims, including but not limited to, claims of ineffective assistance of counsel during the guilt and penalty phases of the trial. In order to support any claims of ineffective assistance of counsel, however, current counsel must fully analyze the record developed at trial in order to determine where and how the trial investigation fell short of prevailing norms in order to develop evidence to support the 2255 claims. *Sinisterra v. United States*, 600 F.3d at 907. "Without a complete record, [the Court] cannot determine whether [petitioner] was prejudiced by counsels' alleged failure to investigate and present mitigation evidence." *Id*. at 908. Counsel must obtain actual evidence to support the likely 2255 claims. *See United States v. Sampson,* 820 F.Supp.2d at 244. Accordingly, counsel seeks appropriate funding to develop a complete record for this Court's review and consideration.

Based upon our work to date, habeas counsel has already identified a number of "red flags" that suggest that trial counsels' investigation into Mrs. Montgomery's background was deficient. As this Court is aware, the trial team went through a myriad of professional problems and turn over. Mrs. Montgomery was initially represented by Anita Burns and Susan Hunt. Anita Burns was then replaced by David Owen. Judy Clarke was brought in to assist with the defense, but was asked to leave the case after approximately six months. This led to Susan Hunt leaving the defense team. John O'Connor and Fred Duchardt were then appointed to the case and represented Mrs. Montgomery, along with David Owen, through the trial.

In addition to this constant changing of counsel, at least three separate mitigation specialists worked on the case. Ron Ninemire from the Federal Public Defender's Office was a constant presence on the defense team, although he is a fact investigator, not a mitigation specialist. Mrs. Montgomery was evaluated by a minimum of six different mental health professionals on behalf of the various defense teams as well as being evaluated by the government experts.

Serious problems resulted from the significant turnover and power struggles within Mrs. Montgomery's defense team and the investigation that was performed did not comply with well-accepted norms and standards of mitigation investigation in capital cases that were in effect at the time of Ms. Montgomery's trial. Many, if not most, witness interviews were conducted in group settings, with multiple witnesses and multiple defense team members present. The vast majority of family interviews occurred with multiple family members and multiple defense team members present. Family interviews are often the source of life history information such as family history of sexual abuse, substance abuse, mental health history and trauma. A group interviewing environment is not conducive to candid disclosure of the often traumatic, painful

and shameful family secrets that are fundamental to an accurate life history. In fact, several witnesses in this case told mitigation investigators that they had information to offer but felt uncomfortable disclosing the information with other family members present. No follow up with those witnesses occurred. The Supplementary Guidelines for the Mitigation Function of Defense Teams provide:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough life history investigation.

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 5.1 (C). 36 HOFSTRA L. REV. 677.

Many interviews with family members and significant others were conducted first in a group setting, and only one follow up interview was conducted, often because the mitigation specialist was fired and replaced with a different mitigation specialist who had to start over in terms of trying to build the necessary rapport with family members and others. One or even two interviews are not sufficient to establish the trust and rapport necessary for a witness to disclose a family's most closely-held, intimate secrets. It is common, well accepted practice that multiple face-to-face interviews with the client and the client's family and significant others are required in a capital case. *See, e.g.*, *Sinisterra v. United States*, 600 F.3d at 907 ("Sinisterra's counsel had an obligation to conduct a thorough background investigation . . . .").

For example, investigation to date has revealed evidence of heavy drinking by Mrs. Montgomery's mother while she was pregnant with Mrs. Montgomery. Drinking while pregnant can damage a fetus and the effects on the individual have been held to be appropriate mitigating evidence. *See Rompilla v. Beard*, 545 U.S. 374 (2006). Evidence of severe, long-term, repeated

trauma in Mrs. Montgomery's background was not documented, analyzed, or addressed by a mental health expert, nor was the client, or her family members, interviewed by a team member trained to recognize and identify signs and symptoms of multi-generational trauma and its impact on behavior and functioning. Counsel and our mitigation investigator have further discovered serious deficiencies in the mitigation investigation that include the failure to interview, or interview properly, significant mitigation witnesses who interacted with Mrs. Montgomery and observed her over time. In this case, trial counsel "had every reason to develop the most powerful mitigation case possible." *Wiggins v. Smith*, 123 S.Ct. at 2530. Our review suggests that serious errors were made in the mitigation investigation.

In order to determine whether trial counsel functioned competently, undersigned counsel must conduct their own investigation in accordance with prevailing professional standards, which provide:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding.

