**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LISA MARIE MONTGOMERY, | |
| *Plaintiff*, | |
| v. | Civil Action No. 20-3261 (RDM) |
| WILLIAM P. BARR, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION**

Plaintiff Lisa Montgomery was convicted of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a) and sentenced to death in 2008.  Her conviction and sentence were affirmed on appeal, her motion for collateral relief was denied, and she was denied a certificate of appealability.  After the Supreme Court denied her petition for a writ of certiorari and petition for reconsideration earlier this year, the Attorney General announced that the Bureau of Prisons had scheduled Plaintiff's execution for December 8, 2020.

Plaintiff brings this action against the Attorney General, an array of other federal officials, the Department of Justice, the Office of the Pardon Attorney, and the Federal Bureau of Prisons.  Plaintiff contends that she has a statutory and constitutional right to meaningful participation by her long-serving, capitally qualified lawyers in the clemency process but that her two capitally qualified lawyers "are functionally incapacitated" and unable to prepare her clemency petition because they both contracted "severe" cases of COVID-19 while traveling to meet with her.  Dkt. 13-1 at 4 (Davis Decl.) (Ex. 1).  She further contends that her "profound mental illness" adds to this predicament in two respects: first, she "requires careful and compassionate legal representation by the lawyers who have spent many years earning her trust,"

and, second, her mental health experts need "to visit her to ascertain her mental status," but they are unable to do so in light of their age and vulnerability to the virus.  Dkt. 2-1 at 3.  All told, Plaintiff contends that proceeding under the current schedule for her execution and under these extraordinary circumstances would deprive her of her statutory right to counsel to assist in the clemency process, 18 U.S.C. § 3599, and her constitutional right under the Due Process Clause, U.S. Const., amend. V, to a "minimally fair clemency process," Dkt. 2-1 at 4.

Plaintiff moves for a temporary restraining order or preliminary injunction precluding Defendants from taking "adverse action on her request for reprieve and commutation," *id.* at 9, and from "carrying out Plaintiff's scheduled execution," Dkt. 2-13 at 1, pending further order of the Court.  Defendants opposed Plaintiff's motion on November 14, 2020, Dkt. 12, and Plaintiff filed her reply on November 15, 2020, Dkt. 13.  The Court heard oral argument on November 16, 2020 and again on November 18, 2020.  Following the November 18 oral argument, the parties submitted additional materials and argument responding to questions posed by the Court.  Dkt. 16; Dkt. 17.

For the reasons explained below, the Court will **GRANT** Plaintiff's motion in part and will **DENY** it in part.

## I.  BACKGROUND

Montgomery, a prisoner "presently incarcerated at the Federal Medical Center (FMC) Carswell" in Texas, is "scheduled for execution by lethal injection at the United States Penitentiary in Terre Haute, Indiana on December 8, 2020," Dkt. 1 at 3 (Compl. ¶ 2), a date set by the Federal Bureau of Prisons on October 16, 2020, *id.* at 6 (Compl. ¶ 18).  Article II of the Constitution vests the President with the "[p]ower to grant [r]eprieves and [p]ardons for [o]ffenses against the United States."  U.S. Const. art. II, § 2, cl. 1.  Federal regulations govern

how prisoners may invoke the President's clemency.  "A person seeking executive clemency by pardon, reprieve, commutation of sentence, or remission of fine shall execute a formal petition," 28 C.F.R. § 1.1, after "proceedings on the petitioner's direct appeal of the judgment of conviction and first petition under 28 U.S.C. § 2255 have terminated," *id.* § 1.10(b) ("No petition for reprieve or commutation of a death sentences should be filed before" that time.).  Although the parties disagree about when Montgomery became eligible to file a petition, *compare* Dkt. 12 at 10 (claiming eligibility began on May 26, 2020) *with* Dkt. 13 at 3–4 n.3 (claiming eligibility began on August 3, 2020), all agree that she was eligible to file a clemency petition no later than August 3, 2020, when the Supreme Court denied rehearing on her petition for a writ of certiorari, *Montgomery v. United States*, 2020 WL 4429729 (U.S. Aug. 3, 2020).  In the case of death-sentenced petitioners, a petition for commutation of sentence must be filed "no later than 30 days after the petitioner has received notification from the Bureau of Prisons of the scheduled date of execution," but a petitioner may file additional material in support of the petition for up to "15 days after the commutation petition has been filed."  28 C.F.R. § 1.10(b).  Accordingly, once the Bureau of Prisons scheduled Montgomery's execution date, she had until November 15, 2020 to file her clemency petition and until November 30, 2020 to supplement that filing.

Plaintiff alleges that she was subjected to "profound trauma . . . during her childhood," including sexual abuse and frequent rape by her stepfather and his "friends;" abuse, beatings, and sex trafficking by her mother; and sexual torture and rape by her stepbrother, whom she was pressured to marry.  Dkt. 1 at 6–7 (Compl. ¶ 20).  She further alleges that the "[d]ecades of rapes, beatings, and sexual torture" that she endured "have taken a devastating toll;" that she suffers from "brain damage," "temporal lobe seizures," "Bipolar Disorder and Complex Post Traumatic Stress Disorder;" that "[s]he dissociates regularly" and suffers from "hallucinations, psychosis,

mania and depression;" that, notwithstanding treatment with "anti-psychotic, anti-epileptic, and anti-depressant medications," she "continues to experience severe, distressing, and near-constant symptoms of her mental illnesses;" and that she is currently "on 'suicide watch' in solitary confinement." *Id.* at 7 (Compl. ¶¶ 21–22).

