**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **LISA MONTGOMERY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:20-cv-01281-P** |
| | § | |
| **WILLIAM P. BARR et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**OPINION AND ORDER**

Before the Court is Plaintiff Lisa Montgomery's Amended Motion for Preliminary Injunction ("Amended Motion"), in which she asks the Court to bar her transfer to the Bureau of Prison's ("BOP") facility in Terre Haute, Indiana where she will be executed on January 12, 2021. *See* ECF No. 53. Defendants William P. Barr, Attorney General of the United States in his official capacity; the Federal Bureau of Prisons ("BOP"); Michael Carvajal, Director of the BOP in his official capacity; Michael Carr, Warden of Federal Medical Center Carswell ("FMC Carswell" or "Carswell"); T.J. Watson, Warden of Federal Correctional Complex Terre Haute ("FCC Terre Haute" or "Terre Haute") in his official capacity; Rick Winter, BOP Regional Counsel for the North Central Region in his official capacity; and Alix M. McLearen, BOP National Administrator of Women and Special Populations in her official capacity, respond that they plan to transport Montgomery to a **separate** execution building at BOP's FCC Terre Haute facility one to two days before her scheduled execution where she will be the **sole** inmate in the execution

facility until her execution is carried out. *See generally* Original Response ("Orig. Resp."), ECF No. 23.

Despite the parties' lengthy briefing, the issue that Montgomery presents is straightforward. Based on past sexual abuse by males and her associated mental health conditions as a result of such abuse, Montgomery claims it would be discriminatory to be transferred from FMC Carswell to FCC Terre Haute—an all-male prison facility with some male BOP staff supervising her—for forty-eight hours prior to her execution. Thus, Montgomery asks the Court to enjoin the BOP from transferring her to FCC Terre Haute and require that Montgomery's execution take place at FMC Carswell. While the Court is not unsympathetic to Montgomery's concerns, as explained more fully below, the Court finds them unsupported by law and fact as Montgomery will be the only prisoner in the FCC Terre Haute execution facility for a duration of forty-eight hours prior to execution, she will be observed by male and female BOP staff members, and she will have access to an on-call BOP doctor and psychologist. Therefore, because Montgomery has not alleged sufficient facts to establish an arguable violation of her federal constitutional rights and because the applicable law forecloses her federal statutory claims, the Court holds that Montgomery's Amended Motion for Preliminary Injunction should be and hereby is **DENIED** and her amended complaint **DISMISSED without prejudice.**

## BACKGROUND

At the onset, Montgomery objects to Defendants' recitation of the facts relevant to her underlying criminal conviction and capital sentence, but as shown below these facts form the background necessary to understand the case and claims considered within this

Order. Indeed, given the nature of Montgomery's claims, the Court cannot consider certain facts in a vacuum. Montgomery's objection is **OVERRULED.**

### A. Lisa Montgomery's Background

Lisa Montgomery experienced severe, continuous sexual and physical abuse at her stepfather's hands beginning in her early childhood. *United States v. Montgomery*, 635 F.3d 1074, 1081 (8th Cir. 2011); Amended Complaint ("Am. Comp.") at 2–3, ECF No. 43. When she turned eighteen, Montgomery married Carl Boman, her stepbrother, who she alleges subjected her to further sexual abuse. *Montgomery*, 635 F.3d at 1081; Am. Comp. at 3. Together they had four children, after which she underwent tubal fulguration, a sterilization procedure that involved occluding her fallopian tubes by cauterization, rendering her incapable of having children as confirmed by a pretrial hysterosalpingogram. *Montgomery*, 635 F.3d at 1079, 1081.

In the years following her procedure, Montgomery claimed that she had four more pregnancies. *Id*. at 1081. During a period of separation from Boman in 1994, Montgomery had an affair and claimed that she was pregnant, but she ceased making that claim once they reconciled. *Id*. The two later divorced. *Id*.

Montgomery later met her second husband, Kevin Montgomery ("Kevin"), who she did not tell about the sterilization procedure. *Id*. at 1079. In 2000, while the two were still dating, she claimed that she was pregnant and planned to get an abortion. *Id*. at 1081. Kevin gave her forty dollars for the abortion, after which the "pregnancy" was not mentioned again. *Id.* Two years later, Montgomery informed her friends and family that she was pregnant again, claiming that she received prenatal care from her physician but forbidding

Kevin from attending the appointments. *Id.* The physician testified that he treated Montgomery for ankle pain and a cold but that he provided no prenatal care whatsoever. *Id*. When the alleged due date passed, Montgomery claimed that the baby died and that she donated the body to science. *Id.*

**B. The Murder of Bobbie Jo Stinnett**

Montgomery met her victim, Bobbie Jo Stinnett, at a dog show in April 2004. *Id*. at 1079. The two bred rat terrier dogs and met through online message boards dedicated to as much. *Id*. Stinnett maintained a website to promote her dog breeding business located in her home in Skidmore, Missouri. *Id*. The website included pictures of Stinnett and her dogs. *Id*. In spring 2004, Stinnett announced her pregnancy to her online community, which included Montgomery. *Id*.

In spring 2004, Montgomery began telling her friends, family, and online community that she was pregnant. *Id*. Montgomery reported testing positive for pregnancy, began wearing maternity clothes, and began behaving as if she were pregnant. *Id.* Still unaware of her sterilization, Kevin and her children believed her. *Id*. Some of Montgomery's acquaintances believed that she was pregnant and showed signs of pregnancy, but others did not. *Id*. Those who knew that Montgomery had been sterilized—including Boman and his wife—accused her of deceiving her family. *Id*. She responded that she would prove them wrong. *Id*.

Montgomery contacted Stinnett using an alias on December 15, 2004, expressing interest in one of her puppies and agreeing to meet at her home the next day. *Id*. Montgomery then drove to Stinnett's home at the appointed time, carrying with her in her

jacket a sharp kitchen knife and a white cord. *Id*. After playing with the puppies outside, the women entered the home. *Id*. Stinnett was eight months pregnant at the time. *Id*.

