UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LISA M. MONTGOMERY,

*Plaintiff*,

v.

JEFFREY A. ROSEN, *et al.*,

*Defendants*.

Civil Action No. 20-3261 (RDM)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE
AND RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: January 6, 2021

TIMOTHY A. GARRISON
United States Attorney
Western District of Missouri

JEFFREY RAY
Deputy United States Attorney
Western District of Missouri

BRIAN P. CASEY
Chief, Appellate Division
Western District of Missouri

/s/ Alan T. Simpson
ALAN T. SIMPSON, Missouri Bar #65183
Assistant United States Attorney
Western District of Missouri
Special Assistant United States Attorney
District of Columbia

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia

BRIAN P. HUDAK
Acting Chief, Civil Division
District of Columbia

/s/ Johnny Walker
JOHNNY H. WALKER, D.C. Bar #991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS .................................................................................................. i

AUTHORITIES ............................................................................................................. ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

STANDARD .................................................................................................................. 4

I.      The Court Should Deny Montgomery Leave ....................................................... 5

II.     Montgomery Does Not Succeed on the Merits .................................................... 5

        A.      Missouri Supreme Court Rule 30.30(f) Does Not Invalidate Montgomery's
                Scheduled Execution Date ....................................................................... 5

                1.      Rule 30.30(f) Does Not Effectuate Death ...................................... 6

                2.      Rule 30.30(f) Governs the Missouri Supreme Court .................... 11

                3.      Rule 30.30(f)'s Limitation on the Number of Executions Is
                        Inapplicable on its Own Terms .................................................... 13

III.    Montgomery Is Not Entitled to Equitable Relief ................................................. 14

        A.      Montgomery's Request to Vacate Her Execution Date Is Properly
                Characterized as a Request for Injunctive Relief .................................... 14

        B.      Montgomery Cannot Satisfy the Standards for Injunctive Relief ............ 18

        C.      Montgomery Cannot Satisfy the Standard for Vacatur ............................ 22

CONCLUSION ............................................................................................................. 24

CERTIFICATE OF SERVICE ...................................................................................... 25

# AUTHORITIES

**Page(s)**

**Cases**

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649 (D.C. Cir. 2019) ............... 22, 23

*Barr v. Lee*, 140 S. Ct. 2590 (2020) .................................................................................... 3, 20

*Barr v. Roane*, 140 S. Ct. 353 (2019) .......................................................................................... 12

*Baze v. Rees*, 553 U.S. 35 (2008) ............................................................................... 2, 20, 21

*Bucklew v. Precythe*, 139 S. Ct. 1112 (2019) .......................................................................... 3, 20

*Bureau of Prisons' Execution Protocol Cases*, 19-mc-145,

    2020 WL 5604293 (D.D.C. Sept. 20, 2020) ...................................................................... 13

*Calderon v. Thompson*, 523 U.S. 538 (1998) ...................................................................... 2, 20

*Glossip v. Gross*, 576 U.S. 863 (2015) ........................................................................................ 19

\*\* *In re Fed. Bureau of Prisons' Execution Protocol Cases*,

    980 F.3d 123 (D.C. Cir. 2020) ........................................................................... 4, 15, 18

\*\* *In re Fed. Bureau of Prisons' Protocol Cases*,

    955 F.3d 106 (D.C. Cir. 2020) ................................................................................ passim

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,

    613 F.3d 1112 (D.C. Cir. 2010) .......................................................................................... 22

*LeCroy v. United States*, 975 F.3d 1192 (11th Cir. 2020) ................................................ 6, 10, 15

*Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*,

    No. 19-mc-145, 2020 WL 7186766 (D.D.C. Dec. 6, 2020) ................................................ 18

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................................................ 4

*PDK Labs., Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004) ............................................................. 22

*Peterson v. Barr*, 965 F.3d 549 (7th Cir. 2020) ............................................................... 6, 9, 10

*Shinseki v. Sanders*, 556 U.S. 396 (2009) ................................................................ 22

*United States v. Mitchell*, 971 F.3d 993 (9th Cir. 2020) ........................................ 6, 9

*United States v. Montgomery*, 635 F.3d 1074 (8th Cir. 2011) ................................... 20

*United States v. Vialva*, 976 F.3d 458 (5th Cir. 2020) .................................. 6, 9, 10, 19

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................ 18

**Constitutional Provisions, Statutes, Rules, and Regulations**

5 U.S.C. § 702 ............................................................................................................ 17

5 U.S.C. § 703 ............................................................................................................ 17

5 U.S.C. § 706 ............................................................................................................ 22

18 U.S.C. 3596(a) .......................................................................................... 5, 7, 9, 10

Ga. Code Ann. § 17-10-40(a) ..................................................................................... 12

Mo. Const. art. V ......................................................................................................... 5

Missouri Supreme Court Rule 30.30(f) ............................................................. passim

28 C.F.R. § 26.4(a) ................................................................................................ 16, 19

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ....................................................................... 6

John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal*

*Injunctions or Other Universal Remedies*, 37 Yale J. on Reg. Bull.  (2019-2020) ................ 17

## INTRODUCTION

This Court should deny Montgomery's motion for partial summary judgment. Now less than a week from her execution, Montgomery seeks delay for its own sake based on alleged procedural violations that she could have raised many months—if not years—ago. Montgomery's claims are meritless; no provision of law requires Defendants to comply with Missouri state court rules of practice, procedure, and pleading. Those claims are also subject to dismissal based on unjustifiable delay alone. A condemned prisoner cannot obtain a last-minute vacatur of her execution date based on a narrow procedural objection that has been apparent since at least July 2020, when Defendants revised the nonbinding execution protocol to suggest 50 days' notice.