*Supplementary Guidelines for the Mitigation Function of Capital Defense Teams 10.11.C*, 36 Hofstra L. Rev. 677, 689 (2008).

As noted briefly above, review of the record and preliminary investigation have revealed deficiencies in trial counsels' performance that must be explored. Mrs. Montgomery cannot prevail on any claims she might raise regarding ineffective assistance of counsel without also alleging and ultimately establishing prejudice. *Strickland v. Washington*, 467 U.S. 1267, 104 S.Ct. 2052 (1984). For current counsel for Mrs. Montgomery to show prejudice, they must have

the time and resources necessary to conduct a thorough life history investigation, including the following:

> (a) conduct one-on-one, in-depth interviews with all of Mrs. Montgomery's siblings and children, her former and current husband, her parents and other relatives, and significant others in order to assess in a comprehensive manner Mrs. Montgomery's history of trauma, depression, mental and cognitive impairments, and redeeming qualities;
>
> (b) verify that all medical records pertaining to Mrs. Montgomery and relevant family members, including those addressing the pregnancy of Judy Shaughnessy with Mrs. Montgomery, have been collected;
>
> (c) interview Judy Shaughnessy and all of her siblings and significant others concerning her health during her pregnancy with Mrs. Montgomery, including her reported maternal ingestion of alcohol, drugs, and prescription medications, and concerning the conditions of Mrs. Montgomery's birth and childhood;
>
> (d) work intensively with Mrs. Montgomery to help her disclose information or provide leads relevant to the 2255 proceeding; and
>
> (e) identify and provide information that was not disclosed to the evaluating mental health experts during the trial phase of the case as well as all new information that is discovered in connection with the foregoing tasks to the trial mental health experts, potentially ask those experts to interview Mrs. Montgomery again concerning the crime against Mrs. Stinnett, ask those experts to re-evaluate the nature of Mrs. Montgomery's mental illness and brain dysfunction, and ask those experts to examine how Mrs. Montgomery's mental disorders, together with her experience of childhood abuse and trauma, impacted her behavior and functioning over time and during the entire course of the crime against Mrs. Stinnett, with an eye toward determining how Mrs. Montgomery's mental disorders, together with her experience of childhood abuse and trauma, may have impacted her during her development, during the crime, and during the entire course of the proceeding; and
>
> (f) have Mrs. Montgomery's mental health re-evaluated by a new mental health expert if deemed necessary and relevant.

Undertaking these investigative tasks is required by the Supreme Court's death penalty jurisprudence, *Williams v. Taylor,* 529 U.S. 362 (2000), *Wiggins v. Smith, supra, Rompilla v. Beard*, 545 U.S. 374 (2006), and the *ABA Guidelines on the Appointment and Performance of*

*Defense Counsel in Death Penalty Cases*, 31 HOFSTRA L. REV. 913 (Summer, 2003). The diligent pursuit of Mrs. Montgomery's claims will require undersigned counsel to conduct the investigation that trial counsel failed to perform. Undersigned counsel understand that it is our ethical duty to explore these issues and it will be more efficient and cost-effective to utilize an expert in the standard of care for mental health evaluations and mitigation specialists to assist with this investigation as opposed to legal counsel attempting to educate ourselves on mental health issues or being placed in a primarily investigative posture. This will allow legal counsel to focus on identifying the viable legal claims, including those unrelated to mental health and mitigation, and on drafting of the 2255 motion. The strict one-year statute of limitations for filing Mrs. Montgomery's 2255 claims and supporting documentation requires that all claims be explored, identified, and pled by counsel in a timely manner and counsel require assistance in accomplishing such tasks within the statute of limitations.

Counsel respectfully requests that the Court, in reviewing this additional investigation budget, consider the following circumstances surrounding the representation:

**A. The volume of the record**: Records in federal capital cases tend to be voluminous, and this case is no exception. As noted above, Mrs. Montgomery was represented by six different attorneys during the trial phase of this case with a seventh attorney added on appeal. To date, the files that have been collected in this case consist of 38 banker's boxes filled with documents, and over two dozen CD Rom discs also containing documents, photographs, and audio and video files. Counsels' best estimate is that there are approximately 95,000 pages of documents (estimated 2,500 pages of documents per box, 38 x 2,500 = 95,000) of varying degrees of relevance to sort through in this case. It is apparent that critical life history documents, including specific medical, employment, institutional and psychiatric records, are not among

those gathered by trial counsel and will need to be obtained. It also appears that counsel did not request or receive the raw data upon which several experts based their opinions and it is critical to obtain and analyze such data.