Plaintiff further maintains that "[m]ental illness and trauma lie at the core of [her] case." *Id*. at 15 (Compl. ¶ 61). Because the courts have found the claims that she has raised on post-conviction review unavailing, "[c]lemency represents the only viable means at this late hour to consider how her mental illness affects her moral culpability," and, in Plaintiff's view, her mental illness "weigh[s] in favor of mercy." *Id.* But, according to Plaintiff, the ongoing pandemic has prevented her from preparing and submitting a clemency petition that adequately conveys her claim.

Most significantly, Plaintiff contends that her ability to make a meaningful request for clemency is stymied by the illness of her two, capitally qualified lawyers, both of whom contracted COVID-19 after traveling to visit her in late October and early November 2020, and both of whom remain very ill today. Following the announcement on October 16, 2020 of Plaintiff's execution date, the Federal Public Defender for the Middle District of Tennessee granted Plaintiff's two capitally qualified defense attorneys, Amy Harwell and Kelley Henry, permission to travel from their office in Tennessee to meet with Montgomery in Texas, which they did multiple times between October 19, 2020 and November 2, 2020. Dkt. 1 at 10–11 (Compl. ¶¶ 36–40); Dkt. 2-2 at 3 (Harwell Decl. ¶¶ 9–13) (Ex. 1); Dkt. 2-3 at 4–5 (Henry Decl. ¶¶ 18–20) (Ex. 2). According to Harwell and Henry, they found during these visits that Plaintiff's mental health was deteriorating and that she "exhibit[ed] symptoms of terror and

dissociation." Dkt. 2-2 at 3 (Harwell Decl. ¶¶ 9–11) (Ex. 1); *see also* Dkt. 2-3 at 5–6 (Henry Decl. ¶¶ 20, 23) (Ex. 2).

On November 5 and November 7, respectively, Harwell and Henry began to experience COVID-19 symptoms. Dkt. 1 at 11 (Compl. ¶¶ 41–42, 45). On November 10 and 11, they tested positive for the virus. *Id.* (Compl. ¶¶ 42, 45). Both have quarantined themselves and cannot travel to meet with Plaintiff. Dkt. 2-2 at 4 (Harwell Decl. ¶¶ 14, 17) (Ex. 1); Dkt. 2-3 at 7 (Henry Decl. ¶¶ 30–32) (Ex. 2). Both are also experiencing "extreme fatigue" and "impaired thinking and judgment," in addition to a range of other symptoms, including cough, severe headaches, and gastrointestinal distress. Dkt. 2-2 at 4 (Harwell Decl. ¶ 16) (Ex. 1); *see also* Dkt. 2-3 at 6 (Henry Decl. ¶ 25) (Ex. 2). Both attest that these symptoms make it "impossible" for them to effectively advocate on Plaintiff's behalf, including working on her clemency petition. Dkt. 2-2 at 4 (Harwell Decl. ¶ 16) (Ex. 1); *see also* Dkt. 2-3 at 6, 8 (Henry Decl. ¶¶ 25, 36) (Ex. 2). A physician for the California Department of Corrections—who reviewed Harwell's and Henry's medical histories and conducted telephone interviews with each—moreover, attests that both "exhibit . . . more severe symptoms of COIVD-19;" that these symptoms "are very serious and concerning from a medical perspective;" and that, given their "precarious physical health conditions," he "would recommend a minimum of [four] weeks of recovery at home, without the demands and stresses of professional obligations, before considering return to work." Dkt. 13-1 at 1, 3 (Davis Decl.) (Ex. 1). He attests, for example, that Harwell has "serious concentration and memory problems" and that Henry's blood oxygenation has been "persistently . . . low" and "[h]er heart rate[] [has] been elevated during the day." *Id.* at 2.

Harwell and Henry have represented Plaintiff since November 2012 as post-conviction counsel. Plaintiff credibly alleges that "they possess [an] unparalleled understanding of [the]

case and have built an attorney-client relationship with" Plaintiff that could not be replicated by substitute counsel in a short time-period. Dkt. 1 at 14–15 (Compl. ¶¶ 58–59); *see also* Dkt. 2-2 at 2 (Harwell Decl. ¶ 7) (Ex. 1); Dkt. 2-3 at 3–4, 7–8 (Henry Decl. ¶¶ 7–17, 33) (Ex. 2). Plaintiff has another attorney, Lisa Nouri, who was also appointed in 2012 pursuant to 18 U.S.C. § 3599. Dkt. 13-2 at 1 (Nouri Decl. ¶ 1) (Ex. 2). Nouri has "been in private practice as a solo practitioner since 1991." *Id.* Her role in Plaintiff's case, however, "has been predominantly dealing with local counsel and local rules, along with occasional visits to and phone calls with" Plaintiff. *Id.* (Nouri Decl. ¶ 5) (Ex. 2). Nouri attests that, when she was appointed to serve as post-conviction counsel, she lacked the necessary experience and expertise and thus secured "the assistance of qualified habeas counsel"—Harwell and Henry—"[a]s required by the [American Bar Association] guidelines in representation of capital clients." *Id.* (Nouri Decl. ¶¶ 3–4, 6) (Ex. 2). Consequently, Nouri "was always accompanied by [] Henry or [] Harwell" whenever she had a substantive discussion with Plaintiff. *Id.* (Nouri Decl. ¶ 6) (Ex. 2).