Sometime between 2:30 p.m. and shortly after 3:30 p.m., Montgomery attacked Stinnett, using the cord to strangle Stinnett until she was unconscious. *Id*. She then used the kitchen knife to cut into Stinnett's abdomen, causing her to regain consciousness. *Id*. A struggle ensued, and Montgomery strangled Stinnett a second time, killing her. *Id*. at 1079–80. Montgomery then extracted the premature baby from Stinnett's mutilated body, cut the umbilical cord, and fled the scene. *Id*. at 1080. Shortly thereafter, Stinnett's mother found her daughter lying on the living room floor, covered in blood. *Id*. She said that Stinnett's stomach looked like it had exploded. *Id*.

Following the murder and kidnapping, Montgomery placed the infant in a car seat, told Kevin that she gave birth at a women's clinic, and returned home pretending that the child was hers. *Id*. Shortly thereafter, she confessed to the crime and the child was safely returned to the father. *Id*.

**C. The Trial**

At trial, Montgomery asserted an insanity defense premised upon the evaluations of defense mental health experts Drs. Vilayanur Ramachandran and William Logan, both of whom diagnosed her with depression, borderline personality disorder, post-traumatic stress disorder, and pseudocyesis. *Id.* at 1082. The American Psychiatric Association's Diagnostic and Statistical Manual's revised fourth edition defines pseudocyesis as a somatoform disorder associated with a false belief of being pregnant associated with objective signs of pregnancy, including physiological changes. *Id*.

Dr. Ramachandran testified that Montgomery suffered from a severe pseudocyesis delusion and was in a dissociative state when she killed Stinnett and delivered the baby. *Id*. at 1083. In his opinion, her history of childhood sexual abuse and post-traumatic stress disorder predisposed her for pseudocyesis and that she maintained her delusion through internet research on cesarean sections, home birth, and related topics, as well as her purchases of maternity clothes, a home birth kit, and a baby nursery. *Id*. Though the details of her delusion fluctuated, Dr. Ramachandran believed that changes in Montgomery's delusional state were designed to accommodate the delusion and not signs of malingering, which he defined as a planned volition or lie. *Id*. at 1083–84.

The Government's mental health expert, Dr. Park Dietz, disagreed, testifying that Montgomery did not have a sincere belief that she was pregnant and therefore did not suffer from pseudocyesis at the time of the murder. *Id*. at 1083. He cited evidence showing Montgomery was well aware she had undergone sterilization, she did not seek medical confirmation of her 2004 pregnancy, she did not seek prenatal care in 2004 as she had in connection with her previous pregnancies, and she filled out an insurance form in September 2004 in which she stated that she was not pregnant. *Id*. Dr. Dietz noted that, if Montgomery truly suffered from a delusion of pregnancy, she would consistently assert that she was pregnant and could not have been talked out of it. *Id*. Instead, Montgomery gave conflicting accounts of the details of her 2004 pregnancy, the gender and number of her fetuses, and the circumstances of her child's birth. *Id*. Dr. Dietz also pointed out that Montgomery's story changed again after her arrest in that she falsely claimed her brother

had gone with her to Stinnett's home on the day of the murder and, when it was established her brother could not have gone with her, she claimed to have amnesia. *Id*.

Dr. Dietz concluded that, in his opinion, Montgomery was entirely capable of appreciating that she engaged in a lengthy and elaborate plan to murder Stinnett at an advanced stage of pregnancy, successfully conduct a crude Cesarean section on her first attempt, and kidnap a healthy infant she could present to the world as her own. *Id*. at 1085. The jury unanimously found Montgomery guilty beyond a reasonable doubt of the capital crime of kidnapping resulting in death. *Id*.

At the punishment phase, Montgomery's mental health experts testified that she suffered from a severe mental or emotional disturbance at the time of her offense which substantially impaired her ability to appreciate the wrongfulness of her actions. *Id*. The jury also heard testimony stating that Montgomery had been a good, loving, and nurturing mother to her four children, with whom she had a harmonious relationship. *Id*. The jury unanimously found that the Government proved all statutory and non-statutory aggravating factors beyond a reasonable doubt, including that Montgomery committed her offense in an especially heinous or depraved manner in that the killing involved serious physical abuse to Stinnett. *Id*. Thereafter, the district court sentenced her to death. *Id*.

**D. Direct Appeal and Post-Conviction Challenge to Conviction**

The Eighth Circuit affirmed Montgomery's conviction and sentence, rejecting her arguments, among others, that: (1) the district court erroneously excluded disputed expert testimony on the results of Montgomery's brain scans; (2) Montgomery's actions in cutting the unborn baby from Stinnett's dead body had not constituted a kidnapping; and (3) there

was insufficient evidence to support the jury's affirmative verdict on the aggravating factors. *Montgomery*, 635 F.3d at 1087–96. The Supreme Court subsequently denied Montgomery's certiorari petition. *Montgomery v. United States*, 565 U.S. 1263 (2012).

Montgomery then filed a motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255, where she asserted a variety of complaints about the performance of her trial counsel. The district court denied relief, the Eighth Circuit denied a Certificate of Appealability (Order, *Montgomery*, No. 17-1716), and the Supreme Court denied Montgomery's petition for writ of certiorari. *Montgomery v. United States*, 140 S. Ct. 2820 (2020).

**E. Montgomery's Time at Carswell**

Since her incarceration at FMC Carswell, Montgomery developed a history of suicidal ideations and attempts that necessarily informed the conditions of her confinement as dictated by FMC Carswell's standard suicide watch protocol. Carr Declaration at ¶ 5, ECF No. 23-2. Staff first placed Montgomery on suicide watch for two days beginning July 30, 2009 after she expressed suicidal ideation to medical staff. *Id.* at ¶ 6. This occurred again at the following dates:

- Three days beginning March 31, 2010, after expressing suicidal ideation (*Id.* at ¶ 7;
- Three days beginning July 25, 2010, after reporting suicidal ideation and cutting her wrist with a pencil sharpener (*Id.* at ¶ 8);