First, Montgomery's claims lack merit. Defendants' scheduling of Montgomery's execution for January 12, 2021, complied with the Federal Death Penalty Act (FDPA). It need not have complied with Missouri Supreme Court Rule 30.30(f), which is a state court rule relating to practice, procedure and pleading *in state court*. The Rule governs the Missouri Supreme Court and tells that court to afford 90 days' notice prior to an execution. It also prohibits the Missouri Supreme Court from requiring the state department of corrections to execute more than one death warrant in a single month. Four circuit courts have rejected the view that the FDPA sweeps in all state statutes concerning executions, consistent with the view that it incorporates only those state rules that "effectuate death." Rule 30.30(f) is a scheduling rule that does not effectuate death. The D.C. Circuit's prior decision in *In re Fed. Bureau of Prisons' Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020), does not answer the question here or otherwise control this Court's resolution of the question presented.

In addition, the FDPA does not incorporate state rules that govern state court procedure and internal state organization. Rule 30.30(f) is such a rule: it operates to define the role of various

state institutions and their interaction with each other. Attempting to translate that court rule to the federal context—such as by requiring the Supreme Court to consult with the BOP in scheduling federal executions—would be nonsensical. Montgomery has no real response to this point, mischaracterizing Defendants' argument as suggesting that the FDPA does not incorporate *any* state law that references state actors. But there are no translation problems for state laws governing *executive* actors, since the federal Executive similarly performs the tasks necessary to effectuate death. In drafting the FDPA, Congress did not anticipate problems translating state court rules to the federal system because, though courts sometimes have roles to play in scheduling executions, it is axiomatic that only the executive branch implements a sentence of death.

Second, Montgomery cannot satisfy the requirements for a last-second "vacatur" of her execution date. The improbable upshot of Montgomery's vacatur invitation is that numerous other inmates challenging the federal execution protocol mislabeled their requests as for injunctive relief, rather than vacatur, and that mislabeling resulted in executions inmates had rights to delay. But those inmates and counsel understood that regardless of what an inmate calls her request for relief, she cannot stop Defendants from executing her imminently without satisfying the requirements for equitable relief. Montgomery cannot satisfy those requirements, including a showing of irreparable harm. Montgomery's allegations do not rise to the level of irreparable harm, given that Montgomery has been under a death sentence for 12 years and received at least 50 days' notice of each of her execution dates. The public has a "powerful and legitimate interest in punishing the guilty," *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (citation omitted), by "carrying out a sentence of death in a timely manner," *Baze v. Rees*, 553 U.S. 35, 61 (2008) (plurality opinion). Montgomery's requested last-second vacatur would impose significant, unwarranted logistical challenges on the government and the victims' witnesses who plan to attend

Montgomery's execution. Montgomery's ever-evolving procedural challenges do not support additional delay of justice for her heinous crime.

"Last-minute stays" "should be the extreme exception, not the norm." *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (quoting *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019)).  This case presents no ground for an exception. This Court should deny Montgomery's motion for partial summary judgment and to vacate her execution date.

## BACKGROUND

On December 9, Montgomery filed a supplemental complaint raising two claims under the Administrative Procedure Act (APA): a claim asserting that the Director lacks the legal authority to designate a new execution date until January 1, 2021, under the relevant regulations (Claim I); and a claim asserting that the FDPA incorporates a Missouri state court rule requiring at least 90 days' notice in the scheduling of executions and limiting the number of executions that the executive may be required to perform in a particular month (Claim II). Dkts. 28-29 & Minute Order (Dec. 11, 2020).

On December 24, this Court granted partial summary judgment on Claim I, vacating the Director's designation of Montgomery's execution date and later granting partial final judgment on that claim under Rule 54(b). Dkt. 47 at 25-27; Dkt. 48. This Court, however, declined to rule on Claim II on the ground that its holding on Claim I made it "unnecessary to address her FDPA claim, which poses a host of difficult issues that, if possible, are better left for resolution on a less compressed timetable," reasoning that in light of its "conclusion that the Director's existing order must be set aside, the question whether a new order must provide Montgomery with at least 90 days' notice is hypothetical and not ripe for resolution." Dkt. 47 at 25, 27.

On December 28, Defendants appealed the grant of partial final judgment on Claim I and, on December 29, moved the D.C. Circuit for a stay pending appeal or vacatur of the district court's December 24 order. On January 1, 2021, the D.C. Circuit summarily reversed, concluding that "the merits of the parties' positions are so clear as to warrant summary action." Order, *Montgomery v. Rosen*, 20-5379 (per curiam). Montgomery sought en banc review, which the D.C. Circuit denied on January 5. Order, *Montgomery v. Rosen*, 20-5379.

Montgomery now moves this Court for leave to file a renewed motion for summary judgment as to Claim II. Dkts. 57, 57-1, 58, 58-2.

## STANDARD

Montgomery seeks to prevent Defendants from executing her on January 12, 2021 by vacating her execution date. Dkts. 35, 57-1 & 58-2. Defendants acknowledge this Court's contrary ruling but preserve their position: although Montgomery purports to request only vacatur, she must satisfy the requirements for equitable relief to stop Defendants from carrying out her impending execution. "Success on an APA claim does not automatically entitle the prevailing party to a permanent injunction." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137 (D.C. Cir. 2020). "Instead, the party must demonstrate that (i) 'it has suffered an irreparable injury,' (ii) 'remedies available at law . . . are inadequate to compensate for that injury,' (iii) the balance of hardships weighs in favor of an injunction, and (iv) 'the public interest would not be disserved by a permanent injunction.' " *Id.* (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010)).