**B. Significant time constraints.** Mrs. Montgomery's §2255 motion is due in just over six months. Almost one full month of the statute of limitations expired before undersigned counsel were appointed. Almost another full month expired between the time counsel sought the assistance of a mitigation specialist and the date on which said mitigation specialist was partially approved. It has taken almost four months to assemble the complete trial file because it was scattered among all of the attorneys who worked on the case at the trial level. There is limited time remaining within which to identify, plead, and support Mrs. Montgomery's 2255 claims.

**C. Difficulty in obtaining the complete file.** As discussed above, despite diligent efforts by undersigned counsel, there have been delays in obtaining the complete files of the trial level attorneys. This has greatly impeded the ability of current counsel to complete a comprehensive review of the trial file.

**D. Counsel has utilized free and volunteer services**. Counsel has attempted to be reasonable with funding requests in this case and has diligently pursued and obtained free and volunteer resources to the extent possible so that we could begin to determine viable avenues of investigation to pursue. All of the file in counsels' possession, 38 banker's boxes at last count, has been scanned by a local non-profit agency free of charge. Counsel estimates this has saved the Court thousands of dollars in scanning fees and will result in additional savings on legal fees as counsel will be able to utilize the scanned files to easily and quickly search for and locate documents needed to draft the actual 2255 motion. An electronic, searchable file is critical so that the integrity of the file is preserved, documents are never lost or destroyed, and so that

counsel may organize, share and find documents without wasting valuable resources and time searching through the voluminous boxes. The scanning of the file is time consuming, tedious and important work that counsel has obtained without cost to the Court.

Additionally, counsel has sought capital representation training and consultation from the nation's leading experts in the field. These experts have offered their advice, guidance and services to Mrs. Montgomery's current team free of charge. Counsel attended a national seminar at their own expense.

Finally, counsel was able to obtain a mental health consultation with Dr. Kathy Wayland, a leading clinical psychologist familiar with capital litigation, free of charge.

That said, counsel respectfully suggest that they have exhausted all available resources and are now in a position to come to the Court with specific, necessary funding requests to ensure Mrs. Montgomery receives constitutionally adequate representation in this 2255 proceeding.

## III. Specific Budget Requests

**A. Expert in the Standard of Care for Mental Health Investigations.** Based on our on-going review of the files, the preliminary 2255 mitigation investigation, and consultation with Dr. Wayland and others, counsel request the services of an expert "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *See* ABA Guideline 4.1(A)(2). *See also, Sinisterra v. United States*, 600 F.3d at 908 ("Also to be developed on remand is whether counsel were ineffective for failing to investigate and present evidence of Sinisterra's mental health and capacity."). Undersigned counsel propose hiring Scharlette Holdman as said expert. Counsel have contacted Ms.

Holdman and she has agreed to work on this case if the Court approves her services. Her CV is attached as Exhibit A.

Ms. Holdman has 35 years of experience in assisting counsel in identifying, developing, and presenting facts to support mental health and mitigation-related claims at trial and in post-conviction proceedings. Ms. Holdman has worked on behalf of both state and federally-sentenced death row prisoners. Following up on what Dr. Wayland began, she will review Mrs. Montomery's psychological background, medical history, family history, previous mental health examinations, reports, and raw data, and the presentation of mental health evidence at trial in order to streamline counsels' approach to the mental health issues in this case and assist counsel in the identification and development of meritorious claims. In addition, Ms. Holdman will work with counsel to re-visit the mental health experts who previously evaluated Mrs. Montgomery, if appropriate, and to provide them with the materials believed to have been withheld or missing at the time of the original evaluations. Ms. Holdman will advise counsel on the standard of care for counsel and mitigation investigators in capital trials in order to determine whether the standard of care was met. Again, counsel believe this to be the most economical manner in which to present the 2255 claims pertaining to Mrs. Montgomery's social and psychological history, including the reliability of statements, Mrs. Montgomery's mental health at the time of the crime, her ability to aid and assist counsel, her demeanor and appearance at the trial due to medications, and facts to support claims trial counsels' investigation and presentation of mental health-related issues were ineffective.

Should it become necessary to have a new mental health evaluation, Ms. Holdman will assist counsel in identifying the appropriate specialist to conduct such an evaluation without wasting resources.