Plaintiff also contends that the decision to schedule her execution in the midst of the COVID-19 pandemic has interfered with access to the mental health experts that her counsel will need to prepare her clemency petition. Dkt. 1 at 14–15 (Compl. ¶¶ 57, 62). The mental health experts who have knowledge of Plaintiff's condition and who have built a rapport with her all attest that they cannot adequately assess her mental health condition remotely and cannot visit her during the pandemic because they are older and "at high risk of COVID-19 infection and at heightened risk of complication from infection," Dkt. 2-7 at 2 (Gur Decl. ¶ 4) (Ex. 6); *see also* Dkt. 2-9 at 2 (Woods Decl. ¶ 3) (Ex. 8), or because their employer does not permit business-related travel during the pandemic, Dkt. 2-8 at 2 (Porterfield Decl. ¶ 3) (Ex. 7).

On November 9, 2020, the Federal Public Defender for the Middle District of Tennessee, where Harwell and Henry are employed, wrote to President Trump to request a reprieve from the scheduled execution date in light of the difficulties miring Plaintiff's clemency petition.  Dkt. 1 at 18 (Compl. ¶ 74); Dkt. 2-5 (Ex. 4).  The Department of Justice Office of the Pardon Attorney responded and declined to process the request because it was not a formal petition.  Dkt. 2-6 at 2 (Ex. 5).  The Office of the Pardon Attorney did, however, offer "[t]o accommodate the obvious difficulties of [Plaintiff's] attorneys, . . . [by] accept[ing] a 'placeholder' petition for either commutation or reprieve" on or before November 16, 2020, "to be supplemented within the 15-day window outlined in 28 C.F.R. § 1.10(b) . . . [with] any additional materials" that could bolster her case.  *Id.* at 2–3 (Ex. 5).

On the evening of November 16, 2020, Harwell, Henry, and Nouri submitted a placeholder petition for a reprieve and/or commutation of sentence on Plaintiff's behalf.  Dkt. 14-1 at 1 (Ex. 1).  In that petition, they further explain that Harwell and Henry "are unable to provide [the President] with the information . . . [he] would want to have before deciding whether or not to spare this incredibly mentally ill woman's life because [they] contracted COVID-19."  *Id.* (Ex. 1).  The placeholder petition also notes that Harwell and Henry were appointed because Nouri "had no experience with capital cases" and because the appointing judge "understood how important it is to have lawyers with capital experience to work on [Plaintiff's] case."  *Id.* at 1–2 (Ex. 1).  Along with the placeholder petition, counsel submitted Plaintiff's signed authorization for Harwell and Henry "to request clemency or a reprieve on [her] behalf."  *Id.* at 10 (Ex. 1).

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail on a motion for a preliminary injunction, the moving party must show [1] "'that [she] is likely to succeed on the merits, [2] that [she] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [her] favor, and [4] that an injunction is in the public interest.'"  *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quoting *Winter*, 555 U.S. at 20); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (adopting an analogous four-part test for stay applications).  "The last two factors merge when the government is the opposing party."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (internal quotation marks and citation omitted).

For many years, the D.C. Circuit evaluated these factors on a "sliding scale."  *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters, AFL–CIO*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  It has read the Supreme Court's decision in *Winter*, however, "at least to suggest if not to hold," that plaintiffs face "a more demanding burden" under which "a likelihood of success is an independent, freestanding requirement for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (quotation marks omitted).  This issue remains the subject of some uncertainty in this Circuit.  *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("This court has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors is abandoned[.]"); *Am. Meat Inst. v. USDA*, 746 F.3d 1065, 1074 (D.C. Cir. 2014), *reinstated in relevant part by* 760 F.3d 18 (D.C. Cir. 2014) (en banc) ("This circuit has repeatedly declined to take sides . . . on

the question of whether likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction.").  Under either approach, however, a likelihood of success on the merits is "a key issue [and] often the dispositive one" at the preliminary injunction stage.  *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011).

It is well-settled, however, that demonstrating a likelihood of irreparable injury is a prerequisite for obtaining injunctive relief.  "[A] showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases."  *Achagzai v. Broad. Bd. of Governors*, No. 14-cv-768, 2016 WL 471274, at *3 (D.D.C. Feb. 8, 2016); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 241–42 (D.D.C. 2014); *Trudeau v. FTC*, 384 F. Supp. 2d 281, 296 (D.D.C. 2005), *aff'd*, 456 F.3d 178 (D.C. Cir. 2006).

## III.  ANALYSIS

The facts recounted above, many of which are uncontroverted at this point in the litigation, show that the ongoing pandemic and the illness of Plaintiff's long-serving, experienced counsel pose significant hurdles to Plaintiff's effort to present a meaningful petition for a reprieve or commutation of sentence to the President.  Against that factual background, the Court must determine whether 18 U.S.C. § 3599 creates a statutory right to the assistance of previously appointed counsel through the clemency process; whether that right has been or is

likely to be abridged under the present circumstances; and, if so, whether the Court can remedy

any such violation without interfering with the President's constitutional authority "to grant

[r]eprieves and [p]ardons for [o]ffenses against the United States," U,S, Const., art. II, § 2, cl. 1.

If Plaintiff's argument fails any step in that chain of reasoning, the Court must then reach the

constitutional question of whether the Due Process Clause of the Fifth Amendment applies to the

federal clemency process and, if so, whether the inability of Harwell and Henry to assist in the

preparation of Plaintiff's request for commutation of sentence violates due process.