- Two days beginning on April 7, 2011, after reporting feeling overwhelmed by the denial of her first appeal and other inmates expressing their sympathy (*Id.* at ¶ 9);
- Four days beginning August 5, 2011, after taking approximately fifty 325 mg aspirin (she denied this was a suicide attempt), being transported to the hospital for treatment, and returning from the hospital (*Id.* at ¶ 10);
- On August 17, 2011, Montgomery threatened to hang herself if her property were taken from her, as had been warned as a disciplinary sanction. *Id*. at ¶11. She then covered her cell door window with paper and when an officer opened the food slot, she became violent and threw items, including a liquid. *Id*. The same day, red ligature marks were observed on both sides of Montgomery's neck. *Id*. She was again placed on suicide watch until July 19, 2011, based upon her refusal to participate in therapy and her apparent suicide attempt (*Id*.);
- From September 27 to September 30, 2011, Montgomery was again placed on suicide watch after she became agitated over the removal of her property from her cell. *Id*. at ¶ 12. She covered the cell door window and informed staff that her attorney would never see her again. *Id*. When the psychologist visited, she refused to discuss her situation and hid in her shower. *Id*. When staff escorted her out of the cell, it appeared that she tied a piece of yarn around her neck and engaged in self-harm by pulling her hair and cutting her wrists open with small pieces of cement (*Id*.);

- On June 11, 2012, Montgomery became agitated when she was informed that she would be moved to administrative detention pending investigation of a physical assault that she was involved in. *Id*. at ¶ 13. She demanded to speak with psychology but then refused to speak with them when they arrived. *Id*. Upon being asked whether she would move to administrative detention willingly, she began throwing items around her cell and swallowed three or four pills from a Tylenol bottle. *Id*. When prison staff entered her cell to handcuff her, they found that that the 100-pill bottle, which she had only purchased on June 8, had only twenty pills remaining. *Id*. FMC Carswell staff then transported Montgomery to the hospital, where doctors treated her for acute liver failure following her acetaminophen overdose. *Id*. She was again placed on suicide watch until July 2, 2012 (*Id*.);
- On September 25, 2012, Montgomery was placed on suicide watch for two days after she expressed suicidal ideation in response to a recent room change. *Id.* at ¶ 14.
- On September 12, 2019, Montgomery was yet again placed on suicide watch for two days after she expressed difficulty managing her emotions but denied any suicidal intent. *Id*. at ¶ 15.

A review of the record reveals that throughout her incarceration at FMC Carswell, Montgomery repeatedly made statements to medical staff indicating that she was considering or even planning to commit suicide if and when she ever received an execution date, including statements on December 30, 2009; March 29, 2010; April 5, 2010; April

29, 2010; September 29, 2010; September 27, 2010; September 20, 2011; and July 3, 2012. *Id*. at ¶ 16.

On October 16, 2020, after BOP officials informed Montgomery that she received an execution date of December 8, 2020, Warden Carr, considering Montgomery's past actions, directed that Montgomery be evaluated for suicide risk. *Id*. at ¶ 17–18. After Montgomery declined to participate in a clinical interview, a BOP staff psychologist concluded that Montgomery posed a "significant risk for committing suicide and that initiation of suicide watch was clinically necessary for her safety." *Id*. at ¶ 19. Accordingly, for her own protection, Montgomery was placed under intense supervision, which included significant restrictions on her access to her property, recreation, hygiene products, showers, clothing, and reading materials. *Id*. at ¶¶ 19–34. Since then, a licensed psychologist takes daily evaluations of Montgomery. *Id*. at ¶ 20. FMC Carswell staff have made gradual adjustments to the restrictions initially imposed upon her, with many of her belongings and routines restored to her on the condition that she not use them to hurt herself. *Id*. at ¶¶ 19–34.

**F. Proposed Transfer to FCC Terre Haute**

The record now before the Court also includes a declaration by Rick Winter, Regional Counsel for the BOP's North Central Region, in which he addresses some of Montgomery's objections to her transfer to FCC Terre Haute, pending her execution on January 12, 2021. Winter Declaration ("Winter Declr."), ECF No. 32-1. According to Winter's testimony, the BOP plans to transport Montgomery to Terre Haute one to two days before her scheduled execution. *Id*. at ¶ 6. Montgomery's BOP's transport team will

include both male and female staff, including a female psychologist and a female nurse, all of whom are required to complete annual training that focuses in part on mental health, the BOP's sexually abusive behavior and intervention program, and suicide prevention. *Id.* at ¶ 7. Personnel from other law enforcement agencies may also participate in Montgomery's transport. *Id.*

Winter further testifies that while awaiting execution, Montgomery will be the sole inmate housed at FCC Terre Haute's execution building, which is separate from all other facilities at FCC Terre Haute, and that she will not encounter any other inmates whatsoever. *Id.* at ¶¶ 8–10. Montgomery will be the only inmate housed at FCC Terre Haute's execution building until her execution. *Id.* at ¶ 10. Finally, during her stay in the execution building, Montgomery will be observed in her cell by both male and female staff and a BOP doctor and psychologist will be available at all times. *Id.* at ¶ 11.

**G. Procedural History**

Montgomery filed the instant complaint in the United States District Court for the District of Columbia, where she sought declaratory and injunction relief blocking her transfer to FCC Terre Haute. ECF No. 1. On November 25, 2020, the District Court for the District of Columbia transferred this cause to this Court. ECF No. 34. Montgomery then filed an amended complaint in which she asserts that:

(1) Defendants violated her rights under the Rehabilitation Act of 1973 because (a) she has disabilities, *i.e.*, post-traumatic stress disorder, bipolar disorder, epilepsy, depression, and dissociative disorder; (b) Defendants failed to make reasonable accommodations in their policies, procedures, and practices concerning confinement of death sentenced prisoners who have received a death warrant by requiring their transfer to FCC Terre Haute for purposes of execution; (c) Defendants failed to implement modifications or changes that

would mitigate the harm to Montgomery from her transfer to an all-male facility and to reasonably accommodate Montgomery's known disabilities; (d) she is entitled to reasonable accommodations that include (i) not being transported to FCC Terre Haute, (ii) having her execution conducted at FMC Carswell, and (iii) modifications to BOP protocols to limit her exposure to surveillance by men and ensure she retains access to coping tools necessary to maintain stability with her disability; and

(2) Defendants violated her rights under the Administrative Procedures Act ("APA") and Due Process principles because her proposed transfer to FCC Terre Haute violates BOP policies regarding the treatment and oversight of female prisoners with mental illness and prohibiting the transfer of any inmate on suicide watch to any facility other than facility other than a medical center.

Am. Comp. at ¶¶ 67–76

Montgomery also filed a motion requesting discovery in which she asserted her intention at some unspecified point in the future to amend her motion for preliminary injunction. ECF No. 49, at 1 n.1. Given the proximity to her execution date, the Court found it necessary to issue an Order setting an expedited briefing schedule and deadline for any amendment to Montgomery's preliminary injunction as well as the Defendants' response. ECF No. 50.