I.      **The Court Should Deny Montgomery Leave**

Montgomery should be denied leave to file because her renewed motion is a restatement of a pending motion which has been briefed and argued. The Court deferred ruling on Montgomery's initial motion for partial summary judgment, which the Court could have ruled on instead of this renewed motion, and Montgomery alleges no intervening change that warrants an amended motion. Nonetheless, and recognizing this Court's inherent authority to manage its cases, the Defendants understand that whether this Court grants Montgomery leave to file what is effectively a surreply, the issue is ripe for this Court's consideration.

II.     **Montgomery Does Not Succeed on the Merits**

   A. **Missouri Supreme Court Rule 30.30(f) Does Not Invalidate Montgomery's Scheduled Execution Date**

The FDPA requires that the United States Marshal "supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). Montgomery argues that the FDPA incorporates Missouri Supreme Court Rule 30.30(f), which provides that the Missouri Supreme "Court shall set dates of execution after consultation with the director of the department of corrections," and "[a]ny date of execution shall be at least 90 days but not more than 120 days after the date the order setting the date is entered." The Rule further states that "[t]he department of corrections shall not be required to execute more than one warrant of execution per month."

Montgomery is mistaken. Rule 30.30(f) does not address a manner of "implement[ing]" a sentence of death, 18 U.S.C. § 3596(a), and is therefore not incorporated via the FDPA, for two independent reasons. First, it does not directly govern the performance of the execution. Second, it is a Missouri state court rule of "practice, procedure, and pleading," Mo. Const. art. V, § 5, that regulates the internal operation of the Missouri state government, rather than the performance of

executions. And Rule 30.30(f)'s limitation on the number of executions that may be scheduled in a particular month is patently inapplicable on multiple additional grounds.

### 1.      Rule 30.30(f) Does Not Effectuate Death

The phrase "implementation of the sentence in the manner prescribed by [state] law" in § 3596(a) refers at most to "procedures effectuating death." *United States v. Vialva*, 976 F.3d 458, 461-62 (5th Cir. 2020) (per curiam), *cert. denied*, 20-5766 (20A49), 2020 WL 5667626 (U.S. Sept. 24, 2020); *accord Peterson v. Barr*, 965 F.3d 549, 554 (7th Cir. 2020), *stay denied*, 20A6, 2020 WL 3964236 (U.S. July 14, 2020); *United States v. Mitchell*, 971 F.3d 993, 996-97 (9th Cir. 2020); *see also LeCroy v. United States*, 975 F.3d 1192, 1198 (11th Cir. 2020), *cert. denied*, 20-5767 (20A52), 2020 WL 5640389 (U.S. Sept. 22, 2020). Procedures effectuating death include only those procedures connected to the execution itself, not pre-execution process requirements.[1] That conclusion is dictated by the plain text of the statute, which makes clear that the FDPA does not incorporate procedures remote in time or space from the actual execution. To "implement" a sentence means to carry it out. *See* Implement, Webster's Third New Int'l Dictionary 1134 (3d ed. 1993) ("to carry out: accomplish, fulfill"); Implementation Plan, Black's Law Dictionary 872 (10th ed. 2014) ("An outline of steps needed to accomplish a particular goal.").

The structure of § 3596(a) reinforces this conclusion: it states that a person sentenced to death must be "committed to the custody of the Attorney General" while any appeal is pending. After that, "[w]hen the sentence is to be implemented," the Attorney General must "release" the prisoner to the United States Marshal, "who shall supervise implementation of the sentence." As

---

[1] Defendants acknowledge the holding in *In re Fed. Bureau of Prisons' Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020), that the FDPA's incorporation of state law is not limited to the general method of execution, but preserve their position that "the FDPA regulates only the top-line choice among execution methods such as hanging, electrocution, or lethal injection." *Id.* at 113 (Katsas, J., concurring).

Judge Katsas recently concluded, "[t]his language makes clear that the prisoner is transferred to the marshal only '[w]hen the sentence is to be implemented,' and that the 'implementation of the sentence' covers only conduct that follows the transfer. In short, 'implementation' does not include scheduling the execution, but instead presupposes a set time and date." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5361 (D.C. Cir. Dec. 10, 2020) (Katsas, J., concurring in the denial of reconsideration). The text's reference to "supervis[ion]," 18 U.S.C. § 3596(a), is to the same effect: the Marshal lacks the ability to supervise actions that take place far in advance of the execution, such as scheduling.

The D.C. Circuit's fractured decision in *In re Fed. Bureau of Prisons' Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020) ("*Protocol Cases*"), does not suggest a different result. "It addressed what constitutes a 'manner' of execution under the FDPA, not what constitutes its 'implementation.'" *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5361 (D.C. Cir. Dec. 10, 2020) (en banc) (Katsas, J., concurring in the denial of reconsideration). "[T]hat case did not present, and [the court] had no occasion to decide, whether the FDPA extends even to events that precede the release of the prisoner to the marshal." *Id.* Indeed, when the D.C. Circuit recently considered the issue en banc, three judges explicitly concluded that *Protocol Cases* did not demand a conclusion that "implementation" includes the setting of an execution date. *See id.* And despite the views of a minority of the en banc panel to the contrary, a *majority* of the en banc panel declined to enter relief on the theory Montgomery here presses regarding an analogous state-law 90-day notice provision, refusing to halt two Texas-based executions, one scheduled with 55 days' notice and the other rescheduled with 21 days' notice. *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5361 (D.C. Cir. Dec. 10, 2020) (en banc).