**B. Mitigation Investigation of Ms. Montgomery's Life History and Background.** Again, our preliminary investigation has revealed numerous "red flags" demonstrating the need for additional mitigation investigation. Mrs. Montgomery has a multi-generational family history of complex trauma, including physical, sexual, and emotional abuse, alcohol and substance abuse, abandonment and neglect, and major mental illness. Many of these issues remain uninvestigated. Virtually nothing is known about Mrs. Montgomery's biological father or his family, although undersigned's preliminary review suggests that the family has a history of mental illness and alcoholism. Mrs. Montgomery was physically, sexually, and emotionally abused throughout her childhood, yet witnesses with direct knowledge of this abuse were either not interviewed or were interviewed by multiple team members, most of whom did not possess the necessary skills and training to conduct mitigation interviews. Mrs. Montgomery's mother was a binge drinker while Mrs. Montgomery was in utero, yet no investigation was conducted into the effects of alcohol on Mrs. Montgomery's brain and development. Our mitigation specialist has identified many teachers, counselors and neighbors who observed Mrs. Montgomery and her family over time who were never contacted by defense counsel. These are just a few of the areas where 2255 counsel have identified apparent deficiencies in the investigation undertaken by the various trial teams.

Our mitigation specialist has identified educational, family, vital, medical and psychiatric records that were not obtained by trial counsel. The mitigation specialist must request, obtain and digest these missing records to determine if life-saving information and witnesses are contained therein. Examples of the mitigation investigation to be conducted include the following:

**1. Multi-generational family history of trauma**. Mrs. Montgomery was severely physically abused by her stepfather, Jack Kleiner. Counsel has just recently learned, during an interview conducted by our current mitigation specialist, that Mrs. Montgomery was also molested as a young child by an uncle, whom the children called "Sick Vick." Additional preliminary investigation suggests that the trauma endured by Mrs. Montgomery and other family members was much more extensive than the evidence presented to jurors during the trial. There is a crucial multigenerational component to trauma in this case that simply was not explored.

**2. Multi-generational history of alcoholism and drug abuse**. Mrs. Montgomery's mother and father are both alcoholics, and Mrs. Montgomery's mother drank heavily while she was pregnant with Mrs. Montgomery. This aspect of Mrs. Montgomery's history was not evaluated by trial counsel. In addition, little is known about Mrs. Montgomery's biological father and his family history.

**3. Multi-generational history of severe mental illness.** Mrs. Montgomery's father, stepfather, at least two siblings, and at least two first cousins have been diagnosed with severe mental illness, including bipolar disorder. Mental illness has a genetic component and little is known about Mrs. Montgomery's family history because of the chaotic, shallow investigation undertaken by trial counsels' revolving cast of mitigation specialists.

**4. Other**

Based upon our mitigation specialist's preliminary review, over 100 witnesses, including siblings, cousins, teachers, neighbors, employers and close family friends were never contacted or interviewed by the trial team. Interviewing these witnesses is a routine part of any competent trial investigation. Nearly all of the more than 40 additional family member witnesses who were

interviewed were questioned under compromised circumstances unlikely to reveal reliable and life-saving facts about relationships, maltreatment, incest, and mental impairments.

The importance of uncovering background details about Mrs. Montgomery's childhood, upbringing, and family history is illustrated by *Simmons v. Luebbers*, 299 F.3d 929, 938-939 (8th Cir. 2002). In *Simmons*, trial counsel were found to have been ineffective for failing to properly investigate and present evidence regarding Simmons' background. *Id*. *See also*, *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005)(criticizing counsel's "superficial" investigation

Counsel has obtained the services of mitigation specialist Lindsay Runnels to aide in the mitigation investigation. This Court approved a limited, preliminary budget for Ms. Runnels on July 23, 2012. Due to the volume of the record, the amount of investigation needed, and the time constraints imposed by the statute of limitations, it is unreasonable to expect that Ms. Runnels alone can conduct the necessary mitigation investigation in this case. Counsel have inquired into the availability of two other mitigation specialists with federal capital case experience. One is located in Kansas City, Missouri and is available and willing to aid Ms. Runnels in the mitigation investigation. The other is located in Texas, but has more immediate availability. Counsel respectfully suggest that adding one additional mitigation specialist to work with Ms. Runnels is necessary for counsel to have the opportunity to fully investigate Mrs. Montgomery's life-history, background and potential constitutional claims for relief. Additional funding for the mitigation investigation is necessary to develop support for the 2255 claims.