**A.**      **Right to Counsel Under 18 U.S.C. § 3599**

Before reaching Plaintiff's constitutional argument, the Court must consider whether

18 U.S.C. § 3599 creates a statutory entitlement to continuous representation by post-conviction

counsel, qualified under the statute, through the executive clemency process.  Section 3599

provides, in relevant part:

> (a)(1) Notwithstanding any other provision of law to the contrary, *in every criminal action in which a defendant is charged with a crime which may be punishable by death*, *a defendant who is or becomes financially unable to obtain adequate representation* or investigative, expert, or other reasonably necessary services at any time either . . . before judgment; or . . . after the entry of a judgment imposing a sentence of death but before the execution of that judgment . . . *shall be **entitled to the appointment** of one or more attorneys* and the furnishing of such other services in accordance with [other subsections of this section].
>
> . . .
>
> (e) *Unless replaced by similarly qualified counsel* upon the attorney's own motion or upon motion of the defendant, *each attorney so appointed **shall** represent the defendant throughout every subsequent stage of available judicial proceedings*, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, *and shall also represent the defendant in such* competency proceedings and ***proceedings for executive** or other **clemency** as may be available to the defendant*.

18 U.S.C. § 3599(a)(1), (e) (emphasis added).  According to Plaintiff, § 3599 creates an entitlement to meaningful representation by qualified counsel through the clemency process.

In support of this contention, Plaintiff first points to the Supreme Court's decision in *Harbison v. Bell*, 556 U.S. 180 (2009).  That case addressed the question whether § 3599 "authorizes counsel appointed to represent a state petitioner in 28 U.S.C. § 2254 proceedings to represent him in subsequent state clemency proceedings."  *Id.* at 182–83.  In answering that question in the affirmative, the Court did not directly confront the question presented here.  It did observe, however, that "'[c]lemency is deeply rooted in our Anglo-American tradition of law[] and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted.'"  *Id.* at 192 (quoting *Herrara v. Collins*, 506 U.S. 390, 411–12 (1993) (footnote omitted)).  The Court added:  "Far from regarding clemency as a matter of mercy alone, we have called it 'the "fail safe" in our criminal justice system.'"  *Id.* (quoting same).  As relevant here, the Court then concluded that "Congress' decision to furnish counsel for clemency proceedings demonstrates that it, too, recognized the importance of such process to death-sentenced prisoners;" that Congress understood that "clemency proceedings are not [] divorced from judicial proceedings;" and that Congress placed a premium on the "continuity of counsel."  *Id.* at 193.

Two decisions from the Fifth Circuit are more directly on point.  In *Ramirez v. Davis*, 675 Fed. App'x 478 (5th Cir. 2017) (mem. op.), the Fifth Circuit upheld a stay of execution granted by the district court pursuant to § 3599 in order to permit appointment of counsel to assist in state clemency proceedings.  As the district court explained, the lawyer in that case counsel, Michael Gross, was appointed pursuant to § 3599 to represent a capital defendant in federal habeas proceedings, but Gross "abandoned him by not filing a clemency petition."  Order

at 1, 4, *Ramirez v. Davis*, No. 2:12-CV-410 (S.D. Tex. Jan. 31, 2017).  Although the defendant

had directed that Gross refrain from filing a clemency petition, the district court concluded that a

question nonetheless remained because, "[o]nce a court appoints an attorney under § 3599, that

attorney 'shall represent the defendant throughout every subsequent stage of available judicial

proceedings' unless that attorney is 'replaced by similarly qualified counsel,'" and thus Gross

remained the defendant's attorney.  *Id.* at 7 (emphasis omitted) (quoting 18 U.S.C. § 3599(e)).

And because Gross failed either to seek the appointment of substitute counsel or to ensure that a

clemency petition was filed on the defendant's behalf, "Gross . . . created circumstances that left

Ramirez effectively without counsel for state clemency proceedings."  *Id.* at 8.  The district court

then concluded that Gross's inaction violated the defendant's right to counsel for the clemency

proceeding under § 3599 and that the only remedy for that violation was to stay the execution to

permit time to identify and to appoint counsel with "the necessary qualifications to represent" the

defendant.  *Id.* at 9.

      The other case, *Battaglia v. Stephens*, 824 F.3d 470 (5th Cir. 2016), dealt with a similar

circumstance, also featuring Michael Gross.  In that case, the capital defendant filed a motion

seeking appointment of counsel under § 3599 to raise a claim under *Ford v. Wainwright*, 477

U.S. 399 (1986).  The district court declined to appoint new § 3599 counsel on the ground that

Gross was already serving as § 3599 counsel.  *Id.* at 472.  In response to an inquiry from the

court, Gross expressed concerns about the defendant's competency but stated that "competency

proceedings [were] 'wholly outside the scope' of his representation under § 3599."  *Id.*  The

district court (correctly) disagreed, noting that § 3599 requires that, unless replaced, appointed

counsel continue to represent the capital defendant through all "subsequent stage[s] of available

judicial proceedings."  *Id.* at 474.  The district court then declined the defendant's request for a

new lawyer, principally on the ground that fewer than twenty days remained before the scheduled execution date, and denied the defendant's request for a stay of execution. *Id.* at 472–73.