Montgomery then filed her Amended Motion in which she puts forth several propositions. *First*, that Title 18 U.S.C. § 3596, not 18 U.S.C. § 3621 or § 3625, governs the BOP's decision on the place where Montgomery's execution will be carried out. Amended Motion at 15–18. Accordingly, the APA applies to her challenge to the BOP's transfer decision and its alleged failure to comply with its rules and procedures. *Id*. *Second*, that the BOP's alleged failures to follow its suicide prevention and mental health protocols in connection with Montgomery's transfer to FCC Terre Haute are arbitrary and capricious, violating Due Process principles. *Id*. at 15–18. *Third*, that Montgomery suffers from

organic brain damage resulting from in utero alcohol exposure and significant head trauma, multiple mental illnesses (including post-traumatic stress disorder ("PTSD") and bipolar disorder) resulting from a long history of physical and sexual abuse, personality disorders, and major depressive disorder which qualify her as disabled under the Rehabilitation Act. *Id.* at 7–14. *Fourth*, that due to her history of physical and sexual abuse at the hands of numerous men, including her step-father, both husbands, and a series of men to whom her biological mother prostituted Montgomery when she was a teenager, Montgomery experiences severe anxiety and stress when interacting with unfamiliar men, which manifests in hives and PTSD symptoms. *Id*. at 5, 9. *Fifth*, that the BOP's refusal to designate FMC Carswell (a female-centric facility staffed by predominately female staff) as the place for Montgomery's execution is a failure to make a reasonable accommodation and, therefore, a form of discrimination against her based upon her disabilities. *Id*. at 10–14.

Defendants set forth several arguments in response. *First*, the BOP's discretion to transfer inmates from one facility to another is not subject to judicial review absent circumstances (such a fact-specific allegation of a constitutional violation) not present in Montgomery's case. Resp. at 5, 9–10. *Second*, Montgomery failed to exhaust available BOP remedies, thus barring her claims under the PLRA. *Id.* at 3–4. *Third*, the "accommodations" requested by Montgomery are wholly unreasonable given the size of the staff necessary to effectively and efficiently carry out an execution (more than forty BOP employees from multiple facilities in the Terre Haute area and beyond) and the

limitations imposed by the absence at FMC Carswell of the death chamber located at FCC Terre Haute. *Id*. at 1–2, 7–9.

**STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 1915A(b)(1), federal courts are mandated to preemptively screen prisoner complaints against government officials or entities to identify cognizable claims and dismiss the complaint or any portion of the complaint that is frivolous, malicious, or fails to state a claim upon which relief may be granted. *Coleman v. Tollefson*, 575 U.S. 532, ___, 135 S. Ct. 1759, 1764 (2015) (noting the congressional focus on trial court screening of prisoner complaints and dismissal of claims that are frivolous, malicious, or fail to state a claim for relief); *Crawford-El v. Britton*, 523 U.S. 574, 596 (1998) (recognizing the Prison Rights Litigation Act ("PLRA") requires district courts to screen prisoner complaints and authorizes the court on its own motion to dismiss frivolous, malicious, or meritless claims). Claims qualify as frivolous when they lack an arguable basis in law or fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Complaints fail to state a claim upon which relief may be granted where they fail to contain sufficient facts, accepted as true, to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Threadbare recitals of the elements of a cause of action supported by mere conclusory statements are insufficient, because "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## ANALYSIS

### A. Montgomery failed to exhaust her administrative remedies.

Defendants argue that Montgomery failed to exhaust administrative remedies available through BOP policies and procedures. Resp. at 3–4. Ordinarily, prisoners, including death row inmates, seeking any form of relief against government officials or entities must exhaust available administrative remedies, even when the remedies available through administrative proceedings may not afford the complete relief or remedy sought. *Jones v. Bock*, 549 U.S. 199, 211 (2007); *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (explaining that 42 U.S.C. § 1997e(a) "invigorated" the previous statutory exhaustion requirement); *Booth v. Churner*, 532 U.S. 731, 736–41 (2001) (holding that inmate required to exhaust administrative remedies despite prison administrative procedures not including the monetary damages he sought for an alleged Eighth Amendment violation). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). Indeed, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims *cannot* be brought in court," including those of death row inmates. *Jones*, 549 U.S. at 211 (emphasis added).

Montgomery argues that the BOP's administrative grievance procedures are "unavailable" to her (the statutory exception to the PLRA's exhaustion requirement) because: (1) she lacks access to writing materials and therefore cannot fill out the BOP's grievance form under the restrictions imposed by suicide watch (Reply at 9–10, ECF No. 31); (2) her current mental process renders her unable to fulfill the BOP's grievance process

requirements (*Id*. at 10); and (3) the BOP's administrative grievance process is a dead end because there is no guarantee that she could obtain final resolution of her grievances before her scheduled January 12, 2021 execution, despite the fact that BOP is required to respond to an informal request within twenty days (28 C.F.R. § 542.18). *Id*. at 11–12.

Defendants assert that applicable BOP rules and procedures permit Montgomery to obtain assistance from prison staff, family members, or her counsel in filing her administrative grievance. *See* Resp. at 3; Orig. Resp. at 13–16, ECF No. 23. The sophisticated pleadings before the Court belie the argument that Montgomery is incapable, because of her current mental status and lack of access to writing materials, of filing an administrative grievance addressing her transfer to FCC Terre Haute or inquiring as to the details of BOP's plans for that undertaking. Indeed, nothing in BOP policy or applicable federal law has precluded highly competent attorneys currently representing Montgomery from assisting her in filing her grievances—nothing required her to proceed pro se.

Defendants also assert that expedited responses to grievances are available when the grievance raises an emergency issue, such as Montgomery's questions about the training of the BOP personnel to be involved in her impending transfer to FCC Terre Haute. *See* 28 C.F.R. § 542.18; *see* Orig. Resp. at 15. In fact, given Montgomery's focus in her discovery motion on the training of the personnel to be involved in her transfer and the absence of any suggestion that she will be denied any of the current medical care she has been receiving while on suicide watch during her transfer, Montgomery's complaints about the circumstances of her transfer to FCC Terre Haute are precisely the sort of complaints that

could easily be resolved (at least with regard to Montgomery's concerns about inadequately trained BOP personnel at FCC Terre Haute) informally or administratively.