To be sure, Judge Rao's concurring opinion in *Protocol Cases* notes that "[i]n the death penalty context, the term 'implementation' is commonly used to refer to a range of procedures and safeguards surrounding executions, not just the top-line method of execution." 955 F.3d at 133 (Rao, J., concurring). And in support of that observation, she cited BOP regulations that govern "very minute aspects of executions, including the '[d]ate, time, place, and method.'" *Id.* at 134. But although this discussion provided context that guided Judge Rao's interpretation of whether the "manner" of execution extended beyond the method of execution, nothing in her opinion reflects an intent to settle the meaning of "implementation." To the contrary, Judge Rao observed that a Texas statute governing the timing of executions did "not provide for specific procedures." *See Protocol Cases*, 955 F.3d at 135 n.8 (Rao, J., concurring) (citing Tex. Code Crim. Proc. Ann. art. 43.14).

The separate opinions in *Protocol Cases* confirm that Judge Rao did not intend to answer the question presented here. Judge Katsas did not read the FDPA to encompass state provisions regarding execution timing. *See Protocol Cases*, 955 F.3d at 113-24 (Katsas, J., concurring). Judge Tatel, in dissent, limited his broader reading of § 3596(a) to encompass only state provisions specifying "procedures that effectuate the death," such as "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements," expressly acknowledging "the Attorney General's authority to establish procedures unrelated to" death effectuation. *Id.* at 149, 151 (quotation marks and alterations omitted) (Tatel, J., dissenting). Judge Rao did not suggest that she read "implementation" to reach procedures more distantly related to the execution of a

8

sentence than did Judge Tatel.[2] In short, that portion of Judge Rao's concurring opinion Montgomery relies upon does not control the issue before this Court.

The rulings of four circuit courts to address this issue after *Protocol Cases* are consistent with the view that § 3596(a)'s incorporation of state procedures is limited to those that effectuate death, and none has read *Protocol Cases* to answer the question presented here in Montgomery's favor. In squarely rejecting an inmate's invocation of Texas's 90-day notice provision, the Fifth Circuit explained that the FDPA is "at least limited to procedures effectuating death and excludes pre-execution process requirements such as date-setting and issuing warrants." *Vialva*, 976 F.3d at 462 (addressing Tex. Code Crim. Proc. art. 43.141). As the court of appeals explained, "[t]he text of the provision explicitly refers to the 'implementation of the sentence' prior to referencing state law," and thus "[t]he text simply does not extend to pre-execution date-setting and warrants." *Id.* Three other courts of appeal have reached similar conclusions. *See Peterson*, 965 F.3d at 554 (concluding that § 3596(a) "cannot be reasonably read to incorporate every aspect of the forum state's law regarding execution procedure" and noting that the *Protocol Cases* panel's "debate … was limited to state laws, regulations, and protocols governing procedures for effectuating death," and holding that a state law governing execution witnesses falls outside the scope of the FDPA); *Mitchell*, 971 F.3d at 996-97 (holding that "procedures that do not effectuate death fall outside the scope of 18 U.S.C. § 3596(a)," which "addresses, at most, state laws that set forth procedures for giving practical effect to a sentence of death," such as "choice of lethal substances, dosages, vein-access procedures, and medical-personnel requirements") (internal quotation marks omitted);

---

[2] Although Judge Tatel later joined a dissenting opinion expressing a broader view of "implementation," *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5361 (D.C. Cir. Dec. 10, 2020) (en banc) (Wilkins, J., dissenting), that sheds no light on the meaning of Judge Rao's opinion in *Protocol Cases*.

*LeCroy*, 975 F.3d at 1198 (explaining that "even the dissenting opinion" from the D.C. Circuit, "which embraced the most capacious reading" of the FDPA, limited § 3596(a) to only death-effectuating procedures, and concluding that § 3596(a) "does not extend to" state provisions regarding attorney attendance at executions).

The historical role of a U.S. Marshal in executions, Dkt. 44, as reflected in the available evidence, shows that scheduling provisions, including Missouri Supreme Court Rule 30.30(f), are not matters incorporated by the FDPA. The Marshals did not historically set execution dates. Dkt. 44 at 2. Prior to 1830, sometimes the courts set execution dates, and sometimes the President did. *Id.* In 1830, the President determined to let the courts set the dates. *Id.* As of 1971, the United States Marshals Manual stated that "[t]he day upon which the execution shall take place shall be fixed in the judgment or order of the court which imposed the sentence. If only the week is designated, the marshal shall fix the day of the week. If the court order does not fix the time of day, the execution shall take place at 'about sunrise' on the day fixed." *Id.* This history confirms the FDPA's textual indication that the Marshal's role to "supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed" arises only "[w]hen the sentence is to be implemented[.]" 18 U.S.C. § 3596(a). The decision about *when* the sentence is to be implemented is a decision antecedent to implementation and is thus not included in the duties governed by state law that the FDPA contemplates the Marshal will carry out.

Here, Rule 30.30(f)'s 90-day scheduling rule does not "effectuate death." Scheduling is antecedent in time and remote in space from the actual performance of the execution. The Marshal does not "supervise" scheduling. 18 U.S.C. § 3596(a). As the Fifth Circuit correctly concluded in *Vialva*, the text of § 3596(a) "simply does not extend to pre-execution date-setting and warrants." 976 F.3d 462; *accord Peterson*, 965 F.3d at 554; *LeCroy*, 975 F.3d at 1198. And Rule 30.30(f)'s limitation on the number of executions that can be scheduled in a month is even more remote from

the process of implementing a sentence of death. At most, it is an attenuated form of scheduling procedure, coming into play only in particular circumstances, that prohibits a state court from requiring the state correctional department to carry out multiple executions in a single month.