**C. Client Communication** Client communication and rapport are critical in death penalty cases as the defense team "must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome the barriers those individuals have against the disclosure of sensitive information and to assist the client with

the emotional impact of such disclosures." *Supplementary Guidelines for the Mitigation Function of Capital Defense Teams*, 5.1.C Hofstra L. Rev. 677, 683 (Summer, 2008). A competent capital defense lawyer will bring in team members and experts necessary to build rapport and properly interpret the client's behavior, consistent with her duty to "work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress." ABA Guideline 1.1, commentary. It is critical that the mitigation specialists work intensively with Mrs. Montgomery at this final juncture. Upon information and belief, no one on the ultimate trial team established the necessary trust and rapport with their client and the turnover on the case and the removal of the two team members with whom Mrs. Montgomery did begin to establish this critical relationship, without any communication, explanation or notice to Mrs. Montgomery was further detrimental. All of this appears to have taken a toll on the preparation of this case for trial. Mrs. Montgomery appears to have regressed in her ability to trust her trial defense team. Counsel has budgeted time with the client in the table below.

**D. Record and Document Collection.** In order to develop collateral evidence of facts and events described by witnesses and to identify and locate witnesses, it is necessary to request, obtain and analyze social history documents. Such documents are routinely gathered, or should be, during the investigation in capital cases. It appears that many important life history records were not requested, obtained, or digested by trial counsel in this case. Counsel must request those records that are not in the file and must diligently digest and review those records that are in the file to determine what if any information and potential witnesses they contain. Trial counsel did obtain some life history documents for Lisa Montgomery and some for family members. However, our review suggests that those records were obtained and then nothing was

done to digest, synthesize and utilize the valuable information in those records. Such intensive review of documents takes time and skill.

The funding request for locating and interviewing witnesses, document and record collection, and the analysis of those documents represents what counsel believes is more than a full-time position for the next six and a half months, up until the date Mrs. Montgomery must file her Motion Under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. Because Ms. Runnels and the other proposed mitigation specialists have other case commitments, none can commit to Ms. Montgomery's case full time. The funding request represents two mitigation specialists dividing the workload of one full time mitigation specialist.

**E. Paralegal Services**. Counsel also requests the authorization for at least one paralegal to aid counsel in managing the voluminous record. Although the initial file obtained by trial counsel has been scanned, additional documents will be generated. The goal is to upload all documents into a case management software program for easy access that will expedite accessing necessary documents and keep the voluminous file organized. Ms. Runnels has the software program and licenses for the program are being purchased by Ms. Nouri and Ms. Blegen at their own expense. It will be more economical, however, to delegate the tasks of organizing and uploading additional documents to a paralegal at $35-40 per hour rather than having counsel or a mitigation specialist handle file management tasks at a higher rate.

**TABLE A: PROPOSED INVESTIGATION BUDGET**
**SEPTEMBER 1, 2012-MARCH 31, 2013**

| Task or Item | No. Hours and Rate Per Hour | Subtotal |
|---|---|---|
| **Expert in the Standard of Care for Mental Health Investigations**. Review | 700 hours @ $125/hour | $87,500 |

| **Task or Item** | **No. Hours and Rate Per Hour** | **Subtotal** |
|---|---|---|
| existing medical records, family history, prior mental health examinations, and trial presentation as well as new evidence as developed to identify 2255 claims pertaining to mental health; identify new mental health expert if necessary | | |
| **Expert Travel** (associated with meeting with trial experts and counsel) | 4 separate 3-day trips based on expert location @ $900/trip for airfare, car, and lodging at government rate | $3,600 |
| **Mitigation Witness Interviews**: locate and interview up to 80 witnesses, draft memoranda, declarations, and/or affidavits | 700 hours @ $80/hour | $56,000 |
| **Mitigation: Travel.** (associated with witness interviews) | 12 separate 5 day trips based on witness locations (1 5 day investigation trip/month for both mitigation specialists x 6 months = 12 total investigation trips)<br><br>120 total nights lodging estimated at $125/night (excluding tax, average fed. per diem, varies by location) = $15,000<br><br>120 days M&E at $56 (average fed average per diem, varies by location) = $6, 720<br><br>Airfare (when necessary) through National Travel at the federal government contract rate. Estimated at | $35,290 |