On appeal, the Fifth Circuit agreed with the defendant that Gross had "effectively abandoned him" with respect to any competency proceedings. *Id.* at 473. Noting that the Supreme Court held in *Harbison* that the right to § 3599 counsel extends through clemency proceedings, the court extended the same logic to Gross's abandonment of his client—that is, the court read *Harbison* to recognize a *right* to have counsel appointed pursuant to § 3599 to continue that representation through the clemency process and concluded that the same logic applied to the continuation of representation through "competency proceedings." *Id.* at 474. Finally, the Fifth Circuit held that "it would be improper to approve [the defendant's] execution before his newly appointed counsel ha[d] time to develop his *Ford* claim" and granted the defendant's motion for a stay of execution. *Id.* at 475. As the court put it, "[a] stay [was] needed to make [the defendant's] right to counsel meaningful."[1] *Id.*

The Supreme Court has also interpreted this language to "'entitle[] indigent defendants to the appointment of counsel in capital cases, including habeas corpus proceedings.'" *Christeson*

---

[1] Justice Sotomayor's statement respecting the application for stay of execution and denial of certiorari in *Holiday v. Stephens*, 577 U.S. 999 (2015), is to similar effect. Like the Fifth Circuit, she read the statute and *Harbison* to recognize a statutory right to the meaningful participation of § 3599 counsel through the clemency process. *Id.* In that case, the capital defendant's § 3599 counsel declined to file a state-law clemency petition on the ground that "there was 'no chance at all that a clemency petition would be granted.'" *Id.* That was problematic in Justice Sotomayor's view, but she joined the Court's decision denying Holiday's petition for a writ of certiorari because, "[a]fter the court rejected Holiday's request for new counsel, his original attorneys eventually submitted a clemency application on his behalf." *Id.* Although that application "likely would have benefited from additional preparation by more zealous advocates," Justice Sotomayor concluded that the Supreme Court was "likely" without power to order the state "to reconsider its clemency decision with new attorneys representing Holiday."

*v. Roper*, 574 U.S. 373, 377 (2015) (per curiam) (quoting *Martel v. Clair*, 565 U.S. 648, 652 (2012)). Nothing in the plain language of the statute, moreover, differentiates between the entitlement to the assistance of § 3599 counsel in "habeas corpus proceedings" and in clemency proceedings. As the Fifth Circuit recognized in *Battaglia*, the same logic applies to each of the statutorily enumerated steps in the process leading from trial through clemency. 824 F.3d at 474. If the right to counsel is impinged at any point in the process, moreover, courts can stay executions. In *Christeson*, for example, the Supreme Court stayed an execution because counsel for the capital prisoner had missed the filing date for his first habeas petition, and the district court erred in declining to appoint conflict-free, substitute counsel under § 3599. 574 U.S. at 374–75.

This Court shares the reading of § 3599 suggested in *Harbison* and embraced in *Ramirez* and *Battaglia*: § 3599 creates an entitlement to the continuity of representation by qualified counsel through post-conviction review, competency proceedings, and whatever clemency proceedings that are "available to the defendant." 18 U.S.C. § 3599(e). Here, Plaintiff claims to fall within this line of authority; while conceding that she "'technically' has counsel," she asserts that without Harwell and Henry, her "'right to counsel [is not] meaningful,'" in violation of 18 U.S.C. § 3599. Dkt. 13 at 8 (quoting *Battaglia*, 824 F.3d at 474)). The Court agrees and finds that, as in *Ramirez* and *Battaglia*, Plaintiff's counsel—albeit through no fault of their own—have "effectively abandoned" her, *Battaglia*, 824 F.3d at 473, at the critical "fail safe" stage in the death penalty system, *Harbison*, 556 U.S. at 192.

Plaintiff's two experienced death penalty lawyers, Harwell and Henry, are both suffering from "more severe symptoms of COVID-19," Dkt. 13-1 at 3 (Davis Decl.) (Ex. 1); *see also id.* at 4 (Ex. 1) (concluding that "severe illness" has rendered both counsel "functionally

14

incapacitated"), which they acquired while striving to represent their client.  The Court credits

both of their declarations, submitted under the penalty of perjury, attesting that they are currently

unable to assist Plaintiff.  According to Harwell:

> [Her] symptoms have been increasing daily, so far including: extreme fatigue,
> impaired thinking and judgment, cough, sweats, chills, feeling feverish,
> moderate-to-severe body aches and headaches, loss of appetite, nausea,
> vomiting, and sore throat.  [She is] unable to focus for prolonged periods, and
> [she] need[s] to lie down throughout the day.  Despite [her] best efforts, [she
> has] found it impossible to do the work necessary to prepare Mrs. Montgomery's
> clemency application.

Dkt. 2-2 at 4 (Harwell Decl. ¶ 16) (Ex. 1).  Henry's declaration is to similar effect.  She attests

that

> [Her] symptoms, which continue to increase daily, now include gastrointestinal
> distress, severe headache[s], loss of taste, loss of appetite, cough, sore throat,
> and head congestion.  [Her] overarching symptom is fatigue and impaired
> concentration.  [She has] been instructed to rest and not work.  [She further
> notes] that in preparing [her] declaration [she] had to take frequent breaks
> because looking at the computer worsens [her] headaches.  [She] also had
> difficulty finding the correct words [and] used [her] computer's grammar
> software to assist [her].  [Her] declaration took [her] three to four times as long
> to write as would normally be the case for [her].

Dkt. 2-3 at 6 (Henry Decl. ¶ 25) (Ex. 2).  Henry further attests that her doctor has informed her

that she is "at risk for stress cardiomyopathy" and that this condition has caused her and her

"physician concern about the impact" of the virus "on [her] heart."  *Id*. (Henry Decl. ¶ 26) (Ex.