Under these circumstances, Montgomery fails to establish that the BOP's administrative grievance process is "unavailable" to her in a way that excuses her failure to exhaust administrative procedures. *See Ross*, 136 S. Ct. at 1856–58 (rejecting the argument that federal courts have discretion to fashion "special circumstances" exceptions to the PLRA's exhaustion requirement); *Valentine v. Collier*, 978 F.3d 154, 160–62 (5th Cir. 2020) (rejecting the argument that special circumstances, even emergencies on the scale of the COVID-19 pandemic, justified an exception to the exhaustion requirement under the guise of a finding of "unavailability" and specifically holding that "inadequate is not a synonym for unavailable"). For that reason alone, her claims lack arguable merit and are subject to dismissal under § 1915A(b)(1).

Thus, the Court finds that Montgomery's claims should be and hereby are **DISMISSED** and any relief predicated upon them **DENIED**.

### B. Merits Analysis

Even if Montgomery exhausted her administrative remedies or proved their unavailability, the Court would still dismiss her claims under the Rehabilitation and Administrative Procedure Acts.

The BOP's general responsibilities concerning persons sentenced to imprisonment by federal courts are mandated in Title 18 of United States Code at sections 3621 through 3626. 18 U.S.C. §§ 3621–26. Subsection 3621(b) specifies the factors that the BOP must consider when it determines where to house a federal prisoner. *Id*. § 3621(b). It also

provides that the BOP may at any time, having regard to the factors set forth in the subsection, direct the transfer of a prisoner from one penal or correctional facility to another. *See Reno v. Koray*, 515 U.S. 50, 58 (1995) (recognizing that the BOP retains the discretion to direct the transfer of a prisoner from one penal or correctional facility to another). Importantly, subsection 3621(b) provides that, "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection *is not reviewable by any court*." *Id*. § 3621(b) (emphasis added); *see Tapia v. United States*, 564 U.S. 319, 331 (2011) (explaining that after a federal court sentences a person, the BOP has plenary control, subject to statutory constraints, over the place of the prisoner's imprisonment).

While Montgomery argues the BOP's decision regarding the location where she is to be executed is governed by 18 U.S.C. § 3596, nothing in that statute can be reasonably construed as circumscribing what the Supreme Court characterized as the BOP's plenary control over decisions addressing where to incarcerate a prisoner. *Cf. Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 181539 (2019) (Gorsuch, J.) (observing that "courts aren't free to rewrite clear statutes"); *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630 (1818) (Marshall, C.J.) ("[W]hen the legislature manifests [its] clear understanding . . . with its words, courts are bound by it."). Further, nothing in section 3596 precludes the BOP from designating FCC Terre Haute as the place where Montgomery's execution is to be carried out or otherwise subjects the BOP's decision to transfer her there on the eve of her

scheduled execution to scrutiny under the APA.[1] Moreover, the only arguably relevant case law cited by Montgomery in support of her strained interpretation of section 3596 is wholly inapposite.[2]

---

[1]§ 3596. Implementation of a death sentence

(a) In general.--A person who has been sentenced to death pursuant to this chapter shall be committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence. When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

(b) Pregnant woman.--A sentence of death shall not be carried out upon a woman while she is pregnant.

(c) Mental capacity.--A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

18 U.S.C. § 3596.

[2]Montgomery cites the Seventh Circuit's decision in *Richmond v. Scibana*, a case where a federal inmate brought a section 2241 challenge to a BOP rule which limited the amount of time near the end of an inmate's term of incarceration when the inmate would be eligible for placement in home confinement. 387 F.3d 602 (7th Cir. 2004); Amended Motion at 15. The issue presented in *Richmond* was whether 18 U.S.C. § 3624(c) required the BOP to consider an inmate's placement in home confinement earlier than the time frame set forth in a proposed BOP rule that was then undergoing review in the APA's normal rule-making process but had not reached final adoption. The Seventh Circuit ultimately concluded that a federal habeas corpus action under section 2241 was not the proper vehicle for challenging the BOP's proposed new rule regarding the timing of transfers to home confinement near the end of an inmate's term of incarceration. Nothing in the Seventh Circuit's analysis of those issues in any way impacts the BOP's plenary power to transfer inmates between facilities or, in Montgomery's case, to transfer her to FCC Terre Haute to carry out her scheduled execution. Nor does *Richmond* support Montgomery's assertion that section 3596 circumscribes the BOP's authority to transfer an inmate to an execution-capable facility in

1. Montgomery's Rehabilitation Act Claim

Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)) prohibits discrimination based on disability. *N.C.A.A. v. Smith*, 525 U.S. 459, 467 (1999); *see also Smith v. Harris County, Texas*, 956 F.3d 311, 316–17 (5th Cir. 2020) (explaining how Section 504 of the Rehabilitation Act operates in conjunction with Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) and Title II of the Americans with Disabilities Act ("ADA") of 1990 (42 U.S.C. § 12132) to prohibit discrimination on the basis of disability); *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (ADA and Rehabilitation Act are generally interpreted *in pari materia*). To make out a prima facie case of illegal discrimination under the ADA or the Rehabilitation Act, a plaintiff must show: (1) that she is a qualified individual, *i.e.*, that she is disabled within the meaning of the ADA and the Rehabilitation Act; (2) that she is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). Alongside their prohibitions on disability-based discrimination, both acts impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals. *Id.*

To prevail on a failure to accommodate claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff

---

advance of a lawful execution.

requested an accommodation or because limitation's nature was open and obvious. *Id*. at 724. A plaintiff's requested accommodation must also be "reasonable," meaning that it neither imposes undue financial or administrative burdens nor fundamentally alters the nature of the service, program, or activity. *Id.*

Montgomery argues that Defendants' planned transfer to FCC Terre Haute amounts to discrimination against her on the basis of her disability because (1) Defendants refused to adequately accommodate her anxiety over the possibility that she will be subject to observation and surveillance by male prison staff during her transfer and after her arrival at FCC and (2) BOP personnel with whom she will interact during and after her transfer may not be adequately trained to address her gender-specific traumatic history of sexual abuse. *See* Amended Motion at 10–14. Montgomery seeks an accommodation that either the BOP guarantees she will not be required to interact with, or be surveilled at any time by, any male BOP employees with whom she is unfamiliar during her transfer to FCC Terre Haute and thereafter, or that her execution be conducted at FMC Carswell. *Id*. at 24–25. Both of these requests are without merit.