### 2.    Rule 30.30(f) Governs the Missouri Supreme Court

The FDPA imports state rules prescribing a manner of implementing a sentence of death, not state court rules of procedure, practice, and pleading—particularly those rules that organize the internal operations of state government. Indeed, incorporation of the latter in a statute governing *federal* executions would be incoherent. Because Rule 30.30(f) governs Missouri court procedure and the Missouri judiciary's interactions with the Missouri executive, it is not incorporated by the FDPA.

The text of the court rule reflects its focus on state institutional roles. It provides that the *Missouri Supreme "Court* shall set dates of execution after *consultation with the director of the department of corrections*." (Emphasis added). And it states that "[t]he *department of corrections shall not be required* to execute more than one warrant of execution per month." (Emphasis added). This language prescribes the roles and interaction of different state entities. It establishes certain duties of the Missouri Supreme Court, and it limits that court's authority by requiring it to consult with the executive agency that conducts executions and prohibiting it from overburdening that agency by providing inadequate notice or by scheduling multiple executions in rapid succession. And the legally "binding" nature of the rule is limited to the extent the rule relates to court practice, procedure, and pleading. Mo. Const. art. V, § 5.

Montgomery does not suggest that the FDPA incorporates Rule 30.30(f) directly, such that the Missouri Supreme Court is responsible for scheduling federal executions. Moreover, the rule's framework cannot sensibly be translated to the federal level. The Supreme Court—the federal

equivalent of the Missouri Supreme Court—does not set the dates of federal executions and does not consult with the BOP in scheduling executions. Indeed, it is unclear whether the Supreme Court even enjoys the constitutional authority to perform these tasks. Incorporating Rule 30.30(f) would thus be incoherent and could render it "impossible to carry out executions of prisoners sentenced in some States." *Barr v. Roane*, 140 S. Ct. 353 (2019) (Alito, J., statement respecting the denial of stay or vacatur). The FDPA simply cannot be read to incorporate state-level, inter-branch coordination rules of this kind.

Recognizing this problem, Montgomery picks and chooses the parts of the Missouri rule she wishes to incorporate. She argues that the 90-day notice provision binds the federal government but does not suggest that the rule requires the Supreme Court (or any court) to schedule executions or consult with the BOP in doing so. But she offers no explanation for why, on her own theory, the FDPA selectively incorporates the state law's rule about when the execution will be scheduled, but not the state law's rule about which officials will schedule the execution. There is no basis in law or logic for Montgomery's preferred gerrymandering. Because the FDPA plainly does not incorporate the rule in its entirety, it does not incorporate the rule at all. It is accordingly unsurprising that two prior Missouri defendants did not raise this argument prior to their executions. *See United States v. Purkey*, Dkt. Nos. 615, 617-21, 4:01-cr-308 (W.D. Mo. July 16, 2020); *United States v. Nelson*, Dkt. Nos. 492-94, 4:99-cr-303 (W.D. Mo. Aug. 28, 2020).[3]

---

[3] Another court in this District recently rejected a similar argument. In that case, a federal condemned inmate argued that the FDPA incorporates Georgia Code Ann. § 17-10-40, entitled "Fixing of new time period for execution where original time period has passed." That provision gives the "judge of the superior court of the county where the case was tried[,] . . . the power and authority to pass an order fixing a new time period for the execution of the original sentence," subject to certain minimum and maximum timing requirements. Ga. Code Ann. § 17-10-40(a), (b). Judge Chutkan held that the FDPA does not import those Georgia timing requirements because the state statute "sets forth the power afforded to Georgia superior court judges in capital cases
(continued on next page)

Montgomery attacks a straw man, arguing that "[u]nder Defendants' logic, they could avoid any obligation under state law simply because a state's laws contemplate that all matters relating to implementation of an execution will be carried out by that state's institutions." Renewed Mot. 7. Of course, that is plainly *not* Defendants' position.  State laws governing the way the state *executive* effectuates death can easily be translated to the federal level, where the Executive similarly effectuates death. The fact that the FDPA does not account for translation problems of the kind at issue here—which would arise frequently if the FDPA incorporated state laws governing decisions remote from the actual execution, like scheduling—confirms that it incorporates only those state laws governing the effectuation of death.

### 3. Rule 30.30(f)'s Limitation on the Number of Executions Is Inapplicable on its Own Terms

Even apart from the insuperable problems described above, Rule 30.30(f)'s limitation on the number of executions that can be scheduled in a particular month is inapplicable on its own terms. Montgomery claims that the scheduling of her execution violated this rule because two other federal executions are also currently scheduled for January 2021. *See* Dkts. 35 at 10; 58-2 at 4. But neither of those executions is governed by Missouri law.[4] And Rule 30.30(f)'s limitation plainly pertains only to other executions scheduled *under Missouri law*. *See* Mo. Sup. Ct. Rule 30.30(f) ("*The department of corrections* shall not be required to execute more than one warrant of execution per month.") (emphasis added). There is nothing to suggest that Rule 30.30(f) is intended

---

carried out by the state of Georgia, not the federal government." *In re Bureau of Prisons' Execution Protocol Cases*, 19-mc-145, 2020 WL 5604293, at *3 (D.D.C. Sept. 20, 2020).

[4]    *See*    https://www.justice.gov/opa/pr/executions-scheduled-inmates-convicted-brutal-murders-many-years-ago.

as a limit on the number of executions that may occur nationwide in a single month. The two additional federal executions referenced by Montgomery are therefore irrelevant.