| **Task or Item** | **No. Hours and Rate Per Hour** | **Subtotal** |
|---|---|---|
| | $500/flight x 10 round trip flights = $5,000<br><br>Rental car (when fly) through National Travel at the federal government contract rate, amounts based on location). Estimated at $500/trip x 10 trips = $5,000<br><br>Mileage (when drive) up to 7,000 miles $.51/mile = $3,570 | |
| **Mitigation: Document Collection and Review**. Request, obtain, analyze and digest life history documents, create case chronology, manage documents for experts. | 500 hours at $80/hour = $40,000 | $40,000 |
| **Fees for Record Collection** | Many sources charge copying fees or record production fees | $1,500 |
| **Mitigation: Client Communication**. 2 client interviews/month | 14 interviews x 6 hours per interview = 84 hours @ $80/hour = $6,750 | $6,750 |
| **Mitigation: Travel.** (associated with client visits and communication) | 14 trips to FMC-Carswell at federal government per diem rates<br><br>14 flights @ $420/flight = $5,880<br><br>Rental car (when fly) through National Travel at the federal government contract rate, amounts based on location). Estimated at $300/trip x 10 trips = $3,000<br><br>14 nights lodging @ $139 | $12,394 |

| **Task or Item** | **No. Hours and Rate Per Hour** | **Subtotal** |
|---|---|---|
| | (fed per diem for Tarrant County, TX) = $1,946<br><br>28 days M&E @ $56 = $1,568 | |
| **Paralegal Services.** Manage and organize electronic file, assist counsel in administrative tasks including document collection, assist counsel in filing the Motion and in creation, organization and filing of exhibits | 30 hours/week x 30 weeks = 000 hours @ $35/hour = $31,500 | $31,500 |
| **Grand Total** | | $274, 534 |

In further support for the necessity of the funds requested in Table A, counsel has attached the Declaration of Marcia Morrissey, one of the lead attorneys in *Angela Johnson v. United States*, 2012 WL 992109, as Exhibit B.

IV. Appointment of Federal Public Defender in the Alternative

As an alternative approach to providing necessary resources, undersigned counsel respectfully request that the Court consider appointing a Federal Public Defender with expertise in capital habeas representation as co-counsel for Mrs. Montgomery in her capital § 2255 proceedings. A Federal Public Defender office would provide its services at no cost to the Court, as all expenses -- including compensation for its staff (including paralegals and investigators), travel expenses, and fees for any experts or other auxiliary services in the future -- would come from its own budget. This would relieve this Court of the administrative burden of managing

budgets and funding this litigation,[1] and would also allow undersigned counsel to spend the time remaining on the statute of limitations focused on developing and preparing the § 2255 claims. Appointment as co-counsel of a Federal Public Defender possessing expertise in capital post-conviction litigation would ensure that the undersigned would be able to meet their obligations and that the case would be handled efficiently and without wasting resources.

## V. Conclusion

WHEREFORE, for the foregoing reasons, petitioner Lisa Montgomery, by and through undersigned counsel respectfully moves the Court to grant petitioner Lisa Montgomery's *Ex Parte* Motion to Approve Revised Investigation Budget Through March 22, 2013 Petitioner seeks approval to retain an expert in the standard of care for mental health evaluations at a rate not to exceed $125/hour for services up to $87,500. Petitioner seeks approval of travel for her expert in the standard of care for mental health evaluations up to $3,600. Petitioner seeks approval for two mitigation specialists at a rate of $80/hour for investigation, document collection, and interviews, including client interviews, up to a maximum of $102,750. Petitioner seeks approval of travel expenses for the mitigation specialists not to exceed $47,684. Petitioner seeks $1,500 for record collection fees and expenses. Finally, petitioner seeks approval for a paralegal with fees not to exceed $31,500.

[1] It should be noted that while Federal Public Defender offices have been established in various jurisdictions, including this one, to help minimize the administrative burden to courts and provide qualified representation to indigent individuals at all stages of proceedings, the Western District of Missouri Federal Public Defender is not a viable option for appointment in this case. As the Court is aware, our local Federal Public Defender represented Mrs. Montgomery at trial and therefore has a conflict which precludes it from representing her in § 2255 proceedings. As such, undersigned counsel have made a preliminary inquiry to the Middle District of Tennessee Federal Public Defender which has staff specializing in capital habeas work. We learned that that office not only may be available for appointment in these proceedings, but that it has staff who have ties to this jurisdiction and have specialized knowledge and experience germane to issues in this case.

In the alternative, petitioner asks that a Federal Public Defender office be appointed to assist undersigned counsel in this 2255 proceeding for the reasons stated above.

Respectfully submitted,

*/s/ Christine M. Blegen*
Christine M. Blegen, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
Phone: (816) 524-7023

*/s/ Lisa G. Nouri*
Lisa G. Nouri, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
Phone: (816) 471-1000
*Attorneys for Lisa Montgomery*