2).  Finally, she observes that she and Harwell "are in an untenable position"—if they work on

behalf of Plaintiff, they put their health "as serious risk," and, "[e]ven if [they] could engage in

meaningful legal work at [their] home computers, [they] are unable to access [Plaintiff's]

physical file"—which, Henry attests, contains the types of exhibits frequently included in

clemency petitions—"because [they] are not permitted to leave [their] homes or enter [their]

office building."  *Id*. at 7 (Henry Decl. ¶¶ 30–31) (Ex. 2).

15

The Court has no reason to doubt the veracity of this testimony or to believe that either

Harwell or Henry are malingering in the hope of delaying their client's execution date.  They

undoubtedly have serious cases of COVID-19, and, although Dr. Davis was unable to examine

them in person, he confirms their account, and, indeed, adds worrisome details—such as Henry's

low blood oxygenation level.  Dkt. 13-1 at 2 (Davis Decl.) (Ex. 1).  Dr. Davis opines, "with a

reasonable degree of medical certainty," that Harwell and Henry are both suffering from "severe

illness;" "that they are now functionally incapacitated from performance of any professional

obligations;" and that they need time for "their brains and bodies [to] recover from the disease."

*Id.* at 4 (Davis Decl.) (Ex. 1).  Nor do Defendants dispute that Harwell and Henry are suffering

from serious cases of COVID-19.  Counsel for Defendants merely suggests that either or both

might nonetheless be able to communicate with another lawyer, Lisa Nouri, to guide her through

the clemency process.  Nov. 18, 2020 Hrg. Tr. (Rough at 34).  Counsel might be right that, at

some time in the next several days, Harwell and/or Henry will feel well enough to do so.  But Dr.

Davis advises against any such efforts, Dkt. 13-1 at 3 (Davis Decl.) (Ex. 1), and both counsel for

Defendants and the Court can only speculate today about the future course of a disease that is, by

all accounts, unpredictable and, at times, gravely debilitating.  The Court, accordingly, finds that

Harwell and Henry are currently unable meaningfully to assist in the preparation of Plaintiff's

clemency petition.

Defendants respond that Harwell and Henry are not "effectively abandoning" their

responsibility under § 3599 to represent Plaintiff through the completion of the clemency process

because neither was, in fact, appointed as "qualified counsel" under the statute.  Rather,

according to Defendants, "U.S. District Judge Gary A. Fenner appointed the Office of the

Federal Public Defender for the Middle District of Tennessee" to represent Plaintiff, Dkt. 16 at 7,

and that office remains available to file a clemency petition on her behalf, *id.* at 9.  That contention, however, ignores three important considerations.

First, although Defendants are correct that Judge Fenner appointed the Office of the Federal Public Defender pursuant to § 3599, he also ordered "the assistant federal public defenders from the Middle District of Tennessee planning to work on this case [to] enter their appearances on behalf of petitioner," Dkt. 17-3 at 2, and Harwell and Henry are the only two lawyers from their office to have entered an appearance pursuant to that order.

Second, as *Harbison* notes, § 3599(e) "emphasizes continuity of counsel" and recognizes that "federal habeas counsel are well positioned to represent their clients in [] state clemency proceedings."  556 U.S. at 193.  There is no reason to believe that Congress was less solicitous of the need for continuity of death-penalty counsel in federal clemency proceedings.

Third, Defendants mistakenly equate the "*minimal* procedural safeguards" that the due process clause confers on capital inmates seeking clemency, *see Oh. Adult Parole Auth. v. Woodard*, 523 U.S. 272, 289 (O'Connor, J., concurring in part and concurring in the judgment); *id.* at 290–91 (Stevens, J., concurring in part and dissenting in part), with the more robust entitlement created by § 3599.  Early on, the district court recognized, as did Nouri, that this was a complicated case and that additional counsel were needed.  Thus, the Federal Public Defenders Office—and Harwell and Henry in particular—were appointed pursuant to 18 U.S.C. § 3599(d).  Section 3599(d) permits the appointment of counsel with "background, knowledge, or experience . . . to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation."  Harwell and Henry were brought into the case to fill a void in the type of "background, knowledge, or experience"

17

necessary "to properly represent" Plaintiff.[2]  Plaintiff's need for such "qualified counsel" continues to exist today, 18 U.S.C. § 3599(e), and § 3599(e) protects her interest in the "continuity of [that] counsel" through the succeeding stages of the proceedings, including proceedings for executive clemency, *Harbison*, 556 U.S. at 193; *see also* 18 U.S.C. § 3599(e) (noting that "*each* attorney so appointed shall represent the defendant throughout every subsequent stage of" the proceedings) (emphasis added).

Other attorneys in the Office of the Federal Public Defender cannot fill the shoes of Harwell and Henry at this late date.  Plaintiff offers the declaration of Henry A. Martin, the Federal Public Defender for the Middle District of Tennessee, who attests that the only lawyer other than Harwell and Henry who has played a role in Plaintiff's case is Richard Tennent, who "appeared briefly for [Plaintiff] in method of execution litigation," while working under the supervision of Henry.  Dkt. 17-1 at 2 (Martin Decl. ¶ 6) (Ex. 1).  As Martin explains, Tennent "was involved in the case for only [two] weeks and has no information about the substance of any matter that would be relevant to [Plaintiff's] clemency application."  *Id.*  Although the Court does not doubt that, with adequate time, another lawyer could come up to speed and could replace Harwell and/or Henry as "qualified counsel," that is neither possible in the next 11 or 12 days nor consistent with § 3599(e)'s emphasis on continuity of counsel.