In response, Defendants present uncontroverted evidence that they plan to transport Montgomery to FCC Terre Haute's execution building a day or two before her scheduled execution. Winter Declr. at ¶ 6. During her transfer, BOP personnel who have been trained in accordance with BOP policy will accompany her, along with a female nurse, a female psychologist, and possibly law enforcement personnel from other agencies. *Id*. at ¶ 7. Once at FCC Terre Haute, Montgomery will be housed separately from all other inmates as the lone inmate in the execution building until her execution is conducted. *Id*. at ¶¶ 8–10.

*First*, while Montgomery repeatedly asserts that BOP personnel at FCC Terre Haute are inadequately trained concerning her mental health and gender-specific mental disabilities, she furnishes no fact-specific allegations—let alone evidence—that support this assertion. Instead, Montgomery simply assumes that because there are currently no female inmates housed at FCC Terre Haute, all of the BOP personnel at that facility never received any training concerning suicide prevention, caring for inmates with mental disabilities, supervising inmates who have been sexually abused or assaulted, or supervising female inmates generally. Defendants dispute these assertions with evidence, noting that all BOP employees receive annual training that includes instruction on the very subjects Montgomery disputes, *i.e.*, suicide prevention and the care of mentally disabled and sexually abused inmates. Winter Declr. at ¶ 7.

Montgomery's assumption that male BOP personnel working at all-male facilities lack training and experience in addressing female inmates who have been raped or sexually assaulted, lacks specific factual or evidentiary support. Montgomery identifies no deficiencies in the BOP's training programs for its employees regarding inmate sexual assault—intergender and intragender—which again is part of every BOP employee's annual training. Nor does Montgomery allege any specific facts showing that the BOP's annual employee training regarding inmate sexual assault is inadequate or deficient in terms of enabling BOP employees to address inmate complaints of sexual assault or abuse.

*Second*, the fundamental problem with Montgomery's request that her execution be conducted at FMC Carswell is that it is unreasonable. *See Cadena*, 946 F.3d at 724. Defendants' evidence shows that BOP conducted multiple successful executions at FCC

Terre Haute in recent months. In contrast, Montgomery alleges no specific facts and provides no evidence showing that: (1) it is feasible to convert any identifiable portion of FMC Carswell, a medical facility designed to *preserve* human life, into an execution facility similar to that which already exists at FCC Terre Haute; (2) it is practical or even remotely feasible for BOP personnel at FMC Carswell to be adequately trained in the interval between now and January 12, 2021, in the manner of execution that has proven so efficacious at FCC Terre Haute; (3) it is financially feasible to convert any identifiable portion of FMC Carswell into an execution facility similar to the one which already exists at FCC Terre Haute; or (4) it is practical or even remotely feasible for BOP to transport its execution-skilled personnel to FMC Carswell and back without disrupting any other scheduled executions.

Montgomery's purported expert, Martin Horn, a former state parole and prison administrator with very limited experience conducting executions (he supervised three more than twenty years ago employing an unspecified protocol, which may or may not have been anything similar to the single-drug lethal-injection execution protocol currently in use at FCC Terre Haute), has little-to-no experience with the federal prison system, and no personal knowledge of the facilities at FMC Carswell. Instead, Horn offers what is best described as purely speculative advice. Horn Declr., ECF No. 54-9. The thrust of Mr. Horn's opinions is upon the likely impact of Montgomery's transfer to FCC Terre Haute upon her mental health, but nothing in his declaration suggests that he possesses any training or experience which qualifies him to render an opinion on an inmate's mental health. *See, e.g.*, *id.* at ¶¶ 15–18, 23, 26–28.

Likewise, Horn's assertion that it would be easy to convert a portion of FMC Carswell into an execution chamber is without specific factual support regarding what such a conversion would entail (except that he suggests it would be necessary to bolt a gurney to the floor as is apparent from the photograph accompanying his declaration). *See id*. at ¶ 33. Moreover, he offers no details regarding the cost or amount of time necessary to complete such an undertaking. Nor does he offer any suggestion as to what training would be necessary for FMC Carswell personnel before they could carry out Montgomery's execution with the same efficiency shown by the employees located at FCC Terre Haute in other recent federal executions.

Finally, Mr. Horn's suggestion that BOP could simply hire unidentified individuals possessing unspecified skills who could carry out Montgomery's execution effectively and efficiently (because years ago Pennsylvania retained the services of an unidentified number of similarly unidentified individuals over an unspecified time frame) at FMC Carswell is entirely unsupported. *Id*. at ¶¶ 35–36. Mr. Horn offers no detailed explanation of what he deems to be the types of skills necessary to successfully carry out a lethal injunction execution protocol of the type employed by BOP staff at FCC Terre Haute. In sum, he presents no facts showing that it would be possible for BOP to identify and retain the services (as independent contractors) of sufficiently skilled individuals within a time frame that would permit BOP to conduct Montgomery's scheduled lethal injection execution at FMC Carswell.

For the foregoing reasons, Montgomery fails to allege any specific facts showing that the refusal of BOP officials to conduct her execution at FMC Carswell constitutes a

failure to make reasonable accommodation in view of Montgomery's mental health disabilities. Thus, the Court finds that her Rehabilitation Act claim should be and hereby is **DISMISSED** and any relief predicated upon it **DENIED**.

2. <u>Montgomery's APA Claim</u>

The APA waives sovereign immunity concerning non-monetary claims made against federal agencies, including the BOP. 5 U.S.C. § 702. However, 18 U.S.C. § 3625 provides, that sections 701 through 706 of the APA, "do not apply to the making of any determination, decision, or order under this subchapter" (which includes subsection 3621(b)). 18 U.S.C. § 3625. As explained in detail above, the section 3625's plain text instructs that BOP decisions regarding the placement or transfer of an inmate **are not** subject to the provisions of the APA. 18 U.S.C. §§ 3621(b), 3625; *cf. Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) (Thomas, J.) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.") (quotations omitted); *Evans v. Jordan*, 8 F. Cas. 872, 873 (C.C. Va. 1813) (Marshall, J.), *aff'd*, 13 U.S. (9 Cranch) 199 704 (1815) ("[In the legislative branch] is confided, without revision, the power of deciding on the justice as well as wisdom of measures relative to subjects on which they have the constitutional power to act. Wherever, then, their language admits of no doubt, their plain and obvious intent must prevail.").