In addition, Montgomery's execution is the *first* execution scheduled for January.[5] Rule 30.30(f) limits the number of executions that the Missouri Supreme Court may require to be carried out in a particular month, not the number that may be scheduled. *See* Mo. Sup. Ct. Rule 30.30(f) (restricting the number of death warrants that the department of corrections is "*required to execute*") (emphasis added). As a result, even assuming Rule 30.30(f) governs all three executions in January, there would be no violation of the rule at the time of Montgomery's execution. And Montgomery lacks standing to challenge purported defects in the planned executions of other prisoners.

## III.    Montgomery Is Not Entitled to Equitable Relief

Montgomery asks the Court to vacate her execution date. Because she seeks to prevent Defendants from carrying out her execution on that date, however, Defendants maintain that her requested relief must satisfy the requirements for equitable relief, which Montgomery cannot meet. And even if vacatur is the appropriate label for the relief Montgomery seeks, she cannot satisfy the standard for vacatur, either.

### A.    Montgomery's Request to Vacate Her Execution Date Is Properly Characterized as a Request for Injunctive Relief

Montgomery's request to vacate her execution date is a request for an injunction against the implementation of her lawful capital sentence. Montgomery seeks to evade the stringent standard for injunctive relief by recaptioning her request as one for vacatur. But the D.C. Circuit has already indicated that the standard for equitable relief governs execution challenges of this

---

[5]    *See*    https://www.justice.gov/opa/pr/executions-scheduled-inmates-convicted-brutal-murders-many-years-ago.

kind. In *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 126, 137, the court of appeals held that "the 2019 Protocol [should] be set aside to the extent that it permits the use of unprescribed pentobarbital in a manner that violates the Federal Food, Drug, and Cosmetic Act," but "affirm[ed] the district court's denial of a permanent injunction to remedy the FDCA violation" based on a lack of irreparable harm. Critically, the court held that "[s]uccess on an APA claim does not automatically entitle the prevailing party to a permanent injunction" absent satisfaction of the injunctive-relief factors. *Id.* at 137; *see In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 20-5260 (D.C. Cir. Aug. 27, 2020) (similar). And as Judge Chutkan recently found, a "request to vacate [an] execution [date] . . . is a request for an injunction couched" in different terms. Order at 3, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, (D.D.C. Aug. 20, 2020), Dkt. 209. The Eleventh Circuit has similarly rejected the kind of procedural maneuver Montgomery attempts here. *LeCroy*, 975 F.3d at 1196 ("Although LeCroy's motion carefully avoided using the word 'stay'—instead repeatedly asking the district court to 'reset' or 'modify' his execution date—LeCroy has failed to explain how his pleading can sensibly be understood as anything other than a request to stay his execution.").

Montgomery's vacatur theory creates perverse timing incentives to delay in direct contravention of the Supreme Court's admonitions that expeditious resolution of capital challenges is appropriate. The D.C. Circuit has concluded that the FDPA incorporates at most those state procedures that are readily apparent to both the federal government and death-sentenced inmates. *See In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d at 135 (Rao, J., concurring) ("If 'prescribed by the law of the State' includes only a state's statutes and formal regulations, the Marshal will be able to identify the requirements of state law. . . . When Congress used the term 'prescribed by the law of the State,' it did not mean secret policies and constantly

changing informal protocols."). Thus, as soon as an inmate can identify a divergence between such a state provision asserted to be incorporated by Section 3596(a) and federal procedure, she can and should raise that FDPA claim. Other inmates have proceeded accordingly, alleging that the federal execution protocol conflicted with various state statutes even before the government scheduled their executions. *See In re Bureau of Prisons' Execution Protocol Cases*, 19-mc-145, Dkt. No. 92-1 (June 1, 2020) (asserting, *e.g.*, that a Texas statute controlling the time of day at which executions may be scheduled was incorporated into the FDPA). And they have sought "injunctive and declaratory relief for . . . violations and threatened violations of the . . . Federal Death Penalty Act" based on such scheduling claims. *Id.* at 1.

On Montgomery's theory, however, an inmate can evade the usual standards for enjoining alleged violations of federal law by simply delaying in raising an FDPA scheduling claim—no matter how apparent it should have been earlier—until after the government has set her execution date, and then seeking to "set aside" that date under the APA. Montgomery has long been on notice that the federal government does not consider itself bound by Missouri's 90-day scheduling provision. Binding federal regulations have provided for a 20-day minimum notice period since 1993, *see* 28 C.F.R. § 26.4(a), and even the nonbinding federal execution protocol was amended in July 2020 to contemplate 50, rather than 90, days' notice, *see In re Bureau of Prisons' Execution Protocol Cases*, 19-mc-145, Dkt. No. 171 (July 31, 2020). The federal government began scheduling other inmates for execution accordingly immediately thereafter, *see id.* Dkt. 171, No. 1:19-mc-145 (D.D.C.) (informing plaintiffs who brought earlier FDPA challenges of the protocol change); *see also id.* Dkt. 172 (scheduling Vialva's execution with 55 days' notice), and on October 16, 2020, Montgomery herself was originally scheduled for execution on December 8, 2020, with 53 days' notice. She did not raise her claims then, or even when she filed this lawsuit.

Instead, she waited until December 9 to file a supplemental complaint raising this claim.  Dkt. 29. She identifies no reason why her delay in raising an FDPA claim should permit a court to halt her scheduled execution without conducting the equitable analysis that would have attended a more timely request for relief from federal procedures alleged to violate the FDPA.