---

[2]  Consistent with this understanding, the lawyers for Plaintiff explained in a filing with the Eighth Circuit that "the Office of the Federal Public Defender for the Middle District of Tennessee was appointed to assist with the mitigation investigation in this case" and that Harwell and Henry "have become actively involved in this case, particularly with respect to the mitigation investigation and coordinating expert services in support of Mrs. Montgomery's" claims. Dkt. 16-4 at 69.  Of course, presenting mitigation evidence and coordinating expert services, which is an area in which Harwell and Henry specialize, is at the very heart of presenting a clemency petition.

Defendants also fault Harwell and Henry for not preparing a clemency petition sooner. This case, however, is unlike *Hall v. Barr*, where this Court noted that the capital inmate had 13 years to prepare a petition. Mem. Op. at 8, No. 20-cv-3184, (D.D.C. Nov. 16, 2020), *aff'd*, No. 20-5340 (D.C. Cir. Nov. 19, 2020). Here, the Supreme Court did not deny Plaintiff's petition for rehearing until August 3, 2020, leaving her with only a few months' time. Plaintiff has offered convincing evidence that Harwell and Henry have not dragged their feet and have not engaged in any gamesmanship. As explained in the Martin declaration, Harwell and Henry did not have reason to believe that an execution date would be set for some time; in his words, "[t]he execution date came as a complete surprise." Dkt. 17-1 at 2 (Martin Decl. ¶ 7) (Ex. 1). And, meanwhile, Harwell and Henry were working extremely hard—70 to 80 hours per week—on an overwhelming array of other matters, as recounted in the Martin declaration. *Id.* (Martin Decl. ¶ 8) (Ex. 1). The Court has no reason to believe that either Harwell or Henry was less than diligent in this matter.

Defendants further contend that the unavailability of Harwell and Henry is of no moment because Plaintiff is still represented by Lisa Nouri, who was also appointed pursuant to § 3599. The Court is, once again, unpersuaded. To start, Nouri candidly explains that she sought the assistance of experienced capital counsel in Plaintiff's case because she lacked the necessary experience. She "had never had a capital trial, federal or state, and had never done a capital habeas case." Dkt. 13-2 at 1 (Nouri Decl. ¶ 3) (Ex. 2). Similarly, she has "never been involved in a clemency proceeding." *Id.* (Nouri Decl. ¶ 8) (Ex. 2). Nouri also describes her role in Plaintiff's case as limited. She attests, under the penalty of perjury, that her "role has been predominantly dealing with local counsel and local rules, along with occasional visits to and phone calls with" Plaintiff. *Id.* (Nouri Decl. ¶ 5) (Ex. 2). She does acknowledge that she

occasionally visited Plaintiff on her own but qualifies that assertion by stressing that she "was always accompanied by Ms. Henry and Ms. Harwell" when "any substantive discussions" occurred.  *Id.* (Nouri Decl. ¶ 6) (Ex. 2).  Nouri further explains that Plaintiff "is severely mentally ill" and that she lacks "the training or expertise to recognize and understand her illness" or "to deal with medical and mental health experts as required by the ABA and CJA guidelines for capital cases."  *Id.*

More significantly for present purposes, Nouri attests that, "[b]ecause of [her] inexperience," it was agreed that Harwell and Henry "would take responsibility for preparing and presenting [Plaintiff's] clemency application."  *Id.* (Nouri Decl. ¶ 8) (Ex. 2).  And perhaps most significantly, Nouri represented to the Court that as of November 15, 2020—the day she executed her declaration—she had "taken *no* steps to prepare a clemency application for" Plaintiff.  *Id.* (emphasis added).  At the Court's request, Nouri appeared by teleconference on November 18, 2020, and the Court was convinced that she is unable to take the lead in preparing a clemency petition compliant with the dictates of § 3599.[3]  Harwell and Henry were appointed pursuant to § 3599(d) because Nouri was ill-equipped to handle this complicated case without the assistance of attorneys with the necessary "background, knowledge, or experience," and that remains true today.  But, even if Nouri could, under normal circumstances, assemble an appropriate clemency petition, she has done little to nothing to date, and, given the impending deadline and her lack of experience, she has "effectively abandoned" Plaintiff in her pursuit of clemency.

---

[3]  When asked by the Court whether she could prepare a clemency petition without Harwell and Henry in the remaining time, Nouri responded, "I don't feel like I could do that.  It's a daunting task.  I've never [prepared] a clemency petition before."  Nov. 18, 2020 Hrg. Tr. (Rough at 10).