Perhaps implicitly recognizing this, Montgomery's amended complaint and amended motion for preliminary injunction shifted her attack from a purely statutory argument. *See* Am. Comp.; Amended Motion. Instead, she now presents what the Court interprets as an implicit Due Process challenge. Montgomery asserts that BOP rules and

regulations designed to protect the mental health and safety of BOP inmates will be violated if she is transferred to FCC Terre Haute (an all-male facility where her gender-focused anxiety and PTSD will be exacerbated) while she is currently on suicide watch (because FCC Terre Haute is not a medical facility as required by BOP suicide prevention protocols). Amended Motion at 10–14. To the extent that Montgomery makes such a Due Process challenge, for the following reasons the Court finds that it should be **DENIED**.

*a. Procedural Due Process*

The Due Process Clause protects against deprivations of liberty and property interests. Procedural due process rights attach to liberty interests that are either created by non-constitutional law, such as statutes, or are sufficiently important to flow implicitly from the design, object, and nature of the Due Process Clause. *Kerry v. Din*, 576 U.S. 86, 97–98 (2015). To have a property interest in a benefit, a person must have more than an abstract need or desire and more than a unilateral expectation of it—he must have a legitimate claim of entitlement to it. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). A benefit is not protected if government officials may grant or deny it at their discretion. *Id.*

The Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement. *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."). Section 3621 grants BOP officials *plenary* discretion over prisoner housing designations and transfers, subject only to the statutory

considerations listed in section 3621(b) (which plainly do not forbid Montgomery's transfer to FCC Terre Haute). 18 U.S.C. § 3621. Thus, Montgomery possesses no protected liberty or property interest in avoiding her transfer and brief detention as the lone inmate in the execution building at FCC Terre Haute. *Cf. Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). The transfer's purpose is to facilitate the execution of her lawfully imposed criminal sentence in a manner consistent with an execution protocol approved by the Supreme Court.

It is undisputed that Montgomery is currently on suicide watch, with some related restrictions on her conduct that she outlined in her original complaint. Her amended complaint, however, deleted her Eighth Amendment challenge to her current conditions of confinement. *Compare* Am. Comp. *with* Orig. Comp. She does not allege that she will be taken off suicide watch any time prior to her scheduled execution, either during her transfer to FCC Terre Haute or after her arrival there. It bears repeating that Montgomery is currently on suicide watch because of her lengthy history of suicidal ideation, comments, gestures, and attempts. *See supra* at 8–11. Based on the record before the Court, these conditions of confinement will remain substantially the same for Montgomery upon her arrival at FCC Terre Haute's execution building.

As is presently the case, Montgomery will be under surveillance by both male and female BOP employees. The Supreme Court held that no violation of a constitutionally protected liberty interest occurred when an inmate was placed in administrative segregation for thirty days as a disciplinary sanction because the disciplinary segregation did not differ substantially from the ordinary conditions of the inmate's prison life. *Sandin v. Connor*,

515 U.S. 472, 483–84 (1995). There is no fact-specific allegation before this Court establishing that Montgomery's transfer to FCC Terre Haute just one to two days before her scheduled execution will substantially alter the conditions of her suicide watch or her life in prison generally.

From her arrival at FCC Terre Haute (which Winter testifies will be one to two days before her scheduled execution) until her execution, Montgomery will be the **only** inmate in the execution building at that facility. *See* Winter Declr. at ¶¶ 8–11. There is no evidence that the BOP will deprive Montgomery of any of the medical or psychological services she is currently receiving, including her anti-anxiety medications. While the staff at FCC Terre Haute will include both male and female guards, Montgomery possesses no constitutionally protected liberty interest in avoiding a heightened sense of anxiety because of her possible interaction with unfamiliar male guards. Thus, Montgomery's procedural due process challenge to her transfer is legally and factually unsupported.

*b. Substantive Due Process*

"The touchstone of substantive due process protection is the protection of the individual against arbitrary government action." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). Montgomery argues that her transfer to FCC Terre Haute is arbitrary and capricious because it is inconsistent with the details of BOP rules and regulations designed to protect inmate health and safety (including BOP's suicide prevention program). Amended Motion at 15–17. This argument lacks merit.

There is nothing arbitrary or capricious about BOP's proposed transfer of Montgomery to FCC Terre Haute one to two days before her scheduled execution. The BOP plans to transfer Montgomery to the only BOP facility where staff have a demonstrated record of successfully conducting executions employing the lethal injunction protocol expressly approved by the Supreme Court in *Barr v. Lee*. 130 S. Ct. 2590, 2591–92 (2020). As stated previously, the BOP plans to house Montgomery as the sole inmate in FCC Terre Haute's execution building for the brief duration of her stay prior to her execution. *See* Winter Declr. at ¶¶ 6, 8–10.

The fact that Montgomery does not wish to be housed for one to two days on a campus where she will be the lone female inmate does not violate substantive due process principles, even giving due regard to her mental health issues. *See Washington v. Harper*, 494 U.S. 210, 225–26 (1990) (holding prison officials did not violate substantive due process principles by treating non-consenting mentally ill prison inmate with antipsychotic medications). In a prison environment, officials routinely confront individuals with a demonstrated propensity for antisocial, criminal, and violent conduct. *Id.* The government's interest in carrying out a lawfully imposed capital sentence is not defeated by an inmate's preference for being surrounded only by familiar faces and persons of their own gender. *See Cnty. of Sacramento*, 523 U.S. at 845.

In Montgomery's case, BOP officials have the responsibility of ensuring the safety of both Montgomery and the prison staff who will participate in her execution. Stated otherwise, they are under a duty to carry out a lawfully imposed capital sentence in a manner which conforms with constitutional requirements and avoids the unnecessary risk

of a failed execution. There is no fact-specific allegation showing that the BOP possesses any facility other than FCC Terre Haute with the necessary physical requirements and experienced staff to carry out a lethal injection protocol execution in a constitutionally acceptable manner. The BOP's plan to transfer Montgomery to FCC Terre Haute and briefly house her there as the sole inmate in its execution building pending her execution is neither arbitrary nor capricious. *Harper*, 494 U.S. at 225–27.

Thus, the Court finds that her APA claim should be and hereby is **DISMISSED** and any relief predicated upon it **DENIED**.