Montgomery's request for an injunction in the guise of vacatur also misunderstands the APA, which does not authorize plaintiffs to evade the traditional strictures of equitable relief in seeking to bar future agency action. *See* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Reg. Bull. 37 (2019-2020) (explaining that the APA's reference to "set[ting] aside" agency action does not require any particular remedy). 5 U.S.C. § 703 provides in relevant part that "[t]he form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." Montgomery does not identify any form of legal proceeding that would allow her to block her execution without satisfying the traditional requirements for equitable relief, including irreparable harm. *See* 5 U.S.C. § 702 (specifying that the APA's authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground"). Indeed, Montgomery's argument means that the D.C. Circuit should have treated prior execution challenges differently had those inmates simply relabeled their motions as requests for "vacatur" instead of injunctive relief—a proposition that cannot be reconciled with the court of appeals' correct conclusion that judicial orders halting executions do not necessarily follow from a finding of a bare statutory violation.

*See In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 137; *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20-5361 (D.C. Cir. Dec. 10, 2020) (en banc).

### B.    Montgomery Cannot Satisfy the Standards for Injunctive Relief

To obtain an injunction, "the prevailing party must demonstrate that it actually 'has suffered' or is 'likely to suffer irreparable harm.'" *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 137 (citation omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Montgomery cannot demonstrate that she has suffered harm by receiving fewer than 90 days' notice of her execution date or by being executed during the same month as another federal prisoner. A regulatory or statutory violation standing alone does not support an injunction without an additional showing of irreparable harm.

Nor does a bare request for additional time support injunctive relief delaying a valid capital sentence. As Judge Chutkan recently recognized in an FDPA challenge arguing for the incorporation of the Texas 90-day notice statute, even if a court believes a statute affords a condemned prisoner additional days of life, providing fewer days' notice does not rise to the level of irreparable harm when the prisoner has been under a death sentence for well over a decade and has received notice well in advance of the execution. *See In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145, 2020 WL 7186766, at *7 (D.D.C. Dec. 6, 2020). A unanimous panel of the D.C. Circuit similarly denied injunctive relief on that claim, and the en banc court denied the inmates' request to reconsider. *See* Order of Dec. 9, 2020, No. 20-5361 (D.C. Cir.); Order of Dec. 10, 2020, No. 20-5361 (D.C. Cir.) (en banc).

For both of Montgomery's execution dates, she received at least the 50 days' notice set forth in the nonbinding 2019 Execution Protocol. Montgomery has been on notice of the government's intent to execute her since October 16, 2020—which is 88 days in advance of her

18

January 12, 2021 execution date. She has been afforded more notice of her imminent execution than that afforded to several other executed prisoners, including William LeCroy, Christopher Vialva, Brandon Bernard, and Keith Nelson (who was sentenced in Missouri). Dkt. 35-2. She received more notice of her rescheduled date than executed prisoners Daniel Lee, Lezmond Mitchell, Wesley Purkey, Alfred Bourgeois, or Dustin Honken. Dkt. 35-2. As the Fifth Circuit concluded in *Vialva*, in denying the prisoner's request for a preliminary injunction based on the 90-day Texas notice statute, the fact that a prisoner "was given official notice well in advance of his execution date"—there, 55 days—militates against equitable relief. 976 F.3d at 462. As the court observed, "[a]lthough the death penalty itself is irreversible, there comes a time when the legal issues have been sufficiently litigated and re-litigated so that the law must be allowed to run its course." *Id.* Here, Montgomery has "sufficiently litigated [her] case." *Id.* (internal quotation marks omitted).

The equities also weigh heavily against granting Montgomery additional delay of her sentence. The government and the public's interest in the timely implementation of capital sentences clearly outweigh Montgomery's assertion of the need for additional notice. *Cf. Glossip v. Gross*, 576 U.S. 863, 881 (2015). Montgomery first sought to delay her execution so her lawyers could prepare a better clemency petition. The Court granted that request, and Defendants accommodated Montgomery by delaying her execution over one month—thirteen days more than the Court's preliminary injunction required. Now, Montgomery argues that she is entitled to additional delay due to the delay she secured earlier. But as explained above, Montgomery could have brought her FDPA claims months, if not years, ago. The federal government's binding regulations have always provided for a minimum of only 20 days' notice, 28 C.F.R. § 26.4(a), and if Montgomery considered the federal regime inconsistent with the FDPA's incorporation of a

Missouri provision, she could have asserted that inconsistency at any point, as other death-row inmates have asserted inconsistencies under the FDPA in challenges to federal execution procedures stretching back years. *See In the Matter of the Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145 (D.D.C.) (consolidating cases bringing FDPA challenges as early as 2012); *see also id.* Dkt. 92 (June 2020 amended complaint after the D.C. Circuit's *Protocol Cases* opinion but before any executions were rescheduled, bringing an FDPA claim based on, *e.g.*, Texas time-of-day scheduling provisions).

There is no excuse for Montgomery's delay and transparent efforts to delay her execution at all costs. *Cf. Barr*, 140 S. Ct. at 2591; *Bucklew*, 139 S. Ct. at 1134. The Supreme Court has specifically warned against "transform[ing] courts into boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology." *Baze*, 553 U.S. at 51. And if this warning applies to the method of execution, a stronger warning surely applies to serial litigation concerning alleged technical deficiencies in the notice of an execution date, where each accommodation to a capital defendant is alleged to create rights to additional delay.

It has been over 16 years since Montgomery brutally murdered Bobbie Jo Stinnett. Montgomery does not challenge her conviction for the kidnapping and murder she committed "in an especially heinous or depraved manner," *United States v. Montgomery*, 635 F.3d 1074, 1095-96 (8th Cir. 2011), nor does she challenge her sentence of death. The public has a "powerful and legitimate interest in punishing the guilty," *Calderon*, 523 U.S. at 556 (quotation omitted), by

"carrying out a sentence of death in a timely manner," *Baze*, 553 U.S. at 61. Even minor delays impose serious psychological harms on the families and communities of the victims.[6]

In addition, the logistical challenges associated with conducting an execution—which are substantial in any case, see Dkt. 38-4 at 3—are particularly acute here. The government already plans to transport an execution team to Terre Haute for the week of January 11, but there are no further executions scheduled after that week. Due to logistical issues, the government has not conducted or scheduled executions in separate weeks during the same month in 2019 through 2021. *See* Dkt. 35-2. Moreover, Montgomery is currently housed in a women's prison in Texas and will need to be transported to Terre Haute shortly before the execution. The BOP has already committed staff resources for Montgomery's execution. Necessary arrangements for an execution include the activation of the execution team, which consists of approximately 40 BOP staff members. R. Winter Decl. ¶ 4 (Jan. 6, 2021). These staff members will, by necessity, be removed from their normal duties, which include a wide range of correctional and administrative positions within the BOP. *Id.* These staff members are scheduled to cease their normal duties several days in advance of Montgomery's execution in order to give the team time to practice and prepare for their role in an execution *Id.* FCC Terre Haute is also mobilizing personnel in preparation of the currently scheduled executions during that week. *Id.* FCC Terre Haute has also been coordinating with federal, state, and local law enforcement agencies, some of whom have indicated their plans to send personnel to FCC Terre Haute to help maintain security for the currently scheduled executions. *Id.* Staffing schedules and atypical operations plans for FCC Terre Haute are being created. *Id.* The BOP has made travel

---

[6] *See* "People Gather in Skidmore to Remember Bobbie Jo Stinnett," (Dec. 9, 2020), https://www.kq2.com/content/news/People-in-Skidmore-gather-to-remember-Bobbie-Jo-Stinnett-573340761.html (noting candlelight vigil for Montgomery's victims on original execution date).

and lodging arrangements for Montgomery's victims' family members to attend the execution on January 12, 2021.

Montgomery has known for over 12 years that a day will come when she is executed. Over two months ago, Defendants told her that day was imminent. She has litigated her challenges to her conviction and sentence, and she has already received a three-week postponement of her execution date based solely on the illness of two lawyers (out of a score). Equity does not support a further delay of Montgomery's lawful sentence based on her narrow procedural claims.

### C.   Montgomery Cannot Satisfy the Standard for Vacatur

Defendants preserve their position that even if Montgomery's requested relief were properly analyzed under the standard for vacatur rather than injunction, she would still fail. Courts reviewing agency action under § 706(2) must take "due account . . . of the rule of prejudicial error, 5 U.S.C. § 706, as well as equitable considerations. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019), *cert. denied*, No. 19-1115, 2020 WL 3492665 (U.S. June 29, 2020). First, Montgomery bears the burden to demonstrate prejudice. *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009). "The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.' " *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)).

Montgomery does not demonstrate prejudice. Montgomery alleges her January 12, 2021, execution date deprives her of: (1) days of life; (2) time for further consideration of her clemency petition; (3) time to prepare, mentally and spiritually, for her death; and (4) time to mount additional legal challenges. Dkt. 35 at 12-13. No provision of law entitles Montgomery to avoid

any of her alleged instances of prejudice. Montgomery does not dispute that under the Missouri Supreme Court's rules, the government was free to schedule her execution for December 8, 2020 or January 12, 2021; at most, compliance with various Missouri provisions would have required the government to give Montgomery earlier notice of that fact, or reschedule *other* executions for different months. Montgomery also fails to show that additional time would result in more favorable review of her clemency petition or materially change her ability to prepare for her death sentence, which she has had over 12 years to contemplate. The Court has already provided sufficient time for the filing of a clemency petition via its prior injunction. And being denied "significant time to seek legal relief from . . . one's own execution," Dkt. 35 at 13, is not legally cognizable harm, particularly when Montgomery has already had over a decade to mount challenges to her conviction and sentence.

Second, courts consider equitable factors in evaluating the propriety of vacatur under the APA. *See Am. Bankers Ass'n.*, 934 F.3d at 674. Those equitable considerations preclude vacatur based on Montgomery's narrow claims. For the reasons explained above, the government, the public, and the victims' family all have a strong interest in Montgomery's sentence being carried out in a timely fashion. Montgomery's interest in additional delay, predicated on purported technical violations of procedural rules and in the absence of cognizable harm, do not outweigh that interest, so vacatur is not an appropriate remedy.

## CONCLUSION

For the foregoing reasons, the Court should decline to grant leave and decline to enter summary judgment in favor of Montgomery or enter any relief prohibiting the government from carrying out Montgomery's execution on January 12, 2021.


Dated: January 6, 2021                      Respectfully submitted,

                                            TIMOTHY A. GARRISON
                                            United States Attorney
                                            Western District of Missouri

                                            JEFFREY RAY
                                            Deputy United States Attorney
                                            Western District of Missouri

                                            BRIAN P. CASEY
                                            Chief, Appellate Division
                                            Western District of Missouri

                                            */s/ Alan T. Simpson*
                                            ALAN T. SIMPSON, Missouri Bar #65183
                                            Assistant United States Attorney
                                            Western District of Missouri
                                            Special Assistant United States Attorney
                                            District of Columbia

– and –

MICHAEL R. SHERWIN
Acting United States Attorney
District of Columbia

BRIAN P. HUDAK
Acting Chief, Civil Division
District of Columbia


*/s/ Johnny Walker*
JOHNNY H. WALKER, D.C. Bar #991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2021, I caused a true and correct copy of the foregoing

to be served on all counsel of record via the Court's CM/ECF system.


/s/ *Alan T. Simpson*
Special Assistant United States Attorney