Finally, Defendants argue that granting Plaintiff the relief that she seeks would interfere with the President's sole power to grant reprieves and pardons.  U.S. Const., art. II, § 2, cl. 1. The Court agrees that it must proceed cautiously in light of the constitutional commitment of that authority to the President.  "Where a power has been committed to a particular [b]ranch of the [g]overnment in the text of the Constitution, . . . [it] is improper for this Court to arrogate to itself the power to adjust a balance settled by the explicit terms of the Constitution."  *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 486 (Kennedy, J., concurring in the judgment).  In the words of Alexander Hamilton, "the benign prerogative of pardoning should be as little as possible fettered or embarrassed."  *The Federalist No. 74*; *see also Ex Parte Garland*, 71 U.S. 333, 334 (1866); *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981).  To be sure, courts may play a very limited role in ensuring that the pardon *process* is consistent with "some *minimal* procedural safeguards," as five Justices held in *Woodard*, 523 U.S. at 289 (O'Connor, J., concurring in part and concurring in the judgment); *id.* at 290–95 (Stevens, J., concurring in part and dissenting in part), but the Court need not cross that bridge at this time.[4]

For present purposes, it is sufficient for the Court to stay Plaintiff's execution—briefly— to permit Harwell and Henry to recover from their illness and to have a short time to finish their work in supplementing Plaintiff's placeholder petition for a reprieve or commutation of sentence. To start, it is unclear whether the Court has authority to enjoin the Pardon Attorney from taking any "adverse action," Dkt. 2-1 at 9, and, in any event, nothing the Pardon Attorney does can limit the President's constitutional authority to consider a clemency petition at any time he deems

---

[4]  *Woodard* dealt with a state clemency proceeding in a state with a constitution that reserved a role for the state legislature in regulating the clemency process, rather than giving the governor sole authority over the pardon process.  For the reasons discussed above, the Court need not, and does not, express a view on whether *Woodard*'s holding extends to the federal pardon power.

appropriate.  *See* 28 C.F.R. § 1.11 ("The regulations contained in this part are advisory only and for the internal guidance of Department of Justice personnel.  They create no enforceable rights in persons applying for executive clemency, nor do they restrict the authority granted to the President under Article II, section 2 of the Constitution.").  In addition, the Court has not been asked to address the merits of Plaintiff's petition, nor would it be appropriate for the Court to do so.  And, as for procedural due process, if the President acts on Plaintiff's petition before Harwell and Henry have had even a minimal period of time to finalize it, Plaintiff can return to this Court and argue that such an action violates the "*minimal* procedural safeguards" recognized in *Woodard*.  For now, however, the Court expresses no view on that issue, which may or may not arise.  Finally, given the Court's finding that Plaintiff's counsel "effectively abandoned" her in her pursuit of clemency, thereby depriving Plaintiff of her entitlement to "qualified counsel," the Court need not, and does not, reach Plaintiff's separate constitutional challenge.[5]

## B.    Other Preliminary Injunction Factors

The Court is also convinced that Plaintiff "is likely to suffer irreparable harm in the absence of preliminary relief," *Winter*, 555 U.S. at 20, in the absence of preliminary relief.  There is insufficient time between now and her scheduled execution for Harwell and Henry to recover and to prepare a clemency petition consistent with the dictates of § 3599(e), nor is there time to appoint substitute counsel to act in their stead.  If the execution proceeds as scheduled on December 8, 2020, Plaintiff will lose her statutory right to meaningful representation by counsel in the clemency process and would be deprived of meaningful access to the "fail safe" of the

---

[5]  As suggested above, however, the Court notes that the "*minimal* procedural safeguards" recognized in *Woodard* are, in all likelihood, less demanding than § 3599's requirement that "qualified counsel" provide continuity of representation through the clemency process.  It is thus far from clear that the circumstances present here would violate due process, as opposed to § 3599.

criminal justice system. *Harbison*, 556 U.S. at 192. That loss would be irremediable. Given the finality of death, "'[i]n a capital case, the possibility of irreparable injury weighs heavily in the movant's favor.'" *Battaglia*, 824 F.3d at 475 (quoting *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982)). Plaintiff has thus demonstrated a strong likelihood of irreparable injury in the absence of an injunction.

Finally, the Court concludes "that the balance of equities tips in [Plaintiff's] favor, and that an injunction is in the public interest," *Winter*, 555 U.S. at 20. "The[se] last two factors 'merge when the Government is the opposing party.'" *Guedes*, 920 F.3d at 10 (quoting *Nken*, 556 U.S. at 435). Although Plaintiff argues that she "cannot identify any harm that would be suffered by Defendants by an injunction," Dkt. 2-1 at 8, the Court recognizes weighty interests on both sides in the case. Plaintiff committed a brutal crime, and there is a strong public interest in carrying out a sentence that was imposed twelve years ago. *See* Dkt. 12 at 26. At the same time, Plaintiff has a right to meaningful access to the clemency process, and the public has an interest in ensuring that this "'fail safe' of our criminal justice system," *Herrara*, 506 U.S. at 415, operates in a fair and considered manner. Most notably, the public's interest in seeing justice done lies not only in carrying out the sentence imposed years ago but also in the lawful process leading to possible execution. Given the gravity of the circumstances and the extraordinary circumstances of the pandemic, the Court concludes that the balance of equities and the public interest weigh in Plaintiff's favor. But the Court will also fashion its injunction to give due respect to the interest of Defendants and the public in avoiding unjustified delays in capitals cases.

**CONCLUSION**

The Court, accordingly, will **GRANT** in part and will **DENY** in part Plaintiff's motion for a preliminary injunction and temporary restraining order.  The Court will enter an order briefly staying Plaintiff's execution date to permit Harwell and Henry to finalize her clemency petition but will not enjoin any government official, including the President, from taking "adverse action on her request for reprieve and commutation," Dkt. 2-1 at 9.  The Court will further **ORDER** that, if both Harwell and Henry believe that they will be unable to timely file a petition without further assistance by December 24, 2020, they shall immediately apply to the U.S. District Court for the District of Missouri to appoint qualified, additional counsel or shall enlist the assistance of other attorneys working in the Office of the Federal Public Defender for the Middle District of Tennessee.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  November 19, 2020