**C. Motion for Discovery**

Rule 8 of the Federal Rules of Civil Procedure may no longer require the type of hyper-technical pleading that once held sway in federal judicial proceedings, but it does not swing wide the doors of discovery for a plaintiff armed with nothing more than conclusions. *Iqbal*, 556 U.S. at 678–79. Montgomery's conclusory pleadings do not entitle her to discovery, however limited, in connection with this case. As explained above, her claims are precluded by specific federal statue. She is not entitled to burden Defendants with discovery requests in support of her meritless claims. *Id.* Thus, the Court finds that Montgomery's Discovery Motion should be and hereby is **DENIED**.

**D. Motion for Preliminary Injunction**

Plaintiffs seeking a preliminary injunction must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that the injunction is in the public interest. *See e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008);

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). The requirements for a preliminary injunction are essentially the same as those for a permanent injunction except that the plaintiff must show a likelihood of success on the merits rather than actual success. *Winter*, 555 U.S. at 32 (quoting *Amoco Production*, 480 U.S. at 542, n.12).

As discussed above, Montgomery's claims based upon the Rehabilitation Act and the APA fail to establish a likelihood of success on the merits. *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019) (encouraging federal courts to employ their equitable powers to dismiss lawsuits challenging execution protocols that are based on speculative theories). Thus, the Court finds that her Amended Motion for Preliminary Injunction should be and hereby is **DENIED**.

## CONCLUSION

The PLRA's exhaustion requirement is wholly consistent with the clearly expressed congressional intent underlying the final sentence of 18 U.S.C. § 3621(b), as well as 18 U.S.C. § 3625. Collectively, these statutory enactments reflect a desire to remove federal courts from the role of micromanaging federal prisons, particularly regarding administrative decisions on the placement and transfer of inmates. Absent some showing that an inmate's federal constitutional rights have been violated, challenges to BOP decisions regarding the designation of an inmate's place of incarceration or transfer between facilities have no efficacy.

This is not a case in which a prisoner is attacking an administrative interpretation of a statute or the validity of an agency's proposed or existing rules. Such challenges can properly be brought under the APA because that legislation was enacted, in part, to bring

uniformity and coherence to the federal administrative rule-making process. This is also not a case in which a prisoner alleges that he or she is exempt from execution because of a constitutional barrier (such as intellectual disability or mental incapacity). *See* 18 U.S.C. § 3695(b).

Montgomery committed the ultimate criminal offense recognized by this nation—a capital offense. A jury of her peers unanimously concluded that offense was especially heinous, a conclusion fully supported by the evidence of the extensive planning which preceded it and Montgomery's ruthlessness in executing her plan. *Montgomery*, 635 F.3d at 1085. At trial, Dr. Dietz noted Montgomery's remarkable ability to study medical information online and then successfully perform a Cesarean section on her first attempt. *Id*. Her jury unanimously concluded these were not the actions of someone in a dissociative state. *Id*.

A jury heard extensive evidence of: (1) Montgomery's history of in utero alcohol exposure; (2) her multiple head injuries; (3) her lengthy history of sexual abuse and assault by her stepfather, her husbands, and many others, much of which occurred with the knowledge and complicity of her biological mother; and (4) her diagnoses of a variety of mental illnesses, mental defects, and personality disorders. *See generally id*. Despite this evidence, her jury unanimously returned a verdict at the punishment phase of trial which compelled the federal district court to impose the death penalty. *Id*. at 1079.

Montgomery's unanimous jury, the Eighth Circuit, and the Supreme Court have all declared that the punishment for her capital offense is death. The existence of BOP rules, regulations, and policies requiring BOP officials to conduct themselves in a manner

designed to protect the health and safety of inmates, including BOP's suicide prevention program, may not be employed to prevent the execution of Montgomery's lawful sentence. This includes efforts to preclude her transfer to the lone BOP facility with the necessary physical resources and experienced staff to carry out her execution in a constitutionally acceptable manner.[3] To hold otherwise would prevent BOP officials from ever executing her capital sentence.[4]

Therefore, it is hereby **ORDERED** that:

Montgomery's amended complaint, (ECF No. 43), is **DISMISSED without Prejudice** pursuant to 28 U.S.C. § 1915A(b)(1).

Montgomery's amended motion for preliminary injunction, (ECF No. 53), is **DENIED.**

---

[3]Insofar as Montgomery's pleadings and motions in this cause can be construed as an eleventh-hour attempt to preclude her execution, an assertion which she denies, this action could also be construed as an attempt to circumvent the procedural requirements of 28 U.S.C. § 2255(h) requiring Circuit Court approval before the filing of a second or successive motion under that statute. *See Nance v. Commn'r, Ga. Dep't of Corr.*, ___ F.3d ___, 2020 WL 7053435, * 6 (11th Cir. Dec. 2, 2020) (holding a prisoner's claim for injunctive relief that would prevent a state from implementing a death sentence under the only method authorized by state law was required to be brought as a federal habeas corpus action).

[4]Montgomery's arguments in this case furnish extensive details of her lengthy history of physical and sexual abuse, brain impairments, and resulting mental disabilities and personality disorders. These arguments read like a clemency petition. Of course, this Court is not the proper forum in which to make a request for clemency, which lies within the exclusive province of the Executive Branch, not the Judicial Branch. *Cavazos v. Smith*, 565 U.S. 1, 8–9 (2011) (clemency is the prerogative granted to the executive to help ensure that justice is tempered with mercy); *Harbison v. Bell*, 556 U.S. 180, 187 (2009) ("Federal clemency is exclusively executive: Only the President has the power to grant clemency for offenses under federal law."); *cf*. Letter from Thomas Jefferson to Willian Charles Jarvis (Sept. 28, 1920) *in* 15 THE WRITINGS OF THOMAS JEFFERSON 277 (Lipsomb & Bergh eds., Memorial Ed. 1903-04) ("To consider the [federal] judges as the ultimate arbiters of all constitutional questions [is] a very dangerous doctrine indeed, and one which would place us under the despotism of an oligarchy.").

Montgomery's motion for discovery, (ECF No. 49), is **DENIED.**

The applications for admission Pro Hac Vice, (ECF Nos. 51, 57), are **GRANTED.**

All other pending motions are **DISMISSED as moot.**

**SO ORDERED** on this **15th day** of **December, 2020.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE